UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
UNITED STATES OF AMERICA,

                    -against-                        **ORDER**
                                                     16-CR-540 (JMA)

EDWARD MANGANO,
LINDA MANGANO, and
JOHN VENDITTO,

                               Defendants.
-----------------------------------------------------------------------X

**AZRACK, United States District Judge:**

      Defendants Edward Mangano ("Mangano") and John Venditto are charged with conspiracy, and various bribery offenses in the Superseding Indictment (the "Indictment"). Mangano's wife, Linda Mangano ("Linda Mangano"), is also named as a defendant. Defendants have filed numerous pretrial motions in which one or more of them assert that:

- Counts 1, 2, 3, 4, 8 and 9 should be dismissed as deficient and/or time-barred;

- Counts 1 through 4 are impermissibly duplicitous;

- Severance is required because defendants are improperly joined and is also warranted because of the potential prejudice of a joint trial;

- The Indictment should be dismissed because of selective prosecution;

- Certain statements made by Venditto during interviews with the government should be suppressed and Counts 12 and 13 against Venditto should be dismissed because the government's alleged misconduct in connection with these interviews violated his due process rights;

- Defendants are entitled to: (i) disclosure or in camera review of grand jury minutes; (ii) a bill of particulars; and (iii) certain evidence that defendants assert constitute Brady materials.

As explained below, all of defendants' motions are denied.[1]

---

[1] Linda Mangano joined in the motions of her co-defendants to the extent that those motions seek relief related to the charges against her.

# I. BACKGROUND

## A. <u>Factual Background</u>

At the time of the events in question, Mangano was the Nassau County Executive and Venditto was the Supervisor of the Town of Oyster Bay ("TOB"). Mangano and Venditto are charged with conspiring, and engaging in a scheme, to solicit and receive bribes and kickbacks from Harendra Singh, a local businessman, in exchange for "performing official actions, on an as needed basis, as opportunities arose, in connection with [Singh's] businesses in Nassau County and the TOB." (Indictment ¶ 9.)

Out of this alleged overarching conspiracy, two schemes arose.

In "the TOB Loan Scheme," Mangano and Venditto allegedly took actions that led the TOB to enter into agreements with Singh's business that indirectly guaranteed loans for those businesses. (<u>Id.</u> ¶ 11.) These agreements took the form of amendments to previously existing concession agreements that Singh's businesses had with the TOB. (<u>Id.</u>) These amendments occurred in 2010, 2011, and 2012. (<u>Id.</u> ¶ 12.)

In the "Nassau County Contracts Scheme," Mangano allegedly took actions that resulted in Nassau County awarding contracts to Singh's businesses between late 2011 and December 2012. (<u>Id.</u> ¶ 13.)

## B. <u>The Charges in the Indictment</u>

### 1. The Bribery Counts

Count 1 charges Mangano and Venditto with conspiracy to commit Federal Program Bribery, contrary to 18 U.S.C. § 666(a)(1)(B). Count 2 charges them with substantive Federal Program Bribery in violation of 18 U.S.C. § 666(a)(1)(B). Count 3 charges them with conspiracy to commit Honest Services Wire Fraud, contrary to 18 U.S.C. §§ 1343 and 1346. Count 4 charges them with substantive Honest Services Wire Fraud in violation of 18 U.S.C. §§

1343 and 1346. Count Five charges Mangano with Honest Services Fraud. "Counts Six charges Mangano with Hobbs Act Extortion under § 1951.

The above counts are premised on what is known as the "stream-of-benefits" theory of bribery (also known as the "retainer theory" of bribery), see United States v. Percoco, No. 16-CR-776, 2017 WL 6314146, at *4 (S.D.N.Y. Dec. 11, 2017) (citation omitted). Under the stream-of-benefits theory, "the requisite quid pro quo . . . may be satisfied upon a showing that a government official received a benefit in exchange for his promise to . . . perform [official acts] as the opportunities arise." United States v. Ganim, 510 F.3d 134, 142 (2d Cir. 2007). "[S]o long as the jury finds that an official accepted gifts in exchange for a promise to perform official acts for the giver, it need not find that the specific act to be performed was identified at the time of the promise, nor need it link each specific benefit to a single official act." Id. at 47. Thus, under the stream-of-benefits theory, "[o]nce the quid pro quo has been established . . . the specific transactions comprising the illegal scheme need not match up this for that." Id.

The Second Circuit has recognized that this is a viable theory for bribery under § 666(a)(1)(B) and the honest services fraud statute, as well as for bribery charged as extortion under the Hobbs Act. See United States v. Skelos, No. 16-1618-CR, --- F. App'x ---, 2017 WL 4250021, at *3 (2d Cir. Sept. 26, 2017) (indicating that all three statutes require a "quid pro quo agreement" and applying the principles of the "as opportunities arise" theory to all three statutes); United States v. Rosen, 716 F.3d 691, 698 n.3. & 700 (2d Cir. 2013) (stating, where defendant was convicted of various offenses, including "conspiracy to commit bribery, in violation of 18 U.S.C. §§ 666(a) and 1952(a)(3)" that "[w]e have made it crystal clear that the federal bribery and honest services fraud statutes that Rosen was convicted of violating criminalize 'scheme[s] involving payments at regular intervals in exchange for specific official[ ] acts as the opportunities to commit those acts arise,' even if 'the opportunity to undertake the

requested act has not arisen,' and even if the payment is not exchanged for a particular act but given with the expectation that the official will 'exercise particular kinds of influence'") (citation omitted); United States v. Ganim, 510 F.3d 134, 142 (2d Cir. 2007) (addressing the stream-of-benefits theory with respect to honest services fraud and Hobbs Act extortion). As explained below, the stream-of-benefits theory of bribery plays a prominent role in the government's responses to a number of defendants' pre-trial motions.

### 2. The Counts Concerning the Subsequent Cover-Up and Obstruction

The Indictment also includes counts concerning the defendants' actions in covering up the underlying bribery, including charges concerning false statements to the FBI, obstruction of justice, and securities fraud.

Linda Mangano is charged in Counts 10 and 11 with Making False Statements to the FBI and in Count 8 with Obstruction of Justice. Both she and Mangano are also charged with Conspiracy to Obstruct Justice. Venditto is charged in Counts 12 and 13 with Making False Statements to the FBI and with Obstruction of Justice. Additionally, the recently filed Indictment charges Venditto with nineteen counts involving securities fraud, wire fraud related to securities offerings, and a conspiracy to commit such wire fraud. These charges allege that Venditto concealed the fact and nature of the indirect loan guarantees in securities offered by the TOB. (Indictment ¶¶ 24–27, 59–60.)

### II. DISCUSSION

### A. Motions to Dismiss Counts 1 through 4

### 1. Standard

As the Second Circuit has explained:

It is well settled that an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense. We have explained that an indictment

must charge[ ] a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events. Nevertheless, an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.

United States v. Alfonso, 143 F.3d 772, 776 (2d Cir. 1998) (citations and internal marks omitted).

"Unless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial . . ., the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment." United States v. Perez, 575 F.3d 164, 166–67 (2d Cir. 2009) (quoting Alfonso, 143 F.3d 772, 776–77 (2d Cir. 1998))

### 2. Sufficiency Challenges to Counts 1 through 4

Mangano and Venditto seek to dismiss various counts (or portions thereof), asserting that the allegations in the Indictment are deficient in various respects.[2] Specifically, defendants argue that:

(1) Counts 1 and 2 against Mangano are deficient because he does not qualify as an "agent" of the TOB under § 666;

(2) Counts 3 and 4 against Mangano are deficient because he does not owe a fiduciary duty to the residents and government of the TOB for purposes of honest services fraud;

(3) Counts 1 through 4 against both defendants are deficient because the 2011 and 2012 amendments do not constitute official acts as required under United States v. McDonnell, 136 S. Ct. 2355 (2016); and

(4) Counts 1 through 4 against Mangano are deficient because Mangano's actions in pressuring Venditto and advising him on how to proceed concerning the concession amendments do not constitute official acts under McDonnell because Mangano did not have the authority to direct, supervise or control Venditto and Mangano was not Venditto's subordinate.

The government responds that such sufficiency of the evidence arguments are premature because the government has not made a full proffer of the evidence that it intends to present at

---

[2] Some of these arguments, rather than seeking the dismissal of specific counts, ask the Court to preclude the government from proceeding on certain legal theories at trial.

trial. The Court agrees that defendants' arguments on these points are all premature and must await the presentation of proof at trial.

The Court also notes that a number of Mangano's arguments are premised on the notion that he can only be held liable for certain offenses as a principal. For example, Mangano asserts that he is not an agent of the TOB for purposes of the § 666 counts, including Count 2—the substantive § 666 count. However, even if Mangano did not qualify as agent of the TOB, he can still be found guilty of Count 2 as an aider and abettor, and as a co-conspirator under Pinkerton v. United States, 328 U.S. 640 (1946), because Count 1 alleges a conspiracy to violate § 666. Given the availability of co-conspirator and aiding and abetting liability, the Court declines to address, at this stage, such arguments concerning principal liability, all of which are more appropriately made at trial once the government has offered its proof.

In support of his argument that he is misjoined, Venditto asserts that he cannot be criminally liable for Counts 1 through 4 to the extent that they concern the Nassau County Contracts Scheme. Mirroring Mangano's sufficiency arguments, Venditto asserts, with respect to Counts 1 through 4, that he is not an agent of Nassau County and owes no fiduciary duty to Nassau County. Venditto also maintains that he cannot be liable for these counts as they concern the Nassau Contracts Scheme since there are no allegations that he played any role in (or even knew of) the Nassau County Contracts Scheme. These arguments are premature. The Indictment alleges that Venditto was part of a stream-of-benefits based conspiracy that included both him and Mangano, and involved them using their respective positions in the TOB and Nassau County to help Singh as needed. Venditto did not have to participate in, or even know about, the specific Nassau County Contracts Scheme to be liable for such a broad, overarching, conspiracy.

Finally, in his reply papers, Venditto appears to assert that the stream-of-benefits theory is no longer viable after (or is at least limited by) McDonnell. According to Venditto, "McDonnell requires that the official act must be agreed to at the time of the benefit to the public official." (Venditto Reply Br. at 6.) As such, Venditto seems to argue that it would be improper to charge him in a conspiracy that encompassed the Nassau County Contracts Scheme, about which Venditto appears to have lacked knowledge. To the extent that Venditto is raising such an argument, the Court rejects it. As multiple courts have held, McDonnell did not eliminate the stream-of-benefits theory. See United States v. Percoco, No. 16-CR-776, 2017 WL 6314146, at *4 (S.D.N.Y. Dec. 11, 2017); United States v. Menendez, No. CR 15-155, 2018 WL 526746, at *3–6 (D.N.J. Jan. 24, 2018); see also United States v. Skelos, No. 16-1618-CR, --- F. App'x ---, 2017 WL 4250021, at *3 (2d Cir. Sept. 26, 2017) (relying, in a post-McDonnell decision, on the stream-of-benefits theory).

### 3. Defendants' Timeliness Challenge to Counts 1 through 4

Mangano and Venditto argue that they cannot be convicted of Counts 1 through 4 based on the 2010 amendment because the relevant statute of limitations is five years and the initial indictment was handed down on October 18, 2016.[3]

To the extent that Mangano and Venditto assert that Counts 1 and 3—which charge conspiracies to violate § 666(a)(1)(b) and to commit honest services fraud—are time-barred, that argument is meritless. These conspiracy charges are timely so long as the government establishes "that a conspirator knowingly committed at least one overt act in furtherance" of the conspiracy within the five-year statute of limitations. United States v. Grimm, 738 F.3d 498, 501

---

[3] Mangano and Venditto assert that it is important for the Court decide the question of whether a charge based on the 2010 amendment would be time-barred because according to defendants, the 2010 amendment is the only official action at issue. As noted earlier, defendants assert that the 2011 and 2012 amendments cannot constitute official acts because, according to defendants, those amendments were fraudulently executed by Frederick Mei, a deputy town attorney, and are ultra vires and unenforceable. And, as explained earlier, defendants' sufficiency arguments concerning the 2011 and 2012 amendments are premature.

(2d Cir. 2013).  Venditto and Mangano are alleged to have committed overt acts in 2013 and 2014.  Accordingly, these conspiracy counts are timely and the motions to dismiss on this ground are denied.

The Court now turns to Count 2, the substantive § 666 count, and Count 4, the substantive honest services fraud count.

Mangano's statute of limitations argument focuses on Count Two, the substantive § 666 count.[4]  Mangano argues that the 2010 amendment is outside of the statute of limitations period for purposes of Count 2.  According to Mangano, he could only be convicted under § 666(a)(1)(B) based on the 2010 amendment if § 666(a)(1)(B) is classified as a continuing offense.  Mangano reasons that because Linda Mangano first started receiving a salary from Singh in April 2010 and the 2010 amendment was signed in June 2010, a § 666(a)(1)(B) offense based on the 2010 amendment was already complete in 2010.  Thus, Mangano asserts that such an offense is barred by the five-year statute of limitations.  Mangano asserts that bribery under § 666(a)(1)(B) is not a continuing offense and, therefore, a § 666(a)(1)(B) conviction cannot be based on the 2010 amendment.  In support of this argument, Mangano cites to cases finding that embezzlement and obtaining property by fraud under § 666(a)(1)(A) are not continuing offenses.

---

[4]  A crime under 18 U.S.C. § 666 occurs when an individual:

> (1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof —
>
>> (A) embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that--(i) is valued at $5,000 or more, and (ii) is owned by, or is under the care, custody, or control of such organization, government, or agency; or
>>
>> (B) corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more . . .

Additionally, the government must prove that "the organization, government, or agency" at issue "receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance."  18 U.S.C. § 666(b).

See United States v. Sampson, 122 F. Supp. 3d 11 (E.D.N.Y. 2015); United States v. Sunia, 643 F. Supp. 2d 51 (D.D.C. 2009); United States v. Yashar, 166 F.3d 873 (7th Cir. 1998).

Venditto asserts, without citation to any authority, that Count 4, the substantive honest services fraud count, is also time-barred.

The government responds that Counts 2 and 4 are both timely because defendants are charged under the "stream-of-benefits" theory of bribery and the Indictment alleges that Mangano and Venditto committed official acts and received bribes within the limitations period.

The Court agrees that convictions for Counts 2 and 4 based on the 2010 amendment would not be time-barred. In United States v. Silver, the Second Circuit explained that the government "need not prove that an official act occurred within the statute of limitations period." 864 F.3d 102, 122 (2d Cir. 2017), cert. denied, No. 17-562, 2018 WL 410925 (Jan. 16, 2018). Rather, the government would only have to "prove that some aspect of the particular quid pro quo scheme continued into the statute of limitations." Id. at 122; see id. at 122 n. 110 (citing the discussion of the stream-of-benefits theory in Rosen, 716 F.3d at 700, and citing United States v. Smith, 198 F.3d 377, 384 (2d Cir. 1999) for the proposition that Hobbs Act extortion is a continuing offense). Silver, which involved honest services fraud, disposes of Venditto's argument that Count 4, the honest services fraud charge, cannot be based on the June 2010 amendment because of the statute of limitations. Although Silver did not involve a bribery charge under § 666, the court's citation to Rosen indicates that the statute of limitations analysis would be the same for a § 666 bribery charge based on the stream-of-benefits theory.[5] Moreover, given that the stream-of-benefits theory is available for bribery charges under § 666(a)(1)(B), the Court sees no reason why the statute of limitations analysis for § a 666(a)(1)(B) charge would

---

[5] Silver's citation to Rosen's discussion of the stream-of-benefits theory indicates that the Second Circuit viewed Silver as a stream-of-benefits case. The facts of Silver also indicate it was a stream-of-benefits case. For example, in one of the alleged schemes, a doctor, whose received different types of favorable treatment from Silver, continued to provide referrals to Silver's law firm in order "to maintain their relationship and keep Silver 'incentivized.'" Silver, 864 F.3d at 108.

differ from the analysis for the two statutes that Silver was charged with violating. Accordingly, the Court finds that a conviction under Count 2 may also be based on the 2010 amendment.

Mangano's reliance on cases involving embezzlement under § 666(a)(1)(A) is misplaced. Unlike embezzlement, theft, and obtaining property by fraud—the crimes embraced by § 666(a)(1)(A)—bribery under § 666(a)(1)(B) involves a quid pro quo and, as such, is properly chargeable under the stream-of-benefits theory. Congress must have intended that such a bribery scheme—for which the government is not required to match a specific quid to a specific quo— would constitute a continuing offense for purposes of the statute of limitations. See Toussie v. United States, 397 U.S. 112, 115 (1970) (stating that an offense should not be construed as continuing "unless the explicit language of the substantive criminal statute compels such a conclusion, or the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one").

### 4. Linda Mangano's Motion to Dismiss Counts Seven and Eight

Linda Mangano asserts that Counts Seven and Eight—the conspiracy to obstruct and the substantive obstruction count—are deficient because those counts do little more than track the language of the statute and allege that the unlawful acts occurred between August 2014 and October 2016. This argument fails. Paragraphs 15 through 20 of the Indictment provide sufficient additional details about Linda Mangano's alleged obstruction.

## B. Duplicity

Mangano and Venditto both assert that Counts 1 through 4 of the Indictment are duplicitous.

"An indictment is impermissibly duplicitous where: 1) it combines two or more distinct crimes into one count in contravention of Fed. R. Crim. P. 8(a)'s requirement that there be 'a separate count for each offense,' and 2) the defendant is prejudiced thereby." United States v.

Sturdivant, 244 F.3d 71, 74 (2d Cir. 2001).  However, "'acts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme.'"  Id. (quoting United States v. Tutino, 883 F.2d 1125, 1141 (2d Cir. 1989)).  In considering whether a defendant is prejudiced by a duplicitous indictment, courts take into account the following policy considerations:

> avoiding the uncertainty of whether a general verdict of guilty conceals a finding of guilty as to one crime and a finding of not guilty as to another, avoiding the risk that the jurors may not have been unanimous as to any one of the crimes charged, assuring the defendant adequate notice, providing the basis for appropriate sentencing, and protecting against double jeopardy in subsequent prosecutions.

Id. (quoting United States v. Margiotta, 646 F.2d 729, 733 (2d Cir. 1981)).  In order to "avoid prejudice to the defendant, courts can employ alternatives that are less drastic than dismissal, such as instructing the jury that it must be 'unanimous as to the conduct underlying the conviction.'"  United States v. Barret, No. 10-CR-809, 2011 WL 13175738, at *3 (E.D.N.Y. Dec. 27, 2011) (quoting Sturdivant, 244 F.3d at 79); see United States v. Helmsley, 941 F.2d 71, 91 (2d Cir. 1991) (finding that "any possibility of a duplicitous verdict was removed by [the district judge's] careful charge regarding unanimity").

Defendants assert that Counts 1 through 4 are impermissibly duplicitous, arguing that each of these counts improperly charge crimes concerning both the TOB Loan Scheme and the Nassau County Contracts Scheme.  According to defendants, there should be separate counts concerning each scheme.  Defendants maintain that a single overarching conspiracy that encompasses both the TOB Loan Scheme and the Nassau County Contracts Scheme cannot exist because the Indictment does not allege that Venditto played any role in the Nassau County Contracts Scheme or that he was even aware of its existence.

The government asserts that these counts are not duplicitous because the Indictment alleges a single, overarching, stream-of-benefits conspiracy that includes both Mangano and

Venditto. The government also contends that any duplicity concerns can be addressed by appropriate jury instructions.

"If the Indictment on its face sufficiently alleges a single conspiracy, the question of whether a single conspiracy or multiple conspiracies exists is a question of fact for the jury." United States v. Rajaratnam, 736 F. Supp. 2d 683, 688 (S.D.N.Y. 2010) (quoting United States v. Ohle, 678 F. Supp. 2d 215, 222 (S.D.N.Y. 2010)). "For that reason 'courts in this Circuit have repeatedly denied motions to dismiss a count as duplicitous.'" Id. (quoting Ohle, 678 F. Supp. 2d at 222).

Here, the allegations in the Indictment allege a single, overarching stream-of-benefits based conspiracy that included both Venditto and Mangano, and involved them using their respective positions in the TOB and Nassau County to help Singh as needed. That is sufficient to defeat defendants' duplicity challenge. Moreover, the Court is confident that appropriate jury instructions can address the concerns raised by defendants.

**C. Motions to Sever**

**1. Joinder Under Rule 8**

Federal Rule of Criminal Procedure 8(b) governs joinder and provides that:

> The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

Under this rule, "joinder is proper where two or more persons' criminal acts are unified by some substantial identity of facts or participants, or arise out of a common plan or scheme." United States v. Cervone, 907 F.2d 332, 341 (2d Cir. 1990) (quoting United States v. Attanasio, 870 F.2d 809, 815 (2d Cir. 1989)) (internal quotation marks omitted). "The established rule is that a non-

frivolous conspiracy charge is sufficient to support joinder of defendants under Fed. R. Crim. P. 8(b)." United States v. Nerlinger, 862 F.2d 967, 973 (2d Cir. 1988).

In asserting that joinder is improper under Rule 8, Mangano and Venditto reiterate their contention that the Indictment fails to allege a single, overarching conspiracy. This argument fails for the same reason the Court rejected defendants' duplicity challenge.

Mangano also argues that the Court should, in considering the propriety of joinder under Rule 8(b), "examine the Grand Jury minutes to the determine whether the Government's charging decision bears any realistic relationship to the evidence." (Mangano Br. at 42.) The Court declines to do so. See United States v. Bonventre, 646 F. App'x 73, 80 (2d Cir. 2016) ("[T]he propriety of joinder turns on what is alleged in the indictment, not on evidence later adduced." (citing United States v. Rittweger, 524 F.3d 171, 178 n.3 (2d Cir. 2008)), cert. denied, 137 S. Ct. 676 (2017).

Finally, in his reply brief, Mangano asserts that joinder of the securities fraud counts is improper because that is a separate conspiracy and Mangano is not charged in those counts and played no role in the alleged securities fraud. Mangano maintains that the conspiracy behind the securities fraud counts was "animated by a goal and purpose entirely distinct" from the underlying bribery counts. (Mangano Reply Br. at 27.) In support of this argument, Mangano relies on United States v. Greenfield, No. 01-CR-401, 2001 WL 1230538, at *1 (S.D.N.Y. Oct. 16, 2001). In Greenfield, the court found joinder improper under Rule 8(b) where two distinct insurance fraud schemes were charged and one of the defendants played no role in one of the schemes at issue. Greenfield is nothing like the instant case. Here, the securities fraud counts concern Venditto's attempts to cover-up and conceal the underlying conduct at issue in the TOB Loan Scheme. All of the charges in the Indictment—including the securities counts and the false statement and obstruction counts that were charged in the original indictment—"shared a

common purpose," <u>United States v. Attanasio</u>, 870 F.2d 809, 815 (2d Cir. 1989), and, thus, are all properly joined in a single trial.

## 2. Severance under Rule 14

Even when a defendant is properly joined, a court can sever the defendant pursuant to Federal Rule of Criminal Procedure 14(a) if the defendant would be prejudiced by a joint trial. Prejudice exists "only when 'there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." <u>Rittweger</u>, 524 F.3d at 179 (quoting <u>Zafiro v. United States</u>, 506 U.S. 534, 539 (1993)). "Accordingly, 'less drastic measures [than severance], such as limiting instructions, often will suffice' to cure any risk of prejudice and permit joinder." <u>United States v. Page</u>, 657 F.3d 126, 129 (2d Cir. 2011) (quoting <u>Zafiro</u>, 506 U.S. at 539); <u>see</u> <u>also</u> <u>United States v. Schlegel</u>, 687 F. App'x 26, 28 (2d Cir. 2017), <u>cert. denied sub nom.</u>, <u>Hatfield v. United States</u>, 138 S. Ct. 182 (Oct. 2, 2017). "In addition, "[a] defendant seeking severance must show that the prejudice to him from joinder is sufficiently severe to outweigh the judicial economy that would be realized by avoiding multiple lengthy trials." <u>United States v. Page</u>, 657 F.3d 126, 129 (2d Cir. 2011) (quoting <u>United States v. Walker</u>, 142 F.3d 103, 110 (2d Cir. 1998)).

The Manganos both argue that the Court should sever the counts against them because a joint trial will allegedly be prejudicial. The Court finds that severance is not warranted and that any potential prejudice can be sufficiently cured by appropriate jury instructions. Moreover, severance would result in a substantial amount of duplicative evidence being introduced at multiple trials.

Linda Mangano argues that she should be severed because she is only charged with obstruction and making false statements, and not with the bribery and securities fraud counts. She also stresses that this is a high-profile case in which most of the evidence will be against the

other two defendants. Moreover, she asserts that the jury may find her guilty, simply by association, based on the fact that she is married to Mangano.

The Court declines to sever Linda Mangano. The Court agrees with the government that much of the allegedly prejudicial evidence cited by Linda Mangano would be admissible against her even if she were tried alone because it is relevant to, <u>inter alia</u>, explain the motives for the actions of her and her husband concerning the alleged obstruction and false statements.

The Court also rejects the Manganos' assertions that the inclusion of the securities fraud charges against Venditto establishes that they will be prejudiced absent severance. The securities fraud counts, like the obstruction and false statement counts, are all part of the defendants' alleged attempts to cover up the underlying bribery. It is appropriate for all of the charges to be tried together, and the Manganos will not be prejudiced by the inclusion of the securities fraud counts in the trial. Mangano's claim that the government will introduce voluminous evidence concerning the harm suffered by the TOB's bondholders is speculative. In any event, even if voluminous evidence of such harm were admitted, it would be insufficient to establish prejudice.

Finally, Mangano argues that severance is warranted because he and Venditto will present antagonistic defenses at trial. Mangano, however, has not shown that defendants will assert mutually antagonistic defenses, and has also failed to establish prejudice.

"Defenses are mutually antagonistic when accepting one defense requires that 'the jury must of necessity convict a second defendant.'" <u>United States v. Yousef</u>, 327 F.3d 56, 151 (2d Cir. 2003) (quoting <u>United States v. Cardascia</u>, 951 F.2d 474, 484 (2d Cir. 1991)). Even if mutually antagonistic defenses are at issue, such defenses "are not prejudicial per se." <u>Zafiro</u>, 506 U.S. at 538.

Mangano asserts that "he will seek to establish that he did not undertake any steps to pressure Mr. Venditto, and, indeed that Mr. Venditto decided *independently* to assist Singh."

(Mangano Br. at 43.)  Mangano also asserts that it is "is certainly possible that Mr. Venditto will argue at trial that any actions undertaken in connection with the amendments were not in exchange for the (rather paltry) benefits that were allegedly conferred upon Venditto, but rather to appease some purported request from Mangano." (Id. at 43.)

These assertions fall well short of establishing mutually antagonistic defenses and prejudice.  First, Venditto has not even represented that he is likely to raise this purported defense at trial.  Accordingly, Mangano's speculation on this point is insufficient to establish that Mangano's trial rights will be compromised.  Second, even assuming that Venditto will assert at trial that his actions were only taken to appease Mangano's request and pressure, such actions by Mangano do not, standing alone, show that Mangano was guilty of accepting a bribe.  Notably, Mangano himself asserts that he had a long-standing friendship with Singh, raising the possibility that Venditto will not focus on the alleged bribery as the reason for Mangano's request and pressure.  Third, to the extent that Mangano asserts that he will raise arguments damaging to Venditto at trial, the Court notes that Venditto has not even argued for severance under Rule 14 based on allegedly antagonistic defenses (or any other ground).  In any event, Mangano's purported defenses would not warrant severing Venditto.

Finally, Mangano cites to United States v. Shkreli, 260 F. Supp. 3d 247, 256 (E.D.N.Y. 2017).  As Shkreli concluded, even absent mutually antagonistic defenses, severance can still be warranted if the defenses asserted at a joint trial will prejudice one of the defendants and present a serious risk that a defendant will not receive a fair trial.  That is not the case here.  This case is nothing like Shkreli.

## D.  **Selective Prosecution**

Mangano and Venditto assert the defense of selective prosecution, seeking dismissal of the Indictment.  In the alternative, they seek discovery on their selective prosecution claim. For

the reasons stated below, the Court finds that defendants' proof fails to establish selective prosecution and is also insufficient to warrant discovery on this defense.

**1. Standard**

"A selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." United States v. Armstrong, 517 U.S. 456, 468 (1996). The standard to prove this defense is "a demanding one," id., as the defendant must "overcome the strong presumption of regularity on the part of federal prosecutors, and 'in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.'" United States v. Sanders, 17 F. Supp. 2d 141, 144 (E.D.N.Y. 1998) (quoting Armstrong, 517 U.S. at 464), aff'd, 211 F.3d 711 (2d Cir. 2000).

A defendant claiming selective prosecution "must provide 'clear evidence' that the prosecutorial decision or policy in question had both 'a discriminatory effect and . . . was motivated by a discriminatory purpose.'" United States v. Alameh, 341 F.3d 167, 173 (2d Cir. 2003) (quoting Armstrong, 517 U.S. at 465.)

"The discriminatory effect prong requires a showing that 'similarly situated individuals of a different [classification] were not prosecuted.'" Id. (quoting Armstrong, 517 U.S. at 465). To establish discriminatory purpose, the defendant must show that "the government's discriminatory selection of [the defendant] for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights." United States v. Fares, 978 F.2d 52, 59 (2d Cir. 1992) (quoting United States v. Moon, 718 F.2d 1210, 1229 (2d Cir. 1983)); see also Alameh, 341 F.3d at 173 ("A defendant seeking to show discriminatory purpose must show 'that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part "because of," not merely "in

spite of," its adverse effects upon an identifiable group.'" (quoting <u>Wayte v. United States</u>, 470 U.S. 598, 610 (1985))).

In order to receive discovery on a selective prosecution claim, the defendant must offer "some evidence tending to show the existence of the essential elements of the defense." <u>Armstrong</u>, 517 U.S. at 468 (quoting <u>United States v. Berrios</u>, 501 F.2d 1207, 1211 (2d Cir. 1974)). "[T]he showing necessary to obtain discovery should itself be a significant barrier to the litigation of insubstantial claims." <u>Id.</u> at 464.

**2. Factual Background**

In support of their selective prosecution defense, defendants rely on the following evidence:

(1) the government's decision not to prosecute New York City Mayor Bill de Blasio, a Democrat, despite the fact that Singh pled guilty to bribing de Blasio;

(2) the timing of the indictment against Mangano and Venditto, which was issued on October 20, 2016, only a few weeks before the November 8, 2016 election, in which Venditto's son, Michael Venditto, was running for re-election to the New York State Senate; and

(3) an affidavit from Joseph Muscarella, a Town Councilman in the TOB, who attests to hearing, third hand, that shortly before the November 2016 election Jay Jacobs, the Chairman of the Nassau County Democratic Committee, advised former President Bill Clinton that Jacobs needed the indictment of Venditto and Mangano "to be done and he needed it now."

The details of this evidence are set out below.

In the fall of 2016, Venditto's son, Michael Venditto, a Republican, was running for re-election to the New York State Senate. (Muscarella Aff. ¶ 5.) Venditto's race had become a pivotal election in the Democratic Party's attempt to obtain a majority in the State Senate. (<u>Id.</u> ¶ 9.) On October 20, 2016, the indictment of Mangano and Venditto was announced. (<u>Id.</u> ¶ 4.) Michael Venditto ended up losing his election by an extremely narrow margin. (<u>Id.</u> ¶ 11.)

Muscarella's affidavit states that, after the November 2016 election, he heard the story involving Bill Clinton from Robert McDonald, an acquaintance of Muscarella. McDonald, who was active in the Democratic Party in Nassau County, was elected as a Justice of the Supreme Court in New York in the November 2016 election. According to Muscarella, when he mentioned the timing of the indictment to McDonald, McDonald "advised [Muscarella] of [McDonald's] awareness of the conversation between Jay Jacobs and Bill Clinton in which Jacobs advised Clinton that Jacobs needed the indictment of Venditto and Mangano 'to be done and he needed it now.'" (Id. ¶ 9.)

In pointing to the allegedly suspicious timing of the indictment, defendants also point to the Hatch Act and internal guidance from the Department of Justice to illustrate that it is improper for the government to take prosecutorial actions, or to time such actions, in order to influence elections.

Defendants also cite to the fact that Mayor Bill de Blasio, an alleged Democratic comparator, was not prosecuted for purportedly similar conduct. The recently unsealed transcript of Singh's guilty plea reveals that, in addition to admitting that he bribed Mangano and Venditto, Singh also pled guilty to bribing an unidentified New York City official—who all parties agree is de Blasio—in order to obtain a favorable lease arrangement for one of Singh's restaurants. Specifically, Singh pled guilty to one conspiracy count and two substantive bribery counts concerning de Blasio. In contrast to the instant indictment, Singh did not give de Blasio any personal gifts. Rather, he admitted he "gave and raised tens of thousands of dollars in campaign contributions to" de Blasio "in exchange for efforts by [him] . . . and other City officials to obtain official action from a New York City agency that would benefit" Singh and his restaurants. (Singh Plea Tr. 40.) Defendants also point to a New York Times article recounting details of Singh's interactions with the de Blasio administration concerning the lease at issue. (See

William Neuman and William K. Rashbaum, *The Mayor and the Restaurateur: How de Blasio Sought Help for an Early Donor*, N.Y. TIMES, July 24, 2017.)

Although not cited by the parties, the Court notes that, on March 16, 2017, Joon H. Kim, then-Acting U.S. Attorney for United States Attorney's Office for the Southern District of New York (the "Southern District"), released a statement indicating that the Southern District had investigated de Blasio's fundraising concerning his 2013 campaign and other efforts, and that the Southern District did not intend to bring criminal charges against de Blasio.[6]   (Acting U.S. Attorney Joon H. Kim Statement on the Investigation into City Hall Fundraising, available at https://www.justice.gov/usao-sdny/pr/acting-us-attorney-joon-h-kim-statement-investigation-city-hall-fundraising (last visited on February 9, 2018.))   This statement noted, <u>inter</u> <u>alia</u>, "the particular difficulty in proving criminal intent in corruption schemes where there is no evidence of personal profit."   (<u>Id.</u>)

### 3. Analysis

Defendants have failed to offer sufficient evidence on discriminatory effect to warrant discovery.

Three critical differences render de Blasio distinguishable from Mangano for purposes of selective prosecution.   First, the de Blasio case only involved campaign contributions and not personal gifts.   This is critical because the government faces a more difficult standard in bribery cases involving political contributions, where the government must prove "an explicit quid pro quo."   <u>United States v. Menendez</u>, No. CR 15-155, 2018 WL 526746, at *2 (D.N.J. Jan. 24, 2018) (citing <u>McCormick v. United States</u>, 500 U.S. 257, 273 (1991)); <u>McCormick</u>, 500 U.S. at 273 ("The receipt of such contributions is also vulnerable under the [Hobbs] Act . . . , but only if

---

[6]  The Southern District's investigation into de Blasio's fundraising is also referenced in court filings in another corruption case where the Southern District informed the court that the charges in that case stemmed from a "long-running investigation into," <u>inter alia</u>, "fundraisers for New York City Mayor Bill De Blasio."  (See <u>United States of America v. Jona Rechnitz</u>, No. 16-cr-389 (RJS), ECF No. 21.)

the payments are made in return for an explicit promise or undertaking . . . .").  In addition to the legal hurdles involved in bribery cases involving campaign contribution, it may simply be harder to convince jurors to convict when the defendant is charged with accepting campaign contributions as opposed to personal gifts.[7]

Second, although Singh pled guilty to bribing de Blasio, the defendants here must establish that they are similarly situated to de Blasio.  The fact that Singh was prosecuted, and de Blasio was not, is insufficient to make such a showing.

Third, a different U.S. Attorney's Office made the decision not to prosecute de Blasio.[8] The Southern District investigated the Singh transaction as part of a long-running broader investigation into potential corruption concerning campaign contributions to de Blasio.  And, the Southern District made the decision not to prosecute de Blasio.  Mangano responds that the United States Attorney's Office for the Eastern District (the "Eastern District") knew about de Blasio's conduct with Singh and had the ability to prosecute de Blasio for that transaction because the lease at issue involved a property in Queens.  However, it is obvious that, because the Southern District handled the broader investigation into de Blasio, the Southern District

---

[7]  The recent trial of New Jersey Senator Robert Menendez helps to illustrate the difficulty of prosecuting crimes involving campaign contributions, particularly in the post-McDonnell world.  There was a hung jury in the Menendez trial and the government ultimately elected not to retry Menendez after the district court dismissed all of the counts involving campaign contributions in a post-trial decision.  See Menendez, 2018 WL 526746; Bryan Anselm, *Justice Department Dismisses Corruption Case Against Menendez*, N.Y. TIMES, Jan. 31, 2018.  The Court only cites Menendez to highlight the general difficulty of prosecuting such cases.  The Court acknowledges that, inter alia, the Menendez case was not limited to campaign contributions and that unlike here—where Singh has pled guilty and is cooperating with the government—the payor of the alleged bribes to Menendez also went to trial.

[8]  In considering both discriminatory effect and discriminatory purpose, the focus is on the prosecutor who actually made the decision to prosecute the defendant.  See United States v. Hommosany, 208 F.3d 204 (2d Cir. 2000) (unpublished table case) (finding that, with respect to discriminatory effect, the district court permissibly denied discovery because defendant's evidence did not show that the Southern District had knowledge of, or jurisdiction over, the other offenses that it allegedly failed to prosecute, and finding, with respect to discriminatory purpose, that district court permissibly refused to impute alleged improper motive of agency investigators to "the ultimate prosecutor"); United States v. Hastings, 126 F.3d 310, 314 (4th Cir. 1997) (finding defendant's evidence of discriminatory purpose insufficient and reasoning that "[w]e will not impute the unlawful biases of the investigating agents to the persons ultimately responsible for the prosecution"); United States v. Monsoor, 77 F.3d 1031, 1035 (7th Cir. 1996) ("[T]o connect the animus of a referring agency to a federal prosecutor, a defendant must establish that the agency in some way prevailed upon the prosecutor in making the decision to seek an indictment.").

would make the decision as to whether or not to prosecute him. In these circumstances, it is, at best, highly unlikely, that the Eastern District would prosecute de Blasio after the Southern District decided not to prosecute him. Thus, the Eastern District's failure to pursue charges against de Blasio is not probative on the issues of either discriminatory effect or purpose.[9]

Because defendants here have failed to show a similarly situated comparator, they have failed to make a sufficient showing of discriminatory effect to warrant discovery or to meet their ultimate burden on this element. In light of this conclusion, it is unnecessary to even reach defendants' arguments concerning discriminatory purpose. In any event, as explained below, defendants' proof concerning discriminatory purpose is also insufficient to warrant discovery.

Defendants rely on the Muscarella affidavit, along with the timing of the original indictment in an attempt to show discriminatory purpose. The story that McDonald allegedly told Muscarella is, at best, a third-hand account of the purported interaction between Jacobs and Clinton. Defendants then speculate that Clinton acted in response to this request and that Clinton somehow played a role in the Eastern District bringing this indictment. This speculation is so tenuous that it is insufficient to warrant discovery.

Additionally, the Court notes that defendants' reliance on the allegedly suspicious timing of the indictment is undercut by the fact that the McDonnell decision, which upended the world of political corruption prosecutions, came down on June 27, 2016. Prosecutors undoubtedly needed time to digest and account for McDonnell before negotiating Singh's plea and seeking the indictment against Mangano and Venditto. For all of the reasons stated above, defendants failed to offer "some evidence tending to show the existence of the essential elements of the defense." Armstrong, 517 U.S. at 468. Accordingly, their request for discovery is denied.

---

[9] Additionally, the notion that the decision not to prosecute de Blasio was made because he is a Democrat is belied by the Southern District's recent prosecutions of prominent Democrats, including former Speaker Sheldon Silver and Joseph Percoco a senior aide to Governor Andrew Cuomo. See Silver, 864 F.3d 102; Percoco, 2017 WL 6314146.

"Since the amount of evidence needed to support a selective prosecution claim on the merits is greater than that which justifies discovery, it follows that, when, as here, discovery was not warranted, defendant's merits claim must also fail." Alameh, 341 F.3d at 175.

**E. Venditto's Motion to Dismiss Counts 12 and 13 Based on Alleged Due Process Violation**

Venditto attended voluntary interviews with agents and prosecutors on October 23, 2015, and December 18, 2015. The Indictment alleges that Venditto made false statements at the December 2015 session. Venditto claims that his due process rights were violated because the prosecutors committed misconduct in connection with these interviews. Venditto asserts that, as a remedy, his statements from these two interviews should be suppressed and the obstruction and false statement charges in Counts 12 and 13 should be dismissed. Alternatively, Venditto asks for an evidentiary hearing. For the reasons stated below, the Court denies Venditto's requests.

**1. Factual Background.**

Venditto, who is himself an attorney, submitted an affidavit attesting to the following: Attorneys from Paul, Weiss, Rifkind, Wharton & Garrison ("Paul Weiss") advised Venditto that he should agree to be interviewed and then accompanied him to the two interviews. (Venditto Aff. ¶ 7; see also Gov't Opp. Br. at 76). Venditto asserts that he never retained Paul Weiss to "represent me personally." (Venditto Aff. ¶ 8.) Venditto also maintains that, before the October 23 interview, he "was not offered and did not sign a proffer agreement." (Id. ¶ 10.) According to Venditto, he was never told, prior or during the interviews, that he was a target of the investigation. (Id. ¶ 17.)

Contrary to Venditto's claim that he was never offered a proffer agreement, the government has produced an email showing that the attorneys at Paul Weiss were sent a draft proffer agreement for Venditto on October 22, the day before the initial interview.[10] (Gov't Ex.

---

[10] The draft proffer agreement stated that it did not immunize Venditto from making false statements or obstructing justice during the proffer session. (Gov't Ex. A.)

A.)  Moreover, in this email chain, the attorneys from Paul Weiss refer to Venditto as one of their "clients."  (Id.)

In addition to providing the above email chain, the government represents the following facts in their brief.  In February 2014, a partner at Paul Weiss was retained to represent the TOB and its employees.  (Gov't Opp. Br. at 76.)  After the government raised the notion that Paul Weiss might have a conflict of interest, attorneys at Paul Weiss informed the government that Paul Weiss ethically represented the TOB, Venditto, and another high-ranking TOB employee.  (Id.)  In September 2015, the government requested, through Paul Weiss, that Venditto and another TOB employee make themselves available for voluntary interviews.  (Id.)  The Paul Weiss attorneys immediately inquired whether Venditto and the other TOB employee were "targets" of the investigation.  (Id.)  "In response, the government advised that Venditto and the other [employee] were not targets, but witnesses."  (Id. at 76–77.)  As noted above, in advance of the interview session, the government sent a draft proffer agreement for Venditto to Paul Weiss.  (Id. at 77.)  On October 23, 2015, Venditto met with law enforcement officers and prosecutors, accompanied by three attorneys from Paul Weiss.  (Id.)  Before the meeting began, Venditto's attorneys stated, in Venditto's presence, that Venditto did not want or need the proffer agreement.  (Id.)

Venditto appeared for a second interview session on December 18, 2015 accompanied, again, by attorneys from Paul Weiss.  (Id. at 78.)  Venditto did not request a proffer agreement at this meeting.  (Id.)  After Venditto was questioned, the government informed Paul Weiss that it believed that Venditto made false representations during the meeting and that his status had

changed from being a witness to a target.[11]  (Id.)

## 2. Analysis

Venditto's opening brief asserts that the government acted improperly because it failed to notify him that he was a target of the investigation.  This failure allegedly prevented him from making a fully-informed decision about his representation and resulted in him being accompanied at the interview by conflicted counsel.  Venditto asserts that non-conflicted counsel would have never advised him to attend the interview sessions.  Venditto also maintains that the government should have notified the court overseeing Singh's criminal case about Paul Weiss's potential conflict.  Venditto asserts that, based on all those points, the government violated his due process rights.

None of these arguments have any merit.  The government's failure to identify Venditto as a target is not a basis for a due process claim.  As explained below, even if the government affirmatively misrepresents an individual's target status, such conduct does not warrant suppression or dismissal.

Additionally, although a prosecutor can, during grand jury proceedings, attempt to bring a potential conflict issue to the court's attention, cf. In re Taylor, 567 F.2d 1183, 1186 (2d Cir. 1977),[12] Venditto does not cite any case in which a court suppressed a defendant's statement during a voluntary interview connected to a grand jury investigation because the government failed to apprise the court of a potential conflict of interest involving the defendant's counsel.  In

---

[11]  The government did not submit an affidavit in support of these factual representations set forth above.  Venditto, however, makes no effort to dispute these representations in his reply papers, with the exception of his contention that he was, in fact, a target prior to these interviews.  In any event, even if the Court did not consider the government's factual representations, the Court would still, for the reasons set forth below, reject Venditto's due process claim and request for an evidentiary hearing.

[12]  In Taylor, the court noted that "[a]lthough grand jury investigations are not criminal proceedings, the procedure that this court has established for adjudicating the propriety of a lawyer representing multiple criminal defendants provides a useful framework for discussing the rights of two or more persons, subpoenaed as witnesses to testify before a grand jury or who are themselves under grand jury investigation, who choose to retain the same lawyer." Taylor, 567 F.2d at 1186.

fact, one court has explicitly rejected such an argument where the defendant raised it in seeking to suppress his grand jury testimony. In United States v. Beasley, the court reasoned that:

> Neither [defendant] cites any authority for their argument—that the government has a pre-indictment duty to inform the court of a potential conflict of interest, and a breach of any such duty would warrant the broad relief that Defendants . . . seek, i.e., . . . the suppression of their Grand Jury testimony, and dismissal of the Indictment bringing charges against them. Finding no authority supporting Defendants' claims of a constitutional violation, the Court will not exercise its discretion on these facts to grant the broad relief that Defendants seek.

27 F. Supp. 3d 793, 807 (E.D. Mich. 2015), aff'd, 700 F. App'x 394 (6th Cir. 2017).[13]

After the government indicated in its opposition brief that prosecutors explicitly informed Paul Weiss that Venditto was a witness prior to the interviews, Venditto shifted gears in his reply papers and now argues that his due process rights were violated because the government affirmatively misrepresented his target status and that this misrepresentation is egregious because it was made to counsel who the government knew was conflicted. Even assuming arguendo, that Venditto was, in fact, a target prior to the interviews and that the government, intentionally misrepresented his status, Venditto's claim still fails.

Courts have rejected similar claims asserting that the government affirmatively misrepresented the status of defendants before proffer sessions or appearances in the grand jury. See United States v. Percoco, No. 16-CR-776, 2017 WL 6314146, at *25 (S.D.N.Y. Dec. 11, 2017); United States v. Babb, 807 F.2d 272, 277 (1st Cir. 1986); United States v. Trinh, 638 F. Supp. 2d 143, 144 (D. Mass. 2009). As Judge Caproni explained in Percoco:

> It would be of grave concern if a representative of the prosecution intentionally misled targets of an investigation into believing that they were mere subjects in order to lure them into making proffers . . . . Nonetheless, even if a misrepresentation had been made, and even if that misrepresentation had been made deceitfully (as [defendants] imply), such conduct would not rise to the level of prosecutorial misconduct warranting dismissal of the Indictment, as it would not constitute a "systematic and pervasive pattern of misconduct that undermines

---

[13] In affirming the district court's decision in Beasley, the Sixth Circuit explicitly adopted the "reasoning of the district court with respect to all aspects of [the defendant's] claim related to conflict-free representation." Beasley, 700 F. App'x at 396.

the fundamental fairness of the process that generated the indictment." [United States v. Restrepo, 547 F. App'x 34, 44 (2d Cir. 2013)] Nor would the fact that the Defendants believed they were subjects, rather than targets, of the investigation permit them to lie at their proffer session.

Percoco, 2017 WL 6314146, at *25 (S.D.N.Y. Dec. 11, 2017).

Venditto's argument that Trinh and Babb are distinguishable because those courts did not explicitly find that the government intentionally misrepresented the defendant's status is not persuasive. Neither of those decisions suggest that those courts analyzed the alleged misrepresentations at issue as anything other than intentional. Venditto also cites to United States v. Jacobs, 547 F.2d 772, 774 (2d Cir. 1976), for support. Jacobs, however, is clearly distinguishable as the court relied on its supervisory authority to correct a systemic problem in which a strike force operating in the Eastern District was not following the practices of all U.S. Attorney's offices in the Second Circuit of alerting targets of their status when they were called to the grand jury. Id.; cf. Percoco, 2017 WL 6314146, at *25 (stating that alleged misrepresentation did not constitute "a systematic and pervasive pattern of misconduct").

The Court is also not persuaded by Venditto's argument that the government's alleged misrepresentation is particularly egregious because the government allegedly took advantage of Paul Weiss's conflicted representation. This is insufficient to show the type of egregious conduct that might justify dismissal of Counts 12 and 13 against Venditto or even warrant an evidentiary hearing. Cf. United States v. Schmidt, 105 F.3d 82, 91 (2d Cir. 1997) ("The concept of fairness embodied in the Fifth Amendment due process guarantee is violated by government action that is fundamentally unfair or shocking to our traditional sense of justice, or conduct that is so outrageous that common notions of fairness and decency would be offended were judicial processes invoked to obtain a conviction against the accused." (citations and internal marks omitted)). Moreover, the notion that an un-conflicted attorney would have advised Venditto

differently regarding the interviews after being told that Venditto was only a witness is not credible.

Finally, one additional point must be stressed. Venditto is, himself, an attorney. As an attorney, he was well aware that, whatever the precise nature of Paul Weiss's engagement, there was a potential conflict of interest that he could have avoided by retaining separate counsel. Nevertheless, Venditto elected to submit to the two interviews at issue accompanied by the attorneys from Paul Weiss.

For all of the reasons above, the Court denies Venditto's request to dismiss Counts 12 and 13 and his request for an evidentiary hearing.

**F. Requests for Grand Jury Minutes**

"A review of grand jury minutes is rarely permitted without specific factual allegations of government misconduct." United States v. Torres, 901 F.2d 205, 233 (2d Cir. 1990); see also United States v. Leung, 40 F.3d 577, 582 (2d Cir. 1994) ("A review of grand jury minutes should not be permitted without concrete allegations of Government misconduct." (citing Torres, 901 F.2d at 233)); Schlegel, 687 F. App'x at 30.

Mangano and Venditto request disclosure of certain grand jury minutes or, in the alternative, in camera review of those minutes. As mentioned earlier, defendants assert that the 2011 and 2012 concession amendments cannot constitute official acts under McDonnell because, according to defendants, those amendments are ultra vires and unenforceable. In support, defendants rely on PHL Variable Ins. Co. v. Town of Oyster Bay, No. 16-CV-4013, 2017 WL 2371188 (E.D.N.Y. May 30, 2017), in which the court dismissed a breach of contract claim brought against the TOB concerning the 2011 amendment, finding that the plaintiff failed to plausibly allege that the 2011 amendment was an enforceable contract. In PHL Variable, the court reasoned that the plaintiff failed to plausibly allege that the 2011 amendment was formally

approved by the Town Board and executed by the Town Supervisor, as required by N.Y. Town Law § 64(6). It must be noted that the plaintiff in PHL Variable has filed a motion for reconsideration, which is still pending.

Defendants assert that the PHL Variable decision suggests that the government may have presented materially false information to the grand jury concerning the validity of the 2011 and 2012 amendments. Mangano argues that, in light of the PHL Variable decision, review of the grand jury minutes is warranted if the government "purports to have evidence which would demonstrate that the 2011 and 2012 amendments were, in fact, 'formal exercises of governmental power'-i.e., legally binding documents ratified by the Town Board." (Mangano Br. at 36.)

Defendants have not met the high bar necessary for disclosure of grand jury minutes. PHL Variable does not suggest that the government provided materially false information to the grand jury. As the government points out in its brief, there are multiple ways that the government can potentially satisfy McDonnell's official act requirement in connection with the 2011 and 2012 amendments. (See Gov't Br. at 37.) Relatedly, the Indictment lists multiple actions in connection with the 2011 and the 2012 amendments that may constitute official acts, including Venditto voting on resolutions related to the amendments and having "another TOB official sign, on his behalf, the 2011 and 2012 amendments to the concession agreements." (Indictment ¶ 12). See McDonnell, 136 S. Ct. at 2370 ("For example, a decision or action to initiate a research study—or a decision or action on a qualifying step, such as narrowing down the list of potential research topics—would qualify as an 'official act.'" (emphasis added)). It is premature for the Court to decide the merits of any of these arguments at this juncture. It is sufficient to conclude, for purposes of the request for grand jury minutes, that the Court has no basis to believe that the government provided the grand jury with false information.

Venditto also asserts that disclosure of the grand jury minutes is warranted because the government's allegations are contradicted by the allegations in a civil complaint that the TOB filed against Singh and Mei. The TOB's own self-serving allegations in that civil suit are insufficient to suggest government misconduct.

Mangano also asserts that if the government argued to the grand jury that the 2011 and 2012 amendments constituted official acts and are now changing their theory, this raises the specter of a variance or constructive amendment. This argument is not persuasive. Defendants cite to United States v. Mollica, 849 F.2d 723 (2d Cir. 1988), in which a constructive amendment was found because, although the indictment only charged the defendant with a conspiracy to commit income tax fraud, the jury instructions and evidence at trial improperly permitted the jury to convict the defendant of a conspiracy to defraud that did not involve income taxes. Nothing in Mollica suggests that a court should review grand jury transcripts in order determine whether there has been a constructive amendment to an indictment.

## G. Bill of Particulars

The purpose of a bill of particulars is to "inform a defendant of charges with sufficient precision to allow preparation of a defense, to avoid unfair surprise, and to preclude double jeopardy." United States v. GAF Corp., 928 F.2d 1253, 1260 (2d Cir. 1991). "A bill of particulars is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused.'" United States v. Chen, 378 F.3d 151, 162–63 (2d Cir. 2004) (quoting United States v. Walsh, 194 F.3d 37, 47 (2d Cir. 1999)) (internal marks omitted). However, "a bill of particulars is not necessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means." Id. (quoting Walsh, 194 F.3d at 47).

Mangano and Venditto seek a bill of particulars identifying: (1) all of the alleged bribes and kickbacks they received from Singh; and (2) all of the alleged official acts that the government will rely on in support of the charges. Mangano asserts that a bill of particulars is warranted because the Indictment's discussion of the alleged official acts, bribes and kickbacks at issue uses phraseology such as "among other things" and "not limited to." Venditto also seeks a bill of particulars concerning, inter alia, the ways in which he allegedly obstructed justice as well as the specific false statements he allegedly made along with the specific questions that may have elicited the statements. Similarly, Linda Mangano asks for a bill of particulars identifying the specific false statements at issue in the counts against her.

The government asserts that a bill of particulars is not necessary here because defendants have been sufficiently apprised of the charges against them and have received voluminous pretrial discovery.

The Court finds that a bill of particulars in not warranted here. The Indictment adequately informs the defendants of the specific acts of which they are accused. Moreover, not only have the defendants received voluminous discovery, but they are going to receive trial exhibits, a witness list, and 3500/Giglio material in advance of trial, which will provide additional clarity on the charges.

## H. **Brady and Giglio Material**

Pursuant to Brady v. Maryland, 373 U.S. 83 (1963), the government has a "constitutional duty to disclose evidence favorable to an accused when such evidence is material to guilt or punishment." United States v. Coppa, 267 F.3d 132, 135 (2d Cir. 2001) (citing Brady, 373 U.S. 83). This duty requires that disclosure of such information occur "in time for its effective use" by the defendant. Id. at 144.

Mangano and Venditto ask the Court to order the government to disclose Brady material and impeachment evidence under Giglio v. United States, 405 U.S. 150. Defendants identify various categories of evidence that they assert constitute Brady material. The government has acknowledged its obligations under Brady and represents that it will adhere to those obligations. Additionally, the government addresses the various categories of evidence sought by defendants. For certain categories, the government asserts that it is not aware of any such evidence. For other categories, the government asserts that evidence sought concerns alleged co-conspirators and, thus, constitutes impeachment evidence under Giglio, rather than Brady material.

Where, as here, the government "has made good faith representations to the court and to the defense counsel that it recognizes its disclosure obligations under Brady, and that it has complied with said obligations and will continue to do so in a timely manner," courts in the Second Circuit "repeatedly have denied pre-trial requests for discovery orders." United States v. Shkreli, No. 15-CR-637, 2016 WL 8711065, at *2 (E.D.N.Y. Dec. 16, 2016) (collecting cases); see also United States v. Mohamed, 148 F. Supp. 3d 232, 246 (E.D.N.Y. 2015) ("Courts in the Second Circuit generally do not compel immediate disclosure of Brady/Giglio materials where (1) the Government represents it is aware of and will comply with its Brady/Giglio obligations, and (2) the Defense does not provide any reason for suspecting the Government will not comply.")

Accordingly, defendants' request for the Court to oversee the disclosure of Brady materials is denied. The Court is satisfied with the government's representation that it has met, and will continue to meet, its obligations under Brady. Moreover, the Court has set a schedule for disclosure of 3500/Giglio material well in advance of trial.

### III.  CONCLUSION

For the reasons stated above, defendants' pretrial motions are denied.

**SO ORDERED.**

Dated:  February  9, 2018
        Central Islip, New York

_____/s/_____(JMA)_____
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE