UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
UNITED STATES OF AMERICA

      -against-                             Docket No. CR 16-540 (S-1)

EDWARD MANGANO and
LINDA MANGANO,                        **MEMORANDUM OF LAW**

             Defendants.
-------------------------------------------------------------X

## PRELIMINARY STATEMENT

In the spring of 2018, Mr. Mangano was tried alongside his wife, Linda Mangano, and John Venditto, the former Supervisor of the Town of Oyster Bay. That trial – which lasted for twelve weeks – ended in a total acquittal for Mr. Venditto (on more than 27 counts), and a hung jury as to Edward and Linda Mangano.

In the wake of the mistrial, interviewed jurors indicated that they had been on the verge of acquitting Linda Mangano as well. Jurors further indicated that they were prepared to acquit Mr. Mangano with respect to allegations concerning the Town of Oyster Bay loan "guarantees," as well as the OEM emergency procurement contract. However, they expressed division over allegations that Mr. Mangano steered the Nassau County Jail "bread and rolls" contract to Harendra Singh.

In the months following the mistrial, defense counsel has learned a series of disturbing facts which indicate that this first trial was anything but fair. In particular, unequivocal evidence now shows that prosecutors *repeatedly* suppressed evidence favorable to the defense, and permitted their main cooperating witness, Harendra Singh, to perjure himself in the presence of the jury.

1

Among other things, as set forth in detail below, newly discovered evidence demonstrates the following:

· the Government knew of, but concealed the identity of, a *key* witness who completely contradicted the prosecution's narrative concerning the bread and rolls contract;

· Prosecutors actively solicited testimony from Harendra Singh which they knew or should have known was false, and subsequently stood by while Singh perjured himself on cross-examination.

· the Government repeatedly misrepresented to defense counsel (and the Court) that it had produced the "entirety" of the Singh wiretap, while withholding thousands of recorded calls which included *Brady*, *Giglio*, and hundreds of Hindi calls which the Government had never even bothered to translate.

Based upon the foregoing, defense counsel is asking this Court to dismiss the Indictment with prejudice. In the alternative, we are requesting a full evidentiary hearing, in which the Government is compelled to produce to the Court all pertinent internal communications for an *in-camera* review.

## STATEMENT OF FACTS

### I.    The Government Concealed the Existence of a Highly Exculpatory Witness in Connection with Allegations Concerning the Nassau Jail Bread and Rolls Contract

In the wake of the mistrial, *Newsday* interviewed the jurors from the first trial. According to an article published on June 3, 2018, "[t]he jury, in their secret deliberation, had unanimously decided against convicting Edward Mangano of conspiracy, bribery, wire fraud and extortion based on the alleged Oyster Bay loan scheme or on a county emergency food services contract awarded in the aftermath of superstorm Sandy . . ." The same article, however, reported that jurors were split with respect to the allegation concerning the bread and roll contract. *See Newsday* article, attached as Exhibit A to the accompanying affirmation of Kevin J. Keating (hereinafter the "Keating Aff.").

Hence, the entire outcome of the case ultimately hinged upon the Government's narrative concerning the bread and rolls contract.  Newly discovered evidence reveals that prosecutors knew, or had every reason to know, that such narrative was false, but failed to share such information with defense counsel or the jury.

Specifically, the evidence at trial showed that Peter Schmitt, the Presiding Officer of the Nassau County Legislature, directed his counsel, Chris Ostuni, to inquire whether the bread and rolls contract could be "split" between Rockland and San Remo Bakeries.  Among other things, evidence showed that on June 12th, 2012 Mr. Ostuni wrote to the purchasing department:

> . . . I would like an analysis of the following question: Are we prohibited from awarding to San Remo the items San Remo was low or the same on?  If not, are we then prohibited from offering the balance of those items to Rockland whereby Rockland would be free to accept or reject the award of those items?
>
> I know I am being difficult on this issue.  *However, as per the instruction of the Presiding Officer*, all of these issues must be addressed prior to the Rule Committee's consideration of any contract.
>
> Defense Exhibit 169 (emphasis added).

According to testimony and emails admitted in evidence, this was in accord with Mr. Schmitt's longstanding policy of favoring local Nassau County vendors.  Indeed, Purchasing Department Supervisor Michael Schlenoff testified that he was well aware of Mr. Schmitt's strong feelings on this subject:

> Q. You must have had an understanding then of Peter Schmitt's policy of pushing the local vendor?
> A. Not only Peter Schmitt, but going back to the board of supervisors.
> Q. Did you understand that for Peter Schmitt that was an important policy agenda as it related to purchasing in the County of Nassau?
> A. Yes.
> Q. And that Peter Schmitt pushed heavily the notion that when possible the County of Nassau should select vendors who are local, meaning within Nassau County?
> A. And he has indicated that to me before that time also.
> Q. Personally?
> A. Personally.

3

Q. In your role as head of the purchasing department, he would have conversations with you about that policy issue, correct? . . .

**\*\*\*\***

. . . Personally he had conversations with you about that policy, correct?
A. Yes.
Q. And did he share with you the policy was driven by the fact that if you use a Nassau County vendor, of course it will create jobs in Nassau County?
A. And also tax.
Q. And also sales tax revenue, correct?
A. Yes.
Q. And other tax revenue stemming from the jobs, correct?
A. Yes.

Trial Transcript pp. 6404-6405.

Ultimately, the pressure brought to bear by Peter Schmitt's office led the Purchasing Department to split the contract – something which, according to Michael Schlenoff, the Purchasing Department was permitted to do.  Trial Transcript pp. 6425-26.

The Government had no evidence directly tying Edward Mangano to Peter Schmitt's actions in this regard, and as the Court is aware, Mr. Schmitt is deceased.  Nevertheless, prosecutors urged the jury to *infer* that Mr. Mangano directed Mr. Schmitt to intercede on Singh's behalf.  In this regard, the Government specifically focused on two pieces of evidence: (a) Robert Walker's May 7, 2012 visit to the Purchasing Department to inquire about the contract, and (b) phone records showing that Mangano spoke to Schmitt in the run-up to the incident.

Hence, in its rebuttal summation, the prosecution openly mocked the notion that Schmitt intervened on his own accord – urging the jury to infer that *Mangano* "initiated" Schmitt's "interference" with the bread and rolls contract when he called him on April 22, 2012:

And the notion that this is being done at anything other than Ed Mangano's direction is ridiculous. Aside from the fact that Rob Walker is Ed Mangano's number two, is personally going to the Nassau County purchasing department to talk about a $200,000 bread and rolls contract, the phone records in evidence that on April 22, 2012, Ed Mangano called Peter Schmitt at his home and they talked for 24 minutes, and it is after this call that Chris Ostuni gets involved, and gets on

4

the e-mail traffic with Rob Walker. This interference was not initiated by Peter Schmitt. There is no evidence of that whatsoever. This interference was initiated by the county executive's office, and we all know who in the Nassau County executive's office initiated the interference.

Trial Transcript at p. 8495.

Newly disclosed evidence reveals that, at the very time prosecutors were urging the jury to convict on these grounds, they *knew* that it was a false narrative.  In fact, we now know that during the course of the trial, a key witness told the Government that she – *not Edward Mangano* – first brought this issue to the attention of Peter Schmitt, triggering the chain of events which would lead to the splitting of the bid.

In particular, in the wake of the mistrial, defense counsel became aware of a potential witness named Meredith Hughes, who at the time of the operative events was working as Deputy Majority Counsel to the Nassau County Legislature.  Upon being interviewed, Ms. Hughes informed defense counsel that it was her responsibility to review bid packages submitted by the Purchasing Department and to brief Peter Schmitt on the contents of the bid packages.  Ms. Hughes further explained that one of Mr. Schmitt's responsibilities as Presiding Officer of the Nassau County Legislature was to place contract awards by the Purchasing Department on the Rules Committee calendar for consideration and voting on the contract award.

According to Ms. Hughes, she was aware that Mr. Schmitt strongly believed that, whenever legally possible, County contracts should be awarded to local vendors.  Ms. Hughes had a clear recollection of the issues surrounding the 2012 bread and roll contract.

Specifically, Ms. Hughes informed us that she reviewed the bid package from the Purchasing Department in approximately early May of 2012.  Ms. Hughes recalled that Purchasing had recommended that the contract be awarded to Rockland Bakery; that the second-place bidder

was San Remo Bakery (located within Mr. Schmitt's district of Massapequa); and that the price difference between the two bids was extremely small.

Ms. Hughes informed us that in approximately early May 2012, she met with Chris Ostuni and Peter Schmitt to review pending bid packages, and that she brought the issue to Mr. Schmitt's attention because of his local-vendor policy.  As set forth in her affidavit, Ms. Hughes states:

> It was clear to me that Mr. Schmitt, prior to my briefing concerning these findings, had no prior knowledge of these facts.  Mr. Schmitt made clear in that meeting that he wanted Mr. Ostuni to look into these matters, and that every effort should be made to ensure that the contract, if possible, be awarded to San Remo Bakery.

*See* Affidavit of Meredith Hughes, attached as Exhibit B to the Keating Aff.

Hence, Ms. Hughes testimony clearly establishes that Peter Schmitt's involvement in the bread and rolls contract came about organically, and *not* through the direction of Mr. Mangano. In fact, it shows that Mangano had *nothing* to do with Peter Schmitt's position *vis-à-vis* San Remo Bakery.

Most troubling, Ms. Hughes informed us that she had previously shared all of this information with the Government.  Specifically, Ms. Hughes was contacted by Special Agent Michael Cassidy in the Spring of 2018, while the last trial was ongoing.  According to Ms. Hughes, she relayed all of the above information to Agent Cassidy, who informed her that she might be receiving a call from one of the federal prosecutors assigned to the case.  No such call was ever forthcoming.

To this day – despite assuring this Court on countless occasions that it has met all of its *Brady* obligations – the Government has *never* disclosed Ms. Hughes identity to defense counsel. Instead, counsel learned of her existence through other sources, and first interviewed her in September of 2018.

The Government's actions here are profoundly troubling, and speak to an inherent lack of good faith on the part of prosecutors.  By concealing the existence of an unambiguously exculpatory witness, prosecutors violated their ethical obligations and the Defendants' constitutional right to *Brady* material.  Worse yet, after concealing such evidence, prosecutors capitalized on their own misconduct by actively promoting a false narrative – asking the jury to infer facts which they *knew* to be untrue: namely, that Edward Mangano "initiated" Peter Schmitt's involvement by means of an April 22nd phone call.

Given what we know about the jury's deliberations in the first trial – and the fact that they had virtually acquitted him of all charges *except* the bread and rolls contract – the prejudice to Edward Mangano is incalculable.[1]

## II.     Prosecutors Permitted Harendra Singh to Offer Testimony Which They Knew or Should Have Known Was False

The second aspect of prosecutorial misconduct relates to Singh's perjured testimony on *both* direct and cross examination.  In both of the incidents described below, prosecutors had a clear basis to know that their cooperator was committing perjury.

### A.     Perjury Elicited on Direct Regarding Bethpage Republican Club Lease

On direct examination, the Government elicited testimony that Edward Mangano's campaign rented office space in a shopping center owned by Singh's parents.  Singh told the jury that Mangano demanded that his rent be reduced.  Singh testified that he acceded to this demand as part of a *quid pro quo* understanding.  In furtherance of this narrative, prosecutors introduced into evidence multiple lease agreements, covering the same time period, but with differing rents. In fact, newly discovered evidence shows that the purported "higher-rent" leases were actually

---

[1]      Of note, the structure of the verdict sheet at the first trial made it impossible for the jury to return a partial verdict with respect the TOB or OEM allegations.

forgeries created by Singh, as part of an elaborate scheme to obtain financing for his parents' property. Worse yet, the evidence shows that the prosecutors *knew* about this scheme, but kept its existence from defense counsel.

    *1.    Harendra Singh's Trial Testimony Regarding Bethpage Republican Club Leases*

Edward Mangano's campaign office was located at 162A Hicksville Road in Bethpage – a property owned by Sun Properties Consultant's, Inc. ("Sun Properties"). Sun Properties, in turn, was owned by Harendra Singh's parents.

During the investigative stage of this case, the Government discovered something peculiar. Within Singh's records, the Government found three different versions of a purported lease agreement for the same time period.

The first agreement – which was entered into evidence as GX 411 – ran from June 1, 2009 to May 31, 2019, and provided for $1,800 per month in rent. It was signed on behalf of the Bethpage Republican Club by an unknown signatory. *See* GX 411, attached as Exhibit C to Keating Aff.

The second agreement – entered into evidence as GX 412 – ran from June 1, 2009 to May 31, 2019, provided for $1,854 per month in rent, and was purportedly signed by Doreen Pennica (the Treasurer of the Friends of Ed Mangano Campaign Account) on behalf of the Bethpage Republican Club. *See* GX 412 at Exhibit C to Keating Aff.

The final version of the agreement – entered into evidence as GX 413 – was with the Friends of Edward Mangano. It ran from June 1, 2010 to May 31, 2020, and provided for $1,500 per month in rent. This document, however, was unsigned. *See* GX 413 at Exhibit C to Keating Aff.

On the first day of trial, the Government elicited a long and convoluted narrative from Harendra Singh which explained these various documents in a manner that was intended to implicate Mr. Mangano in a *quid pro quo* arrangement.  Specifically, Mr. Singh told the jury that following Mr. Mangano's election, the Bethpage Republican Club entered into a long-term lease agreement which provided for $1,800 per month in rent.  After that lease was signed by an unknown person, Mr. Singh testified that he realized he had forgotten to include a utility charge. As a result, Mr. Singh testified that a second lease was prepared, providing for $1,854 per month in rent.  That document, he testified, was signed by Doreen Pennica – the Treasurer of "Friends of Ed Mangano."

Mr. Singh further testified that after these leases were signed, he was approached by Mr. Mangano, who told him "$1,854 was a little too high, if I could speak to my mom and reduce the rent."  According to Singh, this demand caused him to reduce the rent from $1,854 to $1,500, resulting in GX 411.  The Government then went on to elicit the following testimony:

Q:   Why did you agree to a $1,500 a month when a lease had already been signed for $1,800 and $1,854?

A:   Well, Ed had called and, you know, that it would be too much to pay $1,854, if I could reduce.  And based upon his request I complied.

Q:   Why did you comply with his request?  Why did you agree to do it?

A:   He was my friend and he was newly County Executive.  I knew I would need him for a lot of things, so it was a good business practice.

Q:   Did you expect anything in return?

A:   Yes.

Q:   What did you expect?

A:   I expected to help wherever there was help needed in Nassau County.

Q:   You expected help from whom?

A:   From Ed Mangano.

*See* Trial Transcript at p. 262-263.

At the time of the trial, defense counsel strongly suspected that GX 411 and 412 were fabricated documents. We knew, for instance: (1) that the Bethpage Republican Club would not have entered into a lease agreement on behalf of Edward Mangano's campaign, because the Club was not affiliated with the Mangano campaign, and because the campaign paid all of its expenses through its "Friends of Ed Mangano" campaign account; and (2) that Doreen Pennica was not authorized to sign legal documents on behalf of the Bethpage Republican Club. It further appeared obvious that Doreen Pennica's purported signature on GX 412 did not match her signature on other documents admitted into evidence. Finally, Singh's testimony that the $1,854 lease was made necessary because the $1,800 lease mistakenly omitted utility charges was nonsensical; both versions of the lease expressly required the tenant to pay utilities out of pocket.

Based upon the foregoing, defense counsel strongly suspected that Mr. Singh created GX 411 and 412 for a fraudulent purpose. Specifically, we suspected that these were forged agreements which inflated the rent, which Singh presented to putative lenders in order to obtain financing for Sun Properties. While Mr. Singh was cross examined at length on this subject, counsel was unable to conclusively demonstrate that the documents were forgeries.

### 2.   *Recent Discovery of Fraudulent Rent Rolls Provided to Lenders*

On September 6, 2018, in the run-up to the retrial, defense received for the first time a mirrored image of Harendra Singh's hard drive, which had been seized by the Government years earlier, during the execution of a search warrant at Singh's office.[2] Since that time, our review of the hard drive has revealed multiple documents which confirm our prior suspicions. The documents conclusively demonstrate that Singh fabricated an elaborate story based upon forged

---

[2]      Defense counsel demanded a mirrored copy of Singh's business server due to our concern that prosecutors had not fulfilled their discovery obligations at the initial trial.

documents which he had created.  In doing so, he lied about his own criminal activity – but even worse, used those forged documents in order to concoct an incriminating story about Edward Mangano.   Hence, documents recovered from Mr. Singh's server – and attached to the accompanying Keating affirmation – show the following:

Exhibit D: 10/4/10 email from Singh employee Jay Jadeja to Singh's attorney, enclosing the "signed" lease with Bethpage Republican Club (GX 112), and other fabricated leases, for purposes of obtaining financing.  While it appears on the face of the email that Jadeja is forwarding information he obtained from "Christina Anturi" at Direct Capital of Long Island, Ms. Anturi was in actuality Mr. Singh's executive assistant.  Direct Capital of Long Island is an entity created by Singh and Jadeja.

Exhibit E: 10/6/10 email from Singh employee Jay Jadeja to Singh's attorney enclosing, "Estoppel Certificates" for Community National Bank, in connection with a proposed loan to Sun Property Consultants.  This includes an Estoppel Certificate from the "Bethpage Republican Club," which represents to Community National Bank that the monthly rent is $1,854 per month, and that its lease does not expire until 2019.  _This document bears the forged signature of Edward Mangano_.

Exhibit F: 10/27/10 email from Singh employee Jay Jadeja forwarding a "Certified Rent Roll," signed by H. Singh, listing the Bethpage Republican Club lease at $1,854 per month. The document is sent to, among others, Steve Shapiro at Circle S Capital.

Exhibit G: 8/10/12 email from Singh employee Salvatore Russo to the law firm Forchelli Deegan Terrana, enclosing Sun Property rent roll for purposes of applying for a tax abatement.  _The Bethpage Republican Club rent is now listed at $1,000 per month_.  This is consistent with Singh's admitted practice of underreporting income for tax purposes, while overreporting income when applying for financing.

Exhibit H: 2/15/13 Email from Singh employee Salvatore Russo to Larry Linksman at Bridge Funding, with attached rent roll for Sun Property.  _Rent from the Bethpage Republican Club has now been inflated to $1,948 per month_.

In short, these documents show that GX 112 was a forged document created for the purpose of overstating Sun Property's income, in order to obtain financing.  The evidence further shows that Mr. Singh caused Edward Mangano's signature to be forged on an estoppel certificate for

purposes of obtaining such financing, and that Mr. Singh would subsequently provide various figures for the rent rolls, increasing or decreasing the purported rent in whatever way suited his interests at the time.

Notably, while the Government possessed Mr. Singh's server for years, and conducted a comprehensive search of the email communications contained therein, the above-emails were all excluded from the material which was produced to defense counsel prior to the first trial.

### 3. Prosecutors Were Informed by Other Witnesses That the Sun Property Rent Rolls Were Fabricated

Worse yet, recently disclosed 3500 material shows that the prosecutor who elicited the above testimony from Singh had every reason to know that the documents were forgeries.

Specifically, in the run-up to the retrial we received, for the first time, notes from interviews of Jay Jadeja and Sal Russo – two Singh employees who played an integral role in his financial crimes. Disturbingly, this material reveals that prosecutors *knew* that Singh directed his employees to falsify leases and inflate the rent rolls at Sun Property in 2010, for the purpose of obtaining financing. In each case, the relevant proffers were attended by the same AUSA who elicited Singh's testimony on this subject. Hence:

- On February 11, 2015, Sal Russo was shown the Sun Property Consultant's rent roll for December 2010, reflecting rent from the Bethpage Republican Club of $1,848. Mr. Russo informed investigators: "the rental income is a false number that has to match the rent role. The page titled Rent Roll 2010 shows H&R Wines and Specialty Foods but that doesn't exist. Besi's Pizza should be included in Raj & Raj rent. There was never an additional rent for Besi's. The numbers are not legitimate." On the actual document, Mr. Russo (or an agent) wrote "These #'s given to S.R." "The #'s are not legit." *See* 3500 SR-8, pp. 3 and 24-27, attached to Keating Aff. as Exhibit I. Notably, this is the SAME document attached at Exhibit F, which was certified by Mr. Singh and forwarded to Steve Shapiro.

- On January 1, 2015, Jay Jadeja informed the Government that "Steve Shapiro was the broker for the Stan Corp. loans. The paperwork submitted to Stan Corp. included fake leases that had been generated." Likewise, on February 12, 2015, he told the Government

12

that "StanCorp leases were fictionalized.  Steve Shapiro knew the leases were fake."  *See* 3500 JJD-5 at p. 2; 3500 JJD-8 at p. 3, attached to Keating Aff. as Exhibit J.

· On July 8, 2015, Jay Jadeja stated: "JADEJA with the knowledge of SINGH, created a fake rent roll and fake leases for BESI and H&R WINES to provide to STANCORP for a loan. STANCORP requested the leases and JADEJA, in turn created those fake leases to satisfy the request."  *See* 3500 JJD-11 at p. 7, attached to Keating Aff. as Exhibit K.

It is unclear whether these witnesses specifically mentioned forging the Bethpage Republican Club lease, or were shown such document.  Nevertheless, at a bare minimum, the Government *was* on notice that: (a) in 2010, the rent roll for Sun Properties was falsely inflated to obtain financing; and (b) that Singh engaged in the practice of forging leases to substantiate that rent roll.

Although this conduct constitutes *Giglio* material, *once again*, no disclosure was made to defense counsel prior to the last trial, and 302s for Russo and Jadeja were not produced.

Given the specific information which had been relayed to the Government, and given the facially suspicious nature of multiple leases – purportedly signed by different persons and in differing amounts, created at the same time that the rent roll fraud was being perpetrated – it is hard to imagine that prosecutors did not at least suspect that such documents might be forgeries. Nor would it have been difficult to conclusively vet Mr. Singh's narrative.  Indeed, the Government had access to Mr. Singh's server, which contained documents that irrefutably demonstrated that he repeatedly altered and manipulated the rent roll for the campaign office and even *forged Ed Mangano's signature*.  Notably, we were able to locate such documents after possessing the hard drive for only twelve days.  The Government possessed the hard drive for years prior to the trial.

In short, Mr. Singh was encouraged and permitted to take the fruits of his own criminal activity and spin a wholly fictional narrative around them, in an effort to advance the Government's theory of the case.

13

Once again, the evidence irrefutably shows that: (a) the Government possessed information which showed that their lead cooperator was lying; (b) that such information was withheld from defense counsel; and (c) that prosecutors took advantage of this asymmetry of information in order to promote a false narrative that was damaging to the Defendant.

B.      Singh is Permitted to Perjure Himself
        Regarding His Purchase of Overseas Real Estate

The second area of perjury relates to Singh's undisclosed ownership of overseas real estate. Mr. Singh was asked on cross-examination about his purchase of property during a trip to Goa, India in December 2012 with Fred Mei.  He *unequivocally* denied such purchase.  Newly discovered documents from his server show that he in fact bought *three* properties during this trip. In addition, newly produced 3500 material shows that prosecutors were familiar with documents relating to this transaction (but did not produce them in discovery), and had specifically discussed Singh's Goa apartments with various Singh employees (but did not produce their proffer notes). Despite this, prosecutors made no effort at trial to correct Singh's unambiguous perjury on this subject.

1.    *Testimony at Trial*

The relevant portion of Singh's testimony can be found at pages 2558 through 2564 of the trial transcript.  Under cross-examination by co-defendant's counsel, Singh testified as follows:

Q. How long were you and Fred Mei in India in December of 2012?
A. I met my father in Mumbai, and we went to Goa for a couple of days, then we went back to the village where the hospital is.
Q. And did Fred Mei go to Goa as well?
A. He was there, yes.
Q. And did you travel together, you and Fred?
A. We were on the same plane.
Q. Right. . .

14

**\*\*\*\***

Q. When you landed to Mumbai, where did you go?

A. Went to Goa.

Q. You never left the airport?

A. We went from the international airport to domestic airport, met my father there, and flew to Goa.

Q. That was Fred Mei and you together?

A. Me, myself, my father, and my cousin.

Q. What did you do in Goa?

A. I was in Goa, and my father had met me. I was doing -- looking into some real estate investments and doing some businesses.

Q. What real estate investments were you looking into at Goa?

A. I was looking to buy a small apartment.

Q. Were you doing that with Fred Mei?

A. No.

Q. So you went to look at real estate?

A. Yes.

Q. Did Mei go with you?

A. Yes, he did.

Q. Okay. So you and Mei went together to look at real estate, right?

A. Myself, my father, and my cousin.

Q. And what kind of real estate were you, your father, your cousin and Mei looking at?

A. We were looking to buy some retirement homes.

Q. Retirement homes in Goa?

A. Yes.

Q. Now -- and this was December of 2012, correct?

A. Yes.

Q. All right.  I'm going to show you an email, Government Exhibit 954. It's from October 2012. And it is -- it's Government's Exhibit 954.

MS. MIRABILE: Thank you.

Q. It says: Hello, everyone. Hope all is well. This is from Abhi. Hello, everyone. Hope all is well. Per Mr. Singh, the labor cost in all facilities are very high. Needs to be reduced 20 percent from current payroll figures. Kindly go through all the parties that are booked in catering and forecast estimated revenue in restaurants. Based on the revenues, consolidate the work force in all areas, front and back of the house. Mr. Singh needs a report sent to him before Friday. In the report he needs to see the reduction, along with the game plan, correct?

A. Yes.

Q. Now, at this point in time you were looking to cut your staff, right?

15

A. I was looking to cut my staff.

Q. And you are looking to cut your staff because you are having significant cash flow problems, right?

A. We were having economic problems in 2008.

Q. But this is the fall of 2012, right?

A. Yes.

Q. All right. And you're still check hiding[3], right?

A. Yes.

Q. And you are trying to cut down on your staff. You are letting people off, right?

A. Yes, I was.

Q. How were you planning on paying for retirement homes in Goa?

A. That was a proposal by my cousin and my father was buying the homes. My father wanted to look for something in Goa.

Q. And did you end up buying anything in Goa?

A. No.

(Emphasis added).

### 2.     *Documents from Singh's Server Show He Lied*

As previously noted, we first received a mirrored image of Mr. Singh's server in September of this year, following the mistrial.  Attached as Exhibit L to the Keating Aff. are documents which we located on that server.  In short, they show that in 2012, Mr. Singh purchased *three* apartments in Goa (valued at approximately $800,000), and that the very purpose of the December trip was to take possession of such properties.  As Mr. Singh wrote in November of 2012:

> Hope you are well.  I will be traveling down to India and arriving in Goa on Sunday 12/09/2012.  I will be there in Goa for 2 days during which I would like to take the transfer of possession of my flats . . .

These emails further show that Singh was continuing to make maintenance payments for his three properties in 2014.

---

[3]      Should read "kiting".

16

Again, we have cross-referenced these emails against the emails which the Government selectively produced from Mr. Singh's server prior to the first trial.  None of these emails were produced in discovery.

Mr. Singh's clear perjury on this subject suggests that he was either: (1) seeking to conceal his overseas assets from the Government so that he could evade his forfeiture and restitution obligations; (2) seeking to conceal his money laundering activities, as the Goa properties appear to have been purchased with the proceeds of the fraudulently acquired NDH loans (obtained through the efforts of Fred Mei); or (3) seeking to conceal the extent of his corrupt relationship with Mr. Mei (who traveled with Singh when he went to take title to the apartments).   In this regard, it is interesting to note that the March 26th, 2015 body wire captured the following exchange about Mei moving part-time to India.

> H. SINGH: Listen, the worst will be -- the worst will be you will put your paper in, you retire, I'll make sure, you know, you're taken care of, your income will actually go up, (inaudible) a couple of times a year you go to India, help my father as long as he is alive.
>
> F. MEI: Maybe I'll just spend half my year in India and half my year in Mexico.
>
> H. SINGH: Right, and that's fine. You know and so on, it might be something very good, you know, bless you what they do.

3.      *The Government Knew That Singh Was Lying*

Regardless of Singh's reason for lying, we know that the Government was not deceived, because by the time Singh gave this testimony, prosecutors had already discovered emails regarding the Goa transaction and had discussed them in detail with other witnesses.

We know this from the new 3500 material that was recently produced to us.  Hence, on September 28, 2018 we received, for the first time, proffer notes from Robert Lobo, one of Singh's accounting employees, and a co-conspirator with respect to his financial crimes.  They show that

Mr. Lobo repeatedly and specifically described Mr. Singh's Indian real estate to the Government. Hence, on April 22, 2015, he told Special Agents Hosey and Spence, as well as AUSA Mirabile:

> Singh has three apartments in a tourist area called Goa, India and a house in Lucknow, India.  Lobo estimated the value of the apartments at approximately $700,000 to $800,000 and the value of the house at approximately $400,000.  Singh also owns an apartment in Dubai which he purchased in 2008.

> *See* 3500-RL-6 p. 10, attached as Exhibit M to the Keating Aff.

Thereafter, the Government located one or more of the above-described emails on Singh's server relating to such purchases.  Hence, on July 9, 2015, Mr. Lobo attended another proffer session with AUSAs Mirabile and Tierney, as well as Agents Spence, Rooney, and Cassidy.  The notes indicate that Mr. Lobo was shown the email chain with Harendra Singh dated <u>November 23, 2012</u>, which reads as follows:

> Singh: Robert sahib, please make sure proper fund is sent to my fathers account and speak to people in Goa so I can transfer the property in Goa.  Also let my father know.  On Monday I will tell him what to bring to Goa.

> Lobo: Sure Sir.  We have already started sending funds to ICICI bank to your father's a/c. So afr [stet] we have sent 5k USD.

> Singh:  Please make sure all is done by the time I go.

The email was attached as Exhibit 4 to Lobo's 302.  *See* 3500-RL-9 p. 5 and Exhibit 4 thereto, attached at Exhibit M.  The handwritten proffer notes from the same interview indicate that the agents and AUSAs were told the following by Lobo:

· That "H" has an apartment in Dubai which was not fully paid for, on which he was making installment payments;

· That he had three apartments in Goa;

· That he had one apartment in Luchnow, India, which was sold to make an $80,000 payment to the Town of Oyster Bay.

·       That with respect to the 11/23/12[4] email, H "wanted to make a payment to Goa people, so wire $ from his account to dads account.  Then H said H would take it from there."

See 3500-RL-10 p. 15, attached as Exhibit M to the Keating Aff.

Robert Lobo's information was further confirmed by multiple conversations captured on the Government's wiretap.  For instance, on May 9th, 2015, the wiretap captured a conversation between Singh and a person located in India, concerning an unspecific transaction and the incoming payment of funds from Lucknow.  Thereafter, on May 28, 2015, the Government recorded a conversation between Singh and his father in which the two discussed how best to funnel proceeds from the sale of an Indian house (presumably the Lucknow property) back into the United States.  During the conversation, the two men plot to disguise the transaction as a donation to Mr. Singh's charity, in order to avoid taxes.  As noted in greater detail below, this is just one of the many wiretapped conversations which prosecutors chose to withhold from defense counsel.

Finally, Robert Lobo was far from the only witness who told the Government about Singh's overseas real-estate.  Although not as detailed in their information, Singh employees Christine Anturi and Jay Jadeja both told the Government that Singh owned apartments in India.  Likewise, Salvatore Russo actually reviewed financial spreadsheets with the Government *showing* the diversion of unreported cash proceeds to pay for Singh's "India properties and their maintenance." See 3500-JJ-3 p. 1; 3500-CA-1 p. 3; 3500-SR-14, p. 2, attached as Exhibit N to the Keating Aff. Again, the 3500 material for these witnesses was only recently produced.

---

[4]       The 302 and proffer notes inaccurately state that the date of the email was November 2010. As can be seen from the email itself, the correct date is November 2012.

In short, the evidence demonstrates: (a) that the Government possessed Singh's server, which contained documents conclusively showing that he purchased properties in Goa; (b) that the Government was indisputably aware of such documents; (c) that multiple witnesses were asked about and confirmed Singh's ownership of such properties in the presence of both the lead agent (who was sitting at the trial) and AUSAs; (d) that the Government intercepted conversations in which Singh discussed the sale of the Lucknow property; (e) that the Government withheld all such witnesses and evidence from defense counsel; and (f) that despite all of the foregoing, the Government permitted Singh to testify under oath that he did not own such properties.

## III. The Government's Non-Disclosure and Affirmative Misrepresentations Concerning the Singh Recordings

After litigating this case for over two years – including a twelve-week trial which ended in a hung jury, we have now learned that the Government possessed numerous undisclosed recordings of its main cooperating witness.  Prior to this recent discovery, prosecutors had repeatedly and unequivocally denied that such recordings existed.  Troublingly, this conduct appears to be just part of the larger pattern of behavior by the prosecutorial team which was initially assigned to handle this case.

### A.  History of Non-Disclosure Prior to First Trial

In May of 2017, prior to the first trial, we received three short recordings of Harendra Singh's telephone conversations.  Two of the recordings were brief, uneventful calls between Singh and Edward Mangano; the third was inaudible.

Thereafter, a trial date was set for March of 2018.  As that trial date approached, defense counsel inquired as to the source of such recordings, and was informed that they came from a 30-day wiretap which the Government obtained on Mr. Singh's telephone in May of 2015.  Counsel thereafter requested copies of *all* such recordings.  When the Government initially declined to

produce the recordings, the undersigned counsel indicated that he would file a motion to compel their disclosure.  On January 19, 2018, prosecutors asked defense counsel to "hold off" on filing such a motion, indicating "we may be willing to give this to you in *its entirety*." (Emphasis added). *See* email chain, attached as Exhibit O to Keating Aff.

Over the next two weeks, defense counsel continued to ask for the wiretap recordings, with no response.  After repeated requests for such material (from my own office and from my co-counsel), on February 5, 2018, one of the prosecutors wrote:

> In response to your collective request for the production of all the recordings from the Singh Wiretap, please be advised that *we don't believe the recordings constitute Rule 16 discovery*. However, the government will agree to produce *all of the recordings* to the defendants with the understanding that, to the extent you intend to use a recording for cross-examination of any witness, you provide advance notice to the government so that we may litigate the propriety of the use of such recordings. Please confirm your agreement thereto.

> *Id.* (emphasis added).

When questioned as to the legal justification for such a perplexing position, the Government merely responded:

> We are making what we think is an appropriate compromise. Let us know if you are willing to agree.

> *Id.*

We refused to accede the prosecutors' unorthodox demand for "advance notice." Thereafter, on February 12, 2018, the Government appeared to relent – producing 17 wiretap audio files labeled HSR 10-26.  Each file contained between one to four recordings, some which were voicemails or dropped calls.  Altogether HSR 10-26 contained 30 recorded telephone calls, including the three calls that were previously produced in May of 2017.

These new recordings contained unambiguous *Brady* material.  Among other things, they captured Singh telling a close friend and confidant that the Government had strong evidence of his financial crimes.  Discussing the possibility of cooperation, Singh told his friend that the Government wanted him to "tell them a story about some politician," but that in order to do so, he would have to "make shit up . . . it will be all lies . . ."

It is worth emphasizing that prosecutors *never* conceded that these recordings were exculpatory, and did not proactively volunteer to produce this material.  In fact, these initial recordings were *only* produced after counsel threatened to make a motion to compel their disclosure.  Even then, as reflected in the above email-exchange, prosecutors took the disingenuous position that such recordings were not discoverable.

On February 12th, the Government also produced HRS 1 - HSR 9, which consisted of consensual recordings made by Frederick Mei, an employee of the Town of Oyster Bay who had a long-standing, corrupt relationship with Singh, and who was cooperating at the time.  Of these nine files, six were brief phone calls or attempted calls by Mei.  The three remaining files were from in-person meetings that took place between Singh and Mei on February 10th and February 26th, 2015, which Mei recorded by means of a body-wire.

The Government represented at the time that these 39 recordings constituted the entire universe of Singh's recorded statements.

However, subsequent to the February 12th production, we discovered a reference to yet *another* recording, buried within the voluminous 3500 materials which had been produced in the run-up to trial.  The reference was contained within a typed 302 which merely stated that on March 26th, 2015, Frederick Mei was provided with a wire recorder and tasked with discovering "what Singh received in return for the job Singh provided to ED MANGANO'S wife, LINDA

MANGANO."  The 302 did not disclose what was said during the subsequent recorded meeting, and no notes relating to Fred Mei's March 26th exit interview have ever been produced.

As such, in late February 2018, we made demand for *this* recording, which was belatedly produced on February 28th – seven days before the start of trial.  *See* email correspondence attached as Exhibit P to Keating Aff.

This third consensual recording – "HSR 27" – was *stunningly* exculpatory.  As noted above, Mr. Mei was specifically tasked during this meeting with finding out what, if anything, Singh got from Mangano.  During this recorded conversation, Harendra Singh advised Mei, on three occasions, that he received *nothing* from Ed Mangano in exchange for his hiring of Linda Mangano.  This tape consisted of *Brady* material of the highest order – going to the core of the issue at trial.  It had been in the possession of the Government for nearly three years, and was produced approximately 7 days before the start of trial, only after it was discovered and explicitly demanded by the defense.  Prosecutors cited "inadvertence" for their earlier failure to produce this recording.

Following the last-minute production of this March 26, 2015 recording, the Government repeatedly represented that *all* of the recordings of Mr. Singh – including all wiretap recordings – had now been produced.  Hence, in a letter dated March 1, 2018, prosecutors unequivocally stated:

> Finally, while your letter requests production of the "entirety of the recordings retrieved during the 30-day wire-tap on Mr. Singh's phone," this has already been produced to you on February 12, 2018.  Please confirm that you have received this information.

*See* March 1, 2018 correspondence, attached hereto as Exhibit Q.

Although we relied upon these representations at the time, we have since learned that they were false.

B.      September 2018 Disclosure of Additional Consensual Recording

In the lead-up to the impending retrial, by correspondence dated August 24th, 2018, the defense made *yet another* demand for the production of all recordings of Harendra Singh. Thereafter, on September 6th, 2018, having received no response from the Government, the defense reiterated this demand.  In response, the Government advised that our demand would be addressed in the Government's opposition to our pending, pre-trial motions.   However, when the Government's opposition brief was filed, it failed to specifically address whether the Government possessed any additional recordings.  Instead, the Government merely assured the Court that it had "complied with its ongoing obligation to produce both exculpatory and impeachment material."

On the following day, the defense corresponded with the Government and *again* reiterated its demand for the production of all recordings.  On September 7th, 2018, the Government advised that there was indeed *yet another*, undisclosed consensual recording of Mr. Singh, and further advised "while it does not appear to contain any discoverable information, we are going to produce it anyway. *Our understanding* is that we don't have any other Singh recordings."   (Emphasis added).  I was frankly perplexed by this representation: either additional recordings existed or they did not. *See* correspondence attached as Exhibit R to Keating Aff.

Our review of this new consensual recording reveals that it *does* contain discoverable information.  The recording consists of a three-hour and ten-minute consensual recording made by a Singh employee on February 19th, 2015.  The conversation implicates Mr. Singh in criminal activity.  As such, the recording consists of impeachment material which the Government was required to produce *prior* to the earlier trial.

24

C.      The Government Represents to the Court That No Additional Wiretaps Exist

Troubled by the belated disclosure of yet another recording, and by the less-than-unequivocal representation in the Government's September 7th email, defense counsel raised this issue at an October 3, 2018 pretrial conference.   Consistent with its letter of March 1st, the Government made the following, unequivocal representation to the Court:

> GOVT: As far as recordings, we turned over all of the recordings that we have, all of them. *We're not qualifying this, Your Honor, we've turned over all of the recordings.*
>
> THE COURT: So you are representing that you have turned over all recordings –
>
> GOVT: Yes.
>
> THE COURT: -- that you have in this case whether you view them as *Brady* material, as whatever, you've turned them over.
>
> GOVT: Yes. And we're going to go back and look again, write the Court letter saying we've done this, so that we can put this to bed. *We have spent a lot of time going through this because of these allegations and just because we haven't written a note that says to counsel, to counsel this is Brady material doesn't mean that we don't view it as Brady or they don't view it as Brady. It's their job to figure that out. It's our job to give them the information and we've done it.*[5]
>
> THE COURT: Look, I mean I think you have an affirmative obligation to identify *Brady* material, but if you are representing to the Court that you are turning over every recording, I am satisfied with that.

*See* October 3, 2018 transcript at pp. 24-25, attached as Exhibit S to Keating Aff. (emphasis added).

---

[5]      The prosecution's comments in this regard reflect an alarmingly cavalier view of the Government's *Brady* obligations.

D.   Defense Counsel Locates a Reference in Newly Produced 3500
     To What Was Believed To Be a Previously Undisclosed Recording

As noted, in the run-up to the scheduled October retrial, the Government had recently produced a voluminous amount of never-before-seen 3500 material, pertaining to more than 50 witnesses.  On October 1st, we received another batch of this 3500 material.  Within that 3500 material was the following brief notation:

> *Agent's note: This telephone number was used by Randy Sarf when speaking to Harendra Singh during May 2015 TIII interceptions.*

> *See* 3500-PS-2, attached hereto as Exhibit F.

Initially, it was our belief that the Government had never produced *any* recordings of Randy Sarf, despite the agent's obvious familiarity with such a call.  Based on this information, defense counsel publicly filed a discovery demand on October 4th, noting what appeared to be a reference to additional, undisclosed recordings – contrary to the Government's in-court representation made one day prior.  *See* Discovery Demand, attached as Exhibit T to Keating Aff.[6]

E.   In Response, the Government Reveals 44 New Calls

The next evening, we received an email from AUSA Mirabile, which stated in relevant part:

> as we stated we would undertake at the conference, we, likewise, did another check of our records to determine if there were any additional recordings.  We have located two additional recordings, which have been marked HSR 35 (a 5/19/15 call between Singh and Joe Conway) and HSR 36 (a 5/15/19 call between Singh and Sal Russo).  Both of these recordings have been uploaded to the dropbox.  We wish

---

[6]   Mr. Sarf is a convicted felon who assisted Mr. Singh in obtaining financing.  It has subsequently been brought to our attention that *one* of the originally produced 39 recordings was, in fact, a recorded phone conversation between Harendra Singh and Randy Sarf, although Mr. Sarf was not identified during the call.  We have also learned that the Government was in possession of additional Singh/Sarf recordings which were not disclosed.  It is unclear why the Government elected to produce one such call prior to trial, while withholding the remaining calls.

to advise you that HSR 35 contains <u>Brady</u> material.  Please be advised that we have additional intercepted calls between Singh and Conway that we were unable to produce before our paralegal went home for the night but we will produce those to you, via the dropbox, tomorrow.  We are continuing to search our records and will provide any additional recordings, if such outstanding recordings are identified.

*See* October 5, 2018 email, attached as Exhibit U to Keating Aff.

The following day – Saturday, October 6th – AUSA Mirabile notified us by email as to the existence of <u>forty-four</u> additional, previously undisclosed recorded calls, including five Hindi calls which the Government had gotten translated over the weekend.

The Government's October 6th email did not reference the need for any further or additional searches – seemingly suggesting that we had *finally* received all of the calls.  *See* October 6th emails and chart at Exhibit V.

F.     The Government Reveals More than 2,000 Additional, Undisclosed Calls After Defense Counsel Threatens to Subpoena Phone Records

Nevertheless, out of an abundance of caution, defense counsel wrote to Ms. Mirabile the following email on Monday, October 8th:

Good Morning Catherine - I do not recall ever seeing Mr. Singh's cell phone records.  If you have such records, we are respectfully requesting copies so that we can cross-reference those records with the recordings produced to date.  In the alternative, please provide us with Mr. Singh's subscriber information so that we may subpoena such records ourselves.

*See* October 8th email, attached as Exhibit W to Keating Aff.

AUSA Mirabile did not respond.  However, an hour and fifty minutes later, AUSA Christopher Caffarone emailed back to ask if defense counsel was available for a call.  During the ensuing call, it was explained for the first time that in addition to the material produced by AUSA Mirabile over the weekend, the Government was also in possession of: (a) *not five*, but <u>307</u> calls of Singh speaking in Hindi; (b) 32 additional calls of Singh speaking with counsel which had not

been produced (despite Singh's written waiver of the attorney client privilege); (c) and more than 2,000 calls which, the Government claimed, had been marked as "non-pertinent."  We were informed that the Hindi calls had all been stored in a single "bucket" (separate from the non-pertinent calls), and that these calls had not been previously translated.[7]

The parties appeared before Your Honor on October 9th, at which time Your Honor adjourned trial due to the late disclosure of this massive volume of material.  On that same day, Government "sources" informed the press that the undisclosed material consisted of non-pertinent, minimized calls.  Those same sources reported that prosecutors had been unaware of the non-pertinent calls, and portrayed the Government as going "above and beyond" its disclosure requirements.  As *Newsday* reported:

> While it is unusual for the government to turn over such material, the government is giving its comprehensive files to the defense, even material it considers irrelevant and is not required to do so, to prevent possible grounds for appeal, sources said.
>
> FBI agents usually do not mention to prosecutors minimized information that the investigators believe has no bearing on a case, and they had not done so in the Mangano case until recently.
>
> *See* 10/9/18 Newsday Article, attached as Exhibit X to Keating Aff.

A review of material produced to date demonstrates that this public spin cannot be reconciled with reality.  In fact, a comparison of the "line-sheets" prepared by the agents with the material produced prior to the first trial shows that there is relatively *little* cross-over between the materials labeled as "pertinent" by the agents, and the calls actually produced by prosecutors.

In total, agents labeled 55 of Harendra Singh's calls as "pertinent."  Prosecutors only turned over 16 of those pertinent calls prior to trial – *less than* one third of the "pertinent calls."   Indeed,

---

[7]     It is unclear how or why AUSA Mirabile selected only five of these calls to produce over the weekend.

of the 30 calls that *were* turned over to defense counsel, ten had actually been labeled as *non-pertinent* by the agents, and another three had been labeled as "unknown."  *See* breakdown of produced calls at Exhibit Y to Keating Aff.

Hence, prosecutors *did not* simply produce calls which had been previously marked as pertinent – rather, they cherry picked a small portion of such calls to produce, while withholding others, and while also including calls that the agents had deemed to be "unknown" or "non-pertinent."  While it is unclear at this juncture exactly how prosecutors came to select this particular mix of calls, it is *crystal clear* that the decision-making process cannot be blamed on the agents. It is also clear that prosecutors cannot credibly maintain that they lacked access to or knowledge of the non-pertinent calls.

In addition, more than 300 of the calls captured by the wiretap were either partially or entirely in Hindi.  Such calls were labeled as having "unknown" pertinence by the agents, because they required translation. Again, to suggest that agents *never told* prosecutors that they had captured over 300 calls which needed translating is utterly preposterous.  Indeed, the very notion that prosecutors were generally oblivious as to the existence some 2,700 calls is incredible.  Among other things, prosecutors are typically charged with furnishing the Court with a detailed breakdown of intercepted calls via "ten-day reports;" presumably such reports were prepared and submitted in this case.[8]

In light of these facts, it is virtually impossible to regard the Government's repeated and unqualified assertions, made to both this Court and to defense counsel – that "*all* recordings" had been produced – as anything other than a flagrant and willful misrepresentation.

---

[8] Defense counsel has requested copies of such reports.  No response has been forthcoming from the Government.

Finally, contrary to the Government's public spin, the undisclosed calls include both *Brady* material and *Giglio* material.  Indeed, the Government expressly acknowledged as much in its October 5, 2018 email to defense counsel.  The call referenced in that email – HSR 35 – captures a call between Singh and his counsel, Joe Conway, discussing their plans to meet with the Manganos on May 19th. As the Court will recall, prosecutors portrayed this meeting as a nefarious gathering of co-conspirators, the purpose of which was to obstruct justice.

The captured recording – of which prosecutors were clearly aware – is starkly at odds with this narrative.  In it, Conway notes that "Ed" requested the meeting because Linda was anxious about her upcoming proffer with the Government.  Singh adds that the purpose of the meeting is just to calm her down and that she should simply *tell the truth* when she meets with the Government.  Conway agrees.

In addition, *many* of the withheld calls capture Singh engaged in what appears to be ongoing criminal activity with employees and family members, while others clearly relate directly to the case.  For example, the undisclosed recordings include the following[9]:

·   Multiple calls with Sal Russo, one of the primary authors of Singh's fraudulent documents, about the preparation of "new leases re: Sun Properties" and other documents for use in a potential refinancing that was being sought through one of Singh's associates.  (934, 954, 5162).  In one such call, Singh asks Mr. Russo, "Those contracts, did you get the right dates on them?"  When Russo begins to respond, Singh emphasizes the coded nature of the conversations: "No, *I'm* talking about something else."   Russo responds that he understands.  (5245).

---

[9]     Defense counsel has conducted a preliminary review of the withheld calls, with the assistance of a person fluent in Hindi.  In addition, the Government has recently produced line sheets (which contain call summaries) and a limited number of draft translations relating to these calls.  Defense counsel has signed a stipulation which prevents counsel from using the draft transcripts produced by the Government.  If the Government consents to the submission of such documents for the Court's review, counsel will provide copies.  In addition, upon request counsel can also furnish the original recordings for the Court's review.

·   A discussion between Mr. Singh and his father where the two bemoan the fact that, after all Singh has done for politicians, he received *nothing* in return.  (4076).  This call constitutes yet another example of undisclosed *Brady* material.

·   Conversations with persons in India about a payment from Lucknow (287, 288, 381) and the mechanics of transferring funds from abroad (288, 381, 2470, 2979, 5310).  At one point the calls reference the amount $79,634, which correlates to information that Robert Lobo provided to the Government in undisclosed proffer notes – *i.e.*, that Singh sold his Lucknow home, and transferred $80,000 into the United States, in order to pay the Town of Oyster Bay.

·   Conversations with his mother and father about bringing $9,500 in cash into the country on a return trip from India (2627, 2958, 3188), and about disguising money from the sale of the house as a charitable donation to the Raj & Raj Foundation, in order to avoid taxes (3832).  In one such conversation, his mom warns him to use his judgment and "don't say anything to anyone."  (2727).

·   A conversation with his father about using hawala to transfer funds into the United States through Jerry Kohli, during which his father warns that "private account and foundation account" in India are "being checked a lot."  (5599).

·   A call between Singh and Joe Conway regarding Singh's extensive arrears in terms of rent payments due to the Town of Oyster Bay under the Concession Agreements, Lenny Genova's efforts to "spin" the issue, and put off inquiries from *Newsday*, and Singh's efforts to come up with money.  (6094).

·   Conversations with Ruby Singh about the investigation, wherein Ruby and Harendra complain they are being persecuted by "racist bastards" who are jealous of Singh's success, and who get a badge in order to harass people who are not white. (4328).  During a follow up call, Singh announces that he has no respect for the American justice system, while simultaneously acknowledging that he made some "wrong business decisions" by "paying cash." (4406).

·   Discussions with Ruby about Fred Mei's cooperation with the Government (2263); in a follow up, Singh repeatedly denies having done anything wrong (2380).

·   A call during which Singh can be heard talking about the criminal investigation: "They want Mondello, they want Mangano, they want everyone . . ."  (4570).

·   Discussions with Ruby about taking money "temporarily" from the business in order to pay debts (2048).

·   Conversations about creating new corporate entities which cannot be traced back to Singh, for purposes of obtaining new loans.  (1553).

31

- Conversations about having an employee (Robert Lobo) impersonate Singh at a bank. (5512).

- Discussions with Mr. Russo about the transfer of a "bag of cash" to Kamlesh Mehta and the preparation of a personal financial statement for submission to a lender. (3512).

- Conversations with Robert Lobo about using a credit card issued in the name of John Cammarta. (1804, 1880).

- Conversations regarding the ongoing negotiations with New York City in connection with the Waters Edge, and the need to directly contact the "tall guy" (presumably Mayor DeBlasio) in order to get the issue resolved. (1954).

- A series of calls in which Singh phones multiple "massage parlors" asking "how many girls they have available tonight," which appear to co-relate to criminal conduct previously disclosed by the Government. (4390-92).

At the end of the day, there is simply no way to reconcile this massive universe of undisclosed material with the Government's repeated and *unequivocal* statements that no such material exists.  Nor is it plausible to suggest that, after two years of litigation and repeated demands, prosecutors honestly believed that they had only captured 30 calls on their 30-day wire.

As to *why* prosecutors would have chosen to conceal the existence of these calls, the answer is less clear.  At a minimum, we know that such calls included *Brady* and *Giglio* material.  In addition, it is also possible that in the immediate run-up to the original trial, with time running short, prosecutors were caught off-guard by the Defendant's request for the Singh wiretap recordings – which included over 300 Hindi calls that *they had never bothered to translate*.

This may also explain the prosecutors' unorthodox and unexplained demand for "advance notice" regarding the calls which defense counsel intended to use at trial.  Such notice would have presumably given prosecutors an opportunity to prepare their own translations of the relevant Hindi calls, and/or to assert privilege with respect to calls between Singh and his lawyers.[10]

---

[10]     Indeed, it is unclear why prosecutors would have needed such "advance notice" if they actually believed that there were only thirty calls total on the wiretap.

32

However, when defense counsel refused to agree to this limitation, prosecutors were faced with the choice of either turning over thousands of recordings – including *Brady*, *Giglio*, and the 307 Hindi recordings that had never been translated – or simply hiding the existence of such calls from defense counsel.

Regardless of the motivation, it appears clear from the record that prosecutors violated their legal and ethical obligations to furnish discoverable evidence to the defense, and thereafter made affirmative misrepresentations to both defense counsel and the Court regarding the existence of such materials.

## IV.   The Government's December 14, 2018 Disclosure of Rivkin Radler *Brady* Material

As defense counsel was working to finalize these motion papers, we received, for the first time, yet another disclosure relating to previously withheld exculpatory evidence.  In particular, on December 14th, we received never-before produced 3500 material from Peter Contino, Rivkin Radler's General Counsel.  The interview with Mr. Contino took place on September 24, 2015, and was attended by two of the AUSAs who tried the initial case.  During the meeting Mr. Contino informed the Government that the law firm possessed undated notes which had been handwritten by Bill Savino, and that those notes were "*regarding a conversation with Leonard Genova . . .* written on 8.5 x 11 sized paper."  *See* 3500-RR-1, attached Exhibit Z to the Keating Aff.

As the Court will recall, this was a hotly contested issue at trial, where the Government called Bill Savino, who testified that he had no independent recollection of either the notes or the underlying conversation, but whom *hypothesized*, based upon a series of clues written on the margins of the pad, that the conversation had been with Edward Mangano.  Trial Transcript 3397-3398.  The notes, which were entered into evidence as Government Exhibit 423, supposedly reflected Rivkin's initial briefing on the TOB concession amendment.  The issue was highly

material, because it related to the Government's claim that Mangano played a key role in soliciting Rivkin to create the June 8, 2010 TOB concession amendment.  Indeed, the Government argued that Mangano's alleged action in reaching out to Rivkin – as reflected in GX 423 – constituted "official action."

In the face of this argument, defense counsel argued stridently that Mr. Savino was mistaken, and that the notes actually reflected a conversation with Leonard Genova.  Notably, Savino had no independent recollection of Mangano's supposed role in bringing the matter to Rivkin, and Singh himself had told the Government in early proffer sessions that he "did not know for a fact why or how Rivkin was the chosen law firm" and that "Singh never spoke to Mangano about Rivkin giving their opinion."  3500-HS-27 p. 3, *see also* Trial Transcript at p. 1530.  Again, in rebuttal summation, prosecutors mocked that notion as fanciful:

> How long did Mr. Keating spend trying to convince you that these were actual notes from a conversation with Len Genova as opposed to Ed Mangano? He claims that document hardly matters and tries to convince you that he isn't worried, but he is worried. He's worried. He's worried because this document proves the lengths Ed Mangano went to get the Town of Oyster Bay to guarantee Singh's loans. This document matters. It's an important document. That's why Mr. Keating wants you to believe that Government Exhibit 423 are Bill Savino's notes from a call between Savino and Genova. . .

***

> . . . That's just absurd. To use one of Mr. Keating's favorite lines, it's ridiculous. There is no question that Ed Mangano picked up his cell phone on April 13, 2010, and called Bill Savino. And there is no question that Ed Mangano asked Bill Savino to work with the Town of Oyster Bay to find a solution, a solution to Harendra Singh's problems. There is no question and there is no doubt.

> By the way, ladies and gentlemen, this is yet another example of Ed Mangano and John Venditto's official action.

> Trial Transcript pp. 8440-8446.

34

This newly disclosed material clearly shows that the Defendant's position was *anything but* "ridiculous", and that prosecutors were actually hiding an inconsistent statement which they *knew* would have supported the Defendant's position. It shows that in 2015 – three years prior to the trial – attorneys at Rivkin (including, presumably, Mr. Savino) believed that GX 423 reflected a conversation with *Leonard Genova*. It would further appear that this position only changed after meetings with prosecutors in the immediate run up to trial.

The Government's failure to disclose such exculpatory material – while aggressively soliciting a contradictory narrative – is just the latest, troubling example in what appears to be a pattern of bad faith behavior.

## ARGUMENT

In light of the above, there is clear and unequivocal evidence that prosecutors have violated the Mangano's constitutional rights through: (1) the non-disclosure of *Brady* and *Giglio* material, and (2) their conduct in allowing (and promulgating) false evidence at trial. The law prohibiting such prosecutorial misconduct is well entrenched.

With respect to the first category of misconduct, the Supreme Court has repeatedly warned "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Kyles v. Whitley*, 514 U.S. 419, 432, 115 S. Ct. 1555, 1565, 131 L. Ed. 2d 490 (1995), *citing Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963). This obligation applies "not only to exculpatory evidence, but also to evidence that could be used to impeach government witnesses." *United States v. Orena*, 145 F.3d 551, 557 (2d Cir. 1998).

While the suppressed evidence must be "material," the Supreme has further clarified that "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles v. Whitley*, 514 U.S. at 434 (internal citations omitted).  Rather:

> [the] touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

> *Id. at 434, citing United States v. Bagley,* 473 U.S. 667, 678 (1985).

With respect to undisclosed impeachment material, such evidence is more likely to be "material" if it relates to a crucial Government witness. *United States v. Avellino,* 136 F.3d 249, 256 (2nd Cir.1998).  Moreover, the analysis ultimately "turns on the cumulative effect of all such evidence suppressed by the government" – and not of each separate item considered in isolation. *Kyles v. Whitley*, 514 U.S. at 421.

Prosecutors similarly violate a Defendant's constitutional rights where they knowingly utilize false evidence, or even allow a Government witness to testify falsely on cross examination. This is true regardless of whether the false testimony goes directly to the allegations against the Defendant, or relate merely to the credibility of the Government's witness.  As the Supreme Court has explained:

> it is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment. The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.

> The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the

> credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.

*Napue v. People of State of Ill.*, 360 U.S. 264, 269, 79 S. Ct. 1173, 1177 (1959) (internal citations omitted); *see also United States v. Bartko*, 728 F.3d 327, 335 (4th Cir. 2013) ("[D]ue process is violated not only where the prosecution uses perjured testimony to support its case, but also where it uses evidence which it knows creates a false impression of a material fact . . . Hence, evidence may be false either because it is perjured, or, though not itself factually inaccurate, because it creates a false impression of facts which are known not to be true.").

In the instant case, prosecutors flagrantly violated *both* of these constitutional proscriptions by: (1) withholding crucial, exculpatory information provided to the Government by Meredith Hughes, concerning how and why a deceased and unavailable witness, Peter Schmitt, chose to intervene in the bread and rolls contract; (2) aggressively advancing an argument to the jury which the Government *knew* to be false, in light of the undisclosed information they had obtained from Ms. Hughes; (3) eliciting false and incriminating testimony from Harendra Singh regarding the multiple versions of the "Bethpage Republican" lease, despite having been told by multiple, undisclosed witnesses that such leases were forgeries; (4) permitting Mr. Singh to lie about his purchase of properties in India, after having reviewed clear documentary evidence of such transactions, and discussing such purchases with multiple witnesses; (5) withholding thousands of undisclosed recordings of Mr. Singh, including calls containing *Brady*, *Giglio*, and otherwise pertinent discussions relating to the allegations in this case, while unequivocally representing to defense counsel and this Court that no such calls existed.

The cumulative prejudice to the Defendants has been profound and undeniable – especially as it relates to the "bread and rolls" allegations, which appear to have been the only thing standing between the Manganos and a full acquittal.

In light of this prejudice, we are respectfully asking the Court to dismiss the indictment. The Second Circuit has held that "the extreme sanction of dismissal of an indictment is justified in order to achieve one or both of two objectives: first, to eliminate prejudice to a defendant in a criminal prosecution; second, to help to translate the assurances of the United States Attorneys into consistent performances by their assistants." *United States v. Fields*, 592 F.2d 638, 647 (2d Cir. 1978).

Although dismissal of an indictment in an extraordinary remedy, we respectfully submit that nothing short of such an extraordinary remedy is capable of righting the wrong which has occurred in this case. *See United States v. Walters*, 2018 WL 6314126 (2d Cir., Dec. 4, 2018) ("the exercise of a court's supervisory authority to dismiss an indictment is a drastic remedy" which should not be employed where "means more narrowly tailored to deter objectional prosecutorial conduct are available."); *United States v. Brown,* 602 F.2d 1073, 1077 (2d Cir.) ("We have approved [the] extreme sanction [of dismissal of the indictment] only when the pattern of [prosecutorial] misconduct is widespread or continuous."), *cert. denied,* 444 U.S. 952, 100 S.Ct. 427, 62 L.Ed.2d 323 (1979). *United States v. Hogan,* 712 F.2d 757, 761-62 (2d Cir.1983) (indictment dismissed where the prosecutor's "flagrant and unconscionable" acts included presentation to the grand jury of false testimony, extensive reliance on misleading and speculative hearsay, and unsupported allegations of other criminal conduct); *United States v. Vetere,* 663 F.Supp. 381, 386-87 (S.D.N.Y.1987) (indictment dismissed where prosecutor made extensive use

of false and misleading evidence before the grand jury regarding defendant's alleged criminal background).

Indeed, there is clear precedent for the use of such an extraordinary remedy under these unusual circumstances. Specifically, in *United States v. Chapman*, 542 F.3d 1073 (9th Cir. 2008), the Ninth Circuit Court of Appeals had occasion to consider a fact pattern much like the one presented in the instant case. The defendants in *Chapman* were charged with securities fraud; in the middle of their trial, it came to light that the Government had failed to timely produced impeachment material – including past convictions – of several prosecution witnesses. The District Court, upon learning of the *Brady* and *Giglio* violations, ultimately declared a mistrial.

Thereafter, a post-trial hearing was held to determine the appropriate remedy. The District Court concluded that prosecutors had acted "flagrantly, willfully and in bad faith," and that such conduct "subvert[ed] the due process rights that the defendants are guaranteed by the Constitution" and also the "Sixth Amendment right to confront adverse witnesses." *United States v. Chapman*, 524 F.3d 1073, 1080 (9th Cir. 2008). In response to such findings, the Government asserted that the proper remedy was merely a new trial. *Id*. at 1087.

The District Court, however, recognized that such a sanction would be meaningless. The Court "noted that the government's case to date had been quite weak and that the defendants would suffer substantial prejudice if the case were retried because 'the government and its witness[es] will not make [the same] mistake[s] again.' It concluded that the government should not be permitted to 'try out its case identifying any problem areas and then correct those problems in a retrial.'" *Id.* at 1080. As such, the District Court ruled that dismissal of the indictment was the only adequate remedy.

On Appeal, the Ninth Circuit Court of Appeals affirmed.  In doing so, the Court of Appeals made clear that the dismissal of the indictment was *not* based upon Double Jeopardy concerns, because there was no evidence that the mistrial was intentionally brought about by the Government for "tactical advantage."  *Id*. at 1082.  Rather, the Court of Appeals noted that an indictment may be dismissed with prejudice under either of two theories:

> First, a district court may dismiss an indictment on the ground of outrageous government conduct if the conduct amounts to a due process violation.  Second, if the conduct does not rise to the level of a due process violation, the court may nonetheless dismiss under its supervisory powers.

*United States v. Chapman*, 524 F.3d at 1084, *citing United States v. Barrera–Moreno,* 951 F.2d 1089, 1091 (9th Cir.1991) (citations omitted).

The Court of Appeals thereafter went on to hold that under the facts of *Chapman*, the lower Court properly exercised its supervisory powers to dismiss with prejudice, where the Government's conduct was "flagrant," and evidenced a "reckless disregard for the prosecution's constitutional obligations."  The Ninth Circuit explained "[a] court may dismiss an indictment under its supervisory powers only when the defendant suffers 'substantial prejudice' and where 'no lesser remedial action is available."  As the Court went on to observe, such conditions existed in Chapman because the only other alternative – another trial – would effectively reward the prosecution's misconduct, "probably allowing it to salvage what the district court viewed as a poorly conducted prosecution."  *Id*. at 1087; *see also United States v. Aguilar*, 831 F.2d 1180 (C.D. Cal. 2011) (prosecutorial misconduct at trial warranted post-conviction dismissal of indictment with prejudice).

This Court is faced with the same situation.  The prejudice to the Defendants, as in *Chapman*, is both real and profound.  Having been forced to run the gauntlet of a federal criminal trial – a brutal, twelve-week ordeal which left the Mangano's both financially and emotionally

drained – the Defendants *now* learn that they were deprived of a fair opportunity to obtain a full acquittal, due to serious and pervasive prosecutorial misconduct.

To suggest that the appropriate sanction for the Government is, in effect, a second chance to convict the Manganos, would be nothing short of perverse.  As far as prosecutors are concerned, a retrial is no sanction at all, but rather an opportunity to correct their prior mistakes.  Under these circumstances, there is no remedy short of dismissal which is capable of eliminating the prejudice to the Defendants, or deterring future constitutional violations by the Government.

Finally, to the extent that the Court has any question as to what has transpired here, why material was not produced, or whether the Government acted in bad faith, we are asking for a full evidentiary hearing.  We are further asking that prosecutors be directed to produce to this Court, for an *in-camera* inspection, all internal Government emails, communications, and memorandum (including communications between AUSAs and investigative agents) concerning: (a) conversations intercepted *via* the Singh wire-tap; (b) the need to obtain Hindi translations for such calls; (b) the March 26th, 2015, Frederick Mei body wire recording; (c) the Government's decision to produce a limited subset of the available recordings to defense counsel; (d) Meredith Hughes; (e) overseas property owned or acquired by Harendra Singh; (f) the potential forgery of lease agreements; (g) Bill Savino's handwritten notes; and (h) potential perjury committed by Mr. Singh or any other Government witness.  Following this Court's in-camera review of such materials, we respectfully request that all relevant materials be disclosed to defense counsel in advance of any evidentiary hearing.

## CONCLUSION

Based upon the arguments set forth herein, and the evidence contained within the accompanying affirmation of Kevin J. Keating, counsel for Edward Mangano hereby moves for dismissal of the indictment with prejudice.  In the alternative, defense counsel requests a full evidentiary hearing to resolve any factual disputes arising from the instant motion.

Dated:  Garden City, New York
        December 19, 2018

                              Respectfully submitted,

                        By: /s/  Kevin J. Keating
                            Kevin J. Keating, Esq.
                            Matthew W. Brissenden, Esq.
                            *Counsel for Edward Mangano*
                            666 Old Country Road, Suite 900
                            Garden City, New York 11530
                            (516) 222-1099