CCC:CMM:LTG

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                    16-CR-540 (S-2)(JMA)

EDWARD MANGANO and
LINDA MANGANO,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

POST-HEARING MEMORANDUM OF LAW IN OPPOSITION TO
THE DEFENDANTS' POST-TRIAL MOTIONS FOR
A NEW TRIAL PURSUANT TO RULE 33(b)(1)

MARK J. LESKO
Acting United States Attorney
Eastern District of New York
610 Federal Plaza
Central Islip, New York 11722

Catherine M. Mirabile
Lara Treinis Gatz
Christopher C. Caffarone
Assistant U.S. Attorneys
    (Of Counsel)

<u>PRELIMINARY STATEMENT</u>

The government respectfully submits this supplemental memorandum of law in opposition to the defendant Edward Mangano's ("Mangano") motion, dated January 27, 2020 ("Def. Mot."), and his post-hearing memorandum, dated May 15, 2021 ("Def. Supp. Mem."), requesting a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.[1]

As set forth in more detail below, and in the government's Memorandum of Law in Opposition to the Defendants' Post-Trial Motions, dated June 5, 2020 ("Govt Mem."), the defendants' request for a new trial pursuant to Fed. R. Crim. P. 33 must be denied as the alleged "newly discovered evidence" of perjury upon which it is based is merely a distortion of trial witness Harendra Singh's post-trial deposition testimony. Indeed, contrary to the defendants' claims, Singh did not perjure himself at trial when he testified that he bribed Mangano in exchange for Mangano's pressure and assistance in obtaining the Town of Oyster Bay's guarantees of certain loans for Singh's businesses. Moreover, there is overwhelming independent evidence of the defendants' guilt. In other words, the defendants cannot establish that Singh committed perjury at trial, and, even if they did, they cannot reasonably argue that this alleged perjury reasonably affected the jury's judgment, as there is overwhelming independent evidence supporting the defendants' convictions. Accordingly, the defendants' motion for a new trial should be denied in their entirety.

---

[1] On January 30, 2020, defendant Linda Mangano ("L. Mangano") joined in the motion. (<u>See</u> ECF Dkt. No. 421). L. Mangano did not question witness Harendra Singh during the April 20, 2021 post-trial hearing (the "April 2021 Hearing"), nor did she submit a supplemental memorandum of law post-hearing.

<u>THE POST-TRIAL HEARING</u>

On April 20, 2021, this Court held a post-trial hearing; Singh was the only witness called to testify. (ECF Dkt. No. 441; Hr. T. 3-130). [2] At the hearing, Singh reaffirmed his trial testimony and clarified certain portions of his post-trial deposition statements. Specifically, at the April 2021 Hearing, Singh testified as follows with respect to his trial testimony:

> Q:    During the criminal trial, what testimony did you offer about Ed Mangano as it relates to this hearing?
>
> A:    That I bribed Ed Mangano.
>
> Q:    Why did you bribe Ed Mangano?
>
> A:    I bribed him to help me get the loan of the Town of Oyster Bay.
>
> Q:    And does that testimony remain truthful today?
>
> A:    Yes.

(Hr. T. 4:3-10; <u>see also</u> Hr. T. 4:16-6:21; TT. 1427:24-1428:10, 1428:22-1429:11). Notably, Singh reaffirmed the following trial testimony:

- When Mangano became Nassau County Executive, Mangano became a "good investment" for Singh to benefit Singh's businesses; among other items, one of the bribes Singh gave Mangano was a custom-made office chair. (Hr. T. 6:22-8:21; <u>see also</u> TT. 1452:18-1453:13);

- In late 2009, early 2010, Singh was struggling financially and was having difficulty obtaining financing to make capital improvements at the Woodlands and the Tobay Beach Concessions. As early as January 2010, Singh enlisted Mangano's assistance to convince the Town of Oyster Bay ("TOB") to guarantee loans which would enable Singh's businesses to make the required capital improvements at the Woodlands and

---

[2] "Hr. T." refers to the transcript of the April 2021 Hearing in this matter; "TT." refers to the transcript of the trial in this matter; "GX" refers to government exhibits introduced in evidence at the trial.

the Tobay Beach Concessions. Singh told Mangano that, in order to make improvements at both locations, he needed millions of dollars. In turn, Mangano spoke to TOB Supervisor John Venditto about the TOB guaranteeing the loans. (Hr. T. 8:22-11:20; see also TT. 1459:7-1461:7, 1461:14-21);

- In January 2010, Mangano arranged for Singh and Venditto to have an in-person conversation about the loan guarantees at a political event at the Crest Hollow Country Club. During that conversation, Venditto told Singh that, because Mangano requested that the TOB back Singh's loans, Venditto would "get it done." (Hr. T. 11:21-14:21; see also TT. 1463:23-1466:7);

- On April 7, 2010, via email, Jonathan Sinnreich, the TOB's outside counsel, recommended against the TOB guaranteeing Singh's loans. That email was forwarded to Singh, who panicked, realizing that it was unlikely that the TOB would agree to act as a guarantor for the loans. Singh surmised that TOB Deputy Supervisor Len Genova was the official at the TOB who had decided against the loan guarantees; thus, Singh repeatedly contacted Mangano, urging him to reach out to Venditto to ask him to fix the situation, i.e., overrule Genova and ensure the TOB guaranteed the loans. Mangano agreed to speak to William Savino, the managing partner at Rivkin Radler, a law firm at which Mangano was previously employed, as, according to Mangano, Savino would assist the TOB in arranging for Singh's loans. (Hr. T. 14:22-18:19; see also TT. 1472:19-1475:5, 1475:12-1476:5; GX 821);

- In April 2010, Singh spoke with Mangano on a nearly daily basis about the TOB guaranteeing Singh's loans; during these conversations Mangano confirmed that he had spoken with Venditto and Savino and assured Singh that the TOB would guarantee Singh's loans. (Hr. T. 24:4-26:17; see also TT. 1482:18-1484:12);

- Mangano arranged for a meeting to be held on April 28, 2010 at Venditto's campaign headquarters in North Massapequa. The meeting was attended by Mangano, Singh, Venditto, Genova, Savino, William Cornachio (another lawyer from Rivkin Radler), Fred Mei and possibly Rob Walker, the Deputy County Executive. During the meeting, loans for capital improvements at both the Woodlands and Tobay Beach were discussed. Mangano's presence at this meeting was significant. The meeting concluded with both Mangano and Venditto urging the lawyers to find an expeditious way to ensure Singh obtained the TOB-backed financing. (Hr. T. 24:18-32:7; see also TT. 1484:13-25, 1485:24-1487:6, 1487:20-1488:7, 1489:7-15, 1490:16-1491:19);

- After the hiring of Rivkin Radler and the April 28, 2010 meeting, each occurring at Mangano's direction, the Rivkin Radler lawyers found what they believed to be a solution to the loan guarantee issue, one that did not violate the New York State Constitution. Singh immediately contacted Mangano to inform him of this development; in response, Mangano stated that he was "glad [he] could [] help."

Thereafter, Singh obtained four loans, each indirectly guaranteed by the TOB, collectively totaling over $20 million. (Hr. T. 32:8-36:22; see also 1495:3-1496:18, 1499:3-1500:25); and

- During this same time-period, the Mangano family was experiencing their own financial difficulties, as, once Mangano assumed the position of County Executive, his salary was reduced by approximately $100,000. In order to make up the loss of income, Mangano pressured Singh to hire defendant L. Mangano. In April 2010, in order to ensure Mangano's assistance with all matters, including the loans, Singh began issuing paychecks to L. Mangano as a bribe. The first paycheck was issued on April 9, 2010, two days after Sinnreich counseled against the loan guarantee. Singh hired L. Mangano as a bribe in exchange for Mangano's help in obtaining the loan guarantees from the TOB. In addition, at Mangano's request, Singh issued paychecks to L. Mangano from Singh's only Queen-based business in order to conceal the origin of L. Mangano's salary. (Hr. T. 18:20-24:3; see also TT. 1477:6-1478:4, 1478:11-19, 1481:8-1482:17, 1734:6-24; GXs 465, 822, 1662).

At the April 2021 Hearing, Singh, likewise, testified about the circumstances surrounding the civil lawsuit, titled Singh v. Chopra et ano., Index No. 613462/17 (Nassau County Supreme Court), and clarified certain portions of his post-trial deposition statements. (Hr. T. 36-130). Singh initiated the civil lawsuit because of a financial dispute between himself and the defendants. (Hr. T. 36:23-37:8). He described the deposition as stressful, hostile and intimidating, and that he was angry, emotional and argumentative. (Hr. T. 50:1-14; see also Hr. T. 40:22-24).

In particular, Singh stated that the attorney at the deposition had a copy of the transcript of Singh's guilty plea and knew about Singh's testimony at the Mangano I and Mangano II trials, but, nevertheless, asked Singh questions that the attorney should have known the answers to from reading the transcripts. In response, Singh was annoyed, gave the attorney a hard time, and was purposefully argumentative. For example, Singh stated "[t]he attorney had the answer for – you know, he had my guilty plea. He had the answer. He was giving a hard time, being a wise guy, so I was being a wise guy. That is all." (Hr. T. 40:22-25; see also

Hr. T. 49:20-50:14 (angry at the deposition because attorney already knew answers to questions and could have read the transcripts; attorney gave Singh a hard time so Singh gave the attorney a hard time); 55:12-14 (attorney "was being a jerk, so [Singh] was acting [the] same way, being a jerk.")).

Moreover, Singh repeatedly confirmed that the attorney's questions during the civil deposition were imprecise and incomplete. For example, the attorney's questions focused solely on SRB Convention and Catering (the Woodlands) as opposed to both SRB Convention and Catering (the Woodlands) *and* SRB Concessions (the Tobay Beach Concessions).[3] In describing what he meant in his post-trial deposition statements, Singh stated: "Well, what – what I was trying to say, this attorney was focusing on SRB Convention. My bribe to Ed

---

[3] Indeed, Singh attempted to clarify this point at his deposition when he testified as follows:

> Q: You don't recall the whole Town of Oyster Bay loan scheme?
>
> A: Yes. The alleged loans taken from the Town of Oyster Bay.
>
> Q: Right. That had to do with SRB Convention and Catering Corp, didn't it?
>
> A: It had to do with two facilities, SRB Convention *and* SRB Concession.
>
> Q: SRB Concession Inc. that was for Tobay Beach, correct?
>
> A: Yes.

(See August 5, 2019 deposition transcript attached as Exhibit A to Govt Mem. at 192:22-193:10 (emphasis added)). Despite this clarification, the attorney at the deposition continued to limit his questions to SRB Convention and Catering.

Mangano and John Venditto and Lenny Genova and Freddy Mei was both SRB Convention, as well as SRB Concession, which was Tobay Beach." (Hr. T. 39:17-21). Singh explained that the questions posed by the attorney at the deposition continued to focus on just SRB Convention and Catering (the Woodlands) and, therefore, were incomplete questions; thus, Singh provided incomplete answers. (See Hr. T. 42:20-43:11). Indeed, when asked to reconcile his trial testimony with the principal exchange from the deposition regarding Mangano (see Govt Mem. Ex. A at 190:16-191:24),[4] Singh stated that he referred the civil attorney to transcript of his guilty plea hearing and:

> Well, what basically I was trying to tell that, listen, my bribe was both for SRB Convention and SRB Concession. He was asking question only regarding SRB Convention and also he knew the answer from my guilty plea. He knew that I bribed Ed Mangano. He knew that I bribed Ed Mangano, Lenny Genova and everyone.
>
> He was asking the question, so I believe I was giving him, you know, not a complete answer.

(Hr. T. 44:34-45:5). Singh further testified as follows:

> You know, this was a [sic] attorney who was asking not a complete question. He had the knowledge of my guilty plea. He had everything with him. He knew that what guilty plea – my guilty plea was bribing officials, as well as many other charges, and he was asking. So I was not paying attention and I was just answering whatever.
>
> I am human. I am emotional just like anybody else. I was getting angry. And I answer whatever, you know, it came in my mind without listen [sic] to the question.

---

[4] As noted in the Govt Mem., in the more than 350 pages of deposition testimony, the name Mangano appears only ten times.

(Hr. T. 49:20-50:3). In further explaining his frustration with the civil attorney at the deposition, Singh stated:

> What I was saying in there that he knew that I was – what I had pleaded guilty, who I bribed. He knew that I bribed Ed Mangano. He knew that I bribed John Venditto. He knew that the loans were for both facilities, and I had bribed Lenny Genova and Freddy Mei, and he was asking the question, so I was really giving him a answer which was, you know, probably under duress and under stress. So I just gave the answer that, Hey, listen, you have nothing to do, I'll talk to my attorney.
>
> And, you know, was it right answer? I don't know, but I was not paying any attention to him. It was a hostile environment. It was a intimidating environment. And, you know, I answered whatever came in mind at that time under the duress.

(Hr. T. 51:15-52:3). Singh's frustration continued and is evident in his continued responses to the civil attorney's deposition questions. Again, in further explaining his civil deposition testimony, Singh stated:

> Well, again, what I meant by [sic] was that he knew that what I pleaded guilty to. He knew that I bribed Ed Mangano, John Venditto and Freddy Mei and Lenny Genova to get these loans guaranteed, and he was asking the same question. So I said, Hey, you know what, I'm not going to do your homework. You go do your homework. You can read in the transcript, which is already there that I pleaded guilty to bribing public official and – and many other charges.

(Hr. T. 53:12-20).

Despite Singh's annoyance with the civil attorney and his failure to pay attention to detail at the deposition, Singh repeatedly confirmed that at no time during his deposition did he deny bribing Mangano or others. (See Hr. T. 39:25-40:2 (not denying that he committed honest services fraud or that he bribed anyone); 41:3-43:18 (bribed both Mangano and Venditto for more official action than set forth in the question); 40:3-41:2 (bribed Venditto, but noted

that the jury acquitted Venditto); 46:19-48:20 (trying to explain that NDH did not know that he bribed Mangano and Venditto, but not denying that he did, in fact, bribe Mangano and Venditto); 48:21-49:17 (doing nice things was a "fancy word for the bribe"); 53:21-54:3 (bribed Mangano, Venditto, Genova and Mei and did not deny bribing these individuals); 55:15-57:16 (bribed Genova and Mei, but noting that Genova was never charged criminally).  Notably, with respect to the principal exchange regarding Mangano from the deposition, Singh testified as follows:

> Q:    When you said on [page 191] lines 10 through 12 "It is the county.  It had nothing to do with the Town of Oyster Bay," what did you mean?
>
> A:    What I meant that [Mangano] was a county – a county official, but obviously he had influence in Town of Oyster Bay.  He was county executive.
>
> Q:    In your experience, what was your understanding of Ed Mangano's influence in the Town of Oyster Bay?
>
> . . .
>
> A:    Ed Mangano had a tremendous influence.  He was a county executive.  He was a Bethpage Republican leader.  He was a personal friend of John Venditto.  So whatever, you know, he told John did, you know, John Venditto did whatever had to be done.  So he had a tremendous influence.
>
> Q:    Were you denying that you bribed Ed Mangano in regards to the loans for the Woodlands that the Town of Oyster Bay guaranteed?
>
> A:    No, I was not.
>
> Q:    Were you denying that you bribed Ed Mangano in regards to the loans for Tobay Beach that the Town of Oyster Bay guaranteed?
>
> A:    No.

Q:      Did you bribe Ed Mangano?

A:      Yes, I did.

Q:      For what purpose?

A:      To get the loan guarantee done from the Town of Oyster Bay.

Q:      For which facilities?

A:      For Tobay Beach and Woodlands, which was Town of Oyster Bay Golf Course.

Q:      Did you bribe anyone else to make sure that that happened, the loan guarantees?

A:      Yes.

Q:      Who else did you bribe?

A:      Supervisor Venditto, Lenny Genova, Freddy Mei.

(Hr. T. 45:6-46:18).

## ARGUMENT

## THE DEFENDANTS HAVE FAILED TO MEET THEIR BURDEN
## OF SHOWING THAT THEY ARE ENTITLED TO RELIEF UNDER RULE 33

In his supplemental memorandum, Mangano claims that he is entitled to a new trial, pursuant to Fed. R. Crim. P. 33, because Singh offered perjured testimony at trial and that the perjured testimony was material. Mangano further asserts that the government knew or should have known that Singh committed perjury. (See Def. Supp. Mem. at 2-4, 18-25). In support of his claims, Mangano argues that: (i) Singh's attempts to reconcile his deposition testimony with his trial testimony are "patently incredible" (id. at 4-16); (ii) Singh lied during the April 2021 Hearing about unrelated matters (id. at 16-18); and (iii) Singh's post-trial deposition statements mandate a new trial (id. at 18-25). Mangano is wrong on all fronts.[5]

---

[5] Defendant further argues that, in his post-trial deposition statements, Singh denied bribing Venditto and other TOB officials related to the TOB Loan Scheme and, accordingly, the charges cannot stand under the Second Circuit's decision in United States v. Silver, 948 F.3d 538 (2d Cir. 2020) ("Silver II"). (See Def. Supp. Mem. at 13-16). As an initial matter, as the defendant himself notes, "none of this testimony related to [] Mangano." (Id. at 14). Moreover, just as the civil attorney's questions concerning Mangano were imprecise and incomplete, his questions relating to Venditto and other TOB officials were equally imprecise and incomplete. In any event, as Singh explained in the April 2021 Hearing, at no time during the deposition did he deny bribing Venditto, Genova or Mei as it related to the TOB Loan Scheme. (See Hr. T. 39:25-40:2 (not denying that he committed honest services fraud or that he bribed anyone); 41:3-43:18 (bribed both Mangano and Venditto for more official action than set forth in the question); 40:3-41:2 (bribed Venditto, but noted that the jury acquitted Venditto); 46:19-48:20 (trying to explain that NDH did not know that he bribed Mangano and Venditto, but not denying that he did, in fact, bribe Mangano and Venditto); 48:21-49:17 (doing nice things was a "fancy word for the bribe"); 53:21-54:3 (bribed Mangano, Venditto, Genova and Mei and did not deny bribing these individuals); 55:15-57:16 (bribed Genova and Mei, but noting that Genova was never charged criminally).

In any event, the government submits that it fully briefed the legal issues surrounding Silver II as it relates to the evidence in this case in its Memorandum of Law in Response to Defendant Edward Mangano's Motions for Reconsideration, Judgment of Acquittal and a New

Indeed, Mangano distorts both Singh's post-trial deposition statements and his April 2021 Hearing testimony in a desperate attempt to cobble together a baseless claim of perjury, and then levels additional unsupported and baseless accusations, all in an effort to overturn the jury's considered verdict, which is supported by overwhelming testimonial and documentary evidence. In sum, the defendant's arguments are meritless and should be resoundingly rejected by the Court.

I.    Legal Standard[6]

Rule 33 permits a district court to "vacate any judgment and grant a new trial if the interests of justice so requires." Fed. R. Crim. P. 33(a). Such motions, however, are disfavored in this Circuit. See United States v. Gambino, 59 F.3d 353, 364 (2d Cir. 1995). In order to grant a new trial based on newly discovered evidence of trial perjury, the defendant must first demonstrate that the witness in fact committed perjury. United States v. Monteleone, 257 F.3d 210, 219 (2d Cir. 2001) (citing United States v. Torres, 128 F.3d 38, 49 (2d Cir. 1997)). A witness commits perjury if "he gives false testimony concerning a material matter with the willful intent to provide false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory." See United States v. Dunnigan, 507 U.S.

---

Trial, dated May 22, 2020. To the extent the Court seeks additional legal briefing on this issue, the government will submit a supplemental memorandum of law at the Court's request.

[6] The defense correctly points out in its reply brief of June 22, 2020 (ECF Dkt. No. 428), that some of the cases the government cited in it response in opposition as the applicable law on the standard of review on a Rule 33 motion for a new trial were cases in which the Court was asked to make a post-trial assessment of witness incredibility, which utilizes a different standard of review than a Rule 33 motion alleging post-trial "newly discovered evidence" of witness perjury. Therefore, in order to clarify our position, the government cites the correct standard of review herein.

87, 94, (1993). "Simple inaccuracies or inconsistencies in testimony do not rise to the level of perjury." See United States v. Sanchez, 969 F.2d 1409, 1414-15 (2d Cir. 1992).

However, the inquiry does not end there. Even when a Court has determined that a witness committed perjury, the Court must then determine:

> Whether the introduction of perjured testimony requires a new trial, which depends on the materiality of the perjury to the jury's verdict and the extent to which the prosecution was aware of the perjury. With respect to this latter inquiry, there are two discrete standards of review that are utilized. Where the prosecution knew or should have known of the perjury, the conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. Indeed, if it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic. Where the government was unaware of a witness' perjury, however, a new trial is warranted only if the testimony was material and the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.

United States v. Wallach, 935 F.2d 445, 457 (2d Cir. 1991).

In sum, the defendants must establish that a witness committed perjury at trial which reasonably affected the jury's judgment, a high burden to overcome in cases where there is independent evidence supporting the defendant's conviction. United States v. Wong, 78 F.3d 73, 82 (2d Cir. 1996) (a new trial is warranted only where the testimony was material and the court is left with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted).

II.     <u>Analysis</u>

     A.     <u>Singh's Trial Testimony Was Truthful and the Deposition Testimony<br>Does Not Contradict That Testimony</u>

As an initial matter, the defense motion must fail as Singh did not commit perjury when testifying at the defendants' criminal trial and nothing in his post-trial deposition statements or his April 2021 Hearing testimony indicates otherwise. In reality, as set forth fully in the Govt Mem., Singh's testimony in <u>Mangano II</u> was truthful and corroborated by overwhelming testimonial and documentary evidence of the defendants' guilt. Notably, the defendant's opening and supplemental memoranda wholly fails to dispute, let alone even acknowledge, the overwhelming evidence of the defendants' guilt, independent of Singh's testimony, including but not limited to the fact that Singh's trial testimony about the TOB Loan Scheme was supported and corroborated by the testimony of Len Genova, Jonathan Sinnreich, William Savino, Anthony Gulino and Timothy Zike, employment records, emails, phone records, receipts, text messages, checks, photographs, Mangano's financial disclosure statements, strong circumstantial evidence and just plain common sense. (<u>See</u>, <u>e.g.</u>, Govt. Mem. at 33-46). Singh certainly did not commit perjury, and his post-trial deposition statements and his April 2021 Hearing testimony do not contradict his trial testimony or the overwhelming testimonial and documentary evidence of the defendants' guilt.

Putting aside the fact that Singh's post-trial deposition statements did not actually contradict his trial testimony, Mangano bizarrely argues that Singh committed perjury when pleading guilty to federal criminal charges and when testifying in a federal criminal trial, but told the truth in a post-trial deposition related to civil action initiated by Singh in an attempt to recover a substantial amount of money. Indeed, Mangano argues, that Singh's attempts to

reconcile his trial testimony and his post-trial deposition statements are "patently incredible." (See Def. Supp. Mem. at 3-4). The defendant is wrong. Contrary to Mangano's nonsensical allegations, Singh's explanations of his post-trial deposition statements are not "patently incredible."

At the April 2021 Hearing, Singh credibly testified that he was argumentative because he was annoyed by the fact that: (i) the attorney was asking questions the attorney should have already known the answers to; (ii) he was essentially being asked to do the attorney's "homework" for him by explaining what was in the criminal trial transcripts which the attorney had access to; (iii) the attorney's questions were imprecise and incomplete and, thus, in response, he provided incomplete answers; and (iv) as a result, he stopped paying attention to the attorney's questions. As Singh explained: "[t]he attorney had the answer for – you know, he had my guilty plea. He had the answer. He was giving a hard time, being a wise guy, so I was being a wise guy. That is all." (Hr. T. 40:22-25; see also Hr. T. 49:20-50:14 (angry at the deposition because attorney already knew answers to questions and could have read the transcripts; attorney gave Singh a hard time so Singh gave the attorney a hard time); 55:12-14 (attorney "was being a jerk, so [Singh] was acting [the] same way, being a jerk.")).

Indeed, the deposition itself supports Singh's explanations of his statements. At the deposition, Singh repeatedly told the attorney to read the related criminal transcripts, including Singh's guilty plea in which he admitted to bribing Mangano and others (see Govt Mem. Ex. A at 191:18-20, 198:8-199:2, 204:5-12, 209:9-11), and even tried to clarify for the attorney that his questions were imprecise and the TOB Loan Scheme involved both the Woodlands *and* the Tobay Beach Concessions (id. at 192:22-193:10). Moreover, contrary to the defendant's unsupported conclusions (see Def. Supp. Mem. at 11-13), the presence of a

special master and commentary amongst the deposition participants illustrates that this civil deposition was anything but civil.  (See, e.g., Govt Mem. Ex. A at 198:13-14 (when Singh referred the attorney to the related criminal transcripts without offering any additional detail, the attorney unprofessionally responded "Okay.  That's your answer, and you're sticking to it.")).

In support of his motion for a new trial, Mangano argues that Singh's interpretation of the phrase "related" to mean "related only" is not credible and, therefore, Singh's post-trial deposition statements entitles Mangano to a new trial.  (Def. Supp. Mem. at 5-9).  Again, Mangano is wrong.  While Mangano is critical of Singh's alleged failure to understand the definition of "related," he wholly fails to acknowledge that the attorney's questions during the deposition were, in fact, imprecise and incomplete and he is dismissive of the fact that Singh tried to explain to the attorney how his questions were incomplete.  (See Govt Mem. Ex. A at 192:22-193:10 (Singh explained that the TOB Loan Scheme involved both SRB Convention and Catering (the Woodlands) *and* SRB Concessions (the Tobay Beach Concessions)).  Despite this clarification, the attorney at the deposition continued to ask Singh questions limited to SRB Convention and Catering.  Thus, as Singh plainly explained, given the tenor of the deposition, he provided incomplete answers to what he considered to be incomplete questions.  While such conduct is not necessarily ideal, it is not perjurious.  Rather, it is explainable and understandable and certainly not "patently incredible" to merit overturning a jury's verdict.

Mangano further cites imprecise and non-responsive deposition testimony claiming that it proves that Singh perjured himself at trial when he testified that he bribed Mangano to assist him with the TOB Loan Scheme and posits that the jury's verdict should be

overturned because Singh provided "no coherent explanation as to what he meant when he testified that payments to [] Mangano 'had nothing to do with the Town of Oyster Bay.'"  (See Def. Supp. Mem. at 9-11).  Again, Mangano is wrong.

First, Mangano takes Singh's deposition testimony out of context.  A review of the deposition transcript reveals that the question specifically posed by the attorney limited the question to Singh's bribes of _town officials_:  "In terms of the bribery of the _town officials,_ does that relate to SRB Convention and Catering Corp?."  When Singh did not mention Mangano, the attorney asked "What about Ed Mangano?," to which Singh, correctly responded "Ed Mangano is not Town of Oyster Bay.  He is Nassau County." (See Govt Mem. Ex. A at 191:16-192:4).  There is nothing incorrect or even contradictory in Singh's response.  Indeed, Mangano would be the first person to say that he was not a _town official_, and Singh never testified at the criminal trial that Mangano was a _town official_.

What is notable—and what Mangano fails to acknowledge—is that, in contrast to the April 2021 Hearing, Singh was never asked relevant follow up questions at his deposition.  For example, while Singh correctly stated that Mangano was technically a Nassau County official, the civil attorney never asked Singh a single question about Mangano's relationship with the TOB or John Venditto or even Mangano's influence in the TOB and its officials.  It was not—and is not—incumbent on a witness in a deposition to volunteer information when not asked a particular question.  The fact that the questioner at the deposition lacked an understanding of the TOB Loan Scheme, failed to ask coherent and precise questions, and failed to ask relevant follow up questions does not, thus, merit a new trial for the defendant.

Nothing pointed out by the defense proves that Singh testified inconsistently with his trial testimony.  To the contrary, as noted in the Govt Mem., what is clear from Singh's

deposition testimony is that: he admitted that he bribed Mangano (<u>id</u>. at 190-91); he never denied that one of his reasons for bribing Mangano was to obtain Mangano's assistance with the TOB Loan Scheme; and he continually referred the questioner back to his guilty plea and trial testimony thus reaffirming that one of his reasons for bribing Mangano was so that Mangano would use his official position to advise and pressure the TOB to back his loans. (<u>See</u> Govt Mem. Ex. A at 191, 198, 200, 204; Ex. B at 17; Ex. C at 309-10, 313-14). In sum, Singh reaffirmed his trial testimony at the April 2021 Hearing, his depositions statements are not inconsistent with his trial testimony, and, thus, the defendant is not entitled to a new trial.

Critically, the defendants proffer no evidence, new or otherwise, that Singh lied at trial. As the April 2021 Hearing made clear, the post-trial deposition testimony cited by the defendants does not support the claim that Singh testified the bribes paid to Mangano were unrelated to the TOB Loan Scheme, therefore, the defendant's motion for a new trial must be denied.

B. <u>Singh Did Not Commit Perjury at the April 2021 Hearing</u>

In an attempt to further besmirch Singh's credibility, Mangano levels baseless, unsupported accusations that Singh lied during the April 2021 Hearing. Specifically, Mangano claims that Singh lied to the Court when: (i) he was asked if he held himself out as a consultant in the restaurant industry; and (ii) he claimed that his failure to information the government about his civil deposition was not intentional but, rather, an oversight on his part. (<u>See</u> Def. Supp. Mem. at 16-18). Mangano's accusations are without merit, suffer from pure speculation and conjecture, and should be resoundingly rejected.

Aside from being immaterial (and arguably cumulative impeachment evidence elicited at trial), Mangano offers no actual evidence that Singh violated his bond conditions.

17

Moreover, Singh did not deny that he possibly held himself out as a consultant in order to assist his son in purchasing a copy machine for a restaurant. In fact, Singh testified that he "may have said that." (Hr. T. 98:5-8). Under no competent reading of Singh's testimony could one conclude that he denied possibly holding himself out as a consultant of a restaurant in connection with the purchase of a leased copy machine. Further, Mangano has no evidence whatsoever supporting his contention that Singh's failure to inform the government of his civil deposition was intentional. His claims are pure supposition and speculation.

At bottom, Mangano's argument that Singh lied at the April 2021 Hearing on these two points, and that these "lies" are evidence that Singh is not credible and, thus, he committed perjury at the criminal trial is utterly nonsensical and should be rejected.

C.   Singh's Post-Trial Deposition Statements Do Not Mandate a New Trial

Simply put, Singh's post-trial deposition statements are not "newly discovered evidence" mandating a new trial. Quite the contrary. As set forth in the Govt Mem., as established during the April 2021 Hearing, and as discussed in detail above, Singh did not perjure himself at trial and his post-trial deposition statements—in response to incomplete, imprecise questions—did not contradict his trial testimony. The inquiry, thus, stops there, and Mangano's continued claims that Singh perjured himself at trial, and that the government knowingly suborned that perjury (see Def. Supp. Mem. at 18-25), should be resoundingly rejected.

Notably, each of the "salient points" that Mangano claims Singh lied about at trial (and that he claims the government knew or should have known were lies) is corroborated by testimonial and documentary evidence wholly independent of Singh's testimony. Specifically,

- With respect to the timing and purpose of Singh's hiring of L. Mangano in April 2010 (i.e., that Singh hired L. Mangano as a bribe to ensure Mangano's assistance with the TOB Loan Scheme), the undisputed documentary evidence shows that L. Mangano's first paycheck was issued on April 9, 2010, two days after Sinnreich counseled against the loan guarantee, and that L. Mangano's paychecks were issued from Singh's only Queen-based business, a clear effort to conceal the origin of L. Mangano's salary. (GXs 465, 822, 1662; see also GXs 328, 1663). Moreover, evidence that L. Mangano's paycheck was a bribe is further evidenced by the fact that the paycheck was for a "no show" job. This was overwhelming established, independent of Singh, by the testimonial evidence of Joseph Scalise (TT. 198-258), Melissa Evwiehor (TT. 289-374), Paul Evwiehor (TT. 374-447, 455-78), Jan Guarino (TT. 3336-68), Lisa Graham (TT. 3368-82), John Stevens (TT. 3382-3463), George Feis (TT. 3464-3507), Tara Baglietto (TT. 3531-64), Karen Dellago (TT. 3375-90), David Salony (TT. 3390-3490), and Michael Landesberg (TT. 3704-41).

- The fact that Mangano enlisted Rivkin Radler in order to find a solution to the loan guarantee issue was established, independent of Singh, by the testimony of William Savino, the managing partner at Rivkin Radler himself. (TT. 2838-2938; GX 423). Indeed, William Savino testified in detail about a 12-minute April 13, 2010 conversation with Mangano; and phone records corroborated the communications between Savino and Mangano. (TT. 2864-65; GXs 423, 999, 1102). During the 12-minute conversation, Mangano essentially hired Savino on behalf of the TOB and provided Savino with specific information about Singh and the TOB loan guarantee issue, which Savino summarized in contemporaneous notes, demonstrating that Mangano had a strong understanding of what Singh required and the relevant issues. (TT. 2845, 2859-61; GX 423). Savino's notes include reference to multiple concession agreements, capital improvements in the millions of dollars, and the TOB's desire to be a "guarantor" for Singh, without violation the New York State Constitution's prohibition preventing municipalities from lending their creditworthiness to individuals. (TT. 2859-61; GX 423). Further, TOB Deputy Supervisor Len Genova also testified that Mangano was the one who requested Rivkin Radler's assistance in finding a resolution to the loan issue. (TT. 2978-83).

- The fact that Mangano arranged for the April 28, 2010 meeting at Venditto's office was established, independent of Singh, through the testimony of Genova, who confirmed that Venditto advised him (Genova) that Mangano had asked Venditto to set up a meeting between TOB officials and Rivkin Radler in order to facilitate the loan guarantees. (TT. 2984-85; see also GX 713 (email from Singh to Mangano requesting that Mangano schedule a meeting with Venditto to discuss the loan guarantees)).

- The fact that the TOB's (indirect) guarantee of Singh's loans would never have happened without Mangano's official action was established, independent of Singh, through the testimony of Genova and Sinnreich. For his part, Sinnreich testified that

he raised serious concerns about the legality of the loan guarantees and informed Genova and other TOB officials of his concerns. (TT. 2738-40, GXs 807, 817, 822). Ultimately, on April 7, 2010, via email, Sinnreich recommended against the TOB guaranteeing the loans. (TT. 2745-46; 2976, GX 822). Similarly, Genova testified that, as a result of Sinnreich's advice, the TOB was inclined not to guarantee Singh's loans. (TT. 2978-80). Genova further testified that Venditto called him and informed him that, although he (Genova) had previously decided against the loan guarantees, Venditto was overruling that decision at Mangano's request. (TT. 2980-81; see also TT. 3184, 3277). Moreover, both Genova and Sinnreich testified that, during the April 28 meeting, wherein loans for both the Woodlands and Tobay Beach were discussed, Mangano's presence at the meeting was significant. (TT. 2749-53, 2987). Sinnreich explained that Mangano was at the meeting to encourage the TOB to back Singh's loans. (TT. 2751-53 ("He contributed by his presence, obviously, and he contributed by stating his encouragement . . . to try to find a way to resolve the problem."). Genova testified that Mangano welcomed everyone to the meeting and told the meeting members, in sum and substance, to "get this done" for Singh. (TT. 2986-88). The meeting concluded with both Mangano and Venditto urging the lawyers to find an expeditious way to ensure Singh obtained the TOB-backed financing. (TT. 2987-89).

Mangano wholly ignores this independent testimonial and documentary evidence in his continued and fervent distortion of Singh's proffer and post-trial statements and his claims of perjury.

Moreover, if anything is "patently incredible," it is Mangano's claims that Singh must have lied in February 2019 at the criminal trial and told the truth at an August 2019 civil deposition. Even assuming, arguendo, that Singh's August 2019 civil deposition testimony contradicts his trial testimony (which it does not), it would seem more likely that Singh would have provided false testimony at a civil deposition in an attempt to obtain money than he would have in a criminal proceeding in which he pled guilty to federal criminal charges that will likely restrict his physical liberty for years to come.

Further underscoring Mangano's nonsensical position is Singh's post-trial deposition statements about Fred Mei. It is undisputed that after each of the four loans were completed, Singh gave Mei cash as a bribe ($10,000 after the first two loans, and $25,000 after

the second two loans).  Singh testified to those bribes at Mangano's criminal trial.  (TT. 1541:16-1541:20).  However, similar to Singh's responses to questions related to Mangano and Venditto, at the deposition, Singh did not specifically state that be bribed Mei after each TOB-backed loan.  Rather, when asked if he bribed Mei, Singh was nonresponsive and replied "Frederick Mei was a nobody."  (See Govt Me. Ex. A at 207:20-208:3).  When asked if he pled guilty to bribing Mei, Singh responded: "I may have.  I don't know.  I have to look.  We have to look at the transcript."  (Id. at 209:5-11).  Is Mangano actually claiming that Singh told the truth about Mei at the criminal trial but lied about Mei at the deposition, while at the same time lying about Mangano at the criminal trial and telling the truth about Mangano at the civil deposition?  This position is illogical and, quite frankly, "patently incredible."

The government submits that the defense failed to prove that Singh committed perjury at trial; thus, the Court's inquiry should stop there.  However, even if the Court found that Singh committed perjury at trial, the defendants cannot prove that the purported perjury was material to the jury's verdict nor that the prosecution was aware of the perjury.  Try as they might, the defense fails to prove that the government knew or should have known of the alleged perjury, regurgitating the same tired and unpersuasive argument that Singh's statements as detailed in the 3500 material are proof that the government was on notice of Singh's perjury as opposed to recognizing that they are merely proffer statements made in an attempt to protect Mangano.

In short, the defendants have utterly failed to proffer any evidence, new or otherwise, that Singh lied at trial. Equally clear is that the overwhelming testimonial and documentary evidence introduced at trial, irrespective of Singh's testimony, demonstrated the defendants' guilt.  As noted in the Govt Mem., these facts are devasting, irrefutable proof of

the illegal quid pro quo relationship and the Manganos' obstructive conduct. As the defendants

have fallen far short of meeting their high burden, their motion for a new trial must be denied.

<u>CONCLUSION</u>

For the foregoing reasons, and those set forth in the government's Memorandum

of Law in Opposition to the Defendants' Post-Trial Motions, dated June 5, 2020, the

government respectfully submits that the defendants' post-trial motions seeking a new trial

should be denied in their entirety.

Dated: Central Islip, New York
June 4, 2020

Respectfully submitted,

MARK J. LESKO
Acting United States Attorney
Eastern District of New York

By:     /s/ _____
Catherine M. Mirabile
Lara Treinis Gatz
Christopher C. Caffarone
Assistant U.S. Attorneys
(631) 715-7900

cc:     Clerk of the Court (JMA) (By ECF)
All Defense Counsel (By E-mail)