UNITED STATES DISTRICT COURT                          <u>For Online Publication Only</u>
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
UNITED STATES OF AMERICA,                        **FILED**
                                                 **CLERK**
       -against-                  2:57 pm, Jan 06, 2022        <u>**MEMORANDUM &**</u>
                                                                             <u>**ORDER**</u>
                                             **U.S. DISTRICT COURT**          16-CR-540 (JMA)
                                     **EASTERN DISTRICT OF NEW YORK**
EDWARD MANGANO, and                       **LONG ISLAND OFFICE**
LINDA MANGANO,

                   Defendants.
--------------------------------------------------------------------X
**AZRACK, United States District Judge:**

      The first trial of Defendants Ed Mangano ("Mangano") and Linda Mangano ended with a hung jury and a mistrial. After the mistrial, the government disclosed to the defense interview notes, emails and other electronically stored information, as well as numerous additional recordings from a wiretap of cooperating witness Harendra Singh. None of these materials had been disclosed to the defense prior at the first trial. Defendants maintain that these disclosures contain <u>Brady</u> and <u>Giglio</u> material and also establish that the government knowingly introduced and permitted perjury at the first trial. Mangano also learned, after the first trial, of Meredith Hughes, an allegedly exculpatory witness, who could potentially provide favorable testimony to Mangano concerning the Bread and Rolls Contract. A government agent had interviewed Hughes in early March 2018, but the government did not disclose, to the defense, her name or the substance of her statements to the agent.

      A month before the second trial was scheduled to begin, Mangano filed a motion that sought dismissal of the indictment based on alleged prosecutorial misconduct concerning the newly disclosed and discovered evidence. Linda Mangano joined that motion. Defendants argued that the retrial they were already receiving was an insufficient remedy for this allegedly egregious

prosecutorial misconduct because the government's failure to disclose this evidence irreparably prejudiced them.  In support of this argument, Defendant argued that:  (1) the acquittal of co-defendant John Venditto and the hung jury showed the case against them was weak; (2) the Court should rely on a Newsday article which states that the jury was likely to acquit Linda Mangano of all charges and had already decided to acquit Mangano of bribery concerning the TOB Loan Scheme and the OEM Contract; and (3) permitting a retrial would be inappropriate as it would only reward the government's misconduct and give them an opportunity to refine and correct the flaws in its case from the first trial.  Defendants also sought discovery and an evidentiary hearing into the government's alleged misconduct.

The Court denied the motion to dismiss and request for an evidentiary hearing in a short order prior to the second trial, which indicated that an opinion would be forthcoming.  At the second trial—which began only eight months after the first trial ended—Defendants had all of the newly disclosed materials at their disposal and mounted a vigorous defense.  Mangano was ultimately convicted of the bribery offenses concerning the TOB Loan Scheme and was acquitted of all the bribery charges concerning the Bread and Rolls Contract and OEM Contract.  Mangano and Linda Mangano were both convicted of conspiracy to obstruct justice and Linda Mangano was also convicted of obstruction of justice and making false statements.

Defendants' motion focuses on four topics:  (1) the wiretap and body recordings of Singh; (2) the government's failure to disclose Hughes and the statements she made to the agent who interviewed her; (3) undisclosed interview notes from Peter Contino, the General Counsel of Rivkin Radler; and (4) two aspects of Singh's trial testimony, which, according to Defendants, was shown to be false by materials that the government possessed, but which were only disclosed to the defense after trial.

When the Court denied Defendants' motion to dismiss in February 2019, it did so based on the record that existed prior to the second trial. However, because this opinion is being issued after the conclusion of the second trial, the Court has also noted, where relevant, how the events of the second trial have further confirmed the Court's decision to deny the motion.

## A.  Standard

### 1. Brady/Giglio

Brady v. Maryland, 373 U.S. 83 (1963), Giglio v. United States, 405 U.S. 150 (1972), and their progeny:

> require[ ] that the government disclose material evidence favorable to a criminal defendant.  Evidence is favorable if it is either exculpatory or impeaching, and it is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. The defendant need not show that the suppressed evidence would have resulted in an acquittal. Rather, a conviction must be reversed upon a showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

United States v. Rowland, 826 F.3d 100, 111–12 (2d Cir. 2016) (citations and internal marks omitted).  The materiality analysis "turns on the cumulative effect of all . . . evidence suppressed by the government." Kyles v. Whitley, 514 U.S. 419, 421 (1995).

Under Brady and Giglio, "[a]n individual prosecutor is presumed . . . to have knowledge of all information gathered in connection with his office's investigation of the case and indeed 'has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.'"  United States v. Avellino, 136 F.3d 249, 255 (2d Cir. 1998) (quoting Kyles, 514 U.S. at 437)).  A Brady or Giglio violation occurs even if the government's suppression of the evidence in its possession was "inadvertent[]." Banks v. Dretke, 540 U.S. 668, 691 (2004).

However, evidence "is not considered to have been suppressed within the meaning of the Brady doctrine if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that evidence." Rowland, 826 F.3d 100, 113 (2d Cir. 2016) (quoting United States v. Paulino, 445 F.3d 211, 225 (2d Cir. 2006)) (internal quotation marks omitted).

For Giglio claims, when "ample ammunition exists to attack a witness's credibility," suppressed evidence that would have "provide[d] an additional basis for doing so is ordinarily deemed cumulative and hence immaterial." United States v. Orena, 145 F.3d 551, 559 (2d Cir. 1998).

## 2. Standard for Dismissing an Indictment Based on Prosecutorial Misconduct

"Dismissal of an indictment due to prosecutorial misconduct is appropriate 'only in very limited and extreme circumstances' in which 'there [is] a need either to eliminate prejudice to a defendant in a criminal prosecution, where it [is] impossible to do so by imposition of lesser sanctions, or to deter a pattern of demonstrated and longstanding widespread or continuous official misconduct." United States v. Nordlicht, No. 16-CR-00640, 2019 WL 235640, at *2 (E.D.N.Y. Jan. 16, 2019) (quoting United States v. Broward, 594 F.2d 345, 351 (2d Cir. 1979)). This "'extreme sanction'" and "'drastic remedy'" is "appropriate only when it is otherwise 'impossible to restore [the] defendant to the position that he would have occupied vis-a-vis the prosecutor' or when there is a 'widespread or continuous" pattern of prosecutorial misconduct.'" United States v. Halloran, 821 F.3d 321, 342 n. 14 (2d Cir. 2016) (quoting United States v. Fields, 592 F.2d 638, 647 (2d Cir. 1978)).

Generally, in order to warrant dismissal of an indictment, the prosecution must engage in "egregious and deliberate" misconduct or act flagrantly, willfully, and in bad faith. See United

States v. Espinal, 96 F. Supp. 3d 53, 71 (S.D.N.Y. 2015) (concluding that "the extraordinary remedy of dismissal of the indictment [was] not warranted" because the court did not "believe the government acted flagrantly, willfully, or in bad faith"); United States v. Reyes, No. 88-CR-1006, 1989 WL 99806, at *4 (S.D.N.Y. Aug. 18, 1989), aff'd, 904 F.2d 34 (2d Cir. 1990) ("The dismissal of an indictment is an extreme sanction that may only be used when there has been egregious and deliberate governmental misconduct[.]"); United States v. Kohring, 637 F.3d 895, 912–13 (9th Cir. 2011) (denying, without any hearing, request to dismiss indictment for Brady violation involving thousands of documents disclosed after trial where there was insufficient "evidence to conclude the prosecution 'acted flagrantly, willfully, and in bad faith,'" and noting that conduct that is "'negligent, or even grossly negligent' is generally not sufficient");; United States v. Amaya, 750 F.3d 721, 727–28 (8th Cir. 2014) (affirming denial of request for dismissal of indictment based on discovery violation where the court found that the government did not act in bad faith); United States v. Dvorin, 817 F.3d 438, 453–54 (5th Cir. 2016) (affirming district court's denial of additional sanctions for the prosecution's Brady and Napue violations and explaining that "[g]enerally, a district court will not impose severe sanctions . . . where the government's discovery violations were not committed in bad faith" and that the new trial defendant received "obviate[ed] most of the prejudice involved").

Additionally, the prosecutorial misconduct must prejudice the defendant to such a degree that dismissal, rather than other remedies, is warranted. The standard remedy for a Brady violation is vacatur of the judgment of conviction and a new trial in which the defendant will have the Brady material available to him. Halloran, 821 F.3d at 342 n.14 (finding that even if alleged Brady violation had occurred dismissal of indictment would not have been an appropriate remedy). While, in certain circumstances, Brady violations may justify dismissal, courts routinely find that

a new trial is sufficient  See, e.g., United States v. Porchay, 651 F.3d 930, 941–42 (8th Cir. 2011) (affirming denial of motion to dismiss indictment—in case where first trial ended in acquittal on one count and hung jury on remaining counts and second trial ended in mistrial as a result of Brady violation—because the "the delayed disclosure did not prejudice" the defendant since she "became aware of [the material] in time to use it for impeachment purposes" at her third trial); United States v. Babiar, 390 F.3d 598, 599–600 (8th Cir. 2004) (finding that new trial was a full and adequate remedy for Brady violation and that the defendant failed to show that his ability to present a defense and receive a fair trial was prejudiced).  As the D.C. Circuit has explained, dismissal of an indictment for a Brady violation is only warranted where "the lingering prejudice of [the] Brady violation has removed all possibility that the defendant could receive a new trial that is fair" and dismissal, which "is appropriate only as a last resort," must be employed because "no other remedy would cure [the] prejudice against a defendant."  United States v. Pasha, 797 F.3d 1122, 1139 (D.C. Cir. 2015).

The Court assumes that a lesser showing of prejudice could be sufficient if a court concludes that there was egregious prosecutorial conduct and that sanctions were necessary to deter "a pattern of demonstrated and longstanding widespread or continuous official misconduct."

In contending that there is sufficient misconduct and prejudice here to warrant dismissal of the indictment, Defendants rely heavily on United States v. Chapman, 524 F.3d 1073, 1085 (9th Cir. 2008), where the Ninth Circuit found that the district court did not abuse its discretion in dismissing an indictment after the finding that the prosecution engaged in "flagrant misbehavior" that resulted in a mistrial due to Giglio violations.  The district court, which noted that the government's case was "quite weak," refused to permit a retrial, reasoning that such a "remedy would advantage the government" and "probably allow[] it to salvage . . . a poorly conducted

prosecution" with "myriad weaknesses" that the government would seek to correct at a second trial.  Id. at 1080, 1087.

**B.  Overview**

Here, even assuming that certain Brady or Giglio violations have occurred, Defendants had all the newly disclosed and discovered materials in their possession in advance of the second trial.  And, they were able to use all of this material as they saw fit at the second trial, which began only eight months after the first trial ended in a mistrial.  At the second trial, there was no "lingering prejudice" from the government's failure to disclose any of this evidence earlier—Defendants' second trial was fair and their claims of prejudice are unavailing.  While the Court examines in depth each of Defendants' claims below, this critical, overarching point, bears on all of Defendants' claims.  Ultimately, none of Defendants' claims, when considered both individually and collectively, involve egregious prosecutorial misconduct or have prejudiced Defendants in a manner that would warrant dismissal of the indictment.

With respect to Defendants' reliance on Chapman, the Court finds that decision from the Ninth Circuit to be distinguishable.  I find that the government's case here was not weak and its conduct was not flagrant and egregious.  While it is true that the prosecution will have the ability to make changes to its case whenever there is a second trial, a defendant, of course, also gains critical insights from a trial that ends with a hung jury, which can be used bolster his defense.  The fact that the prosecution has an opportunity—as it does in any retrial—to make changes to its case does not render the retrial unfair.

Turning now to Defendants' specific claims, the Court addresses each in turn beginning with the wiretap and body recordings of Singh as this issue provides an opportunity to recount the relevant procedural history of this case.

**C.  <u>The Singh Recordings</u>**

Due to certain errors made by agents and the prosecutors' lack of sufficient diligence, the government failed to disclose, prior to the first trial, a number of recordings of Singh.  The bulk of these favorable recordings involve cumulative impeachment evidence and, thus, do not constitute a true <u>Giglio</u> violation.  While the Court assumes that one recording—involving Singh's lawyer, Joe Conway—is material under <u>Brady</u>, it is clear, given the circumstances, that the government's failure to disclose this recording, which was privileged when it was intercepted, was inadvertent.  Moreover, given that the prosecutors' failures to disclose the Conway call and the other potentially relevant calls at issue were the result of inadvertent errors, the Court finds that dismissal of the indictment is clearly not warranted.

**1.  Events Leading Up to the First Trial**

The first trial was scheduled to begin on March 12, 2018.  This was a sprawling and complex case.  During this years-long investigation and prosecution, the government conducted hundreds of interviews, issued more than 800 grand jury subpoenas and obtained approximately two million pages of documents, and more than approximately four terabytes of electronic information.  (Gov't Opp'n Mem. at 2, ECF No. 343.)  During the ten weeks of testimony at the first trial, the government ultimately called approximately 60 witnesses.

The first trial was scheduled to begin on March 12, 2018.  At a pretrial conference on February 7, 2018, the Court ordered the government to begin producing 3500 material on February 20, 2018 and required that briefing on motions <u>in limine</u> be completed between February 21, 2018 and February 28, 2018.  (<u>See also</u> Gov't Opp'n at 18 n.14, 20–21.)  There were extensive motions <u>in limine</u> and other motions filed by the parties.  In addition to the disclosure of the 3500 material,

the government also produced other voluminous discovery beginning in November 2016.  (See Gov't Opp'n Mem. at 5–8; Id. Ex. 1.)

### i. *The Singh Wiretap*

One aspect of the government's production concerned a 30-day wiretap of Singh's phone that the government had conducted in the Spring of 2015.  Prior to the pretrial conference, the defense had threatened to bring a motion to compel disclosure of the wiretap recordings.  The government responded by asking defense counsel to "hold off on the motion" and indicated that "[w]e may be willing to give this to you in it's entirety."  (ECF No. 339-18.)

On January 23, 2018, defense counsel had asked if the government had made a determination about "the entirety of the 30 day wire."  (ECF No. 339-18.)  The government responded that "[w]e are still discussing the possible production of the wire recordings."  (Id.)  On January 31, 2018, defense counsel again inquired about the "production of the entire Singh wiretap."  (Id.)

On February 5, 2018, the government informed defense counsel:

> In response to your collective request for the production of all the recordings from the Singh Wiretap, please be advise[d] that we don't believe the recordings constitute Rule 16 discovery. However, the government will agree to produce the all the recordings to the defendants with the understanding that, to the extent you intend to use a recording for cross-examination of any witness, you provide advance notice to the government so that we may litigate the propriety of the use of such recordings.

(Id.)  Defense counsel refused to agree to this proposal.  (Id.)

Then, on February 18, 2018, the government produced 17 audio files from the wiretap on

Singh's phone, containing a total of 30 recorded telephone calls.[1]  (Keating Affirm. ¶ 22.)  Some of the recordings were "voicemails or dropped calls."  (Id.)  Three of the recordings had previously been disclosed to the defense in May 2017 as the government believed that these three recordings were between Singh and Mangano.  (Id.; Gov't Opp'n Mem. at 18.)

One of the recordings disclosed on February 18, 2018 was the telephone call between Singh and Roger Paganuzzi in which Singh said that the government wanted him to "tell them a story about some politician," but that in order to do so, he would have to "make shit up . . . it will be all lies . . ."  (Keating Affirm. ¶ 23.)  Defendants used this recording at trial.

In a March 1, 2018 letter, defense counsel again demanded "the production of the entirety of the recordings retrieved during the 30-day wire tap on Mr. Singh's phone."  (ECF No. 176.)  Later that same day, the government responded with a letter stating that "while your letter requests production of 'the entirety of the recordings retrieved during the 30-day wire-tap on Mr. Singh's phone,' this has already been produced to you on February 12, 2018.  Please confirm that you have received this information."  (ECF No. 178.)

The prosecutors maintain that, in this letter and their other communications with defense counsel, they were only referring to the "pertinent calls" from the wiretap.  (Gov't Opp'n at 21; Mirabile Aff. ¶ 5; Gatz Aff. ¶.)  Defense counsel did not inquire into whether this production also included non-pertinent calls and, prior to the conclusion of the first trial, never asked any questions about the obviously small number of recordings from a 30-day long wiretap of Singh.  (Mirabile Aff. ¶ 5–6.)  While the prosecutors should have been clearer on this point, given all of the

---

[1]  As discussed infra, the prosecution would eventually, after the first trial, disclose additional recordings from this wiretap.  While the defense claims that the government engaged in intentional misconduct, as the government points out, it "produced the exact same recordings to the defendants [in February 2018] as it had produced to Singh in January 2016."  (Gov't Opp'n at 19.)  That fact weighs in favor of the prosecution's claim that the various deficiencies in the government's production of the recordings discussed below were not a result of deliberate misconduct.

circumstances, the Court finds that the prosecutors' actions here were not unreasonable and that they did not intentionally misrepresent what they produced to defense counsel. The prosecutors' belief that defense counsel was only asking for the calls from wiretap that monitoring agents had deemed pertinent or relevant was reasonable. As the government correctly notes, that "understanding is also reasonable in light of the law's concern with protecting the privacy rights of the person whose calls are being intercepted," particularly since the intercepted calls at issue all involved third-parties speaking with Singh. Gov't Opp'n Mem. at 44; see S.E.C. v. Rajaratnam, 622 F.3d 159, 169 (2d Cir. 2010) (noting that "there is a distinct privacy right against the *disclosure* of wiretapped private communications that is separate and apart from the privacy right against the *interception* of such communications"). Additionally, the prosecution's statements must also be considered in light of the fact that "non-pertinent intercepted calls of one defendant generally are not produced to a different defendant." (Gov't Opp'n Mem. at 45.)

Additionally, the Court also finds that the prosecution believed, at the time, that they were, in fact, producing all the "pertinent calls" from the wiretap. (Gov't Opp'n Mem. at 19.) However, as discussed infra, that turned out to be an erroneous belief. Due to various errors, these 30 calls did not actually constitute the entire universe of "pertinent" calls. Those additional calls, which were not disclosed until after the first trial, are discussed further below.

### ii.  *The Mei Recordings of Singh*

On February 12, 2018, the government produced nine consensual recordings that Fred Mei had made of meetings and telephone calls he had with Singh from early 2015. (Keating Affirm. ¶ 24.) These were the same nine consensual recordings that had been produced to Singh on October 9, 2015 and in January 2016. (See Gov't Opp'n Mem. at 17—18.) According to Mangano's

counsel, "the Government represented . . . that these 39 recordings [30 from the wiretap and 9 from Mei] constituted the entire universe of Singh's recorded statements."  (Keating Affirm. ¶ 25.)

After the disclosure of the nine Mei recordings, the defense reviewed a typed 302 in Mei's 3500 material, which indicated that, on March 26, 2015, Mei was provided with a wire recorder and tasked with discovering "'what Singh received in return for the job Singh provided to ED MANGANO'S wife, LINDA MANGANO.'"  (Id. ¶ 25.)  The 302 did not disclose what was said during the subsequent recorded meeting.  (Id. ¶ 25.)

The defense subsequently made a demand for this recording, which the government disclosed on February 28, 2018.  (Id. ¶ 26.)  This recording of the March 26, 2015 meeting between Singh and Mei is the recording in which Singh states, inter alia, that Mangano did "nothing" for him and that Singh "lost money" on Linda Mangano.  Prosecutors cited "inadvertence" for their failure to disclose the recording earlier.  (Id. ¶ 27.)  The defense did not seek a continuation of the trial and the March 26, 2015 recording would be an important aspect of Mangano's defense at trial. (Id. ¶ 27.)

As the defense had the March 26, 2015 recording in advance of the first trial and relied extensively on the recording at trial, Defendants do not have a cognizable Brady claim concerning this recording.  Nevertheless, in this motion to dismiss, Mangano suggests that the government's actions in connection with the March 26, 2015 recording still constitute prosecutorial misconduct and are both a reason to dismiss the indictment as well as proof of the government's broader bad faith and intentional misconduct concerning the wiretap recordings and the failure to disclose other material prior to the first trial.  The Court, which previously considered and rejected a claim of

misconduct in connection with this recording, rejects Mangano's claim of misconduct here.[2]

### iii.  The Government's *Giglio* Letter

Prior to the start of trial, on March 9, 2018, the government sent defense counsel a letter

disclosing impeachment information concerning Singh, which recounted that, inter alia:

> Singh engaged in schemes to fraudulently under-report to federal and state tax authorities the true amount of money his business entities earned and the wages he paid his workers, thereby dramatically lowering the federal and state taxes that Singh and his business entities owed and paid. Singh also filed false and fraudulent individual and corporate tax returns to both the Internal Revenue Service and the New York State Department of Taxation and Finance.

> Throughout the years, Singh engaged in bank, wire and mail fraud, by providing false financial information to various banks and lenders in order to obtain various lines of credit, loans and equipment leases[;]

> Singh forged, or had others forge on his behalf, various documents, including but not limited to: (a) loan applications indicating that he owned Sun Properties, LLC, which was, in fact, owned by his father, Rajesh Singh; (b) Rajesh Singh's signature on loan documents; (c) Ruby Singh's signature on loan documents; (d) Frank Nocerino and John Venditto's signatures on a concession agreement related to Tappan Beach; and (e) a sign permit approval from the Town of Oyster Bay for a TD Mobile store owned and operated by Ravinder (Jerry) Kohli[;] while out on bail on his federal criminal case, Singh submitted and caused to be submitted, over interstate wire transmissions, false and fraudulent documents in support of a credit application in violation of Title 18, United States Code, Section 1349, in direct

---

[2]  Mangano used this recording at the first trial and did not raise any issue about the production of this recording until Mangano requested a curative instruction in response to an argument made in the government's rebuttal summation. In connection with this proposed curative instruction, Mangano asserted that the government intentionally tried to hide the March 26, 2015 recording from the defense before trial. (Tr. 8462–72.) The Court considered and rejected defense counsel's request for an instruction and claim of misconduct, explaining that "if [they] wanted to hide something you wouldn't have gotten it in the 302" which indicated that Mei was tasked with making a recording concerning the Mangano. (Transcript of First Trial at 8469–8570.) The Court also considered this issue further after the first trial in light of the arguments made in Defendants' Motion to Dismiss and still concludes, given all the circumstances, that the government's failure to disclose of this recording was inadvertent and, thus, neither warrants sanctions nor constitutes evidence of any broader bad faith or misconduct the by government.

Relatedly, the Court notes that, during the second trial, Mangano objected to the government's presentation of the March 26, 2015 recording and renewed the defense's prior request for dismissal based on alleged misconduct. (2019 Tr. 1528–31.) Mangano also requested, in the alternative, an instruction to the jury informing the jury: (1) "what the government did with regard to this recording"; and (2) the first trial ended in a mistrial and that the government changed their strategy. (2019 Tr. 1531–37.) The Court denied this request at sidebar and in a subsequent written decision. (Tr. 1537; ECF No. 369.)

violation of his conditions of release[;] [and] Singh altered, attempted to alter, and instructed his employees to alter, documents [in connection with various litigation].

(ECF No. 343-2.)  The government also produced notes and reports from 24 interviews of Singh concerning crimes that Singh committed.  (Gov't Opp'n Mem. at 10.)

## 2.  The First Trial

The first trial began on March 14, 2018 and lasted ten weeks.  The jury began deliberating on May 18, 2018.  On May 24, 2018, John Venditto was acquitted of all charges.  The jury deliberated through May 31, 2018 on the charges against the Manganos, but did not reach a verdict on any of those counts.  The Court declared a mistrial on all the charges against the Manganos.

The Manganos claim that in light of Venditto's acquittal and the hung jury, the government's failure to disclose <u>Brady</u> and <u>Giglio</u> material prior to the trial first prejudiced them and deprived them of a chance at acquittal.  The Manganos rely heavily on a Newsday article about the deliberations during the first trial—for which five jurors were reportedly interviewed—in their attempt to establish prejudice.  According to this Newsday article, the jury had unanimously decided against convicting Mangano on the bribery charges concerning the TOB Loan Scheme and the OEM Contract, but was 11-1 in favor of conviction on the Bread and Rolls Contract. (Nicole Fuller, "Mangano Corruption Mistrial:  What Went on in the Jury Room, Newsday, June 3, 2018 (hereinafter "Newsday Article", ECF No. 339-3.)  According to the article, one juror—the foreman who told Newsday that he personally believed the Manganos were innocent—reported the jury was "more split" on Ed Mangano, which contrasted to the 11-1 breakdown cited by other jurors in article.  (<u>Id.</u>)  While the article also states that "Linda Mangano was likely cruising toward an acquittal," one juror is quoted as saying that although he had, at some point, switched his vote on Linda Mangano to "not guilty," on the "morning of [the mistrial ruling], [the jury] got the evidence of the call logs, and [he] was thinking of changing it back to guilty again."  (<u>Id.</u>)

14

The Court does not believe that it is appropriate to consider this hearsay newspaper account of jury deliberations in determining whether the defendants have been prejudiced.  In any event, even if it is appropriate for the Court to consider this newspaper article and the Court were to credit the statements in the article, the Court would still find that defendants have not established prejudice that would warrant dismissal of the indictment here.

### 3.  Lead-Up to the Second Trial

The retrial of the Manganos was scheduled to begin in mid-October of 2018.  After the lengthy and complex first trial, the prosecutors voluntarily re-examined their entire case file and directed the case agents on the case to do the same.  (Gov't Opp'n at 45.)  The government proceeded to disclose additional notes and reports from interviews of more than 100 individuals who were not expected to be called at trial, but "who may have said anything about the Manganos or the facts at issue."  (Id.)  These voluntary disclosures provided Defendants with a substantial amount of new information.  Defendants' motion to dismiss the indictment—which claims that the prosecution acted in bad faith, and engaged in intentional and repeated misconduct—relies extensively on these disclosures.

In an August 24, 2018 letter, defense counsel reiterated a demand for production of any Brady and Giglio material.  In this letter, defense counsel also requested, for the first time, that they be permitted to "mirror each of the hard drives/and or servers seized by the Government" when a search warrant was executed on Singh's business.  (ECF No. 339-21.)  On September 6, the government agreed to this request and, on September 12, the government produced a mirrored copy of the information seized, which included approximately four terabytes of compressed information.  (ECF No. 339-21; Gov't Opp'n Mem. at 6 n.7.)  Defendants' instant motion also relies extensively on materials found on the mirrored hard drive/server.

Defendants also requested—in both their August 24 letter and in a September 6 follow-up email—that the government produce any other consensual or wiretap recordings of Singh. (Keating Affirm. ¶ 29; ECF No. 339-21.)   On September 6, in an opposition brief to the Defendants' pretrial motions, the government reiterated that it had complied with its ongoing obligations to produce exculpatory evidence and impeachment material.  (Id.)

On September 7, the defense again demanded any other recordings of Singh.  (Id. ¶ 30; ECF No. 339-21.)   That same day, the government produced an additional three-hour-long consensual recording of Singh made by Sal Russo, a Singh employee.  (ECF No. 339-21.)  The government also informed defense counsel that "[o]ur understanding is that we don't have any other Singh recordings." (Keating Affirm. ¶ 30; ECF No. 339-21.)  The recording made by Russo implicated Singh in a fraudulent tax scheme involving sales taxes, which was cumulative of other impeachment material previously provided by the government.  (Keating Affirm. ¶ 30; ECF No. 339-21; see Gov't Opp'n Mem. at 22.)

On October 3, 2018, the parties appeared before the Court for a pretrial conference to address various issues.  At the time, jury selection was scheduled to begin on October 16, 2018. During the pretrial conference, the parties discussed the recordings of Singh.  Defense counsel explained:

> Singh was on the wiretap for 30 days, it's a 30-day wiretap. I ask if there are any other wiretap recordings beyond those disclosed. Because those disclosed, they're not of great quantity, they are just not, maybe they were minimized, maybe Singh for this period of time oddly wasn't on the phone, that would be odd for Singh but who knows. So I'm asking, are there more wiretap recordings that weren't disclosed? Are there more body wire recordings that weren't disclosed?

(Oct. 3, 2018 Tr. at 24.)  This appears to be the first time defense counsel raised the quantity of the recordings or referenced "minimized" calls. Then, the following exchange about the recordings occurred:

16

GOVT: As far as recordings, we turned over all of the recordings that we have, all of them. We're not qualifying this, Your Honor, we've turned over all of the recordings.

THE COURT: So you are representing that you have turned over all recordings –

GOVT: Yes.

THE COURT: -- that you have in this case whether you view them as Brady material, as whatever, you've turned them over.

GOVT: Yes. And we're going to go back and look again, write the Court letter saying we've done this, so that we can put this to bed. We have spent a lot of time going through this because of these allegations and just because we haven't written a note that says to counsel, to counsel this is Brady material doesn't mean that we don't view it as Brady or they don't view it as Brady. It's their job to figure that out. It's our job to give them the information and we've done it.

THE COURT: Look, I mean I think you have an affirmative obligation to identify Brady material, but if you are representing to the Court that you are turning over every recording, I am satisfied with that.

(Oct. 3, 2018 Tr. at 24-25 (emphasis added).)

On October 4, 2018, the defense filed another written demand for recordings, noting the number of recordings obtained by the government during this 30-day wire "appear small in number." (ECF No. 339-23.) This letter also noted that one piece of newly disclosed 3500 material referenced a recording that the defense believed had never been produced by the government. (ECF No. 339-23; Keating Affirm. ¶ 33; see also Mot to Dismiss at 26 n. 6, ECF No. 339.)

In accordance with their representation to the Court at the October 3 conference that they would go back and look further into the issue of the recordings, prosecutors sought to confirm that they had, in fact, produced all pertinent calls from the Singh wiretap. (Gov't Opp'n at 22.)

On October 5, prosecutors discovered one additional wiretap recording between Singh and Sal Russo that had inadvertently not been produced to either Singh or defendants. (Gov't Opp'n at 22.) That same day, prosecutors also located calls between Singh and his attorney Joe Conway

17

that had not been located with the original recordings produced by prosecutors because the recordings involving Conway were, originally, given to a privilege team to review and the calls had been marked as privileged.  (Id. at 22–23.)  Prosecutors immediately disclosed two of the calls along with draft transcripts of the calls.  (Id. at 23.)  The next day, the government produced the remaining seven intercepted calls that had been marked as privileged.  (Id. at 23.)

One of recordings disclosed on October 5 was a May 19, 2015 call between Singh and Joe Conway[3]  (2019 Tr. 1583, 2019 GX267A; ECF No. 339-25.)[4]

In furtherance of the prosecutors' efforts to investigate the matter of the Singh recordings, one of the prosecutors requested that the FBI agents provide her with a disc containing the pertinent calls from the Singh wiretap so she could compare the disc with the calls that had been produced. (Mirabile Aff. ¶ 7.)  After comparing this disc to the calls that had previously been disclosed, the prosecutor discovered 37 calls that had been marked pertinent, but which had not been produced and immediately produced them.  (Id. ¶.)  Thirteen of those calls were inaudible, partially

---

[3]  The relevant portion of this call contains the following exchange:

> Conway:  Yeah, Yeah.  What are we doing tonight?
>
> Singh:  Just, I guess, he wants to talk to you, and you know, I think it's more a calming situation.
>
> Conway:  Yeah, yeah.  He mentioned it to me last week when I saw him and I said, yea, you want me to talk to [Linda], let me know.
>
> Singh:  Yeah, it's mostly that and I think she should go there very calm and cool and don't answer too much.  Sometimes she had a tendency to talk too much and, you know, and that can, you mean well, but that can get yourself in trouble for no reason.
>
> Conway:  Yeah, exactly, exactly.
>
> Singh:  You know, and there's nothing there.  You know, there is nothing there.  I've never done anything, you know, so you know, I think she should be as honest as possible and . . . you know, . . . and then we'll do whatever they want to do with it.

(2019 GX267a.)  Later that day, Singh, Conway, and the Manganos would meet at Mangano's house.  The next day, May 20, 2015, Linda Mangano would attend her first proffer session with the FBI.

[4]  Unless otherwise noted, all references to the "Tr." and exhibits herein refer to the transcript and exhibits from the first trial that occurred in 2018.  Citations to the transcript and exhibits from the second trial held in 2019 are delineated with a reference to "2019" in the citation.

inaudible, or contained scheduling information.  (Gov't Opp'n at 23.)  Five of the 37 calls that had

been marked pertinent were in Hindi or partially in Hindi.  (Id. at 23–24.)  Prosecutors provided

the defense with summaries of four of those calls that had been translated by an FBI linguist over

the weekend—the remaining Hindi call had not been translated.  (Id. at 23–24; Keating Affirm. ¶

35.)

Prosecutors endeavored to understand why there was a discrepancy between the calls in

their possession and those on the disc from the agents.  (Gov't Opp'n Mem. at 24.)  Prosecutors

learned that, during the course of the wiretap investigation, one agent had provided the prosecutors

with calls that the agent mistakenly believed were "pertinent" when, in fact, the agents who were

actually monitoring the wire and intercepting these calls had marked these calls as "non-pertinent"

or "unknown."  (Id. at 24.)  Because the prosecutors mistakenly believed that these calls were

pertinent, the prosecutors had previously produced certain "non-pertinent" calls to the defense

believing that the calls were, in fact, pertinent.  (Id. at 24.)

Prosecutors also learned that, out of the 409 calls that contained at least some Hindi,

translations for 76 of these calls had not been completed, and that a number of calls had been

identified by agents as "unknown" and never classified as "pertinent" or "not pertinent."  (Gov't

Opp'n Mem. at 24.)  A number of the calls in Hindi appear to concern additional criminal activity

by Singh.  (See Mot. to Dismiss at 30–32, ECF No. 339.)

In light of these discoveries, the government ultimately agreed to produce all of the

remaining calls from the wiretap including the more than 2,000 calls that had been identified by

agents monitoring the wire as "non-pertinent," as well as the additional calls that agents had simply

classified as "unknown." On October 9, 2018, the government produced a total of 2,789 calls.

Approximately 400 of the 2,789 calls produced were defective and therefore contained no content

whatsoever.  In order to assist Defendants with their review of these recordings, the government voluntarily produced the contemporaneous summaries of the undisclosed calls, summaries of over 300 Hindi calls, and agreed to produce full transcriptions of the Hindi calls to the extent that the government was able to obtain transcriptions in advance of trial.  (Gov't Opp'n Mem. at 32.)

Defendants point out that, on September 8, defense counsel informed the government that he intended to obtain Singh's phone records to confirm that all calls had now been produced. (Keating Affirm. ¶ 36.)  Two hours later, prosecutors contacted defense counsel to see if they were available to speak.  (Id. ¶ 37.)  According to defense counsel, during this call, prosecutors first disclosed that they were also in possession of:  (1) 307 calls of Singh speaking in Hindi; (2) 32 additional calls in which Singh was speaking to his counsel; and (3) over 2,000 calls which had been marked as "non-pertinent."  (Id. ¶ 37.)  According to defense counsel, prosecutors also informed defense counsel during this discussion that the calls in Hindi had been stored in a single "bucket" separate from the non-pertinent calls and that the calls had "not been previously translated."  (Id. ¶ 36.)

While Defendants contend that this timing is suspicious and that the government only produced these recordings because Defendants threatened to subpoena Singh's records, the Court disagrees as the prosecutors were clearly engaged in an ongoing review after the October 3 pretrial conference and during the busy run-up to the start of the retrial.

Defendants also argue that the "prosecutors do not deny that they were aware that [the] untranslated [Hindi] calls existed. And without translations, the Government certainly could not honestly represent that such calls were non-pertinent."  (Mangano Reply Mem. at 11. ECF No. 344.)  The Court, however, accepts the prosecutors' representation that, during their review, they "learned that" only 76 Hindi calls had not been translated.  (Gov't Opp'n Mem. at 24.)  The notion

that the prosecutors made a conscious choice to leave 76 calls untranslated when the government had already translated over 300 Hindi calls makes little sense.[5]  Moreover, this point is ultimately irrelevant because, as explained below, none of the untranslated Hindi calls ended up being material under Brady or Giglio and, of course, the defense had the ability to use any of these calls at the second trial.

### 4. Analysis

As recounted in Defendants' motion, a number of the undisclosed recordings contained favorable material.  However, that alone is insufficient to establish that any of these undisclosed recordings were actually "material" under Brady and Giglio.

Moreover, even if the failure to disclose certain recordings constituted a Brady or Giglio violation, the prosecutors did not act in bad faith and engage in flagrant and willful misconduct concerning the recordings that would possibly warrant dismissal, rather than a retrial here.  The government's failure to disclose the recordings stemmed from sloppiness and various errors by the agents.  Prosecutors should have been more diligent to ensure that this did not occur.  However, the prosecutors' actions simply do not rise to the level of misconduct that would warrant dismissal of the entire indictment, the only sanction that Defendants sought in this motion.

---

[5] Defendants insist, based on their telephone conference with prosecutors, that over 300 Hindi calls had "not been previously translated."  (Keating Affirm. ¶ 37.)  However, the government represents that "translations of" only "76 of the 409 calls that contained at least some Hindi had not been completed."  (Gov't Opp'n Mem. at 24.)  It appears that the government had already translated over 300 Hindi calls because, as the government notes, Defendants were given "summaries of over 300 Hindi calls."  (Gov't Opp'n Mem. at 32.)  Presumably, these calls were "translated" by agents or linguists fluent in Hindi who listened to these calls and who then prepared the summaries for these 300 calls. The prosecutors' statements on the telephone conference with defense counsel appear to have been in reference to the fact that the government did not obtain "full transcriptions" for over 300 Hindi calls.  (Gov't Opp'n Mem. at 32; see also id. at 33 ("To date, the government has produced transcripts from 100 calls containing Hindi.").)  It would have been helpful if the briefing from both parties on this issue had been more precise.

With the respect to the May 19, 2019 recording involving Conway, even assuming <u>arguendo</u> that the failure to disclose this call was a <u>Brady</u> violation,[6] the failure to disclose this call was clearly inadvertent.  The prosecutors' failure to disclose this call—which is the most favorable of all the newly disclosed recordings—is easily explained by the fact that this call was designated as privileged when it was intercepted, and such privileged calls are routinely segregated.  There is not a colorable argument that the prosecutors intentionally suppressed this Conway call such that dismissal would be warranted here.  It is also notable that, while Defendants attempt to make much of the fact that the government only disclosed certain calls after defense counsel threatened to subpoena Singh's phone records on September 8, the government disclosed this Conway call <u>before</u> September 8, which further undermines Defendants' claims of impropriety.  Because the prosecution's failure to disclose the Conway call was not in bad faith and did not involve flagrant and willful misconduct, dismissal of the indictment is clearly not appropriate.

Mangano also contends that the failure to disclose the May 29, 2015 recording between Singh and his father was also a <u>Brady</u> violation.[7]  The Court disagrees.  This is not "material"

---

[6]   While certain aspects of this call are helpful to the defense, it is also notable that, on the call, Singh tells Conway "I've never done anything"—an obvious lie—and also advises Conway that Linda should not "answer too much. Sometimes she has a tendency to talk too much and, you know, . . . you mean well, but that can get yourself into trouble for no reason."  (2019 GX267A.)

[7]   The relevant portion of this call contains the following exchange:

> Singh's Father:  A lot of your time was wasted in Politics etc.  You entertained so many and showed generosity . . . and you never know:
>
> Singh:  An politics came to bite me in the ass, in the end, politics, Politics is really bad.
>
> Singh's father:  And, and you did not say no to anybody . . . "Bravo Bravo" and then what you did need them they cannot do it anything.
>
> Singh:  No, no, nobody.
>
> Singh's father:  De Blasio, I mean he is too busy, he couldn't help you, you know?  You raised lot of money, spent lot of time for him, these politicians the same thing . . . .

(2019 GX 269A).

exculpatory evidence and, in any event, Mangano clearly did not suffer prejudice that would warrant dismissal of the indictment. On its face, this recording is patently incredible—the notion that "nobody" ever did anything for Singh in return for his "generosity" is absurd. More importantly, Singh already had the March 26, 2015 recording made by Mei, which was much more helpful to Mangano's defense. Given that the jury at the first trial heard both the March 26, 2015 recording and the recording involving Roger Paganuzzi, there is not a reasonable probability that the introduction of the May 29, 2015 recording with Singh's father—which was less helpful than the other two recordings—would have led to a different result at the first trial. Additionally, the events of the second trial further confirm that this recording was not material under <u>Brady</u> and that even if this was a <u>Brady</u> violation, the absence of this recording from the first trial did not create prejudice sufficient to warrant dismissal of the indictment. Singh was also defrauding his father— a fact that came out at both trials—and, in addressing the recording at the second trial, Singh explained that he did not disclose that fraud or other crimes to his father. (2019 Tr. 1590–93.) Moreover, during summation at the second trial, defense counsel not only stressed that Singh defrauded and lied to his father, but defense counsel never even mentioned the May 29, 2015 call, which confirms its minimal value to the defense. (2019 Tr. 3872, 3883–84.) Finally, the government's failure to disclose this recording was not a result of flagrant and willful misconduct, rendering dismissal unwarranted.

The various other newly disclosed recordings Mangano cites generally involve additional impeachment evidence. Defendants, however, already had a wealth of impeachment evidence at the first trial which defense counsel used to cast doubt on Singh's credibility during Singh's lengthy cross-examinations. (<u>See</u> <u>also</u> Gov't Opp'n Mem. at 33, 35.) The additional and cumulative impeachment evidence in these undisclosed recordings was not "material" and did not

rise to the level of a true <u>Giglio</u> violation.[8]  <u>See</u> <u>Orena</u>, 145 F.3d at 559 ("where ample ammunition

exists to attack a witness's credibility, evidence that would provide an additional basis for doing

so is ordinarily deemed cumulative and hence immaterial").

It is also notable that, with the exception of the May 19, 2015 call with Conway and the

May 29, 2015 call with Singh's father, the only other recordings explicitly referenced at the second

trial—out of the thousands of calls the government disclosed after the first trial—were two calls

in which Singh said favorable things about Joe Conway.  (Tr. 2110–11.)  Defense counsel briefly

referenced these calls in an attempt to rebut Singh's testimony that he lied to Conway during this

call and that Singh was concerned about Conway sharing information because Conway

representing multiple people.[9]  (Tr. 1587–88.)

As the discussion above makes clear, the prosecutors' failures to disclose the Conway call

and the other potentially relevant calls at issue were the result of inadvertent errors, and dismissal

of the indictment of the indictment is clearly not warranted.

## D.  <u>Meredith Hughes</u>

### 1.  **The Evidence at Trial Concerning the Bread and Rolls Contract**

At trial, the government argued that Mangano intervened, on Singh's behalf, in order to

ensure that Singh's bakery was awarded the Bread and Rolls contract for the Nassau County jail.

---

[8]  As explained earlier, the Court does not believe it is appropriate to rely on the Newsday article discussing the jury deliberations.  To the extent that this article should be considered, it is notable that, in the article, one juror states that he was not going to "take anything [Singh] said at face value."  (ECF No. 339-3.)  This same juror, however, was also apparently still voting to convict Mangano on the Bread and Rolls Contract and also indicated that, on the morning when mistrial was declared, he was—despite his view of Singh's credibility—also thinking of changing his vote on Linda Mangano "back to guilty again."  (<u>Id.</u>)  Those points only further confirm that any of the additional impeachment evidence cited in the motion to dismiss concerning Singh would not have mattered.

[9]  While it may be difficult to discern from the face of the trial transcript the extent to which defense counsel used any other recordings to formulate their cross-examinations for the second trial, it does not appear that the other newly disclosed recordings that were not explicitly referenced at trial played an important role in Singh's cross-examination.

The Nassau County Purchasing Department sent their recommendation on the Bread and Rolls Contract, which was worth approximately $200,000, to the Legislature for its approval on April 11, 2012.  (Tr. 6403.)  The Purchasing Department recommended that the contract be awarded to the incumbent Rockland Bakery, a large commercial bakery, which had submitted a lower bid, by a few hundred dollars, compared to Singh's bakery.  (Tr. 6406.)

In addition to Singh's testimony about his conversations with Mangano concerning the Bread and Rolls contract, Rob Walker—Mangano's second-in-command—made an extraordinary visit to the Purchasing Department on May 7, 2012 to personally inquire about the purchasing department's determination that the contract should be awarded to the Rockland Bakery over Singh's bakery.  (Tr. 6451–55.)  Walker was also involved (along with County Attorney John Ciampoli, Chris Ostuni, and others) in multiple emails that began circulating in early June 2012 and which ultimately culminated in the Purchasing Department changing its recommended award.  (Tr. 6359–6375.)  These emails made Michael Schlenoff, the head of the Purchasing Department, "very uncomfortable" as he felt he was being pressured to change the award.  (Tr. 6368, 6371, 6438.)  Schlenoff ultimately relented in an email to Walker (which cc'd Ostuni, Ciampoli and others) and directed his staff to analyze the bids in a different fashion, which now resulted in Singh's bakery being awarded part of the contract.  (GX1209.)  Singh's bakery would eventually be awarded the entire contract after the Rockland Bakery declined to accept only a portion of the contract.

Chris Ostuni, the Majority Counsel at the Legislature, played a substantial role in the June 2012 email exchanges concerning the Bread and Rolls Contract.  Ostuni worked under Peter Schmitt, the Majority Leader and Presiding Officer of the Nassau County Legislature.  (Tr. 6403, 6436.)  Schmitt, who died before trial, had a policy of pushing local vendors from Nassau County

when possible.  (Tr. 6404–05, 6436.)  Singh's bakery was located in Massapequa, which was Schmitt's district.  (Tr. 6407.)  In one of the emails concerning the Bread and Rolls Contract, Ostuni wrote that he is "being difficult on this issue," but "as per the instruction of the Presiding Officer, all of these issues must be addressed prior to the" Legislature's consideration of the contract.  (GX1208.)  Defendants did not call Ostuni to testify at trial.

In addition to relying heavily on Walker's involvement and Singh's testimony, the government also introduced phone records which showed a 24-minute phone call on April 22, 2012 between Mangano and Schmitt.  The government cited these phone records in an attempt to show that the interference with the award of the Bread and Rolls contract was initiated by Mangano and not Peter Schmitt.  (Tr. 6924, 7955, 8495.)

At trial, defense counsel:  (1) attacked Singh's testimony about the Bread and Rolls Contract as incredible; (2) argued that Schmitt, and not Mangano, was the cause of all of the pressure being put on Schlenoff; and (3) stressed the fact that Mangano was not even on any of the emails.  (Tr. 8122–8143.)

### 2. The Parties' Interviews of Ostuni and Meredith Hughes

On September 7, 2016, two prosecutors and two agents interviewed Ostuni.  According to the 302 memorializing this interview, Ostuni stated:

> The proposed Rockland Bakery contract was stamped and sent to the Legislature for review. When the contract arrived, Ostuni met with PO Peter Schmitt. Schmitt was aware that San Remo Bakery, a local business, had also bid on the contract and he intended to advocate for the local business. Ostuni and Schmitt observed that there was only a $600 difference in the bids from San Remo and Rockland Bakery. . . . Schmitt was the Legislator representing Massapequa and it was very clear to Ostuni that Schmitt was not going to move the contract for Rockland Bakery, that it would be a dereliction of his duties to award the contract to a Nanuet business over a Massapequa business. Ostuni stated Schmitt was adamant over a local preference and that the situation with Rockland/San Remo was unique. This was the first time bids had ever been so close  . . . . At Schmitt's direction, Ostuni did a great deal of research about potential challenges to giving the contract to San Remo.

26

> Schmitt said he would have cancelled the contract rather than wave off the San
> Remo bid. Ostuni did not find this unusual to at the time.

(ECF No. 344-2.)

When asked during this interview about the June 2012 emails involving himself, Walker, and others, Ostuni recalled having a conversation with Walker prior to the emails, "but he could not recall the precise details, except that Walker had no real interest in the contract and left Ostuni to fight it out with the Purchasing Department." (Id.)

The government disclosed the Ostuni 302 to the defense prior to trial. On March 1, 2018, Ostuni was interviewed by AUSA Lara Treinis Gatz and Special Agent ("SA") Michael Cassidy, who had been present for the 2016 interview. (Cassidy Aff. ¶ 3.) AUSA Gatz was not one of the two prosecutors who attended the 2016 meeting with Ostuni. During the March 1, 2018 meeting, Ostuni informed the government that he had been interviewed by Mangano's counsel, who had also served him with a trial subpoena and advised him that he was likely to be called as a defense witness at trial. (Id.) During the March 1, 2018 interview, Ostuni mentioned that his colleague Meredith Hughes had been present for a meeting in 2012 during which Ostuni and Peter Schmitt had discussed the Bread and Rolls Contract. (Id.)

Between March 1 and March 2, SA Cassidy called Hughes and left her a voicemail. (Id. ¶ 4.) The next day, Hughes returned the call and she and SA Cassidy spoke on the phone "for a few minutes." (Id.) SA Cassidy recalled that, during this "brief conversation," "[he] inquired about the 2012 Bread and Rolls Contract" and that "Hughes's responses largely dovetailed with Mr. Ostuni's statement." (Id.) At the conclusion of the conversation, SA Cassidy advised Hughes that she might receive a call from one of the prosecutors assigned to the case, but none of the prosecutors ended up contacting her. (Hughes Aff. ¶ 10.)

The government did not disclose, to the defense, Hughes's identity or the substance of Hughes's call with SA Cassidy.  (Keating Affirm. ¶ 4.)  Defense counsel's affirmation states that he "learned of [Hughes's] existence through other sources, and first interviewed her in September of 2018."[10]  (Id.)

Hughes was the Deputy Majority Counsel and served with Schmitt and Ostuni.  After defense counsel interviewed her in September 2018, she provided the defense with an affidavit stating the following:

> I recall in approximately early May 2012, I reviewed the bid package for the Nassau County Jail Bread and Rolls Contract. I recall the timeframe to be early May, 2012, as the Rules Committee was scheduled to meet on May 7, 2012, and it would be customary for me to review bid packages at least five days before a scheduled Rules Committee meeting, so that I could be prepared to brief Mr. Schmitt on the contents of a bid package.

> [] I recall that for the Bread and Rolls bid package, the Purchasing Department recommended that the contract be awarded to Rockland Bakery, located in Rockland County, New York. I additionally recall that the second place bidder was San Remo Bakery, and they were located in Nassau County. I further recall that San Remo Bakery was located in Massapequa, the district Mr. Schmitt represented. And, I recall that the bid price difference between Rockland Bakery and San Remo Bakery was extremely small, approximately several hundred dollars.

> [ ] I specifically recall meeting in Mr. Schmitt's office with Mr. Schmitt and Christopher Ostuni to discuss contracts eligible for the Rules Committee meeting and bringing to Mr. Schmitt and Mr. Ostuni's attention these findings. It was clear to me that Mr. Schmitt, prior to my briefing concerning these findings, had no prior knowledge of these facts. Mr. Schmitt made clear in that meeting that he wanted Mr. Ostuni to look into these matters, and that every effort should be made to ensure that the contract, if possible, be awarded to San Remo Bakery.

> [] In the Spring of 2018, . . . . I received a telephone call from Federal Agent Michael Cassidy. This was the first contact I had received from any member of Federal law enforcement concerning this matter. In the telephone conversation,

---

[10]  The Court assumes that defense counsel did not actually learn of Hughes until after the first trial.  That said, it is notable that the affirmation submitted by defense counsel on this point does not say exactly when or how defense counsel learned of Hughes (and never explicitly states that he first learned of Hughes after the first trial) .  Defense counsel also did not provide (for even in camera review) any details of his pretrial interview of Ostuni—where defense counsel clearly had an opportunity and incentive to learn about Hughes.  Additionally, defense counsel also never states whether, prior to the conclusion of the first trial. he met again with Ostuni.

> Agent Cassidy inquired of my role in the Bread and Rolls contract, and the roles of Peter Schmitt and Christopher Ostuni. In this telephone conversation, I advised Agent Cassidy of my role in this matter as set forth herein, including the fact that I had brought to the attention of Mr. Schmitt the small discrepancy in the bid price between Rockland Bakery and San Remo Bakery located in Massapequa, and Mr. Schmitt's directive to Mr. Ostuni to look into the matter to ensure that every lawful effort be made to award the bid to the local vendor.

(Hughes Aff. ¶¶ 6–9.)

In response to the Hughes affidavit, SA Cassidy provided his own affidavit, recounting that Hughes's responses during his brief conversation with her "largely dovetailed with Mr. Ostuni's statement." (Cassidy Aff. ¶ 4.) In his affidavit, SA Cassidy also attests that "[a]t no time during [the] brief conversation [with Hughes] do I recall Ms. Hughes state or even imply that it appeared to her that Mr. Schmitt had no knowledge of the Bread and Rolls Contract prior to her briefing him on it." (Cassidy Aff. ¶ 4.) Mangano did not submit a further affidavit from Hughes addressing this specific point.

### 3. Analysis

Mangano contends that the government's failure to disclose Hughes and the substance of her conversation with SA Cassidy was a deliberate <u>Brady</u> violation and that the defense was severely prejudiced by this violation. Mangano maintains that Hughes was a critical witness because she could: "(a) could provide all of the same exculpatory information as Ostuni (relating to Peter Schmitt's behind-the-scenes actions in advocating for San Remo Bakery and his longstanding policy of favoring local vendors); (b) could provide additional exculpatory information concerning how Peter Schmitt came to be involved in the bread and rolls contract; and (c) could not be neutralized like Ostuni," who, as discussed <u>infra</u>, was Joe Mondello's son-in-law. (Mangano Reply Mem. at 3–4.) In arguing that this suppression was prejudicial, Mangano stresses that, according to the Newsday article, the jury had already decided to acquit him of bribery

concerning the TOB Loan Scheme and OEM contract.  Accordingly, Mangano insists that the government's failure to disclose Hughes prevented him from obtaining an acquittal on the remaining counts concerning the Bread and Rolls—purportedly the only bribery offenses that the jury was still contemplating.

This was not a <u>Brady</u> violation.  And, even if this rose to the level of a <u>Brady</u> violation, there was neither flagrant and willful misconduct here nor sufficient prejudice that would warrant dismissal of the indictment.

First, the Court finds that Hughes did not tell SA Cassidy that it was "clear to [her] that Mr. Schmitt, prior to my briefing concerning these findings, had no prior knowledge of [the details of the Bread and Rolls Contract, including San Remo's involvement]."  In his affidavit, SA Cassidy affirmed that "[a]t no time during [the] brief conversation [with Hughes] do I recall Ms. Hughes state or even imply that it appeared to her that Mr. Schmitt had no knowledge of the Bread and Rolls Contract prior to her briefing him on it."  (Cassidy Aff. ¶ 4.)  As noted above, Mangano did not submit a further affidavit from Hughes addressing this specific point.  Contrary to Mangano's argument, Hughes's general assertion that she "advised Agent Cassidy of my role in this matter as set forth" in her affidavit was insufficient to even warrant a hearing on this issue.[11]

Second, while Mangano insists that Hughes's affidavit indicates that her testimony would have been more favorable than Ostuni's testimony, the record does not support that claim. Mangano contends that Hughes would provide more favorable testimony than Ostuni because the 302 from his 2016 proffer "appeared to suggest  . . . that by the time Ostuni met with Schmitt,

---

[11] Moreover, even if Hughes did relay this point to SA Cassidy, this subjective impression may not have been admissible at trial and, even assuming that she would have been permitted to testify on this point, her subjective impression of Schmitt would not have had much probative value.

[Schmitt] already had some awareness of the issue."[12]   (Mangano Reply Mem. at 3.)   Thus, according to Mangano, Hughes supplied the defense with a critical piece of previously unknown information—"how Peter Schmitt became involved in the bread and rolls contract."   (Mangano Reply Mem. at 3.)   Mangano's reliance on the ambiguous phrasing of the Ostuni 302 is not persuasive.   This is not a situation where defense counsel had to speculate as to what Ostuni would testify to based solely on this ambiguous sentence in the 302 because defense counsel was able to interview Ostuni.   Mangano, however, has offered no evidence that, during this voluntary interview with defense counsel, Ostuni provided a different account of the meeting with Schmitt than the account that Hughes subsequently provided in her post-trial affidavit.

As Mangano correctly points out that—even putting aside Hughes's subjective impression of Schmitt's knowledge—SA Cassidy's affidavit does not dispute that Hughes relayed the other points contained in her affidavit to him.   This includes her claim that she brought her findings about the Bread and Rolls contract to Schmitt's attention during a meeting him and Ostuni and, that, in this meeting, Schmitt instructed "Ostuni to look into these matters, and [stated] that every effort should be made to ensure that the contract, if possible, be awarded to San Remo Bakery."

However, Mangano's claim that these undisputed points from Hughes's affidavit are material are undermined by the fact that Ostuni—who was interviewed by defense counsel and served with a trial subpoena—was in a position to provide the same testimony and yet was not even called by the defense.

In an attempt to counter this argument, Mangano insists that Hughes was an important exculpatory witness because, unlike Hughes, Ostuni's background gave the prosecution a powerful

---

[12]   The relevant sentences in the Ostuni 302 state:   "When the contract arrived, Ostuni met with PO Peter Schmitt. Schmitt was aware that San Remo Bakery, a local business, had also bid on the contract and he intended to advocate for the local business.  Ostuni and Schmitt observed that there was only a $600 difference in the bids from San Remo and Rockland Bakery."

tool to neutralize his testimony if he had been called at trial.  Ostuni was the son-in-law of Joe Mondello—the head of the Nassau County Republican party—and the government elicited at trial that Mondello had demanded and received from Singh a $30,000 discount in connection with his daughter's wedding to Ostuni.  Mangano also argues that the prosecution sought to portray Ostuni as a "supposed political appointee who was beholden to both the republican machine."  (Mangano Reply Mem. at 3.)  According to Mangano, this testimony allowed the prosecution to "'dirty up' Mr. Ostuni in the jury's eyes, in order to prevent defense counsel from calling him as a witness," a which defense counsel contends "was ultimately successful," as Ostuni was not called at the first trial.  (Id.)  By contrast, Mangano maintains that Hughes had no such baggage.  This argument is not persuasive.  If Ostuni's and Hughes's account of the Schmitt meeting was truly as exculpatory as the defense maintains, Ostuni's background would not have deterred the defense from calling him at trial.

For the reasons outlined above as well as the additional reasons discussed infra, the Court finds that the substance of Hughes's testimony was not sufficiently material for to constitute a Brady violation.  More importantly, even if a Brady violation occurred, Mangano cannot establish the requisite egregious misconduct or prejudice that would warrant dismissal.

Mangano claims that prosecutors engaged in egregious misconduct because, according to Mangano, they deliberately suppressed her despite "clearly kn[owing] that Ms. Hughes' information was highly problematic."  (Mangano Reply Mem. at 2.)  The Court disagrees with Mangano's claim that the circumstances here suggest flagrant or egregious misconduct.  While Hughes had a brief conversation with SA Cassidy, the prosecutor who interviewed Ostuni on March 1 did not speak with Hughes during that call, which only occurred after Hughes called the agent back a day after he had first contacted her and left her a voicemail message.  The fact that

the prosecutor would have been aware of Hughes's statements to SA Cassidy second-hand makes it less likely that the prosecutor believed that the information provided by Hughes during this brief interview was "highly problematic" exculpatory evidence.[13]   (Mangano Reply Mem. at 2.) Moreover, the prosecutor's absence from this call, which occurred during the busy run-up to trial, also suggests that the failure to disclose Hughes may have been inadvertent.   More importantly, Mangano's claim that prosecutors "clearly knew that Ms. Hughes' information was highly problematic" is belied by the fact that the prosecutor never bothered to interview Hughes herself, despite SA Cassidy telling Hughes that the prosecutor might do so.  This is notable because the prosecutor presumably knew there was a chance that the defense would eventually learn about Hughes (and may have simply assumed that the defense already knew about Hughes).   The prosecutor had learned, on March 1, that Ostuni had already been interviewed by defense counsel and that Ostuni was likely to, himself, be called at trial.  It makes little sense that the prosecutor would simultaneously believe that Hughes was a "highly problematic" potential defense witness and yet, at the same, would not bother to interview Hughes herself given the possibility that the defense might call Hughes at trial.  Additionally, as noted above, given that Ostuni had already spoken to defense counsel, the prosecutor may have simply assumed that defense counsel was already aware of Hughes and her participation in the meeting with Ostuni and Schmitt.[14]  Finally, it is also notable that the government disclosed Ostuni's 302 to the defense prior to trial, which further weighs against Defendants' claim that the prosecutors were engaged in egregious

---

[13]   While SA Cassidy's knowledge of Hughes's narrative from the call is clearly sufficient, for purposes of a <u>Brady</u> claim, to establish that the government was aware of (and suppressed) that information, the question here is not merely whether a <u>Brady</u> violation may have occurred but whether the prosecutor engaged in the type of egregious conduct would warrant dismissal of the indictment.

[14]   Under <u>Brady</u>, a prosecutor should not rely on such assumptions, and must, instead, simply make a disclosure in that situation. However, where a prosecutor believes that defense counsel is already aware of a witness, it is difficult to say the prosecutor engaged in the type of egregious conduct that would warrant dismissal of the indictment.

misconduct.  Ostuni dealt with Walker and had more information about, and involvement in, the Bread and Rolls Contract than Hughes.

Most importantly, dismissal of the indictment is not warranted because Mangano failed to establish the type of prejudice that would warrant dismissal of the indictment, the sole remedy sought in this motion.  Mangano was aware of Hughes prior to the second trial and she was available to testify at that trial.  Mangano cannot point to any "lingering prejudice" from this alleged Brady violation (or any of the other newly disclosed evidence) that would affect the fairness of his second trial.  Accordingly, his request for dismissal fails.

Rather than claiming that this and the other alleged Brady/Giglio violations affected the fairness of the second trial, Mangano raises speculative claims of prejudice, contending that absent these alleged violations, he might have been outright acquitted at the first trial and, thus, should not have to endure a second trial at all.  The Court finds this theory of prejudice unavailing.  Moreover, even if the Court were to accept some of the underlying flawed premises of Mangano's theory of prejudice, the Court would still reject his arguments for the reasons set out below.

Mangano's claim of prejudice relies on the Newsday article's account of jury deliberations, Venditto's acquittal, and the fact that the first trial ended with a hung jury.  Venditto's acquittal is not particularly probative given that the amount of alleged bribes Venditto received was substantially less than what Mangano received from Singh as well as the fact that Venditto had no involvement in the Nassau County OEM and Bread and Rolls contracts.  And, the simple fact that the first trial ended with a hung jury does not establish the type of prejudice that would warrant dismissal.  Cf. Porchay, 651 F.3d at 941–42 (affirming denial of motion to dismiss indictment— in case where first trial ended in acquittal on one count and hung jury on remaining counts and second trial ended in mistrial as a result of Brady violation—because defendant could use the

suppressed material at her third trial).  As for the Newsday article, Mangano's prejudice argument depends on the article's hearsay account of jury deliberations.  Mangano insists that the prejudice to him from the non-disclosure of Hughes is incalculable because, according to the article, the jury had "virtually acquitted him of all charges except the bread and rolls contract."  Thus, according to Mangano, all that stood between Defendants and acquittal was the jury's resolution of the Bread and Rolls Contract, for which he contends the government's evidence was weak.  (Mot. to Dismiss. at 7; Mangano Reply Mem. at 16–17.)  The Court, however, does not believe that it is appropriate to consider this hearsay account of jury deliberations.[15]  If the Newsday article is not considered, Mangano's prejudice argument collapses.

Moreover, even if the Court were to consider the Newsday article, the Court is not persuaded that it establishes prejudice that would warrant dismissal of the indictment.  For one thing, jury deliberations are often fluid and further deliberations on one issue can often cause one or more jurors to rethink another issue that may have previously been considered resolved.  And, even according to the Newsday account, this jury was 11-1 in favor of convicting Mangano concerning the Bread and Rolls contract.  The notion that Hughes's testimony would have (or even might have) caused all 11 of those jurors to take a contrary position on the Bread and Rolls contract and to outright acquit Mangano is simply not persuasive.  Schmitt's involvement in the Bread and Rolls Contract and his preference for local vendors, was already before the jury.  While Hughes's testimony could have helped the defense counter the government's reliance on the April 22 phone call between Mangano and Schmitt, she did not participate in that phone call or have any knowledge of the contents of that call.  More importantly, Hughes had nothing to say about Rob

---

[15] Mangano's opening brief asked for a hearing concerning "what has transpired here, why material was not produced, or whether the Government acted in bad faith."  (Mot. to Dismiss at 41.)  Mangano, however, never asked for a hearing concerning what transpired during jury deliberations.  And, even if he had the Court would have denied such a request.

Walker, who is not even mentioned in her affidavit.  Walker, who was Mangano's second-in-command, became personally involved in the Bread and Rolls matter beginning on May 7. (Tr. 502.)  While Ostuni communicated with Walker, Hughes never did.  And, Walker's involvement was, along with Singh's testimony, the most critical evidence concerning the Bread and Rolls contract.  Thus, even if it is appropriate to consider the Newsday article and to credit the assertions therein, Mangano's motion to dismiss falls short of establishing that the government's failure to disclose Hughes created prejudice that would warrant dismissal of indictment.[16]

### E.  Peter Contino

In March 2015, Rivkin Radler responded to a subpoena and produced certain documents as well as a privilege log concerning certain withheld documents.  Rivkin did not produce the critical notes authored by William Savino at this time and the parties did not receive those notes until shortly before trial when the Court ordered their disclosure.  In September 2015, Peter Contino, Rivkin Radler's general counsel, met with the government to review the firm's document production and answer questions about certain items on the privilege log.  During the meeting, Contino referred to the Savino notes—which were withheld as privileged—as "notes regarding a conversation with Leonard Genova."  (ECF No. 339-29.)  Contino, however, had no personal involvement in the firm's representation of the Town of Oyster Bay in 2010 and would not have had any first-hand knowledge of the notes.  Nothing in the 302 for this interview suggests otherwise.  In fact, all indications are that Contino simply assumed that the notes were from a conversation with Len Genova because Genova's name appears at the top of the notes and Savino's billing records referenced an April 14 call with Genova.  (GX423, GX424.)  While the government

---

[16]  For many of the same reasons set out in the paragraph above, the Court also finds that Hughes's affidavit is not "material" under _Brady_.  Moreover, even assuming _arguendo_ that the Hughes evidence satisfied Brady's materiality standard, the Court would still conclude that Defendants have not established prejudice that would warrant dismissal of the indictment.

did not disclose the 302 for Contino's interview prior to the first trial, the government did disclose the 302 for Savino's interview as well as his grand jury testimony.   In the grand jury, Savino testified that, based on his billing records, he believed that he came to work on the TOB loan guarantees as a result of Genova calling him.  (Savino Grand Jury Tr. 20–21.)  Furthermore, in his grand jury testimony, Savino discussed his limited involvement in Rivkin's production of documents to the government, stating that he "was not particularly involved in [Rivkin's] production" of documents.  (Id. at 21.)  And, when Savino was asked in the grand jury about whether he had searched for any of his notes in response to the grand jury subpoena, he stated:  "I believe we searched all of our files.  I think it was undertaken by others, not me, but my understanding is that the file was reviewed and whatever was not privileged was turned over." (Savino Grand Jury Tr. 48 (emphasis added).)  Savino's testimony about Rivkin's production to the government was further proof that Contino's characterization of the notes likely did not come from Savino.  Given all the circumstances, the Court finds that the Contino 302 was at best, minimally probative impeachment evidence, which was not "material."  Moreover, this conclusion was confirmed by the second trial.  Although the Savino notes continued to play a key role during the second trial, Mangano did not seek to call Contino as a witness and defense counsel never even asked Savino at trial if he had spoken to Contino or anyone else at Rivkin about the notes, whether in the connection with the preparation of the privilege log or otherwise.

## F.  **Mangano's Perjury Claims**

Mangano argues that newly disclosed materials from the government's interviews with Singh's employees and documents from his server establish that Singh testified falsely at trial on two matters and that the prosecutors knew or should have known he was testifying falsely.

While the government should have disclosed some of these materials prior to, or at the very least, during the first trial, the government's conduct in connection with this testimony does not warrant dismissal of the indictment.

### 1. Singh's Testimony About the Space Rented by Mangano for his Campaign

The evidence at trial showed that Singh provided hundreds of thousands of dollars in benefits to the Manganos, through Linda Mangano's $100,000 annual salary and numerous other things of value, including an office chair, a massage chair, hardwood flooring, vacation expenses, and money paid towards the purchase of a luxury watch.  These benefits also included reduced rent (and other favorable treatment) for a space the Mangano campaign leased in a strip mall owned by Singh's parents.

Beginning in June 2009, Mangano's campaign rented a space in this strip mall.  (Tr. 248–254.)  The initial lease, which identified the Friends of Ed Mangano as the tenant, ran from June 8, 2009 to November 8, 2009, and had a monthly rent of $500.  (Tr. 254.)  The prior tenant had paid $2,000 per month.  (Tr. 255.)  The space had been vacant for between eight and twelve months when Mangano began renting it.  (Tr. 255.)  After Mangano won the election in November 2009, he wanted to continue to lease the space.  (Tr. 255.)  For the next four years, Mangano was supposed to pay $1,500 per month for this space.  An unsigned lease from June 2010, which lists the Friends of Ed Mangano as the tenant, identifies a monthly rent of $1,500—which was, again, below the $2,000 per month paid by the prior tenant.[17]  (Tr. 261; GX413.)  In 2010, at Mangano's request, Singh paid for $10,000 in alterations to make the vacant retail space more like an office.  (Tr. 266–69.)  Furthermore, testimony from both Singh and his accountant also established that,

---

[17]  Testimony from Singh's accountant at the second trial also established that the subsequent tenant, which moved into the space sometime in 2014, was a nail salon that paid $2,500 a month.  (2019 Tr. 216; see also GX414 (exhibit admitted at both trials showing that the nail salon paid $2,500 per month in 2014).)

while other tenants generally paid the rent monthly, Mangano was not required to make monthly payments or to pay the rent on time.[18]  (Tr. 263–66.  5439–45; GX414.)

Singh also testified about two leases concerning this space—that testimony is the focus of Mangano's perjury claim.  These two leases, which listed the tenant for this space as the Bethpage Republican Club ("BRC"), provided for monthly lease payments of $1,800 and $1,854 per month, respectively.  (Tr. 257–63; GX412, GX413.)  Singh could not identify who signed the first lease for the BRC and testified that the signature of Doreen Pennica—who was Mangano's secretary— was on the second lease for the BRC.  (Tr. 258, 259.)  Singh testified that the $54 difference between the two leases was to account for a $54 utility charge that had been overlooked.  (Tr. 260.) Singh testified that the BRC never ended up paying $1,800 or $1,854 per month. (Tr. 260–61.) According to Singh, after these leases were signed, Mangano told him that "$1,854 was a little too high" and asked "if I could speak to my mom and reduce the rent."  (Tr. 261–262.)  Singh testified that he then reduced the rent to $1,500 per month.  (Tr. 262–63.)

Mangano insists that the BRC leases were forgeries and, thus, that Singh lied when he testified about the leases and claimed that Mangano told him that "$1,854 was a little too high" and asked that the rent be reduced to $1,500.  During cross-examination at trial, defense counsel— who had already been told by the government that Singh and his employees forged documents in connection with loan applications—questioned Singh about these two leases, suggesting that the two BRC leases were forged and were fraudulently created in order to help obtain a loan involving the strip mall property.  (Tr. 1399–1412.)  Defense counsel pressed Singh about the differences

---

[18] In 2010, the Friends of Ed Mangano made a single $10,500 payment in June.  (Tr. 5440.)  In 2011, the Friends of Ed Mangano paid $6,000 in February and $6,000 in July—for a total of $12,000.  (Tr. 5441–43.)  Similarly, in 2012, the Friends of Ed Mangano paid $6,000 in May and $6,000 in August—for a total of $12,000.  (Tr. 5441–43.)  In 2013, the Friends of Ed Mangano made four payments—$6,000 in January, $6,000 in April, $6,000 in August, and $3,000 in November—for a total of $21,000.  The $21,000 paid in 2013 was apparently made to cover arrearages from prior years and, even with those payments, it is not clear that Mangano ever paid the full amount of outstanding rent. (Tr. 5444.)

between Pennica's purported signature on the lease and had Singh compare it to her signature on other documents, which defense counsel displayed in front of the jury.  (Tr. 1401–1412.)  Singh admitted, at one point, that the signatures were a "little different" and, again, admitted that he did not know who signed the $1,800 per month lease for the BRC.  (Tr. 1403, 1407, 1410–12.)  When defense counsel pressed Singh on whether these leases were forged in order help Singh obtain a loan, Singh stated "I don't that if [Ray Saccaro, his loan broker] forged or if it is real.  I have no idea." (Tr. 1407; see 1403.)  Also, during cross-examination, Singh:  (1) stated he did not recall if he had a signed lease with Mangano; (2) stated he did not "deal with those leases," his staff did; and (3) was pressed about his explanation for the $54 increase, and conceded that the provisions in the leases provided for the tenant to pay all utilities, another point defense counsel elicited in order to attack Singh's testimony concerning the leases.  (Tr. 1399, 1406.)

After the first trial, Mangano received, for the first time, interview notes from two of Singh's employees as well as emails and other documents from Singh's server concerning these leases and Singh's involvement in the leases.  One of the documents is an October 6, 2010 email from Singh's employee to Singh's attorney where Singh was copied on the email.  (ECF No. 339-7.)  In the email, Singh's employee provides "estoppel" certificates from the tenants at the strip mall affirming to the lender the terms of their leases and the monthly rent each paid.  (Id.)  One of the attached Estoppel Certificates contains the forged signature of Ed Mangano and indicates that the BRC pays $1,854 per month pursuant to the lease discussed earlier.  Other emails from October 2010, one of which Singh was copied on, included, as attachments, the $1,854 BRC lease.  Additionally, Mangano received rent roll documents, which were created, at various times, for tax abatement claims and loan applications and which list differing amounts of rent that the BRC was purportedly required to pay under its alleged lease, including $1,854 (in October 2010) and, at

other times, $1,000 and $1,948.[19]  There is also a May 11, 2010 email from Singh's employee, which Singh was cc'd on, which contains the $1,800 BRC lease.[20]  In interview notes disclosed to Mangano, a Singh employee admitted creating fake leases for two of Singh's companies on the October 2010 rent roll, which also lists the $1,854 rent for the Bethpage Republican Club.

As set out earlier, many of the benefits that Singh provided to Mangano in connection with the lease of this space to Mangano are essentially undisputed and are not even addressed by any of the newly disclosed evidence:  (1) Mangano originally only paid $500 per month prior to the election (2) after his election, Mangano was only supposed to pay $1,500 per month; (3) $1,500 per month was substantially less than the prior (and subsequent) tenant paid; (4) Singh paid for $10,000 in improvements; and (5) unlike other tenants, Mangano was not required to pay the $1,500 rent on a monthly basis and was instead permitted to pay some of the rent months, and possibly even years, late.

### 2.  Singh's Trip to Goa, India in December and his Apartments in Goa

After the first trial, Mangano also received material concerning Singh's purchases of three properties in Goa, India.  Mangano maintains that, at the first trial, the government allowed Singh to testify falsely about these properties on cross-examination.

At trial, Singh was asked about a December 2012 trip to India he took with his father and Fred Mei.  (Tr. 2562.)  Singh stated that during the trip he, his father, and his cousin were looking into making real estate investments in Goa involving retirement homes.  (Tr. 2562–63.)  When he

---

[19]  Mangano received one of these rent roll documents—from October 2010—as an attachment to the interview notes of Sal Russo, which the government voluntarily produced after the first trial.  On the copy of the rent roll document that was attached to Russo's interview notes, there is handwriting—from either an agent or Russo himself—indicating that the "The #s are not legit."

[20]  The unsigned Friends of Ed Mangano lease, which lists an effective date of June 1, 2012, post-dates, at least on its face, this May 11, 2010 email.

was asked if "he ended up buying anything in Goa," he answered no.  (Tr. 2565.)  Defense counsel did not ask Singh, generally, about any overseas assets.

In a November 2012 email disclosed after the first trial, Singh indicates that he wanted to "transfer possession of my flats" in Goa during his upcoming trip in December 2012 and was wiring some funds to his father's Indian bank account to accomplish this.  Mangano seizes on this and other newly disclosed materials from the server and interview notes to argue that Singh lied when he said he did not "end up buying anything in Goa" on this trip.

Interview notes and documents from the server indicate that Singh put down a deposit on the three Goa apartments in 2007 and began making "installment" payments that same year.  (350-JJD-3; Gov't Opp'n Mem., Ex. 4.)  A September 2008 email from one of Singh's employees indicates that, as of that date, Singh had already made 75% of the payments on the apartments—having paid Rs. 86,25,000, with an outstanding balance of Rs. 28,75,000.  (Id.)  In the same email, Singh's employee explicitly characterizes the apartments as having already been "purchased" even though additional payments were still being made.  (Id.)  A June 2011 letter from the property developer indicates that construction of the apartment was complete and that Singh was only required to make some relatively small final payments to cover a 2% registration duty, 2% stamp charges and 85,000 INR towards legal expenses and maintenance security deposit.  (Id.)

Mangano notes that, according to the specific terms of the sale agreement, until the sale deed for the apartments was executed and the final outstanding amounts were paid, the purchase of the properties was not complete.  Thus, Mangano contends that Singh's purchase of these apartments was not completed until his December 2012 trip and that Singh's answer at trial was false and clearly intended to deceive.

### 3. Analysis

Under Napue v. Illinois, 360 U.S. 264 (1959) and its progeny, "[a] conviction must be set aside if: (1) it was obtained using perjured testimony; (2) the prosecution knew, or should have known, of the perjury; and (3) "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  Locurto v. United States, No. 10-CV-4589, 2016 WL 7031556, at *1 (E.D.N.Y. Dec. 1, 2016) (quoting United States v. Agurs, 427 U.S. 97, 103 (1976), and citing Napue, 360 U.S. 264).  A conviction will be set aside under Napue if:  (1) the prosecutor knowingly elicits and uses false testimony; or (2) the prosecutor "allows [false testimony] to go uncorrected" even if the testimony not elicited by the prosecutor.  Napue, 360 U.S. at 269.

Although a Napue claim can presumably—in appropriate circumstances of egregious misconduct and resulting prejudice—warrant dismissal of an indictment, the standard remedy for a Napue claim, if established, is vacatur of the conviction and a new trial.  Cf. United States v. Darui, 614 F. Supp. 2d 25, 37 (D.D.C. 2009), aff'd, 368 F. App'x 153 (D.C. Cir. 2010) (denying, after mistrial, the defendants' motion to dismiss the indictment which alleged that the government's "main witness" committed perjury with the government's actual or constructive knowledge, and reasoning that "even assuming" the defendant's allegations were true those "allegations do not convince this Court of the need for it to exercise its supervisory powers and dismiss the indictment"); United States v. Gadsden, No. 11-0302, 2013 WL 3776994, at *2 (D. Md. July 17, 2013) (noting that the "Court has found no authority in which a Napue claim led to dismissal of the indictment").

The alleged perjured testimony Defendants cite concerned relatively minor matters in the context of this complex and lengthy trial.  Defendants make little effort to show how this allegedly perjured testimony—including the testimony about the leases, which was already impeached at the

first trial—could have, given all of the other impeachment evidence at trial, possibly prejudiced Defendants to a degree that would warrant dismissal of the indictment.  Defendants rely on these alleged perjury claims primarily in an attempt to show improper conduct by the government in order to bolster their request for dismissal.

Defendants' arguments concerning the Goa apartments are utterly meritless.

As for Singh's testimony about the leases and rent, defense counsel conducted a skillful and effective cross-examination at trial that impeached Singh concerning the leases and highlighted weaknesses in his testimony.  The government should have disclosed all the materials cited above—concerning the leases, rent rolls, and forged estoppel certificate—prior to the first trial.  At the very least, the government should have—after Singh's cross-examination on these issues highlighted weaknesses that the government likely never suspected—reexamined the documents on Singh's server and the relevant interview notes and disclosed all of those materials to the defense during the first trial.  This would have allowed defense counsel, armed with all these materials, to fully confront Singh at the first trial about this testimony, including his recollection that he provided reduced rent pursuant to Mangano's request.  While Mangano insists that Singh's testimony on these issues was clearly false, the resolution of these questions were, more appropriately, ones for the jury to make after hearing the evidence on this point, including Singh's testimony and a cross-examination informed by all the relevant materials.  Defense counsel, of course, possessed all those materials prior to the second trial and had an opportunity to use all those materials, as they saw fit, to challenge whatever Singh testimony would provide at the second trial.

While the prosecutors should have disclosed the materials at issue to Defendants prior to, or at the very least during, the first trial, the prosecutors did not engage in misconduct here that

would warrant dismissal of the indictment.  And, Defendants have clearly not suffered prejudice that would warrant dismissal of the indictment.

## G. **Cumulative Consideration of All the Claims**

In the prior sections, the Court addressed and analyzed each of the claims raised by Defendants.  The Court has also considered both the government's conduct and the potential prejudice from that conduct cumulatively.  Ultimately, the Court having observed both trials and considered the conduct of the prosecutors discussed herein and throughout this complex and sprawling case concludes that the government's actions do not rise of the level of egregious and flagrant conduct that would warrant dismissal of the indictment or necessitate the imposition of dismissal as a sanction.  The Court has also considered, collectively, the potential prejudice to Defendants from all of the newly disclosed and discovered evidence and the Court finds that Defendants have not established prejudice to warrant the dismissal of the indictment.  Defendants had all of the evidence at issue in this motion before the second trial, which was fair.

## H.  **Hearing**

Defendants also requested discovery and a hearing concerning the government's conduct. Specifically, Defendants asked the Court to conduct an in camera inspection of internal government emails, communications, and memorandum and then disclose to defense counsel any relevant materials in advance of an evidentiary hearing.  The Court denied this request.  The record here did not suggest flagrant, egregious, or bad faith conduct that warranted discovery and a hearing.  Cf. United States v. Kohring, 637 F.3d 895, 912–13 (9th Cir. 2011) (denying, without any hearing, request to dismiss indictment for Brady violation involving thousands of documents disclosed after trial where there was insufficient "evidence to conclude the prosecution 'acted flagrantly, willfully, and in bad faith,'").

**I. <u>Conclusion</u>**

For the reasons stated above, the Court denies Defendants' motion for dismissal of the

indictment and requests for discovery and an evidentiary hearing.

**SO ORDERED.**

Dated:  January 6, 2022
          Central Islip, New York

                                             /s/    (JMA)
                                      JOAN M. AZRACK
                                      UNITED STATES DISTRICT JUDGE