UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

UNITED STATES OF AMERICA,

              -against-

EDWARD MANGANO, and
LINDA MANGANO,

                    Defendants.
-------------------------------------------------------------------X

**FILED**
**CLERK**
2:59 pm, Jan 06, 2022
**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**MEMORANDUM &
ORDER**
16-CR-540 (JMA)

**AZRACK, United States District Judge:**

Currently pending before the Court are two post-trial motions filed by defendant Edward Mangano ("Mangano"), the former Nassau County Executive who was found guilty of bribery and obstruction offenses in 2019.

Mangano's first motion seeks reconsideration, a new trial, and acquittal for the bribery charges based on the Second Circuit's recent decision in United States v. Silver ("Silver II"), 948 F.3d 538, 571 (2d Cir. 2020).

Mangano's second motion seeks a new trial based on newly discovered evidence that Mangano claims shows that the alleged bribe payor, Harendra Singh, committed perjury at trial. Mangano's wife and co-defendant, Linda Mangano ("Linda Mangano"), joins in this motion. Recently, Mangano supplemented this motion for a new trial and requests discovery from the government concerning another cooperating witness, Anthony Gulino.

For the reasons set forth below, both pending motions are denied.

The Manganos were first tried in 2018, along with John Venditto, the former Supervisor of the Town of Oyster Bay ("the TOB" or "the Town" ). After a lengthy initial trial in 2018 that resulted in Venditto's acquittal and a hung jury on all charges against the Manganos, the Manganos

1

were retried in early 2019.  At the retrial, Mangano was convicted of four bribery offenses in connection with the "Town of Oyster Bay Loan Scheme," which is discussed in depth below. Mangano was acquitted of other bribery charges in connection with two other contracts that Singh obtained from Nassau County.  The jury also found Mangano and Linda Mangano guilty of conspiracy to obstruct justice and Linda Mangano guilty of obstruction of justice and making false statements.

## I.  BACKGROUND

### A.  The Evidence at the Second Trial

#### 1.  Mangano's and Singh's Relationship

Mangano, a Republican, was elected Nassau County Executive in 2009 and formally assumed office in January 2010.  (Tr. 1432, 1440, 2964.)  He was the highest elected official in Nassau County and had "tremendous political clout."  (Tr. 2767; see 1448, 1463, 2783, 2964–65.) Mangano was reelected in 2013.

Singh was a prominent businessman and restaurateur on Long Island.  Singh owned, at one time, at least ten restaurants and ran a large restaurant named H.R. Singleton's in Bethpage, where his operations were headquartered.  (Tr. 1435, 1444.)  As part of his restaurant empire, Singh had licenses from the TOB to run facilities on properties owned by the TOB.  (Tr. 1445–57, 2742.)  In addition to restaurants in Nassau and Suffolk Counties, Singh also owned the Water's Edge, a catering facility in Long Island City, Queens, which Singh purchased in 2008.  (Tr. 1435, 1455.) Singh also had an expediting business in the Town

Mangano and Singh had been friends since 1992, and once Mangano became County Executive in 2010, Singh would visit the Manganos' home three to seven times per week.  (Tr. 1727, 1845.)

However, prior to Mangano running for and being elected County Executive, Singh had not given the Manganos any expensive gifts or other things of value. (Tr. 1430.) Yet, after Mangano was elected, Singh paid for, inter alia, a $3,000 office chair in December 2009, a $3,600 massage chair in September 2012, hardwood flooring for the Manganos' house, $19,000 in vacation expenses, and around $5,000 towards a luxury watch for the Manganos' son. (GX1317, GX1310, GX1311, GX1312, GX1315GX1317, GX703, GX741, Tr. 1525–26; see also GX470, 470A.) In January 2010, Singh also discounted a food bill for Mangano's campaign by $42,000. (Tr. 1447–49.) Although Mangano was required to report information about such gifts on his annual financial disclosure reports for the years 2009 through 2014, he never did so. (GX445–450, GX1008; Tr. 3367.)

Additionally, in April 2010, Singh hired Mangano's wife, Linda, at a salary of approximately $100,000 a year for a "no show" job. (Tr. 1429–1430, 1728–29; GX1318; GX1662; GX1163.) Linda Mangano would remain on Singh's payroll until August 2014 when the FBI raided Singh's offices. (Tr. 1690, 1738–39, GX1663, GX1318.)

As explained below, the evidence at trial showed that Singh bribed Mangano to obtain Mangano's assistance on various matters within Nassau County and the TOB, including millions of dollars of loans that the TOB guaranteed for Singh.

## 2. The TOB Loan Scheme

### i. Background of Singh's Relationship with the TOB

The TOB, which has approximately 300,000 residents, is a large, suburban municipality located within Nassau County. (Tr. 2741–42.)

Singh's companies obtained licenses from the TOB to run concessions at two locations. One property, known as the Woodlands, was a restaurant and catering facility located at an old

mansion on a golf course owned by the TOB.  (Tr. 1435, 1456–57.)  Singh's company S.R.B.

Convention and Catering Corp. ("S.R.B. Convention") began running the Woodlands in 1998 and

converted it into a much larger and "grander" facility.  (Tr. 1456–57, 2758, 2880, 2895; GX506,

GX510.)  Beginning in 2005, Singh, through another company, S.R.B. Concession, Inc. ("S.R.B.

Concession"), also ran two restaurants and other concessions located on TOBAY Beach, a

municipal beach owned by the TOB.[1]  (Tr. 1457, GX517.)

In connection with these TOB concessions, Singh dealt with officials at the TOB, including

Venditto, Deputy Supervisor Len Genova, and Deputy Town Attorney Fred Mei.  As the

Supervisor of the TOB, Venditto was the Town's highest-ranking elected official.  (Tr. 1460,

2746.)  Venditto had been the Supervisor in the TOB since 1998.  (Tr. 2748)  As Supervisor,

Venditto had a seat on the Town Board—where the votes were virtually always unanimous and

the Board essentially never voted against something that Venditto supported.  (Tr. 2869.)

Resolutions passed by the Town Board can, inter alia, authorize the Supervisor to enter into

contracts.  (Tr. 2573.)

Genova was the Deputy Supervisor for the TOB throughout the events at issue and also

took on the role of Town Attorney in September 2010.  (Tr. 2749–2750, 2860.)  Like Mangano,

both Venditto and Genova were Republicans.  (1459, 2746, 2749–50.)  All three men sat on the

Nassau County Republican Committee.  (2833.)

Mei was the deputy town attorney responsible for drafting and managing the TOB's

agreements with Singh.  (Tr. 2760–61.)

---

[1]  Singh also had an expediting business in the Town of Oyster Bay where clients would pay him for assistance in
obtaining permits and work variances.  (Tr. 1775–1777, 1956, 2061).

In addition to bribing Mangano, Singh also bribed Venditto, Genova, Mei, and other TOB officials.[2]  Singh gave free limo services and free and discounted parties to Venditto and his family. (Tr. 1547.)  Singh testified that these bribes were worth between $10,000 and $20,000.  (Tr. 1655.) Singh also built a conference room for Venditto at Singleton's in 2006 or 2007.  (Tr. 1889.)  Singh gave Genova free meals, discounted and free events for a charitable organization he ran, and approximately 40 free car service trips worth tens of thousands of dollars.  (Tr. 1546, 2826–27, 2956.)

As for Mei, Singh, as explained infra, gave Mei a total of $70,000 between 2010 and 2012 in connection with the TOB guaranteeing Singh's four loans involved in the TOB Loan Scheme. (Tr. 1784, 1786–87.)  Singh also paid for Mei's BMW car lease, which cost between $18,000 and $24,000, as well as, inter alia, four overseas vacations taken by Mei, two of which included one of Mei's family members, for whom Singh also paid.  (Tr. 1543.)

Over the years, the TOB entered into multiple agreements with Singh that extended Singh's licenses.  (Tr. 1862–1901, 2561–68.)  The TOB also provided Singh with other beneficial contract terms and other favorable treatment and accommodations.  (See, e.g., Tr. 2758, 2760–61, 2881–85, 2896–99, 2900, 2908, 2912; DX13.)  In exchange for the TOB extending his concession agreements, Singh  was required to make millions of dollars in capital improvements at the Woodlands and TOBAY Beach.  (Tr. 2759.)  Any capital improvements that Singh made to these facilities became the property of the TOB.[3]

---

[2]  At both trials, Genova testified pursuant to a grant of immunity.  (Tr. 2820, 2826.)  Mei, who pled guilty and received a cooperation agreement, testified at the first trial, but not the second trial.

[3]  Under New York law, a municipality is not permitted to lease parkland without approval of the state legislature. (Tr. 2582–88.)  Here, Singh did not have any such leases.  Instead, he held merely licenses which could be terminated, at -will, by the TOB subject to the specific provisions in the license agreements.  (Tr. 2582–88.)

In 2008, Singh's companies and the TOB amended his concession agreements. The amendments extended the terms of these agreements to 2045 for TOBAY Beach and to 2049 for the Woodlands. (GX525, GX526.) In return, Singh was obligated to make an additional $2.5 million in capital improvements at TOBAY Beach by April 2015 and an additional $3.25 million in capital improvements at the Woodlands by the end of 2011. (GX525, GX526; Tr. 1457–58, 2915–17, 2954.) The 2008 concession amendment for TOBAY Beach also noted that the initial 2005 concession agreement for TOBAY Beach had already required Singh to make $1,000,000 in capital improvements—so, in total, Singh had to make $3.5 million in capital improvements at TOBAY Beach by April 2015. The 2008 concession amendments indicated that, to date, Singh had already made approximately $4.95 million in improvements at the Woodlands and $750,000 in improvements at the TOBAY Beach. (GX525, GX526.)

### ii. The Beginning of the TOB Loan Scheme

In early 2010, Singh's businesses were struggling financially. (Tr. 1455–59.) Singh sought to obtain financing for his restaurants at the Woodlands and TOBAY Beach, but banks were unwilling to extend the loans Singh sought unless the TOB guaranteed the loans. (Tr. 1459, 2509–11.) Singh first spoke to Mangano in January 2010 about his attempt to obtain these loans and informed Mangano of the multi-million-dollar capital improvements he wanted to make at both the Woodlands and at TOBAY Beach. (Tr. 1457–58, 1461–62.)

Singh asked that Mangano call Venditto to inquire about the TOB guaranteeing Singh's loans. (Tr. 1460–62.) Mangano said he would, and then, after the call with Venditto, Mangano told Singh that Venditto was on board with guaranteeing the loan and wanted to speak to Singh. (Tr. 1461–62, 1465–66; GX1400 (phone records).) Later in January, Singh and Mangano attended a Republican event together at the Crest Hollow Country Club. (Tr. 1463, GX335.) During the

event, Mangano spoke with Venditto and then relayed to Singh that Venditto was "on board" with guaranteeing Singh's loan, but wanted to talk to Singh himself about the matter. (Tr. 1465.) A few minutes later, Singh and Venditto had a conversation in which Venditto told Singh that "Ed Mangano [is] very supportive of this guarantee" and "[w]e will do everything in our power to get it done for you." (Tr. 1465–66.)

Singh subsequently spoke over the phone and in-person with Genova and Mei about the loan guarantees. (Tr. 1467.) Genova was assigned by Venditto to look into the issue and to "try to get it done." (Tr. 1466–68, Tr. 2767–69; see Tr. 2780–81, 2785.) By March 2010, Singh believed that "things were proceeding good" and that the Town was going to guarantee loans for both for the Woodlands and TOBAY Beach. (Tr. 1470–71, 2659–66; GX859, DX679.) However, behind the scenes, concerns were being raised about the Town guaranteeing Singh's loans. In February 2010, given the "unusual" nature of Singh's request, Genova directed Mei to speak with Jonathan Sinnreich, an experienced outside counsel to the TOB, about the proposed transaction which, at the time, contemplated the TOB entering into a direct guarantee agreement with Singh's lender. (GX804, GX1105, Tr. 2537–39, 2769.) As soon as Sinnreich learned the details of the proposed deal, it became clear to him that it was "completely illegal and completely dangerous financially for the town." (Tr. 2539.) Sinnreich believed that the proposed transaction violated the New York State Constitution and that, aside from these constitutional concerns, the deal involved "serious financial risks" for the Town. (Tr. 2542–43, 2453.) He proceeded in various communications with Mei and Genova to advise the Town of the dangers and risks of the deal (in its various iterations) and why, in his opinion, the town should not proceed with the deal. (Tr. 2539–40, 2546.)

On March 10, 2010, Sinnreich sent Mei a lengthy email raising grave concerns about the proposed deal.  (GX807; see also DX723.)  Sinnreich explained his view that the proposed deal violated the New York State Constitution, which precludes towns from guaranteeing the loans of private individuals and corporations.  (GX807.)  Sinnreich was also concerned, among other things, that the proposed deal would allow Singh to use the loan proceeds to fund the "operations of the facilities" and did not require that those funds actually be used for the construction of the proposed capital improvements.  (GX807; Tr. 2543.)  As Sinnreich explained, the deal provided "absolutely no meaningful protection for the Town in terms of how the proceeds of the loan are actually spent" and "the agreement must do everything possible to make sure the funds are properly expended."  (GX807.)  Sinnreich added that even if a guarantee might be permissible under the law if the guarantee was for the public benefit, the fact that the agreement permitted the "the use of funds" for the operations of Singh's "profit-making businesses" showed that the proposed guarantee could not be interpreted as "intended for the public benefit."  (GX807.)  Sinnreich also raised issues about the proposed consideration—a Supervisor's golf outing—that Singh was going to give the Town in exchange for the guarantee.  Sinnreich suggested the possibility of structuring the deal as a "three-way re-purchase agreement with the bank" rather than as a guarantee—a framework that Sinnreich had previously employed in another municipal financing deal.  (GX807.) Sinnreich concluded that he could not "bless this deal," as he did not "believe it would withstand judicial scrutiny, and as drafted, it would subject the Town to genuine and substantial financial risk in the event of a default on the underlying loan . . . which could prove a significant liability, embarrassment or worse for the Town."  (GX807.)

After this email, Sinnreich and Mei continued to discuss the issues, including a guaranty document drafted by TD Bank—one lender with which Singh negotiating at the time.  (DX729.)

Sinnreich informed Mei that that he had "some serious issues with the form of the proposed Guaranty." (DX 729.)

On the morning of March 23, 2010, Sinnreich sent an email to both Genova and Mei reiterating some of his earlier warnings about the risks of this transaction. (GX817.) Sinnreich again stressed that the "key to protecting the Town's interests in the [Singh] guaranty is to control the money and to make sure that every penny of it is spent on the required and approved capital improvements to the Town Facilities." (GX817.) Sinnreich stressed that the transaction should be structured in the same fashion as all construction loans where, inter alia, the bank ensures, through an independent engineer, that the funds are actually being expended on the construction. (GX817; see also GX807.) Sinnreich also stated "I know [Singh] doesn't like it, but truly, he has no legitimate gripe; as I said this is how all construction loans in the private world are structured." (GX817.) Sinnreich asked Genova to "contemplate this nightmare scenario:  the Town approves a draw down of, say, $500,000, but it is diverted to other uses, and then there is a default.  How could we ever explain or justify the loss of public funds?" (GX817.) Sinnreich urged Genova and Venditto "in the strongest terms to reconsider this issue." (GX817.)

Later, on the morning of March 23, 2010, at a Town Board meeting, the Town Board adopted a resolution which included language stating that the Supervisor was authorized to "enter into a guaranty of payment . . . [S.R.B. Convention's] and [S.R.B. Concession's] bank related to Facility Improvements." (DX730; see also DX746).

Genova testified that he did not read Sinnreich's email until after the Town Board meeting where the "guaranty" resolution was approved. (Tr. 2771.)  In his testimony, Genova characterized Sinnreich's March 23 email as a "yellow light." (Tr. 2775, 2848.)

9

Sinnreich and Mei continued to try to find a way to address Sinnreich's concerns.[4]  (Tr. 2775.)  On April 2, 2010, Mei forwarded various draft documents, including a "Guaranty," prepared by an attorney for Madison National Bank ("Madison"), another prospective lender.  (DX732, DX733.)  On April 7, 2010, Sinnreich told Mei that the Madison documents "are less onerous than the predecessor bank document and raise fewer problems."  (DX733.)  However, Sinnreich continued to state that "there are still some major/governmental/political issues that need to be considered."  (DX733.)

Later on April 7, 2010, in a critical email to Genova and Mei, Sinnreich stressed a number of "major concerns" that he had with the "purpose, scope and term of the Town's guarantee." (GX821; Tr. 1471, 2546.)  This lengthy email explained, "[a]s we have discussed many times, in my opinion, the only basis on which this guaranty can be defended legally or publicly, is if every penny or every drawn down is utilized solely for the capital improvements at the Town facilities. That limitation must be in the underlying loan documents and especially in the Town guaranty itself. . . . "  (GX821.)  Sinnreich stressed that the Town's "exposure under the guarantee should be strictly limited only to moneys actually expended for legitimate Town purposes, i.e. construction of the new facilities and nothing else."  (GX821.)  Sinnreich's email concluded: "Bottom line:  I don't see how the Town can possibly guarantee an open-ended general purpose line of credit for [Singh's] business."  (GX821.)

### iii.  Mangano's Intervention with the TOB and Singh's Hiring of Linda Mangano

Mei immediately forwarded Sinnreich's email to Singh at 10:34 am.  (GX821.)  After receiving this email, Singh was "totally in panic mode."  (Tr. 1474.)  In response to the April 7

---

[4] Genova put off responding to Sinnreich's March 23 email.  On April 2, he replied to Sinnreich's email but did not address the substance of that email.  Instead, Genova's reply email discussed an unrelated speaking engagement Sinnreich was involved in and noted that Genova would "catch up with everything else Town related next week." (DX 731.)

email, Singh spoke with Venditto, Genova, and Mei.  (Tr. 2017–2019; DX18.)  Genova considered this email to be a "red light" and told Singh "[t]hat at that point it was a no go."  (Tr. 2777, 3077.)  Singh believed that, after the April 7 email, the loan guarantee would not happen as Genova was now siding with Sinnreich.  (Tr. 1474–75, 1484.)  At the time, getting this loan was the "most urgent matter in [Singh's] life," and the survival of his company depended on it.  (Tr. 1483–84.)

Singh then reached out to Mangano to "bypass" Sinnreich and Genova and "go to the highest level to get this thing back on track."  (Tr. 1474,  GX1404 (showing calls between Mangano and Singh on April 7–8), GX1416.)  Singh told Mangano that "Sinnreich is trying to come up with excuses not to get this loan done and I really need your help to put this thing back on track because this would be a total disaster for myself and my company" if the deal does not go through.  (Tr. 1475.)  Mangano responded he would speak to Venditto and "we'll get it done."  (Tr. 1475, 1484, 1488; see also GX1401, GX1404 (charts of phone calls during April 2010, including calls on April 8 between the phone of Rob Walker—Mangano's second in command—and Venditto's headquarters).)

Shortly after receiving this email, Singh gave Linda Mangano a "no-show" job at a salary of over $100,000 per year.  (Tr. 1477.)  On April 9, 2010, Linda Mangano received her first paycheck from Singh for $3,442.46.  (Tr. 1477, 1481; GX1662, GX1663.)  As explained infra, Singh would keep Linda Mangano on his payroll until 2014 and the evidence at trial showed that, during that time, she did a miniscule amount of work and, for the vast majority of the time, did no work at all.  (GX1318.)

During April 2010, Singh would speak to Mangano—either in person or over the phone— at least every other day about the loan guarantees.  (Tr. 1483.)  Singh's testimony on this point was corroborated by phone records and emails.   (See, e.g., GX710, GX713, GX714, GX1401,

11

GX1404 (chart of phone calls involving Mangano, Singh, Genova, and Venditto in April 2010).) During these conversations, Singh expressed to Mangano "how important [this loan] is to the survival of my company."  (Tr. 1484.)

In order to assist Singh, Mangano reached out to his old law firm, Rivkin Radler ("Rivkin"), which he had left upon his election as Nassau County Executive.  (Tr. 1952.)  After Singh informed Mangano about Sinnreich's opinion that it would be unconstitutional for the TOB to guarantee Singh's loan, Mangano suggested that he speak to Rivkin to see if they could give an opinion that the guarantee is legal.  (Tr. 1475.)  Venditto also spoke with Mangano, who informed Venditto that he wanted to bring in Rivkin to try to find a solution for Singh.  (Tr. 2779–83 (testimony of Genova).)  As explained below, spurred by Mangano, Rivkin's involvement would ultimately culminate in a critical meeting held on April 28, 2010 at Venditto's headquarters involving Venditto, Mangano, Singh, and other relevant players.

On the morning of April 13, 2010, Singh and Mangano spoke three times on the phone. (GX1402.)  Then, only a few minutes later at 9:34 a.m., Mangano spoke to William Savino, the managing partner at Rivkin, for eleven minutes.  (GX1402, Tr. 2639.)  Although Savino had no independent recollection of this call at trial, Savino's contemporaneous notes from this phone call were introduced and Savino emphatically confirmed that these notes—which contained numerous details about Singh and the loan guarantee issue as well as other items that related only to Mangano—were from a call with Mangano.  (GX423, Tr. 2645–2661, 2710–2714, 2735; see also 2661 (testimony that Savino also believed that this conversation with Mangano was the first conversation he had with anyone about the TOB loan guaranty issue).)  Savino's testimony at trial concerning this phone call was powerful evidence for the government showing Mangano's detailed knowledge of, and involvement in, Singh's attempts to have the TOB guarantee his loans.  For the

government, the credibility of this testimony against Mangano was reinforced by the fact that Savino and Mangano were friends and former colleagues.   (Tr. 2642.)  Savino had worked on Mangano's campaign for County Executive and was the Master of Ceremonies for both of Mangano's inaugurations.  (Tr. 1449, 2643, 2697–98.)

Savino's notes reveal that Mangano discussed, and was familiar with, key details of Singh's concession agreements and the loans he was seeking.  The notes, for example, include the phrases "terminable at will" and "extended to 2049"—the year when the Woodlands agreement was scheduled to expire.  (See GX423, GX525, GX526.)  The notes also reference:

- the "$1.5m" loan that Singh wanted the TOB to guarantee

- Singh's "multiple concessions"

- that Singh had to make capital improvements

- that Singh "has a lot of risk"

- that "Sinnreich" is "counsel"; and

- that the New York State Constitution "prohibits" the Town and that the Town "can't call it a [guarantee]"

(GX423, Tr. 2645–2661.)

Less than an hour after the call with Savino, Singh and Mangano spoke again.  (GX1402.) That same day, Genova spoke with Venditto, who told Genova that Mangano had called him and requested that someone from the TOB reach out to Savino at Rivkin "about trying to craft a resolution for Mr. Singh to get this done."[5]  (Tr. 2779–80, 3077.)  Genova—who had previously informed Venditto about the concerns he and Sinnreich had about Singh's loans— believed that, in this call, Venditto "overruled" him and decided to go "in a different direction."  (Tr. 2778, 2782,

---

[5]  The phone records introduced by the government do not show this phone call between Mangano and Venditto.

3077.)  According to Genova, prior to this call, the TOB's position was that "it was a no-go" and Singh's loans would not be backed by the TOB as "Sinnreich's concerns were not addressed."  (Tr. 2781–82.)

At Venditto's direction, Genova tried to call Savino on April 13, but after being unable to reach him, left a message for him.  (Tr. 2783–84, GX966 (email, dated April 13, 2010 at 3:28 PM, from Savino's assistant to Savino indicating that Len Genova had called for Savino).)  The next day, April 14, Genova spoke with Savino and Rivkin began to advise the TOB concerning the loan guaranty.  (Tr. 2784–85, GX424, GX966, GX1404.)  After speaking with Genova, Savino brought in William Cornachio—a corporate partner at Rivkin—who began to work on the matter and review documents that Mei forwarded to Rivkin later that day.  (GX424, GX823, GX970.)

Mangano's involvement in the matter continued as evidenced by, inter alia, phone records from the next day, April 15, 2010, showing calls involving Singh, Mangano, and Savino. (GX1403.)

Notably, Mangano's renewed intervention with the TOB loans on April 13 occurred less than a week after Sinnreich's April 7 email and only four days after Linda Mangano's first paycheck.

On April 8—the day after Sinnreich's April 7 email—Singh also met with Genova and Venditto.  (Tr. 2982–83.)  Genova testified that he did not recall speaking to Rivkin that day.  (Id.) At trial, the defense argued that Genova brought in Rivkin on April 8 and also that Savino's notes

discussed above were actually from a conversation between Savino and Genova.[6]

At the same time that Rivkin was looking into the guarantee issue, Sinnreich and Mei were also continuing to try to find a solution.  In an email exchange beginning on April 20, 2010 involving Sinnreich and Genova, Mei highlighted a few changes in the proposed deal, including the fact that, in the loan documents, the "stated purpose of the loan" had been changed from "working capital" to "capital improvements at the Golf Course and TOBAY Beach."  (DX734.) Sinnreich responded "that's a big improvement, good work," but went on to explain that this does not "fully resolve the basic underlying problem and risk that, regardless of what either the bank documents say, or our own agreement with [Singh] says, if there is not real control on how the money is spent or an express limit on the scope of the Town's guaranty, the Town remains on the hook if the money is mis-spent."  (DX734.)  Sinnreich also asked Mei if the lender was willing to limit the scope of the Town's guaranty to moneys actually expended on capital improvements. (DX734.)  On April 21, Mei responded to Sinnreich, stating "[t]he issue is no longer on hold," but no "final decision" had been made yet.  (DX 735.)  Mei informed Sinnreich that the bank had rejected the possibility of limiting the scope of the guaranty, as Sinnreich had suggested.  (DX735.)

---

[6] According to the defense, Genova, not Mangano, brought Rivkin in to work on the loan guarantee matter as, at this time, Rivkin was already counsel to the TOB in an unrelated civil litigation.  (Tr. 2980, 2984, 2986.)  The defense argued that Savino's handwritten notes were actually notes from a call that he had with Genova and that Genova had first contacted Rivkin on April 8. (Tr. 2981.).  In support of these arguments, the defense relied on, inter alia, testimony from Singh in he admitted that, at an early proffer session in May 2016, he had told the government that:  (1) he had never spoken to Mangano about Rivkin giving an opinion; and (2) that Genova had told Singh that Genova wanted to get an opinion from another law firm and, at that time, Rivkin was called upon.  (Tr. 2020–21, 3500-HS-28 at 3 (also noting that Singh "was not sure of how/why Rivkin was contacted"); see also GX424, GX440; Tr. 2672–74, 2722, 2985.).)

However, extensive evidence—including phone records; an email from Savino's assistant; testimony from Savino and Genova, and the fact that Savino's notes referenced certain items that are only related to Mangano and not to the TOB and Genova—showed that these notes were, in fact, from a call with Mangano.  (See Tr. 2660–70, 2784; GX966, GX 967, GX1404 (phone records showing Savino and Genova spoke for six minutes on the morning of April 14, 2010.); see also Tr. 2724–26, 2672–74 (testimony from Savino explaining why Rivkin's new business memo, which is dated April 22, 2010, incorrectly lists April 8, 2010 as the date Rivkin first worked on the guaranty matter).)

Mei also rebuffed Sinnreich's suggestion that the Town obtain "more direct control over the money" and instead claimed that the fact that the Town has to approve Singh's capital projects and will get "monthly or periodic statements from the Bank" about the loan will allow the Town to "monitor the funds and their use, albeit after the fact." (DX735.)

> iv.  *The April 28 Meeting*

On April 23, 2010, a Friday night, Singh emailed Genova the name and contact information for Singh's attorney and the attorney for Madison, a bank which was interested in financing Singh's loan provided that it was backed by the TOB. (GX709.) Genova responded the next day that he was leaving shortly for Saratoga and would speak to Singh on Monday. (GX710.) Later that day, Singh forwarded Genova's email to Mangano so that Mangano would know that Genova was "dragging his feet." (GX711, Tr. 1617.)

On Sunday, April 25, Singh emailed Genova asking if they could meet on Monday. (GX712.) On Monday morning, April 26, Singh—having not heard back from Genova and clearly concerned—emailed Mangano and asked him to set up a meeting with Venditto. (GX713, Tr. 1619, GX1404 (calls between Venditto and Mangano on April 26).)

On Tuesday, April 27, Singh emailed Mangano again, asking: "Dear Ed, Can you I and Fred Mei meet with JV [Venditto] on [Wednesday or Thursday]?" (GX714.) As Singh explained at trial, he did not want Genova at this meeting because Genova was siding with Sinnreich.[7] (Tr. 1485, 1620.)

According to Singh, Mangano told him that, in response to Singh's emails, Mangano spoke to Venditto to set up a meeting for Singh. (Tr. 1619.) Venditto then called Genova to tell him that

---

[7]  This contemporaneous email undercut the defense theory that Genova fully supported, without hesitation, Singh during this entire process. (See Tr. 3861, 3877, 3912, 3913, 4133, 4148.)

16

Mangano wanted to have a meeting on this matter.  (Tr. 2785, 2998 (testimony of Genova).)  Genova then reached out to Mei and told him that were would be a meeting on April 28, and that he should invite Sinnreich, Savino, and anyone else who was necessary from Rivkin.[8]  (Tr. 2786.)

On April 28, 2010, a critical meeting concerning Singh's loans was held at Venditto's campaign headquarters in North Massapequa.  (Tr. 1486, 1491.)  Mangano, Singh, Venditto, Genova, Mei, Sinnreich, Savino, and Cornachio all attended, as did Rob Walker, Chief Deputy County Executive of Nassau County and Mangano's second-in-command, and Rich Porcelli, Venditto's unofficial Chief of Staff.  (Tr. 49, 120, 146, 1486, 1491, 1547.)

Singh asked Mangano to attend this meeting so that everyone would understand that they needed to figure out a way to get this deal done.  (Tr. 1485–87.)  Singh believed that Venditto "would listen to Ed Mangano a lot more than he would only [to Singh], especially when there [was] opposition within the administration."  (Tr. 1487–88.)

As Genova explained, Mangano's presence at the meeting was "unusual," because the matter of Singh's loans was purely a "town issue."  (Tr. 2788–89; see also Tr. 2552–53 (testimony of Sinnreich explaining that Mangano contributed by his "very presence" at a meeting that concerned a Town of Oyster Bay matter); Tr. 2676–77 (testimony of Savino).)  Genova, however,

---

[8]  Mangano contends that Singh lied at trial concerning the genesis of this meeting.  (See 3500-HS-28 at 4 (notes from proffer session in May 2016 indicating that Singh told the government that he "most likely asked Porcelli to arrange for a meeting to get the loan done" and that the meeting was "arranged by" Genova); Tr. 2030 (Singh's testimony on cross-examination concerning these proffer notes during which Singh testified that "either Rich [Porcelli] or Lenny [Genova], somebody arranged [the] meeting.". .))  However, Singh's testimony concerning Mangano's involvement was corroborated by Genova's testimony as well as by Singh's April 26 and April 27 emails.  Although the proffer notes indicate that Singh told the government at an early proffer session that he "most likely asked Porcelli to arrange for a meeting," Singh's April 26 and April 27 emails to Mangano confirm that Singh asked Mangano to arrange this meeting.  (GX714.)  Additionally, the involvement of others in ultimately arranging this meeting are not inconsistent with Mangano's intervention with Venditto concerning the meeting, about which both Genova and Singh testified.

It should be noted that the 3500 material cited above, and at other points in the background section of this opinion, was not admitted at trial.  The Court has noted this 3500 material because Mangano relies on it in his motion for a new trial based on newly discovered evidence.

was not surprised at Mangano's presence because "the request" had come "multiple times" from Mangano to Venditto and this was obviously "something [Mangano] wanted to get done." (Tr. 2788–89.) According to Genova, it was his idea to invite Sinnreich, and he did so "to make sure his position and mine was adequately reflected at the meeting." (Tr. 2786; see GX111) Genova and Savino spoke for 10 minutes on the phone before the meeting. (Tr. 3001, 2718.)

The meeting lasted for about 60 to 90 minutes.[9] (Tr. 1490, 2547, 2620.) The purpose of the meeting was to discuss how to obtain financing for Singh to do the capital improvements at both locations. During the meeting, Sinnreich and the Rivkin lawyers discussed the "proposed amendment to [Singh's] concession agreement," and "the problems" and "concerns" that Sinnreich had previously outlined in his earlier communications with TOB officials, including the "New York Constitution, the need for consideration, [and] the use of funds." (Tr. 1489–90, 2550, 2617–19, 2788, 3007 1489–90; see also GX424 (noting that the day before the April 28 meeting Cornachio had "[d]iscussions and [performed] additional research regarding Woodlands project.").)

At the end of the meeting, Venditto said to everyone that "we need to find a way to help our friend H Singh." (Tr. 1490.) Although Singh testified that Mangano did not speak during this meeting, Genova testified that, like Venditto, Mangano also said, at the meeting, "we really have to get this done for Mr. Singh." (Tr. 1490, 2788, 2790, 3005.) Sinnreich also recalled that, during the meeting, Mangano stood behind Singh and, at the conclusion of the meeting, put his hand on Singh's shoulder and said "Let's see if we can find a way to help our friend [H]." (Tr. 2551.)

---

[9] According to Sinnreich, Mangano arrived sometime after he did. (Tr. 2621 ("I really don't recall whether it was 20 minutes, 22 minutes, 27 minutes, 30 minutes, 17 minutes. I know that it was after I arrived there was a gap. That's really all that I can testify to."); but see Tr. 3003 (Genova's testimony that Mangano was there when Genova arrived).

At trial, both Singh and Genova also recounted that, at this meeting, Venditto asked Mangano to hire certain individuals to work for Nassau County. According to Singh, when he arrived at the meeting, Mangano, Walker, Venditto, and Porcelli were already discussing Nassau County hiring some people from Venditto's Massapequa Republican club. (Tr. 1488-1489.) Genova recounted a similar story, except in Genova's account, this conversation occurred at the end of the meeting when Venditto approached Mangano about hiring people from Venditto's Republican club and about obtaining promotions for other people in the club who were already working at the County. (Tr. 2790–91.) Mangano was receptive to hiring these individuals. (Tr. 2791.) As Genova explained at trial, this was "politics"—i.e. "we're in a situation where Mangano asked for a favor, this whole thing is convened," and this is "obviously an opportune time for Venditto to ask him for things he needed that were important to him." (Tr. 2791.)

After the meeting, Mei and Cornachio found what they believed to be a solution to the loan guarantee issue. At the time, Singh's concession agreements already required the Town to pay Singh, pursuant to a formula, for the improvements he had already completed if the Town terminated the contract without cause. (GX517, GX518; see discussion infra p. 89–93.) Cornachio's proposed solution would help protect Madison by ensuring, through amendments to Singh's concessions agreements, that the TOB would pay $1.5 million even if the Town terminated

Singh's concession with cause.[10]  (GX716.)  The TOB ultimately adopted this proposed solution, with the TOB backing Singh's first loan in June 2010.[11]

Shortly after the April 28 meeting, Singh spoke to Cornachio about this proposed solution. (Tr. 1491–92.)  Singh then spoke to Mangano and told "him that . . . Cornachio had found a way to get this loan guarantee done through [the] Town of Oyster Bay," to which Mangano replied, "That's great news and it's wonderful.  I'm glad I could be help."  (Tr. 1495.)  On April 29, Singh received an email from Mei outlining Mei's conversations with Cornachio and the bank's attorney about the proposed solution devised by Cornachio.  Later that day, Singh forwarded Mei's email to Mangano in order to keep Mangano "in the loop."  (GX716; Tr. 1623–24.)

Ultimately, Venditto signed off on the TOB "extending its credit to Singh" for his loans

---

[10]  Cornachio's solution did not allay Sinnreich's concerns about the deal.  In communications with Genova and Mei in early May, Sinnreich expressed his view that the proposed transaction was "completely bogus and a sham and was not legal" and that—although no longer a facially unconstitutional straight guarantee— it would not "survive scrutiny."  (Tr. 2553, 2792, 3012, 3079; GX831, GX1164, GX1165.)  Sinnreich also continued to advise, inter alia, that the TOB should only agree to pay $1.5 million after the new capital improvements Singh was planning to make had actually been completed.  (GX1165.)  Sinnreich believed the bank would have issues with the changes that he believed were necessary.  (Id.)  After sending a final email about these concerns to Genova, Sinnreich had no further involvement in the loan guarantee issue.

[11]  Back in February, Mei had suggested an amendment along similar lines in an email to Sinnreich.  (DX721.)  Sinnreich questioned what the consideration provided by Singh would be for such a change, and indicated that he believed that it would have to "be specifically tied to new funding being obtained by the concessionaire specifically for the improvement of the park facilities."  Sinnreich concluded that Mei's idea "Needs to be through, but [is] promising."  (Id.)  As explained infra, the consideration ultimately provided by Singh was a release not to sue the TOB if the Town terminated the agreement and made the payment required by the contract in the event of a termination.

and, according to Genova, Venditto did so "because of Mangano's request."[12]  (Tr. 2792.)

Singh would ultimately obtain four loans that were indirectly guaranteed by the TOB: (1) a $1.5 million loan for TOBAY Beach from Madison in June 2010; (2) a $3.4 million loan for the Woodlands from Madison in May 2011; (3) a $7.8 million loan for the Woodlands from NDH Capital Corp. ("NDH") in November 2011; and (4) a $12 million loan from NDH in July 2012.

On June 8, 2010, the Town Board passed a resolution authorizing "amendments" to Singh's concession agreements.  On that same day, Venditto executed a concession amendment for TOBAY Beach indirectly guaranteeing the $1.5 million Madison loan for TOBAY Beach.  On June 18, Genova executed a related assignment agreement for that loan.  For the remaining three loans, Genova would sign all of the concession amendments and related documents indirectly guaranteeing Singh's loans.  The details of these loans and concession amendments are discussed in greater depth infra.

### 3.  Singh's Hiring of Linda Mangano for a No-Show Job

As stated earlier, two days after Singh received Sinnreich's "red light e-mail" on April 7, Singh hired Linda Mangano.  Additional details about her hiring and no-show job are set forth below.

---

[12]  At trial and in his post-trial motions, Mangano stressed that Singh told the government during an early proffer session that "regardless of whether Ed Mangano had spoke[n] to John Venditto, the result would have been the same." (Tr. 2008.) Singh, however, said this about his initial request that Mangano speak to Venditto about the loan guarantee in January 2010 and not about the subsequent communications between Mangano and Venditto.  (Tr. 2008; see also 3500-HS-28.)  That initial request was, of course, prior to Sinnreich being retained to review the proposed deal and raising red flags that culminated in his April 7 email that threatened to torpedo Singh's loan guarantees.  Moreover, even with respect to Mangano's intervention in January 2010, Singh explained, at trial, that he still wanted Mangano's support to "assure that the loan guarantee happens." (Tr. 2008; see also 3500-HS-28 (proffer notes from May 2016 interview where Singh explained that, in January 2010, he spoke to Mangano and not Venditto because "it would have more of an effect").)

It is also notable that, according to Singh's May 2016 interview notes, Singh told the government at this early proffer session that he wanted Mangano to be present at the April 28 meeting because Singh hoped that his presence "would influence the meeting" and Singh believed that "it helped."  (3500-HS-28 at 4.)  Moreover, those same interview notes indicate that Venditto wanted Mangano to hire people and that "they would not say no to him."  (Id.)

Securing Linda Mangano a job and salary was critical to the Manganos' finances.  Prior to becoming Nassau County Executive, Mangano was a member of the Nassau County Legislature and, concurrently, worked as an attorney at Rivkin.  Between those two jobs, Mangano earned $298,392 in 2009.  (GX1306.)  However, as Nassau County Executive, Mangano's 2010 salary was only $174,896.  (GX1306.)

Sometime in early 2010, Mangano explained to Singh that following his election as County Executive, he had to take a major pay cut of over $100,000.  (Tr. 1476–77, 1993, 2001; GX1306.) Mangano then asked Singh to hire Linda Mangano to make up for this $100,000 difference.  (Tr. 1476–77.)  Singh told Mangano that he would "look into that."  (Tr. 1477.)

Then, on April 9, 2010, two days after receiving the "red light" email from Sinnreich about the TOB loan guarantees, Singh put Linda Mangano on his payroll and cut her first paycheck dated April 9.  (GX1662, GX1663, Tr. 1432.)  She would remain on Singh's payroll for the next four years—with the Manganos collecting over $450,000 from Singh.  (Tr. 1432, GX1318.)  During that time, she did a miniscule amount of work and for long stretches of time did no work at all. The evidence at trial overwhelming showed that Linda Mangano's "job" was clearly a bribe because her position was, as Singh explained, a "no show" job.[13]  (Tr. 1430, 1582, 1697, 1715–

---

[13]  The question of exactly how little work Linda Mangano had done for Singh (and what exactly she said to FBI agents in 2015 about the extent of her work) was the subject of the false statement and obstruction charges for which the jury returned guilty verdicts.

The evidence at trial overwhelmingly showed that this alleged "job" was clearly a bribe.  (See Tr. 1430–1431; Gov't Opp'n to Rule 33 Mot. at 34–35, 43–45 (evidence from other witnesses about Linda Mangano's job).)  Notably, while Linda Mangano's April 9, 2010 paycheck purportedly covered the pay period from March 15, 2010 through March 28, 2010, she clearly performed no work for Singh during that time.  (Tr. 207, 1481, 1730–32; GX1222.)  Also notable is the fact that, a week after Linda's Mangano's first paycheck was issued, Singh's companies placed advertisements for a marketing manager, which was Linda's purported position.  (GX877, GX878, Tr. 1719–1720.) Moreover, despite being paid by Singh's restaurant at the Water's Edge in Queens, Linda Mangano did not even meet Joe Scalice, the manager of the Water's Edge until April 27, 2010.  This meeting occurred at the Woodlands and Linda Mangano appears to have, during her four years on Singh's payroll, only visited the Water's Edge on possibly  one occasion in connection with her purported employment.  (Tr. 202–211, GX1222.)

1720, 1724–1728; see Gov't Opp'n to Rule 33 Motion at 34–35, 43–45, ECF No. 426 (recounting

the documentary and testimonial evidence from numerous witnesses showing that Linda Mangano

had a no-show job and made false statements to the FBI about her purported employment with

Singh).)

Singh issued Linda Mangano paychecks and W-2s from Singh's only Queens-based

business, the Quinn Restaurant Group, Inc. ("Quinn"), the corporate entity that controlled Singh's

Water's Edge restaurant in Queens.  (Tr. 80, 299.)  Mangano had requested that Singh pay Linda

Mangano from a company that was not doing business with the TOB or Nassau County.  (Tr. 1734,

GX481–485, GX446–450.)

At trial, Singh testified about why he hired Linda Mangano.  Singh made clear that

Mangano's assistance in obtaining the loan guarantees from the TOB was a principal reason why

he put Linda Mangano on his payroll with a salary of over $100,000 a year.  (Tr. 1477.)  Singh's

testimony emphasized the clear connection between his hiring of Linda Mangano and her

husband's assistance with the TOB loan guarantees:

> Q:  Why did you agree to hire Linda Mangano:
>
> A:  Again, it was major thing [Mangano] was working on getting the loan
> guarantee, which was the survival of my entire company was depending on this
> loan guarantee, security of my family and myself, my employees.  So when he
> requested and I knew that . . . without his help I won't be able to get this loan
> guarantee done, so I complied with the request.
>
> Q:  We'll get into the details of Linda Mangano's employment in a little bit. But
> can you tell the jury how much she was paid?

---

The evidence that Linda Mangano did any work at all during her four years on Singh's payroll consisted primarily of a series of email exchanges concerning two projects that she worked on for the Water's Edge between April 27, 2010 and August 31, 2010.  (Tr. 202–211, 2307–66; DX527–39, DX541–42, DX544–51, DX553–58.)  Scalice estimated that, working eight-to-ten hour days, these two projects would have taken him three or four days to complete.  (Tr. 210.)  Linda Mangano took three-and-a-half months to do these projects.  (Tr. 210–211.)

A:  She was paid a little over $100,000, maybe $110, $115,000, I don't know the exact number, per year.

\*\*\*

Q:  And how did you decide to pay that salary?

A:  Ed Mangano had spoken to me that that's the difference between his job as an attorney for Rivkin Radler and as a county executive. So if I can pay that, I said I will, and I did.

Q:  Can you explain for the jury again why you hired Linda?

A:  I hired Linda Mangano because I needed this loan guarantee done from Town of Oyster Bay.  So when Ed was on board and supported this loan, when he requested me to help him financially, obviously it was a mutual benefit.  So I did -- I complied with that.

(Tr. 1477–78.)

When asked about the significance of Linda's check being dated April 9, 2010—two days

after Sinnreich's April 7 email—Singh explained that:

> While I'm lobbying . . . Ed Mangano to make sure this loan gets back on track, which was -- which was in grave danger of being done due to Jonathan Sinnreich's e-mail, so I reached out to Ed and I wanted to make sure that he's happy and he's doing whatever needs to be done.  So I had my accounting process a check for Linda Mangano which was dated from March 15th til March 28th of 2010 <u>to make sure that Ed Mangano doesn't have any concern regarding his financials so he can concentrate on getting my work done</u>.

(Tr. 1482 (emphasis added).)

Singh explained that obtaining the loan guarantees was one of the reasons why he hired

Linda Mangano:

Q:  Why did you hire her?

A:  On the request of Ed Mangano, <u>who said that he just has gotten reduced salary from Rivkin Radler and if I can hire her and you know, I hired upon the request of Ed Mangano and I knew that Ed was doing a lot of favors for me, you know, every and different matters.  So I complied with the request really.</u>

Q:  When you say Ed was doing favors for you?

24

A:  Yes.

Q:  What did you expect, what were the favors?

A:  It was like, you know, keeping the County Executive on call, retainer and also making sure that either it was a loan guaranty from Town of Oyster Bay, Nassau County, it was a work with fire marshals, Health Department or really I mean anything, anything I needed in Town of Oyster Bay, Nassau County or even some other level of the government, if I needed something I had to make phone call and get it done.

(Tr. 1717 (emphasis added).)   On cross-examination, Singh further testified that the TOB guarantees were one of the reasons why he hired Linda, as Singh needed Mangano on "many fronts, either contracts with the county, getting work done in Oyster Bay, and also anything I needed and actually anywhere." (Tr. 1994-95.)

Of course, in addition to Singh's testimony on these points, the timing of Linda Mangano's hiring and first paycheck was powerful circumstantial evidence that Mangano's assistance concerning the TOB loan guarantee issue was, at the very least, a principal reason why Singh hired Linda Mangano at a lucrative salary of over $100,000 per year.  It also showed that Mangano understood the arrangement he was entering into with Singh.

Singh proceeded to pay Linda Mangano for the next four years until August 4, 2014 when Linda Mangano received what would end up being her final paycheck.  (Tr. 1432, 1738–39; GX460. GX473.)  The next day, the FBI raided Singh's headquarters.  (Tr. 1738–39.)  Singh then told Mangano that because of the FBI investigation, Linda Mangano would not receive any further paychecks.  (Tr. 1738–39.)

### 4.  The Nassau County Bread and Rolls Contract and the Nassau County OEM Food Procurement Contract

In addition to assisting Singh with his TOB loan guarantees, there was also evidence at trial that Mangano took official action to secure two contracts with Nassau County for Singh's

25

businesses.  First, Singh secured, in 2012, a contract for a storefront bakery he owned to provide bread and rolls to the Nassau County Jail.  (Tr. 478–669, 1501–1509.)   Under this one-year contract, which had an option for Nassau County to extend it for an additional year, Singh's bakery was to be paid approximately $200,000 to provide the bread and rolls for the jail.  (Tr. 504, 1509, 1645.)  Singh testified that Mangano first suggested to Singh that he could supply the Nassau County Jail after tasting some bakery samples that Singh brought over to the Manganos' house. (Tr. 1502–04.)  According to Singh, Mangano repeatedly told him that he would support Singh's attempt to get this contract .  (Tr. 1506.)  Eventually, in 2012, the jail's bread and rolls contract was put up for bid again.  Singh's small storefront operation, and the incumbent vendor, Rockland Bakery, a large commercial bakery, submitted bids.  (Tr. 478–669, 1501–09.)  Although officials in the Nassau County Purchasing Department recommended awarding the contract to Rockland Bakery, Walker—Mangano's second-in-command—intervened in extraordinary fashion with the Purchasing Department to have the contract awarded to Singh's bakery.  (Tr. 478–669.) Ultimately, Singh's bakery canceled the contract shortly after receiving it, after Singh's wife realized that the storefront bakery could not provide the large numbers of bread and rolls required by the contract.  (Tr. 526–27, 1509–1510.)

Singh also obtained a contract to provide food to the Nassau County Emergency Management Center during Hurricane Sandy in November 2012.  The Singh Hospitality Group, which was the parent company for all of Singh's businesses, was paid $240,000 by Nassau County for providing 19 days of food to the Emergency Management Center.  (Tr. 1050, 1646, 1734.) There was evidence at trial, including testimony from both Mangano's former assistant and Singh himself, that Mangano intervened and directed that Singh be awarded this contract.  (See, e.g., GX333; Tr. 835–840, 848–49, 909, 917–920.)

26

Prior to Mangano becoming Nassau County Executive, Singh had not received any contracts from Nassau County.

Singh also testified at trial about how Mangano intervened, sometime in 2011 or 2012, to help Singh obtain a restaurant concession at an OTB location in Carle Place. (Tr. 1650–1654; see Tr. 1653 ("[Mangano said he would speak to the President of OTB] and he will work on getting that contract to me.").) When this restaurant turned out, after two months, not to be profitable, Singh told Mangano he was going to shut down the restaurant. (Tr. 1654.) Mangano responded that he was "disappointed because he had worked hard on getting that contract," and then told Singh to talk to the President of OTB, who would "let [Singh] off the hook" for the restaurant's outstanding lease obligation. (Tr. 1654.) After that conversation, Singh ended up not having to pay the remainder of the rent on this lease. (Id.)

### 5. Obstruction of Justice and Evidence Concerning Anthony Gulino and 329 Broadway

At trial, the government introduced evidence of obstruction of justice. The evidence showed that, after the FBI raided Singh's business in 2014 and agents interviewed Linda Mangano on January 13, 2015, the Manganos, along with Singh, fabricated false narratives about Linda Mangano's employment and the work that she purportedly performed in order to cover up the over $450,000 in bribes that the Manganos received through Linda Mangano's salary. (See Gov't Opp'n to Silver II Mot. at 21, ECF No. 425 (recounting evidence of obstruction).) Linda Mangano then recounted these false narratives and made other false statements during subsequent interviews with FBI agents and prosecutors. (Tr. 1219–1221, 1236–1245, 1249–1250, 1255–1259.)

In addition to this evidence showing that the Manganos obstructed the government's investigation into whether Linda's "job" was a bribe, the government also introduced evidence

concerning two other incidents that shed light on, inter alia, Mangano's intent and his relationship with both Singh and Venditto.

First, a contractor named Anthony Gulino performed a $3,600 repair, for no charge, at Mangano's house and, in order to cover it up, gave Mangano $3,600 in cash and had Mangano write him a check for the same amount.  (Tr. 1143–93.)  Singh then helped Mangano launder the cash.  (Tr. 1748–50.)

Second, in 2012—after Singh helped Mangano sell a piece of property located at 329 Broadway in Bethpage to an associate of Singh's—Mangano spoke to Venditto, who then allowed the purchaser to circumvent the TOB's established permit and variance process to build on the property.  (Tr. 1740–1748, 2838–2844 (testimony of Genova); see also Tr. 3096–3128 (testimony from Timothy Zike); GX164, GX165, GX556–63, GX566–67.)  Mangano had sold the building with the understanding that the purchaser could construct a retail building with apartments at this location and that the Town of Oyster Bay would approve the planned building.  (Tr. 1741, 2838–39.)  After the building was sold, Mangano subsequently intervened with Venditto and secured permission for construction of the proposed building, which was in "gross violation of Town of Oyster Bay code."  (Tr. 1740–1748, 2838–2844, 3120–21.)

### 6. The Government's Case and Mangano's Defense at Trial

At trial, the government argued that Singh had Mangano on "retainer" and, in exchange for Singh's bribes, took official action concerning the TOB Loan Scheme, the Bread and Rolls Contract, and the OEM Food Procurement Contract.  (See, e.g., Tr. 3727, 3788.)  The government also stressed the direct connection, and timing, between Linda Mangano's hiring and Mangano's intervention to make "sure that the Town of Oyster Bay's guarantee happens."  (Tr. 3778.)  The government asked the jury to scrutinize Singh's testimony carefully and to compare it to all of the

28

other evidence in this case which, the government argued "prove beyond a reasonable doubt that the defendants committed the crimes charged" and "confirm[ed] . . . Singh's testimony."  (Tr. 4439-4440.)

During his testimony and extensive cross-examination, Singh, who had already pled guilty to tax evasion in connection with his cooperation and plea agreement, was impeached with, inter alia, his prior inconsistent statements and was shown to have also committed a number of other crimes, including loan, insurance, and litigation fraud.  Mangano's counsel argued that Singh was an inveterate liar and accused Singh of rampant perjury.

With respect to the TOB Loan Scheme, defense counsel attempted to cast all of the witnesses, including Genova, who had received immunity, as giving unreliable testimony that contradicted other evidence in the case and their earlier statements to the government during proffer sessions and interviews.  Mangano's counsel contended that the Town, including Genova, had always accommodated Singh, both before and after the loan guarantees, and that Singh had bribed Mei to obtain the TOB loan guarantees and other assistance.  (See, e.g., Tr. 3855–3858, 3861, 3867–68, 2898–3906, 3909–3911, 3912–13; see also 3877 (discussing "burner phones" that Singh and Mei used together after the government began investigating Singh).)  Defense counsel argued that:  (1) given the TOB's relationship with Singh, there was no need for Mangano to pressure Venditto; (2) Genova, and not Mangano, brought in Rivkin; and (3) all Mangano did in connection with the loan guarantees was attend part of the April 28 meeting where he never said anything, which defense counsel maintained was insufficient to constitute official action.  (See, e.g., Tr. 3913, 4417, 4131)

In addition to arguing that Mangano did not, in fact, obtain the Bread and Rolls contract or the OEM Food Procurement Contract for Singh, defense counsel also stressed two categories of

contracts that Singh did not receive from Nassau County while Mangano was in office. Specifically, Mangano pointed to: (1) Singh's testimony about lucrative Nassau County "requirements" contracts that Singh had hoped to receive through a company of his named SGT Consulting, but never obtained; and (2) evidence that although Nassau County had the ability to give outside vendors contracts worth $25,000 or less without any legislative approval—Singh did not obtain any such contracts from Nassau County.[14] (Tr. 2083, 3862–63.) Defense counsel maintained that Singh's failure to obtain any of these contracts undermined the government's entire theory of the case. (See Tr. 382 ("I think they called him a professional schemer, Ed Mangano. Quite a scheme. [Singh] got nothing.").) Defense counsel also asserted that the requirements contracts that Singh had hoped to receive were the real reason why Singh hired Linda Mangano. (Tr. 4189.)

Mangano also relied on certain recordings during the government's investigation that contained exculpatory statements. The primary recording of Singh was made surreptitiously by

---

[14] A requirements contract, in which a vendor performs contracting services to a municipality, could be worth millions of dollars to the vendor who secures such a contract. (Tr. 1944-45.) Singh had a long-standing relationship with Wellcraft Contracting, which was owned by a contractor named Mike Romeo. (Tr. 1946, 2183.) On April 6, 2010—three days before Linda Mangano's first paycheck and one day before Sinnreich's April 7 email—Romeo registered, in Singh's name, the company SGT Environmental Consulting as a vendor with Nassau County. (DX17; Tr. 1719, 2004.)

At trial, Singh admitted that one of the reasons he purchased Mangano's office chair in December 2009 and hired Linda Mangano in April 2010 was because Singh wanted help obtaining requirements contracts through SGT. (Tr. 1943–46, 2002–05.) Singh, however, insisted that he also had other reasons for bribing Mangano, including the TOB loan guarantees. (Tr. 2002–05; see also 3500 HS-28 at 11 (proffer notes from May 2011 stating: "I will give wife a no show if you help me with the loan. I'll scratch your back you scratch mine".) In discussing SGT, Singh also admitted that he had previously told the government that: (1) he "gave Linda the job thinking [he] would get contracts through SGT"; (2) he had "a lot of expectations of getting work within Nassau County"; and (3) that "if [he] had hired Rob Walker's wife, [he] would have gotten further with SGT." (Tr. 2002–03.)

SGT did not end up receiving any Nassau County contacts between 2010 and 2015. (Tr. 2082.) No further evidence was introduced at trial about SGT or any efforts by Singh and Romeo to obtain any specific contracts from Nassau County.

Mei during a conversation with Singh on March 26, 2015 as part of Mei's cooperation with the government.  In the recording, the following exchanges occurred:

> Mei:  Ed was certainly happy to spend the money that Linda made.  So I don't know why he would be upset.
>
> ***
>
> Mei:  People are going to assume  . . . that if you gave him money like that that he did something for you.
>
> Singh:  That's what the FBI (inaudible.)
>
> Mei:  Was there anything he did for you?
>
> Singh:  <u>Nothing</u>.  <u>Nothing</u>.
>
> Mei:  So there you go.
>
> Singh:  The only (inaudible) Sandy we got the contract to deliver food and that came only through the state not Ed.
>
> Mei:  Right, that FEMA.  Wasn't it FEMA?
>
> Singh:  FEMA, right, so nothing.
>
> ***
>
> Mei:  Well, the assumption is going to be that he did something for you.  What could he have done?
>
> Singh:  <u>They think I have a contract because of Ed which is –</u>
>
> Mei:  <u>What, a contract with the town</u>?
>
> Singh: <u>Yeah.</u>
>
> Mei:  <u>Well, that's not true.  Well, I know that's not true.</u>
>
> ***
>
> Mei:  <u>They are not going to get Ed on anything?</u>
>
> Singh:  <u>Nothing.  (Inaudible.)  No.  She worked (inaudible) she did some work, I paid, you know (inaudible) I didn't get anything, I lost money.</u>

31

(GX210C (transcript) (emphasis added); see GX210a, GX210b.)   Singh sought to explain the

recording, stating, inter alia, that he was not going to disclose to Mei that he was bribing Mangano

and that the "contract" he was discussing was his original "concession agreement."  (Tr. 1578.)

Mangano also emphasized two other recordings.  One was a recording of a June 3, 2015

telephone call between Singh and a friend of his who was a former police officer:

> Singh:  "[T]hey want me basically – I know what they want me to do, you know.
> They want me to, you know, tell me - - tell them a story about some politician, I
> don't have any story about any politician."
>
> Caller:  Right.
>
> Singh:  I wish I did, I mean, I could make shit up, but it will be all lies, that won't
> be good either, you know.
>
> Caller:  I think (inaudible) politicians better than they think they are here.
>
> Singh:  Yeah, they think that everybody totally crooked and corrupt, you know,
> that's the only reason that anybody has friends (inaudible) I had them.  What is
> wrong is being nice and generous to everybody.  So . . . "
>
> ***
>
> Singh:  And now, you know, I do – you know, to save my ass I turn on them, lie –
> I turn on them and I say – (inaudible) if I go and just lie to them and makeup a story,
> because nobody has ever asked me to do, hey, if you do this ---
>
> Caller:  Exactly
>
> Singh:  We'll do this for you.

(Tr. 1596, GX268, GX268 (transcript).)  At trial, Singh testified that, during this call he was lying

to his friend and that there was no reason for Singh to tell him that was bribing politicians.  (Tr.

1596–99.)

Defendants also relied on the following May 19, 2015 recording between Singh and his

lawyer, Joe Conway, related to the obstruction charges and false statement charges:

Conway:  Yeah, Yeah.  What are we doing tonight?

Singh:  Just, I guess, [Ed] wants to talk to you, and you know, I think it's more a calming situation.

Conway:  Yeah, yeah.  He mentioned it to me last week when I saw him and I said, yea, you want me to talk to [Linda], let me know.

Singh:  Yeah, it's mostly that and I think she should go there very calm and cool and don't answer too much.  Sometimes she had a tendency to talk too much and, you know, and that can, you mean well, but that can get yourself in trouble for no reason.

Conway:  Yeah, exactly, exactly.

Singh:  You know, and there's nothing there.  You know, there is nothing there. I've never done anything, you know, so you know, I think she should be as honest as possible and . . . you know, . . . and then we'll do whatever they want to do with it.

(GX267A.)  Later on May 19, 2015, Singh, Conway, and the Manganos would meet at Mangano's house.  The next day, May 20, 2015, Linda Mangano would attend her first proffer session with the FBI.

## B. <u>Procedural History</u>

### 1. **The Original Indictments**

Mangano, Linda Mangano, and Venditto were indicted on October 18, 2016.  Mangano and Venditto were charged with conspiracy to commit Federal Program Bribery and Honest Services Fraud, and related substantive counts, in violation of 18 U.S.C. §§ 371, 666(a)(1)(B), 1343, 1346 and 1349.  The Indictment charged Mangano and Venditto with conspiring, and engaging in a scheme, to solicit and receive bribes and kickbacks from Singh in exchange for "<u>performing official actions, on an as needed basis, as opportunities arose, in connection with [Singh's] businesses in Nassau County and the TOB</u>."  (Indictment ¶ 9 (emphasis added).)  These

bribery charges concerned bribes Mangano and Venditto allegedly received from Singh in connection with the TOB Loan Scheme and the two Nassau County contracts Singh received.

Mangano was also charged with extortion under color of official right, in violation of 18 U.S.C. § 1951, in connection with the Nassau County contracts. The Manganos were both charged with conspiracy to obstruct justice, in violation of 18 U.S.C. § 1512(k). Venditto and Linda Mangano were also charged with obstruction of justice, in violation of 18 U.S.C. § 1512(c)(2), and with making false statements, in violation of 18 U.S.C. § 1001(a)(2). A superseding indictment added securities fraud charges against Venditto.

### 2. The First Trial

Prior to trial, the Court denied the defendants' pretrial motions, which, inter alia, challenged portions of the indictment on sufficiency and duplicity grounds and raised two discrete arguments concerning the statute of limitations and the charges involving the TOB Loan Scheme. In an Order dated February 9, 2018, the Court denied these motions, relying, at various points, on the "stream-of-benefits" theory of bribery advanced by the government. (Feb. 9, 2018 Order, ECF No. 137.)

The first trial began on March 14, 2018. Over the course of ten weeks of testimony, the government called approximately 60 witnesses. Singh, pursuant to a cooperation agreement, testified on the stand for 12 days. The jury began deliberating on May 18, 2018. On May 24, 2018, Venditto was acquitted of all charges. The jury deliberated through May 31, 2018 on the charges against the Manganos, but did not reach a verdict on any of those counts. The Court declared a mistrial on all the charges against the Manganos.

On August 8, 2018, a Second Superseding Indictment was issued, which included additional specificity concerning the alleged false statements Linda Mangano made during her

interviews with FBI agents.  (Second Superseding Indictment ("SSI"), ECF No. 309.)  Similar to

the earlier indictments, Mangano was again charged with "engag[ing] in a scheme to solicit and

receive bribes and kickbacks from Singh in exchange for [Mangano] performing official actions,

or causing the performance of official actions, on an as-needed basis, as opportunities arose."  (SSI

¶ 7.)  As with the earlier indictments:

> Count 1 charged Mangano with conspiracy to commit federal program bribery;
>
> Count 2 charged Mangano with the substantive offense of federal program bribery;
>
> Count 3 charged Mangano with conspiracy to commit honest services wire fraud;
>
> Counts 4 and 5 charged Mangano with the substantive offenses of honest services wire fraud; and
>
> Count 6 charged Mangano with extortion.

Prior to the second trial, Mangano filed a motion to dismiss that raised two new arguments

and also renewed, without any further elaboration, the arguments that he had previously raised in

his prior motion to dismiss.  On December 19, 2019, Mangano also filed a motion to dismiss based

on alleged prosecutorial misconduct and Brady violations.  On January 17, 2019, the Court denied

Mangano's motions and stated, with respect to Mangano's renewal of the arguments that he had

previously raised, that the "Court rejects those arguments for the same reasons stated previously."

(ECF No. 35.)  The Court denied the motion alleging prosecutorial misconduct and Brady

violations in a brief ruling, which indicated that a written decision would "be forthcoming."

The second trial commenced on January 22, 2019.  The jury heard five weeks of testimony

from approximately 40 witnesses.  Singh testified for five days, including a cross-examination that

lasted three-and-a-half days.  After defense counsel cross-examined Singh, the government chose

not to ask questions on redirect examination.

On February 28, 2019, the jury received the Court's instructions and began deliberating. In instructing the jury on Counts One through Six, the Court explained the quid pro quo requirement relevant to the bribery offenses in Counts 1 through 6 as follows:

Quid pro quo is Latin, and it means "this for that" or "these for those."

To prove a quid pro quo, the government must prove that the defendant obtained a thing of value in exchange for the promise or performance of official acts as the opportunities arose.

The government must prove that a bribe was sought or received by the defendant, directly or indirectly, in exchange for the promise or performance of official action. The government does not have to prove that there was an express or explicit agreement that official actions would be taken or that any particular action would be taken in exchange for the bribe.  A quid pro quo can be implied from words and actions because, otherwise, the law's effect could be frustrated by knowing winks and nods.

<u>To establish a quid pro quo, the government does not need to establish that a specific official act was identified at the time an alleged bribe was accepted.  Nor does the government need to link each specific alleged bribe to a single official act. It is sufficient if the government proves that the defendant you are considering accepted a thing of value in exchange for the promise or performance of official acts by the defendant on an "as needed" basis when the opportunity presented itself.</u>

It does not matter who initiated the quid pro quo.  Also, it does not matter if the defendant ever actually performed his part of the quid pro quo provided that he agreed that he would do so.

****

If you find that the defendant understood that the benefits were provided to him solely to obtain access, cultivate goodwill or to nurture a relationship with the person who provided the benefit, and not in exchange for any official action, then this element will not have been proven.  A quid pro quo can be established even if the defendant and the giver of the alleged bribe had a friendly relationship.  Bribery, however, is not proven if you find that a gift is given to and accepted by, a public official solely out of friendship or some other motive wholly unrelated to influencing official action.  Gifts exchanged solely to cultivate friendship or good will or to nurture a relationship are not bribes.  Likewise, if the defendant performed an official act solely for reasons unrelated to the defendant's receipt of gifts or things of value, a quid pro quo has not been established.

However, it is also the case that people may act for multiple reasons. A person giving gifts or making payments, or a person receiving gifts or payments, may have

36

> mixed motives.  If you find that things of value were accepted by the defendant in exchange for the promise or performance of official acts, that is sufficient for you to find a corrupt intent, regardless of any friendship which may have existed between the defendant and Mr. Singh.

(ECF No. 393 at 17–19 (emphasis added); see also Tr. 4516–4520.)  The Court also instructed the jury on what constitutes official action, including informing the jury that "[t]he decision or action must be made on a question or a matter that involves a formal exercise of governmental power. That means that the question or matter must be specific, focused and concrete."  (ECF No. 393 at 19–21; see Tr. 4520–4522.)

The Court's quid pro quo instruction, including the highlighted paragraph above, largely mirrored the quid pro quo instruction the Court had given at the first trial.  Mangano did not, at either trial, raise any objections to this "quid pro quo" instruction that are relevant to his arguments concerning Silver II.  The proposed instructions that Mangano submitted for the second trial largely tracked the instructions that the Court gave at the first trial, including the paragraph highlighted above.  (ECF No. 381-1.)

The Court's charge also provided further specificity about each of the charges and, for certain counts, required the jury to make unanimous findings on the verdict sheet.  (ECF No. 393 at 21–22, 24–25, 30.)  For Count One (Conspiracy to Commit Federal Program Bribery), the jury was instructed:

> If you find the defendant guilty of Count One, you must specify on your verdict form whether you found that the illegal goal of the conspiracy was to commit Federal Program Bribery as to (a) the alleged Town of Oyster Bay Loan Scheme (b) the Nassau County Bread and Rolls Contract; and/or (c) the Nassau County OEM Food Procurement Contract.  If you find Edward Mangano guilty of Count One, you must all agree on at least one of these goals and must indicate your finding on your verdict sheet.  You must mark all goals on which you are unanimous.

For Count Three (Conspiracy to Commit Honest Services Fraud), the jury was charged:

> If you find the defendant guilty of Count Three, you must specify on your verdict
> form whether you found that the illegal goal of the conspiracy was to commit
> Honest Services Wire Fraud as to (a) the alleged Town of Oyster Bay Loan Scheme
> (b) the Nassau County Bread and Rolls Contract; and/or (c) the Nassau County
> OEM Food Procurement Contract.  If you find Edward Mangano guilty of Count
> Three, you must all agree on at least one of these goals and must indicate your
> finding on your verdict sheet. You must mark all goals on which you are
> unanimous.

For Count Two, the jury was instructed:

> If you find the defendant guilty of Count Two, you must specify on your verdict
> form whether you find that this Federal Program Bribery was based upon the
> following grounds:  (a) the alleged Town of Oyster Bay Loan Scheme (b) the
> Nassau County Bread and Rolls Contract; and/or (c) the Nassau County OEM Food
> Procurement Contract.  If you find the defendant guilty of Count Two, you must all
> agree on at least one of these grounds and must indicate your finding on your verdict
> sheet.  You must mark all grounds on which you are unanimous.

For Count 4, the jury was instructed that "Count 4 of the Indictment charges Edward Mangano

with Honest Services Wire Fraud in connection with a scheme to defraud involving the alleged

Town of Oyster Bay Loan Scheme."  (ECF No. 393 at 25.)

The instructions also explained that the Indictment—a copy of which was provided to the

jury—"alleges a scheme existed concerning amendments to the concession agreements involving

the businesses of Harendra Singh and the Town of Oyster Bay" and that this scheme was the

"Town of Oyster Bay Loan Scheme."  (ECF No. 393 at 13, 21.)  The Indictment further defined

the TOB Loan Scheme as:

> the TOB's guarantee of certain loans that certain business entities of Singh's
> received from Madison National Bank (the "Bank") and NDH Capital, a private
> financing company (the "Lender"), in connection with Singh's status as a TOB
> concessionaire (the "TOB Loan Scheme").

(Second Superseding Indictment ¶ 7.)

The same instructions and verdict sheet questions were given to the jury at the first trial.

For Counts 3 and 4, Mangano's proposed instructions at the second trial mirrored the Court's

language quoted above.[15]

The jury did not receive an instruction about the statute of limitations.  Mangano did not request such an instruction at either trial.  In his oral Rule 29 motion at the conclusion of the government's case, Mangano did not seek dismissal based on the statute of limitations or challenge the government's "as opportunities arise" theory as part of that motion.

On March 8, 2019, the jury convicted Mangano of four bribery offenses and marked off its specific findings with respect to those charges on the verdict sheet.  (ECF No. 402.)  For Counts 1 and 3, the jury found Mangano guilty and that the goal of the conspiracies charged in those counts was "to commit [federal program bribery and honest services fraud] as to the alleged . . . Town of Oyster Bay Loan Scheme."  For Count 2, the jury found Mangano guilty of federal program bribery "based upon the alleged . . . Town of Oyster Bay Loan Scheme."  For Count 4, the jury found Mangano guilty of "honest services wire fraud as to the alleged Town of Oyster Bay Loan Scheme."

On the verdict sheet, for Counts, 1, 2, and 3, the jury did not mark any of the fields concerning the Nassau County Bread and Rolls Contract or the Nassau County OEM Food Procurement Contract.  The jury also found Mangano not guilty of Counts Five and Six, which only concerned those two Nassau County contracts.

As for the remaining charges, the jury found the Manganos guilty of conspiracy to obstruct justice and Linda Mangano guilty of obstruction and the false statement counts.

---

[15] Mangano's proposed instructions concerning Counts 1 and 2 included similar language concerning the two Nassau County contracts, but did not reference the TOB Loan Scheme because—for the reasons articulated in his oral Rule 29 motion at the end of trial—Mangano maintained that the evidence was insufficient for the jury to convict him of those counts in connections with the TOB Loan Scheme.  The Court denied Mangano's Rule 29 motion and, accordingly, included the disputed references to the TOB Loan Scheme in the instructions concerning Counts 1 and 2.

Mangano did not file any post-trials motions until almost a year after the jury's verdict, when he filed the motions that are currently pending before the Court.  On January 28, 2020— seven days after the Second Circuit issued its decision in <u>Silver II</u>—Mangano filed a brief concerning three related motions based on <u>Silver II</u>.  That same day, Mangano also filed a Rule 33 motion seeking a new trial based on testimony given by Singh during a post-trial deposition in a civil case.  In connection with this motion, the Court held a hearing on April 20, 2021 where Singh testified about his post-trial deposition.

## II.  DISCUSSION OF MANGANO'S MOTIONS BASED ON <u>SILVER II</u>

Mangano argues that the Second Circuit's decision in <u>Silver II</u> warrants: (1) reconsideration of the Court's denial of his pretrial motions concerning the statute of limitations; (2) a new trial under Federal Rule of Criminal Procedure 33 because, according to Mangano, the Court committed two instructional errors related to <u>Silver II</u> that are not harmless; and (3) a grant of Mangano's Rule 29 motion for acquittal concerning all his bribery convictions because the evidence at trial was insufficient to meet the standards set forth in <u>Silver II</u>.

## A.  The <u>Silver II</u> Decision

In <u>Silver II</u>, 948 F.3d 538 (2d Cir. 2020), defendant Sheldon Silver was convicted of the substantive offenses of honest services mail and wire fraud and extortion concerning two separate bribery schemes involving different bribe payors.  The jury was instructed that it could convict Silver based on the "as opportunities arise" theory of bribery.[16]  However, the panel in <u>Silver II</u> found that the trial court's instructions were erroneous under <u>McDonnell v. United States</u>, 136 S. Ct. 2355 (2016), because they did not inform the jury that "the Government must prove that, <u>at the</u>

---

[16]  This Court's instructions at both of Mangano's trials were similar to the instructions given at Silver's trial on this issue.  However, Silver's jury was not tasked with answering the type of special interrogatories that the Manganos' jury answered on the verdict sheet.

time the bribe was accepted, Silver promised to take official action on a specific and focused question or matter as the opportunities to take such action arose." Silver II, 948 F.3d at 568 (emphasis added).

The Silver II panel addressed the Circuit's earlier decision in United States v. Ganim, 510 F.3d 134, 144 (2d Cir. 2007), which concerned the "as opportunities arise" theory of bribery. The panel explained:

> McDonnell's interpretation of the "official act" requirement fits comfortably with—and provides a narrowing gloss on—Ganim's "as the opportunities arise" theory, which similarly requires an anticipated exchange of payment for "*particular* kinds of influence," Ganim, 510 F.3d at 144 (emphasis added) (citation omitted). We therefore disagree with Silver that the "as the opportunities arise" theory of bribery does not survive McDonnell. But we agree that, if the district court's jury instructions failed to convey that, as relevant here, a particular *question or matter* must be identified at the time the official makes a promise or accepts a payment, they were in error.

Silver II, 948 F.3d at 558 (underlining added and italics in original). Judge Lohier's concurring opinion went even further in stressing his view that the panel decision in Silver II "simply clarifies, without altering, the 'as opportunities arise' doctrine that has long been part of our circuit precedent." Id. at 577 (Lohier, J., concurring).

The panel in Silver II went on to determine whether this instructional error was harmless. Silver was convicted of two different bribery schemes—the "Real Estate Scheme" and the "Mesothelioma Scheme." With respect to the "Real Estate Scheme," the panel found the evidence—including circumstantial evidence concerning the timing of votes by Silver and a side letter retainer agreement making it clear that he would be receiving fees from matters referred by the bribe payor to a law firm with which Silver was associated—demonstrated beyond a reasonable doubt that a properly instructed jury would have convicted Silver of the charges concerning the Real Estate Scheme. Id. at 562–564. It was "clear beyond a reasonable doubt that a rational jury

would have found that Silver accepted referral fees with the belief that he was expected to influence a particular matter, namely the relevant tax abatement and rent stabilization programs" sought by the real estate developers who bribed Silver.  Id. at 570.

The Second Circuit, however, reached a different conclusion concerning the Mesothelioma Scheme because the unlawful quid pro quo took place outside of the statute of limitations.  The panel found that "Silver received a thing of value in return for exerting official influence on a particular matter." Id. at 577.  The Court described this as "a classic example of bribery, and, but for the statute of limitations, Silver's conviction for the Mesothelioma Scheme would stand, regardless of the jury instructions." Id. !The Second Circuit found that the evidence clearly showed that Silver had previously engaged in an unlawful quid pro quo scheme in which he accepted bribes from Dr. Robert Taub (in the form of Mesothelioma case referrals) in exchange for securing research grants for Taub totaling hundreds of thousands of dollars.  Id. at 560–61.  However, due to a change in state law, Silver told Taub in 2007 he could no longer provide those grants.  Although Taub continued to provide referrals to Silver past February 2010 (when the limitations period began) and into 2013, it was clear that "the Mesothelioma Scheme changed after 2007," as Taub himself testified that the post-2010 referrals were "intended to curry generalized goodwill." Id. at 564, 573.  The Second Circuit concluded that, "[a]t best, the Government's evidence suggests Silver understood he was expected to influence some or any matter beneficial to Taub, should an opportunity to do so arise." Id. at 575.  The panel stressed that Taub continued to refer cases to Silver's law firm "after the HCRA scheme ended, without even a 'wink[ ]' or a 'nod[ ]' from Taub indicating what he wanted in exchange for future referrals." Id.  The only subsequent official actions taken by Silver to benefit Taub involved securing a one-time $25,000 state grant in 2008 to the Shalom Task Force, a domestic violence nonprofit for which Taub's wife served as a board

member, and passing a "last minute" and "rush[ed]" Assembly resolution honoring Taub in 2011. Id. at 561, 570.

The panel in Silver II also observed, in a footnote, that although courts, including this one, had used the terms "as the opportunities arise," "stream of benefits," and "retainer" interchangeably, there might be additional retainer-type theories of bribery that survive McDonnell. Id. at 553 n.7. Although the panel opinion declined to express an opinion on any such theories, Judge Lohier's concurrence discussed the possibility of other potentially viable theories of bribery, including where: (1) "a bribe [is given] to an official in exchange for a future favor, in the form of a future official act (a vote, for instance) that will be identified by the payor at a later date"; (2) where "a payment [is given] in exchange for a promise to take all future official actions to benefit the payor." Id. at 578 (Lohier, J., concurring).

**B. Timeliness of Mangano's Motions**

Mangano seeks permission to file a motion for reconsideration of the Court's pretrial rulings concerning the statute of limitations as well as motions for a judgment of acquittal and for a new trial "out of time." Motions under Rule 29 and Rule 33 must be filed within 14 days of the jury's verdict. As Mangano was convicted in March 2019, the deadlines for filing all these motions had long since passed by the time Mangano filed this motion.

Mangano argues that the Second Circuit's decision in Silver II establishes "excusable neglect" under Rule 45 to permit these late motions because he filed them promptly after the issuance of Silver II, which he characterizes as a "significant new holding which clarifies the law in a manner which invalidates the Government's core theory of liability, and substantially undercuts this Court's prior statute of limitations rulings." (Def.'s Rule 29 and Rule 33 Mot. Concerning Silver II ("Def.'s Silver II Mot.") at 10, ECF No. 420.)

"Although none of Rules 29, 33, or 45 defines 'excusable neglect,' courts apply an equitable test that considers all relevant circumstances, including: (1) the danger of prejudice to the non-moving party, (2) the length of delay and impact on judicial proceedings, (3) the reason for the delay, including whether it was within the reasonable control of the moving party, and (4) whether the moving party acted in good faith." United States v. Sabir, 628 F. Supp. 2d 414, 417 (S.D.N.Y. 2007), aff'd, United States v. Farhane, 634 F.3d 127 (2d Cir. 2011). "[A] significant intervening change in law constitutes a valid basis to extend time under Rule 45(b)(1)(B)." United States v. Kirsch, 151 F. Supp. 3d 311, 315 (W.D.N.Y. 2015), aff'd, 903 F.3d 213 (2d Cir. 2018).

The Court finds that Silver II does not establish excusable neglect because, as Silver II itself states, it merely provided a "narrowing gloss" on the Circuit's prior precedent, which does not constitute a significant intervening change in the law. See Silver II, 948 F.3d at 558; see also id. at 577 (Lohier, J., concurring) ("[T]he opinion simply clarifies, without altering, the 'as opportunities arise' doctrine that has long been part of our circuit precedent.").

Mangano also suggests that there is no prejudice to the government or delay that detrimentally impacts court proceedings. Mangano stresses that after he filed this motion on January 28, 2020, the government asked for two extensions to respond to his motion and that his sentencing, which was originally scheduled for March 19, 2020, would have been delayed, in any event, because of the COVID-19 pandemic. This argument is unavailing. Mangano's focus on sentencing is misguided because his Rule 33 motion concerning Silver II seeks a new trial. If Mangano had promptly filed his Rule 33 motion, delays in briefing attributable to the pandemic would have been avoided and, if his motion had succeeded in securing a new trial, that trial may very well have been completed prior to the onset of the pandemic.

44

Moreover, even assuming _arguendo_ that _Silver II_ sufficiently clarified the law in such a manner that it could potentially establish excusable neglect, the Court would find that Mangano has only shown excusable neglect with respect to his request for reconsideration of the Court's ruling denying his pretrial motions concerning the statute of limitations.

Mangano cannot show excusable neglect with respect to his Rule 33 motion for a new trial or his Rule 29 motion seeking acquittal.  As in further detail _infra_, Mangano:

(1) did not pursue a statute of limitations defense at trial;

(2) did not object to—and, in fact, affirmatively endorsed—the Court's instructions concerning the "as opportunities arise" theory of bribery;

(3) did not object to the absence of a statute of limitations instruction in the Court's charge;

(4) did not raise in his oral Rule 29 motion at trial any arguments about the statute of limitations or the "as opportunities arise" theory of bribery; and

(5) even after the jury returned a split verdict and only convicted him of bribery offenses in connection with the TOB Loan Scheme, Mangano did not timely file any post-trial motion under Rule 29 or Rule 33 concerning the statute of limitations or the "as opportunities arise" theory of bribery.

As discussed _infra_, the Court rejects Mangano's claim that the Court's pretrial rulings prevented him from pursuing a statute of limitations defense at trial and, instead, finds that he waived or, at the very least forfeited, his claims of instructional error concerning both the statute of limitations and the Court's "as opportunities arise" instruction.  Now, Mangano asks the Court to excuse his untimely Rule 29 and Rule 33 motions, which he filed almost a year after his convictions.  The Court finds that Mangano has failed to show excusable neglect for those motions and, accordingly, denies them as untimely.

In any event, even assuming <u>arguendo</u> that Mangano can show excusable neglect for all three of his current motions, the Court denies those motions, on the merits, for the reasons set forth below.

**C.  <u>Mangano's Request for Reconsideration of the Court's Pretrial Rulings</u>**

<u>Silver II</u> does not provide a basis to reconsider the Court's pretrial rulings and to grant Mangano's pretrial motions to dismiss on statute of limitations grounds.  The statute of limitations for each of the offenses in Counts 1 through 4 is five years.  18 U.S.C. § 3282.  Accordingly, the limitations period for those charges began on October 18, 2011.

Mangano makes little effort to articulate why <u>Silver II</u> necessitates a <u>grant</u> of these pretrial motions and, instead, focuses in his reply brief on his claims that he is entitled to a new trial under Rule 33 and dismissal under Rule 29.  Even with the benefit of <u>Silver II</u>, the Court would still easily deny his pretrial motions concerning the statute of limitations.

Mangano and Venditto each filed motions on the statute of limitations and also joined in each other's motions.  The statute of limitations argument that Venditto raised in his motion to dismiss (and for which Mangano now seeks reconsideration in light of <u>Silver II</u>) concerning Counts 1 through 4 was, at bottom, a sufficiency challenge for which the Court would have to consider the evidence proffered by the government at trial.  Even after <u>Silver II</u>, that sufficiency challenge could not be decided based solely on the allegations in the indictment.  Venditto's motion to dismiss on statute of limitations grounds focused solely on the official action taken by Venditto in June 2010 and did not address in any fashion the bribes that he and Mangano received.  Even in light of <u>Silver II</u>, this Court could not possibly grant this motion to dismiss Counts 1 through 4 against Mangano as time-barred as this pretrial motion completely ignored the bribes Mangano received.  Additionally, Venditto's motion asked the Court to improperly engage, at the motion to

46

dismiss stage, in a sufficiency analysis concerning the three concessions amendments signed in 2011 and 2012 and the impact of those amendments on the statute of limitations analysis. (February 9, 2020 Order at 7 n.3.)

In denying Venditto's statute of limitations motion concerning Counts 2 and 4, the Court stressed that the Second Circuit's decision in <u>Silver I</u> expressly stated that the government "need not prove that an official act occurred within the statute of limitations period" and would only have to "prove that some aspect of the particular quid pro quo scheme continued into the statute of limitations."  (<u>Id.</u> at 9 (quoting <u>United States v. Silver ("Silver I")</u>, 864 F.3d 102, 119 (2d Cir. 2017).) Clearly, at the motion to dismiss stage, this Court cannot, without delving into the evidence at trial, determine whether Mangano engaged in a particular quid pro quo scheme that satisfies <u>Silver II</u> and whether some aspect of that particular scheme continued into the limitations period. These are clearly, even under <u>Silver II</u>, sufficiency questions that cannot be resolved solely by reference to the indictment on a motion to dismiss.

Similarly, <u>Silver II</u> also does not compel a different ruling on Mangano's argument in his motion to dismiss that Count Two was time-barred.  Mangano argued, in his motion to dismiss, that Federal Program Bribery is not a continuing offense and that, as such, this crime was complete in 2010 when Linda Mangano accepted her first paycheck in April 2010.  The Court rejected this argument as none of the cases cited by Mangano involved bribery under 18 U.S.C. § 666 and the availability of the stream-of-benefits theory for bribery prosecutions showed that Congress intended for § 666 to be a continuing offense.  <u>Silver II</u> upheld, with a narrowing gloss, the "as opportunities arise" theory of bribery and provides no basis for this Court to alter its earlier conclusion that Federal Program Bribery is a continuing offense.

**D.  Rule 33 Motion for a New Trial Based on Purported Instructional Error**

As Silver II does not compel a reversal of the Court's earlier denials of these pretrial motions, the Court now turns to Mangano's arguments that the Court's instructions at trial were erroneous in light of Silver II.  Mangano not only maintains that this purported error was not harmless, but he also contends that all the bribery counts against him must be outright dismissed, under Rule 29, because a jury could not find, beyond a reasonable doubt, that Mangano engaged in an unlawful quid pro quo under Silver II within the statute of limitations.

Mangano argues that the Court's instructions explaining the "as opportunities arise" theory of bribery were erroneous under Silver II.  Mangano also maintains that the Court erred in not instructing the jury concerning the statute of limitations.  Mangano assumes that the appropriate standard of review is whether these purported instructional errors were harmless.

The government maintains that Mangano waived his statute of limitations argument and that, in any event, neither of his arguments can prevail under plain or harmless error review given the evidence arrayed against him at trial.

Although the government does not contend that Mangano also waived his claim of instructional error concerning the Court's "as opportunities arise" instruction, the Court nevertheless finds, sua sponte, that it is appropriate to consider whether Mangano also waived that claim.

As explained below, there are compelling reasons why Mangano waived (or at the very least forfeited) both of these arguments.  Moreover, even if Mangano's arguments were not waived and are analyzed under plain error or harmless error review, he cannot prevail.

1.    **Mangano Waived or Forfeited His Challenge to the Court's Instruction Concerning the "As Opportunities Arise" Theory of Bribery**

Mangano contends that the Court's instructions concerning the "as opportunities arise" theory of bribery were erroneous under <u>Silver II</u>.  Mangano, however, waived his challenge to this instruction, or at the very least, forfeited this argument.  As such, Mangano is, at best, entitled to plain error review.

In <u>United States v. Williams</u>, the Second Circuit summarized the doctrines of waiver and forfeiture:

> Where an objection has not been preserved, this Court has discretion to correct errors that were forfeited because not timely raised in the district court, but no such discretion applies when there has been true waiver.  The distinction between forfeiture and waiver is therefore crucial, because forfeiture does not preclude appellate consideration of a claim in the presence of plain error, whereas waiver necessarily extinguishes the claim altogether. A claim is forfeited when a defendant, in most instances due to mistake or oversight, fails to assert an objection. A claim is waived, on the other hand, when a defendant makes an intentional decision not to assert a right or, put another way, act[s] intentionally in pursuing, or not pursuing, a particular course of action.  And our caselaw makes clear that an identifiable tactical benefit is not a prerequisite to identifying waiver where the totality of circumstances otherwise demonstrate the requisite intentional action.

930 F.3d 44, 64 (2d Cir. 2019) (citations and internal marks omitted).

"[W]here a defendant has 'invited' the instruction he seeks to challenge, he 'has waived any right to appellate review of the charge.'"  <u>United States v. Binday</u>, 804 F.3d 558, 581 (2d Cir. 2015) (quoting <u>United States v. Giovanelli</u>, 464 F.3d 346, 351 (2d Cir. 2006)); <u>see also</u> <u>United States v. Spruill</u>, 808 F.3d 585, 596–97 (2d Cir. 2015) (collecting cases involving the "[v]arious circumstances [that] can manifest a defendant's intentional relinquishment of a known right," and, thus, constitute waiver).

Mangano's current challenge to the Court's "as opportunities arise" instruction was waived because the critical paragraph in the Court's instruction on this issue that he highlights in his

motion papers was, in fact, explicitly endorsed by Mangano himself in the proposed jury instructions that he submitted to the Court for the second trial.[17]

Because the government did not argue waiver on this point, the Court will address three potential objections that Mangano might possibly raise on this issue—none of which preclude a finding of waiver here.

First, Mangano may argue that the Court did not adopt his proposed instructions explaining the quid pro quo requirement in their entirety.  While it is true that the Court did not adopt, in toto, Mangano's entire proposed quid pro quo instruction, it did adopt, essentially verbatim, the critical instruction he now challenges.  None of the other language proposed by Mangano that the Court did not include in its final instructions concerned the alleged deficiency he now raises based on Silver II.  Accordingly, the fact that there were some differences between the charge proposed by Mangano and the one ultimately given by the Court does not preclude a finding of waiver here.

Second, the fact that Mangano's proposed instructions largely mirrored the instructions given by the Court at the first trial also do not preclude waiver.  Mangano was free to propose whatever instructions he desired for the second trial and was not bound by the Court's instructions from the first trial.  Instead, when Mangano submitted his proposed instructions for the second

---

[17] Specifically, both the Court's ultimate quid pro quo instruction and Mangano's proposed instruction state:

> To establish a quid pro quo, the government does not need to establish that a specific official act was identified at the time an alleged bribe was accepted.  Nor does the government need to link each specific alleged bribe to a single official act.  It is sufficient if the government proves that the defendant you are considering accepted a thing of value in exchange for the promise or performance of official acts by the defendant on an "as needed" basis when the opportunity presented itself.

(ECF No. 381-1 at 5–6 (emphasis added); ECF No. 393 at 17–19 (emphasis added); see Tr. 4516–4520.)

trial, he decided to affirmatively endorse—without reserving any objections—the critical language at issue concerning the "as opportunities arise" theory of bribery.[18]  (See ECF No. 381.)

Third, the Court's ruling on the parties' pretrial motions did not preclude Mangano from raising objections to the Court's charge concerning the quid pro quo requirement at the conclusion of the trial and certainly did not compel Mangano to affirmatively propose—without reserving any objection—the very language he now claims is deficient.

While the Court relied on the government's "as opportunities arise"/"stream-of-benefits" theory of bribery in addressing various issues raised by Mangano and Venditto in their pretrial motions, the only McDonnell-based challenge raised in response to the government's invocation of this theory came in Venditto's reply brief.  There—in the context of Venditto's argument that the charges against him concerning the Nassau County Contracts scheme were duplicitous, improperly joined, and insufficient—Venditto asserted that "McDonnell requires that the official act must be agreed to at the time of the benefit to the public official."  (Venditto Reply Br. at 6)

The Court rejected Venditto's sufficiency challenge as "premature" and also stated:

> Finally, in his reply papers, Venditto appears to assert that the stream-of-benefits theory is no longer viable after (or is at least limited by) McDonnell.  According to

---

[18]  Even at the first trial, Mangano did not object to the Court's final instructions concerning the "as opportunities arise" theory.  In fact, Mangano's proposed instructions for the first trial—while using some different verbiage—were not materially different from the "as opportunities arise" instructions that the Court ultimately gave to the jury at the first trial.  (See ECF No. 250 at 18.)  The only time, at the first trial, that Mangano raised any objection concerning the "as opportunities arise" theory occurred, in passing, in connection with the preliminary instructions that the Court gave to the jury at the start of trial.  Prior to the first trial, Mangano submitted proposed preliminary instructions that did not include a reference to the "as opportunities arise" theory.  The Court then circulated proposed preliminary instructions which stated "[t]o prove a quid pro quo, the Government must prove the defendant received something of value knowing that it was given in exchange for the promise or performance of official acts as the opportunities arose."  Mangano objected to this language because he was "concerned that this language unduly focuses on the intent of the bribe payer" and he wanted an instruction that instead focused on the defendant's intent.  (ECF No. 196.)  Mangano proposed the following alternative language—"[t]o prove a quid pro quo, the Government must prove that the defendant received something of value, and that in exchange for the thing of value, he performed or agreed to perform an official action."  (ECF No. 196.)  In response, the Court revised its preliminary instructions to address the intent issue raised by Mangano and, as part of its preliminary instructions, informed the jury that "[t]o prove a quid pro quo, the government must prove the defendant received something of value in exchange for the promise or performance of official acts as the opportunities arose."  Mangano's objection to the Court's preliminary instructions, which was not even focused on the "as opportunities arise" issue, does not preclude finding that Mangano waived (or at least forfeited) his current challenge to the Court's "as opportunities arise" instruction based on Silver II.

Venditto, "McDonnell requires that the official act must be agreed to at the time of the benefit to the public official." (Venditto Reply Br. at 6.) As such, Venditto seems to argue that it would be improper to charge him in a conspiracy that encompassed the Nassau County Contracts Scheme, about which Venditto appears to have lacked knowledge.  To the extent that Venditto is raising such an argument, the Court rejects it.  As multiple courts have held, McDonnell did not eliminate the stream-of-benefits theory.  See United States v. Percoco, No. 16-CR-776, 2017 WL 6314146, at *4 (S.D.N.Y. Dec. 11, 2017); United States v. Menendez, No. CR 15-155, 2018 WL 526746, at *3–6 (D.N.J. Jan. 24, 2018); see also United States v. Skelos, No. 16-1618-CR, --- F. App'x ---, 2017 WL 4250021, at *3 (2d Cir. Sept. 26, 2017) (relying, in a post-McDonnell decision, on the stream-of-benefits theory).

(Feb. 9, 2018 Order at 7.)

While the government advocated a very broad view of the "stream-of-benefits" theory in opposing Venditto's argument on these issues at the motion to dismiss stage, the government eventually narrowed its theory concerning Venditto at the first trial.  The government ultimately did not seek to hold Venditto liable for the Nassau County Contracts scheme that was the subject of the pretrial motion discussed above.  Rather, the jury was instructed that it could only convict Venditto concerning the Town of Oyster Bay Loan Scheme, rendering moot Venditto's pretrial challenge concerning the Nassau County Contracts scheme.  Also, Venditto was acquitted of all charges at the first trial—thus, the issues raised by Venditto concerning his potential liability for the Nassau County Contracts scheme were no longer even at issue in the second trial.

Additionally, by the end of the first trial, the government's stream-of-benefits theory concerning Mangano was refined by the jury instructions and verdict sheet.  Specifically, the jury was asked, on the verdict sheet at both trials, to specify whether, inter alia, the "goal of the conspiracy charged in Count Three was to commit honest services wire fraud as to the alleged . . . Town of Oyster Bay Loan Scheme," and to make similar specific findings, in the relevant counts, concerning the Bread and Rolls Contract and the OEM Food Procurement Contract.  The instruction and verdict sheet also made clear that Count 4 only pertained to the TOB Loan Scheme.

Prior to the second trial, Mangano renewed, in conclusory fashion, his earlier pretrial motions (which, presumably, also included his earlier joinder in Venditto's motions).  Mangano, however, never raised in a pretrial motion a McDonnell-based challenge to "as opportunities arise" theory as it applied specifically to his alleged conduct.

In light of the above, the Court rejects the notion that its disposition of the discrete issues raised by Venditto in his pretrial motion, which were ultimately mooted by subsequent events at the first trial, precludes findings of waiver and forfeiture.  It is also notable that the Court's pretrial ruling addressing Venditto's argument about the Nassau County Contracts scheme merely stated that McDonnell "did not eliminate the stream-of-benefits theory"—a conclusion that is not inconsistent with Silver II's determination that McDonnell put a narrowing gloss on, but did not eliminate, the "as opportunities arise" theory.[19]

The Court's pretrial ruling did not foreclose Mangano from raising objections to the Court's instructions at the conclusion of trial after evidence had been received or from seeking specific clarifying language in the instructions concerning the "as opportunities arise" theory of bribery.  And, this pretrial ruling certainly did not compel Mangano to affirmatively propose— without seeking to preserve any objection on this issue—the very instruction that he now contends was erroneous.  See Binday, 804 F.3d at 581–82 (finding that defendants waived one claim of

---

[19]  In providing an overview of the "stream-of-benefits" theory, the Court's pretrial ruling explicitly cited to both Ganim and United States v. Rosen, 716 F.3d 691 (2d Cir. 2013), and quoted, in a parenthetical, Rosen's statement that "[w]e have made it crystal clear that the federal bribery and honest services fraud statutes that Rosen was convicted of violating criminalize 'scheme[s] involving payments at regular intervals in exchange for specific official[ ] acts as the opportunities to commit those acts arise,' even if 'the opportunity to undertake the requested act has not arisen,' and even if the payment is not exchanged for a particular act but given with the expectation that the official will 'exercise particular kinds of influence.'" (February 9, 2018 Order at 3-4 (emphasis added).)  In Silver II, the Court reaffirmed the propriety of jury instructions using this specific language, stating "that prior instructions requiring the jury to find that the official understood that he or she was expected to exercise particular kinds of influence would not be in error after McDonnell."  Silver II, 948 F.3d at 568 n.19 (emphasis in original).  The fact that the Court's pretrial ruling cites this same specific language is a further reason why Mangano cannot claim that the Court's pretrial ruling precluded him from raising objections to the Court's "as opportunities arise" instruction.

instructional error and assuming without deciding that defendants preserved another specific challenge to jury instructions where "they jointly submitted the charge language with the government," but "did so subject to their previous objections to the government's theory of guilt—made in pre-trial motion practice and again in their Rule 29 motion").

It is also notable that, procedurally, Mangano's actions with respect to the Court's jury instructions addressing the "as opportunities arise" theory contrast sharply with the actions taken by the defense in <u>Silver</u>.  Silver—whose claims of instructional error were analyzed under the harmless error standard on appeal in <u>Silver II</u>—not only squarely argued in a pretrial motion to dismiss that the charges against him had to be dismissed because <u>McDonnell</u> overruled the as opportunities arise theory, but Silver also objected to this issue in both the proposed final instructions he submitted to the court as well as at the charging conference.[20]

For the reasons stated above, the Court finds that Mangano waived his claim of instructional error concerning the Court's quid pro quo instruction.  Moreover, for many of the same reasons, even if the waiver doctrine is not applicable here, at the very least, Mangano forfeited this argument and, therefore, is, at best, only entitled to plain error review on this issue.

### 2.   Mangano Waived or Forfeited his Claim of Instructional Error Based on the Absence of a Statute of Limitations Instruction

Both the procedural history of this case and the relevant case law show that Mangano waived (or at the very least forfeited) his claim of instructional error concerning the statute of limitations.  Thus, at best, Mangano is only entitled to plain error review.

---

[20]  <u>See</u> <u>United States v. Silver</u>, No. 15-cr-93, 2018 WL 1406617, at *4 (S.D.N.Y. Mar. 20, 2018); Transcript of May 8, 2018 Charging Conference at 1563–64, 1598, <u>Silver</u>, 15-cr-93 (S.D.N.Y.); Proposed Jury Instructions, <u>Silver</u>, 15-cr-93, ECF No. 373-3 at 22; Redlined Jury Instructions Attached to May 8, 2018 Ltr. at 1–4, <u>Silver</u>, 15-cr-93, ECF No. 397-1 at 4.

In contrast to <u>Silver</u>, where the defendant requested and received a statute of limitations instruction at trial, Mangano never sought such an instruction.  Mangano attempts to excuse his failure to request a statute of limitations instruction, asserting:

> After the Court's initial pretrial ruling, defense counsel did not press the statute of limitations issue in the presence of the jury, because any such argument would have been rendered frivolous by the Court's interpretation of the case law surrounding "as opportunities arise" bribery.  The Court and the Government contended that the TOB scheme was within the statute of limitations because it was merely one part of a broader, open-ended bribery scheme that continued into 2015.  That legal ruling made it impossible for defense counsel to credibly press a statute of limitations argument.

(Def.'s Reply Mem. re <u>Silver II</u> at 9–10.)  Mangano's claim that he was precluded from pursuing a statute of limitations defense by the Court's pretrial rulings concerning the "as opportunities arise" theory is not persuasive.

First, as discussed earlier, at the second trial, Mangano himself endorsed the "as opportunities arise" instruction that the Court gave to the jury.  Thus, to the extent that the "as opportunities arise" instructions to the jury and Mangano's claim of instructional error concerning the statute of limitations are intertwined, Mangano had an obligation to challenge—rather than affirmatively endorse—the Court's proposed "as opportunities arise" instruction if he believed that instruction would prevent him from advancing a credible statute of limitations defense at trial.  Because Mangano waived his challenge to the Court's "as opportunities arise" instruction, he cannot now claim that the theory embodied in that instruction excuses his failure to request a statute of limitations instruction at trial.

Second, the Court's ruling on the pretrial statute of limitations motions did not preclude Mangano from seeking to raise a statute of limitations defense at trial.  In addressing Venditto's argument concerning the conspiracy charges in Counts 1 and 3, the Court did not even mention the stream-of-benefits/"as opportunities arise" theory.  Instead, the Court simply recounted the

basic principles of conspiracy law, which made it clear that the allegations in the indictment—which included overt acts by Venditto and Mangano in 2013 and 2014, respectively, were sufficient to allege a conspiracy within the statute of limitations.  Nothing in that ruling precluded Mangano from seeking to raise a statute of limitations defense at trial concerning the conspiracy charges.

While the Court did discuss the stream-of-benefits/"as opportunities arise" theory in discussing Counts 2 and 4, the Court's ruling on those counts focused on the express language in Silver I that clearly foreclosed Venditto's argument at the motion to dismiss stage.  As discussed earlier, Silver I expressly stated that the government "need not prove that an official act occurred within the statute of limitations period" and would only have to "prove that some aspect of the particular quid pro quo scheme continued into the statute of limitations."  (Feb. 9, 2018 Order at 9 (quoting Silver I, 864 F.3d at 119).)  Silver I clearly foreclosed, at the motion to dismiss stage, Venditto's statute of limitations argument.  Venditto's argument simply ignored, inter alia, all of the alleged bribes Venditto and Mangano received and instead insisted that Counts 1 through 4 had to be dismissed prior to trial because, purportedly, Venditto's only official act occurred in June 2010.  Neither the Court's ruling on Venditto's motion nor the Court's ruling on a different legal issue raised by Mangano—namely, whether federal program bribery is a continuing offense—foreclosed Mangano from pursuing a statute of limitations defense at trial.

Third, Mangano had ample incentive to press a statute of limitations defense and seek an instruction on that defense given that Mangano knew, based on the first trial, that the jury instructions and verdict sheet would require the jury to make specific findings as to whether the alleged bribery and bribery conspiracy concerned the TOB Loan Scheme.  Those instructions presented the possibility, as ultimately occurred here, that the jury might only find Mangano guilty

concerning the TOB Loan Scheme.  Moreover, Mangano's claim that the Court's pretrial rulings prevented him from presenting a credible statute of limitations argument at trial makes no sense without even knowing exactly what statute of limitations instruction the Court was willing to give in light of the instructions concerning the specific findings the jury was asked to make on the verdict sheet.  Mangano, of course, could have sought, earlier in the trial, clarification from the Court on this issue before making the intentional decision to abandon his statute of limitations defense.

Fourth, Mangano's decision not to raise a statute of limitations defense at trial was clearly a strategic one.  At trial, the government introduced evidence that, in exchange for multiple bribes, Mangano engaged in official action for Singh:  (1) in 2010 by intervening in the TOB Loan Scheme; (2) in 2012 concerning the Bread and Rolls Contract; and (3) in 2012 for the OEM Contract.  If Mangano had pressed a statute of limitations defense at trial directed at the charges concerning the TOB Loan Scheme, he risked undermining his primary defense that he did nothing illegal at all and that the jury should also acquit him of the charges concerning Singh's two Nassau County contracts, both of which were clearly timely.[21]  Mangano and his experienced counsel—who had the benefit of the first trial to hone and refine their strategy for the retrial—clearly elected,

---

[21]  Mangano's strategic decision here dovetails with the Fourth Circuit's observations of a similar strategic decision made by a defendant concerning the statute of limitations:

> The defendants apparently made a strategic decision not to present a statute of limitations defense at trial.  Such a defense would have required them to make an argument to the jury that assumed their guilt on the bribery charges. . . . . While counsel for Hirschfeld was obviously aware of the defense, the strategy apparently undertaken was to meet the charges of Count II head on and not suggest that 'the crime may have been committed, but you got me too late.'  Faced at that time with the choice of strategies and the possible damage that the limitations defense might cause to a defense on the merits, it was not unreasonable for Hirschfeld to have relinquished the limitations defense because of the murky question of whether post-underwriting conduct within the limitations period was in furtherance of the conspiracy.

United States v. Hirschfeld, 964 F.2d 318, 320–21 (4th Cir. 1992).

as a strategic matter, not to pursue a statute of limitations argument before the jury.[22]  Cf. United States v. Agrawal, 726 F.3d 235, 259 (2d Cir. 2013) (determining defense counsel's answer of "[n]o, your honor" in response to Court's question "[a]nything from the defense on this [instruction]" constituted, given the circumstances of the trial, "a strategic decision" that constituted waiver); United States v. Upton, 559 F.3d 3 (1st Cir. 2009) (finding that defendant's admittedly strategic decision not to request a statute of limitations instruction at a charge conference held before the government had rested and to instead wait until after the government had rested to request a statute of limitations instruction resulted in waiver and, at very least, was insufficient to establish that the court's failure to give that instruction constituted plain error).

Mangano's excuses for not requesting a statute of limitations instruction at trial are not persuasive.  And, as explained below, the relevant caselaw shows that his failure to request a statute of limitations instruction constitutes waiver or, at the very least, forfeiture.

Both the Second Circuit and the First Circuit have found waiver when a defendant fails to request a statute of limitations instruction at trial.  See United States v. Grammatikos, 633 F.2d 1013, 1022 (2d Cir. 1980) (finding that defendant who failed to request a statute of limitations instruction at trial waived the issue and also analyzing, in the alternative, the issue under plain

---

[22] Putting aside the potential impact that the specific interrogatories on the verdict sheet might have had on a statute of limitations instruction if one had been requested—even under the other instructions given by the Court, Mangano could have raised a potentially viable statute of limitations defense.  For example, Mangano could have argued that even if he engaged in an unlawful quid pro quo involving the TOB Loan Scheme, that scheme ended at some point before October 2011 and Singh's subsequent bribes were only intended to obtain access, cultivate goodwill or to nurture a relationship.  The reason that Mangano did not press this argument at trial was clearly strategic, as it would have undermined his broader defense.

error review and rejecting the defendant's challenge on that basis as well)[23]; United States v. Alberico, 559 F.3d 24, 27 (1st Cir. 2009) (finding waiver—and, in the alternative, no plain error— when the defendant raised the statute of limitations in passing in a motion for acquittal at the close of the government's case, but did not request that the jury be instructed on the statute of limitations and the statute of limitations did not form part of her trial defense).  Here, Mangano waived his statute of limitations argument and, even if waiver does not apply, the Court's failure to instruct on the statute of limitations was not plain error because Mangano did not rely on a statute of limitations theory at trial.

Mangano argues that waiver does not apply where the statute of limitations issue is raised in a pretrial motion and is "purely an issue of law."  United States v. Vebeliunas, 76 F.3d 1283, 1292 (2d Cir. 1996).  However, unlike in Vebeliunas, Mangano's and Venditto's statute of limitations arguments in their pretrial motions did not raise pure issues of law that left "no factual issue" remaining for the jury's consideration.  Id.  Venditto's motion to dismiss was premised on, for the substantive counts, the still-erroneous notion that the official act at issue had to be within the limitations period, an argument that had already been rejected by Silver I.  The Court's denial of Venditto's motion left open factual issues concerning Venditto's statute of limitations argument on both the conspiracy and substantive counts.  While Mangano's continuing offense argument

---

[23]  The precise scope of Grammatikos' holding concerning waiver is unclear because the panel did not discuss whether defendant had raised the statute of limitations, in some fashion, prior to trial, and instead only addressed the defendant's failure to request an instruction on this issue at trial.  Nevertheless, even assuming arguendo that Grammatikos did not itself involve an earlier pretrial motion that raised the statute of limitations, the court's analysis still suggests that waiver may apply even where a defendant does raise the statute of limitations earlier in this case.  Specifically, in finding waiver, Grammatikos cited to, inter alia, United States v. Cianchetti, 315 F.2d 584, 589 (2d Cir. 1963), where the defendant raised the statute of limitations in a pretrial motion, but then failed to request a statute of limitations instruction at trial.  When she challenged the jury instruction on appeal, the Second Circuit rejected her challenge because of her failure to request that instruction below.  The court, however, ultimately reversed her convictions on other grounds.  The Grammatikos court characterized Cianchetti as finding that the defendant's claim of instructional error had been waived.  Grammatikos, 633 F.2d 1013.

about Federal Program Bribery raised a more discrete issue of law, the Court's rejection of that argument also left open factual questions. Moreover, Mangano's continuing offense argument only concerned the substantive Federal Program Bribery charge in Count 2 and was irrelevant to the other charges, including the substantive honest services fraud charge in Count 4 and the related conspiracy charge in Count 3. <u>Vebeliunas</u> does not preclude a finding of waiver here.

Thus, the Court concludes that Mangano has waived both of his claims of instructional error. Those findings of waiver would presumably defeat Mangano's Rule 33 motion based on instructional error and leave him with only a claim that, under Rule 29, the evidence at trial was insufficient under <u>Silver II</u>.

In any event, even assuming no waiver occurred here and that Mangano is entitled to either plain error or harmless error review, Mangano can still not prevail for the reasons set forth below.

### 3. Standards for Harmless Error and Plain Error Review

"Where a defendant has preserved his claim of error by a timely objection calling the district court's attention to the problem when the court would have the opportunity to fix the error, [the Second Circuit will] review a district court's jury charge <u>de novo</u>, and will vacate a conviction for an erroneous charge unless the error was harmless." <u>United States v. Nouri</u>, 711 F.3d 129, 138 (2d Cir. 2013). "A jury charge is erroneous if it 'either fails to adequately inform the jury of the law, or misleads the jury as to a correct legal standard.'" <u>Silver II</u>, 948 F.3d at 547 (quoting <u>United States v. Quattrone</u>, 441 F.3d 153, 177 (2d Cir. 2006)). "For erroneous instructions to be harmless, it must be 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" <u>Silver II</u>, 948 F.3d at 547 (citations and internal marks omitted).

However, "[w]here a defendant fails to make a timely objection, a court's instruction is ordinarily reviewed for plain error." <u>Nouri</u>, 711 F.3d at 138 (citing Fed. R. Crim. P. 30(d), 52(b)).

A reviewing court will "exercise [its] discretion to correct an error not raised at trial only where [the defendant] demonstrates that: (1) there is an error; (2) the error is plain, that is, the error is 'clear or obvious, rather than subject to reasonable dispute;' (3) the error 'affected the [defendant's] substantial rights, which in the ordinary case means' it 'affected the outcome of the district court proceedings;' and (4) 'the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" United States v. Marcus, 628 F.3d 36, 42 (2d Cir. 2010) (quoting United States v. Marcus, 130 S.Ct. at 2164 (2010)). To determine whether error has occurred at the first two stages of plain error review, this Court must consider the law as it currently stands, which includes the decision in Silver II. See Nouri, 711 F.3d at 138.

### 4. Mangano Cannot Show that Either Purported Error Was Plain

Mangano has not shown that the alleged error in the Court's instructions concerning the "as opportunities arise" theory was "'clear or obvious, rather than subject to reasonable dispute.'" Admittedly, the Court's charge did not include the precise language set out in Silver II, which provides that jury instructions should state that the government must prove that "at the time the bribe was accepted, the defendant promised to take official action on a specific and focused question or matter as the opportunities to take such action arose." Silver II, 948 F.3d at 568 (emphasis added). However, the Court's instructions concerning quid pro quo and official action, along with the additional instructions given by the Court concerning the specific findings required by the verdict sheet, still sufficiently conveyed the requirements of Silver II, such that it cannot be said that the error in the Court's instructions was plain. For example, on Count 3, the jury had to specify whether the "goal of the conspiracy charged in Count 3 was to commit honest services wire fraud as to the alleged . . . Town of Oyster Bay Loan Scheme," as defined in the Indictment. In Silver II—which did involve any conspiracy charges—the Second Circuit observed that

instructions informing a jury that it is required "to find that the official understood that he or she was expected to exercise <u>particular</u> <u>kinds</u> <u>of</u> <u>influence</u> would not be in error after <u>McDonnell</u>." <u>Silver II</u>, 948 F.3d at 568 n.19 (emphasis in original).  As those instructions would not be erroneous under <u>Silver II</u>, it is difficult see how the instructions at issue here—which asked the jury to determine whether the goal of Mangano's conspiratorial agreement was to commit bribery as to the Town of Oyster Bay Loan Scheme—would be plainly erroneous.

Mangano asserts that the verdict sheet and related instructions merely "required the jury to identify the 'particular question or matter' upon which Mangano intervened" and that the instructions allowed the jury to "convict Mangano based upon the performance of any official act which occurred after Linda Mangano was hired, regardless of whether such act was the subject of an agreed-upon quid pro quo between Mangano and Singh."  (Def.'s <u>Silver II</u> Reply Br. at 18.) Mangano's reading of the specific findings required by the instructions and verdict sheet is not persuasive.  Again, on Count 3, the jury had to determine whether the "goal of the conspiracy charged in Count 3 was to commit honest services wire fraud as to the alleged . . . Town of Oyster Bay Loan Scheme."  The Court fails to see how the jury would construe such language in the manner suggested by Mangano.

Finally, as to the statute of limitations issue, following the logic of <u>Alberico</u>, 559 F.3d at 27, Mangano's failure to request a statute of limitations instruction cannot constitute a clear or obvious error because Mangano did not request a statute of limitations instruction or rely on that theory of defense at trial.

**5.  Analysis of Harmless Error Review the Third and Fourth Stages of Plain Error Review**

*i.  Standard of Review*

As noted earlier, when harmless error review applies, it must be 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'"  Silver II, 948 F.3d at 547 (citations and internal marks omitted).

For plain error review, "[i]n the ordinary case, to [determine whether an error affected the defendant's substantial rights] an error must be 'prejudicial,' which means that there must be a reasonable probability that the error affected the outcome of the trial."  Nouri, 711 F.3d at 140 (quoting United States v. Marcus, 130 S.Ct. 2159, 2164 (2010)).  Second Circuit precedent, however, is unclear on the precise standard of review that applies when an instruction fails to correctly inform the jury about an element of an offense.

Some decisions suggest that, when such instructional error occurs, the defendant's substantial rights are not affected unless there is "a reasonable probability that the error affected the outcome of the trial."[24]  Other decisions, however, suggest that, for such instructional error, the reviewing court might have to find that the jury would have returned the same verdict "beyond

---

[24] See United States v. Prado, 815 F.3d 93, 105 (2d Cir. 2016) (finding aiding and abetting instruction was plainly erroneous and reversing conviction for one defendant because "there is a reasonable probability of a different trial outcome had the jury been properly instructed" and affirming the conviction of another defendant because there was "no reasonable probability of a different trial outcome had the jury been properly instructed."); United States v. Agrawal, 726 F.3d 235, 257 (2d Cir. 2013) (finding that evidence at trial "allow[s] us confidently to conclude that there is no reasonable probability that the failure to submit the question to the jury affected the outcome of [defendant's] trial"); United States v. Halloran, 664 F. App'x 23, 29 (2d Cir. 2016) (finding that even if the court's charge was "plainly insufficient in light of McDonnell, . . . any error did not affect [the defendant's] substantial rights" because "there is no 'reasonable probability that the [asserted] error affected the outcome of the trial.'") (quoting Prado, 815 F.3d at 102).

a reasonable doubt" to establish that the defendant's substantial rights were not affected.[25]

One recent panel—which affirmed the defendant's conviction—acknowledged that the "Circuit has used different verbal formulations to describe the standard for evaluating whether a defendant's substantial rights have been affected by an erroneous jury instruction under plain-error review."[26]  United States v. Eldridge, 2 F.4th 27, 39 n.16 (2d Cir. 2021).

While the "reasonable probability" standard might be a lower threshold than the "beyond a reasonable doubt" standard, under either approach the result would be the same in this case.

Similarly, although there is also an argument that the failure to give a statute of limitations instruction only warrants reversal if there is "a reasonable probability that the error affected the outcome of the trial," even if the "beyond a reasonable doubt" standard governs the statute of

---

[25] See Nouri, 711 F.3d at 140 (observing that a reviewing court "will sustain" a conviction if it finds that the jury would have returned the same verdict beyond a reasonable doubt and ultimately affirming the defendant's conviction based on the court's finding that "[w]e have no doubt that, had the jury been properly instructed, it would have found the defendants guilty of honest-services wire fraud based on their scheme of concealed bribery"); United States v. Gomez, 580 F.3d 94, 101 (2d Cir. 2009) (relying on United States v. Jackson, 196 F.3d 383, 386 (2d Cir. 1999), a harmless error case, in support of the proposition that to sustain the defendant's conviction on plain error review, "we must find that the jury would have returned the same verdict beyond a reasonable doubt," and ultimately upholding defendant's conviction because the court found "beyond a reasonable doubt that the jury would have returned the guilty verdict even absent the [erroneous] instruction that was given"); United States v. Miller, 954 F.3d 551, 558 (2d Cir. 2020) (citing Gomez for the proposition that "[w]e ask whether we can conclude, beyond a reasonable doubt, that a properly-instructed jury would have returned the same verdict," but ultimately declining to rule on the third prong of plain error review and instead affirming conviction based on the fourth prong of plain error review).).

[26] The Eldridge addressed these different formulations in a footnote, stating:

> We do not think that there is an appreciable difference between these standards, in practice, as 'a reasonable probability' that the error affected the outcome of the trial would seem to encompass whether a jury could have formed 'reasonable doubts' absent the error.  Thus, to the extent there might be any doubt as to what the 'reasonable probability' test means in the context before us, it is resolved by acknowledging that it means the erroneous jury instruction was "harmless beyond a reasonable doubt.

United States v. Eldridge, 2 F.4th 27, 39 n.16 (2d Cir. 2021).

limitations issue (or the two standards are functionally equivalent), the outcome in this case would be the same.[27]

Finally, "'the defendant has the burden of establishing each of the four requirements for plain-error relief.'"  United States v. Eldridge, 2 F.4th 27, 37 (2d Cir. 2021) (quoting Greer v. United States, 141 S. Ct. 2090, 2098 (2021), and explaining that Greer abrogated the Second Circuit's "'modified' plain-error review" standard).  As such, Mangano bears the burden to articulate and establish that the error was prejudicial.

The Court now turns to analyze the record in light of the standards above.

As explained below, the Court finds that, if the Court had given the specific instruction set out in Silver II, along with an instruction about the statute of limitations, the jury would have returned the same verdict beyond a reasonable doubt.  Here, two critical questions must be answered.  First, at the time of Linda Mangano's hiring in April 2010, did Mangano promise "to take official action on a specific and focused question or matter"—in this case, the TOB loan guarantees?  Silver II, 948 F.3d at 568.  Second, did "some aspect of [that] particular quid pro quo

---

[27]  Even if, under plain error analysis, a reviewing court must conclude beyond a reasonable doubt that the jury would have reached the same verdict where an instruction omits an element of the offense, there is a colorable argument that, at least for Mangano's statute of limitations claim, the relevant question would still simply be whether there is a reasonable probability that the court's failure to give a statute of limitations instruction affected the outcome of the trial.  In United States v. Marcus, the Second Circuit, in the context of plain error review, applied the "reasonable probability" standard to a due process claim based on a trial court's failure to instruct the jury about the date the criminal statute at issue was enacted.  628 F.3d 36, 40–41 (2d Cir. 2010)  In Marcus, the district court's failure to give that instruction—to which the defendant had not objected—raised the possibility that the jury convicted the defendant based solely on pre-enactment conduct that was not unlawful.  The scenario in Marcus is arguably analogous to a district court's failure to give a statute of limitations instruction.  Thus, Marcus suggests that this Court would only have to determine whether there was a "reasonable probability" that the failure to charge the jury on the statute of limitations affected the verdict at Mangano's trial.  Such an approach is further supported by Grammatikos, 633 F.2d 1013, where the Second Circuit, in analyzing an omitted statute of limitations instruction under plain error review, rejected the challenge after finding only that "[t]he jury could well have concluded that [certain] acts indicated the continued existence of the venture set forth in Count Two."  633 F.2d at 1023 (emphasis added).  The standard applied by Grammatikos appears more in line with a "reasonable probability" inquiry than a requirement that the reviewing court must conclude beyond a reasonable doubt that the jury would have returned the same verdict.

scheme continue[] into the statute of limitations period," which began here on October 18, 2011?[28]

Id. at 572.  As explained in further detail below, the answers to both questions is yes.[29]

> ### ii.  Mangano's and Singh's Quid Pro Quo Agreement in April 2010 Concerning the TOB Loan Guarantees Satisfies Silver II

The answer to the first question is resoundingly yes.  There is overwhelming evidence that, in April 2010, Mangano promised to take official action concerning the TOB loan guarantees in exchange for Singh's hiring of Linda Mangano at a salary of $100,000 a year.  The evidence on this score was overwhelming, including the indisputable timing of Linda Mangano's hiring in relation to the April 7 email from Sinnreich questioning the legality and risks of the loan guarantees and the evidence that Mangano took official action concerning the loan guarantees.  See Silver II, 948 F.3d at 557 ("Circumstantial evidence demonstrating an understanding between the payor and the official will often be sufficient for the Government to identify a properly focused and concrete question or matter.").  The evidence at trial strongly corroborated Singh's testimony that identified Mangano's intervention with the TOB loan guarantees as a reason why Singh bribed Mangano by hiring Linda Mangano for a $100,000 per year "no-show job."

---

[28]  In the analysis below, the Court has assumed arguendo that neither of Mangano's claims of instructional error have been waived.  Of course, it would certainly be more difficult for Mangano to ultimately prevail at this stage of plain error review if one of his two claims of instructional error were deemed waived.

[29]  In his motions concerning Silver II, Mangano seeks acquittal and a new trial for the four bribery offenses in Counts One through Four.  Mangano maintains that the evidence at trial is insufficient to establish that Singh's bribes to Mangano were unlawful under Silver II.  Mangano's arguments do not distinguish between the Federal Program Bribery charges in the first two counts and the Honest Services Fraud charges in Counts 3 and 4.  In any event, Silver II provides no basis for relief on Counts One and Two.  Both McDonnell itself, and Silver II's analysis of the "as opportunities arise" theory of bribery in the aftermath of McDonnell, do not apply to the § 666 counts in Counts One and Two even when, as here, the jury instruction for the § 666 charges defined bribery in terms of McDonnell's "official act" standard.  See United States v. Percoco, 13 F.4th 180, 190 (2d Cir. 2021) n.2 (rejecting defendant's argument that the "as opportunities arise" instructional error identified in Silver II "'infected the instructions for'" the defendant's conviction under § 666 because, although "[a]ll counts and their instructions alleged [that the defendant] agreed to take 'official action' 'as opportunities arose,'" McDonnell's official act standard does not apply to § 666); United States v. Ng Lap Seng, 934 F.3d 110, 139 (2d Cir. 2019), cert. denied, 141 S. Ct. 161, 207 L. Ed. 2d 1098 (2020) (affirming that McDonnell's official act standard does not apply to § 666 and finding—where jury instructions nevertheless included an official act requirement—that any purported instructional error based on McDonnell was harmless).

66

Additionally, based on the jury instructions and verdict sheet, the jury made specific findings concerning the TOB Loan Scheme—including a finding that the "goal of the conspiracy charged in Count 3 was to commit honest services wire fraud as to the alleged . . . Town of Oyster Bay Loan Scheme."   Even if the Court's instructions (when considered in light of the interrogatories on the verdict sheet) did not fully convey Silver II's requirements to the jury, these findings on the verdict sheet are still powerful evidence that—after considering all of the purported weaknesses in the government's case that Mangano raised at trial and has now rehashed in his current briefs—the jury, if properly instructed, would have concluded that Mangano agreed, when he accepted Linda Mangano's job and paychecks in April 2010, to take official action concerning the specific and focused matters of the TOB guaranteeing Singh's loans.

While Mangano claims that the verdict sheet and related instructions merely "required the jury to identify the 'particular question or matter' upon which Mangano intervened," the jury's findings—including with respect to Count 3—are clearly broader than Mangano claims.

Given all of the above, the evidence here is analogous to Silver II's analysis of the "Real Estate Scheme" where the Second Circuit concluded that based on the evidence against Silver— including the powerful circumstantial evidence of the timing of key events—it was "clear beyond a reasonable doubt" that a rational, properly-instructed jury would conclude that the bribe payors in that scheme provided business to the law firm affiliated with Silver in exchange for official actions related to two particular questions or matters.[30]

---

[30] In reaching this conclusion, the panel in Silver II also pointed out that "the district court had instructed the jury that, should they find 'Mr. Silver understood that the benefits were provided solely to cultivate goodwill or to nurture a relationship with the person or entity who provided the benefit,'" then no quid pro quo was proven."   Silver II, 948 F.3d at 571.  Notably, this Court provided a similar instruction to the jury.  See Tr. 4519 ("If you find that the defendant understood that the benefits were provided to him solely to obtain access, cultivate goodwill or to nurture a relationship with the person who provided the benefit, and not in exchange for any official action, then this element will not have been proven. . . . . Gifts exchanged solely to cultivate friendship or good will or to nurture a relationship are not bribes.").

Mangano argues that any instructional error cannot be harmless because of the general weaknesses of the government's case, as evidenced by the hung jury at the first trial and Mangano's acquittal, at the second trial, of the bribery charges concerning the two Nassau County contracts. Mangano also asserts, more specifically, that the absence of an instruction in accord with <u>Silver II</u> was prejudicial because "one of the primary defense themes throughout the trial" was that "that Singh actually hired Linda Mangano for purposes entirely unrelated to the Town of Oyster Bay." (Def.'s <u>Silver II</u> Reply Br. at 18.) Mangano contends—as he did during trial and summation—that "Singh actually hired Linda Mangano with the hope and expectation of obtaining multi-million dollar requirement[s] contracts from Nassau County, through his company 'SGT,'" contracts that he ultimately never obtained. (<u>Id.</u>.)

Mangano asserts that this defense theory—namely, that Linda's hiring had nothing to do with the TOB loan guarantees—was buttressed by, <u>inter alia</u>: (1) the March 26, 2015 recording of Singh made by Mei in which Mei states that he knew Singh did not receive a "contract" with the Town because of Mangano; and (2) the evidence of the TOB's long history of accommodating Singh, which, according to Mangano, shows, <u>inter alia</u>, that Singh did not even need Mangano's assistance with the TOB loan guarantees.[31]

---

[31] In addition to arguing that a properly instructed jury would reach a different verdict based on the evidence admitted at trial, Mangano also relies on Singh's post-trial deposition testimony, which is the subject of the Mangano's other pending Rule 33 motion. (<u>See</u> Def.'s <u>Silver II</u> Reply Mem. at 20.) As discussed <u>infra</u> in the Court's denial of that motion, Mangano claims that, in a post-trial civil deposition, Singh admitted that his payments to Mangano "had nothing to do with the Town of Oyster Bay." Mangano contends that this deposition testimony establishes that Singh committed perjury at trial and that this deposition testimony likely would have resulted in a different verdict at trial. As explained in the Court's denial of that motion, at a subsequent hearing, Singh clearly reaffirmed his trial testimony concerning the TOB Loan Scheme, and the Court finds that Singh's ambiguous and equivocal deposition testimony concerning Mangano does not establish that he committed perjury and does not warrant a new trial. In making those findings, the Court considered Singh's post-trial deposition testimony about Mangano in light of the issues raised in Mangano's Rule 33 motion concerning <u>Silver II</u>. That deposition testimony does not alter the Court's conclusions above.

Given all of the evidence arrayed against Mangano, this argument is unpersuasive.  The notion that Singh hired Linda Mangano <u>only</u> because he unilaterally hoped and expected to receive requirements contracts for SGT and that her hiring had <u>nothing</u> to do with the TOB loan guarantees was, frankly, always absurd.  While Singh's testimony indicated that he was also hoping to obtain contracts with SGT, that evidence does not diminish the overwhelming evidence that both Singh and Mangano understood that his intervention concerning the TOB loan guarantees was at least one of the reasons why Singh gave Linda Mangano a "no-show job" with a salary of $100,000 a year.

Right around the time of Linda Mangano's hiring, Singh communicated his immediate and pressing needs concerning the TOB loan guarantees to Mangano, and then Mangano took action, which included bringing pressure to bear on TOB officials at the April 28 meeting for which his presence served no other purpose.  Mangano's claim that, in light of the erroneous instructions, the jury might have convicted Mangano "merely because," after accepting Linda's job, "Mangano later took some incidental action with respect to the loan guarantees" is simply not persuasive.

The Court, after considering the entire record and the results of both trials, finds beyond a reasonable doubt that a properly instructed jury would find that, in exchange for Linda Mangano's hiring in April 2010, Mangano promised "to take official action on a specific and focused question or matter"—namely, the TOB loan guarantees.

### iii.  *This Quid Pro Quo Scheme and Conspiracy Continued into the Limitations Period - Overview*

As set forth above, it is clear that, in April 2010, when Singh hired Linda Mangano and began paying her, Mangano promised "to take official action on a specific and focused question or matter"—specifically, the TOB loan guarantees.  The next question is whether "some aspect of that particular quid pro quo scheme continued into" the limitations period, which began on October

18, 2011.  Silver I, 864 F.3d at 122 (addressing substantive counts against Silver, who was not charged with conspiracy).

For a conspiracy charge which "requires proof of an overt act, the government satisfies the statute of limitations . . .  if it establishes that the conspiracy operated within the five-year period preceding the indictment, and a conspirator knowingly committed at least one overt act in furtherance of the scheme within that period."  United States v. Salmonese, 352 F.3d 608, 614 (2d Cir. 2003).  As the Court instructed the jury, a conspiracy to commit honest services wire fraud—as was charged in Count 3—does not even require an overt act.  See Tr. 4536; United States v. Roy, 783 F.3d 418, 421 (2d Cir. 2015).  For the purposes of statutes of limitations, a conspiracy that does not require proof of an overt act is "deemed terminated when, in a broad sense, its objectives have either been accomplished or abandoned, not when its last overt act was committed."  Grammatikos, 633 F.2d at 1023.

Here, the statute of limitations can be satisfied if, inter alia:

(1)   one or more of Linda Mangano's paychecks after October 18, 2011 were understood by Mangano to be, at least in part, backpay for the earlier official action Mangano had taken in April 2010 concerning the TOB loan guarantees;

(2)   one or more of Linda Mangano's paychecks after October 18, 2011 were accepted by Mangano, at least in part, in exchange for a promise (or as part of a continuing promise) to take official action in the future concerning the TOB loan guarantees if requested to do so again by Singh[32]; or

(3)  some other aspect of the particular quid pro scheme/conspiracy concerning the TOB loan guarantees—including the November 2011 NDH concession amendment—continued into the limitations period.

Mangano maintains that the government cannot prevail on any of these approaches because there is no explicit testimony from Singh that Linda Mangano's paychecks after April 2010 were

---

[32]  Or, to put it another way—when Mangano accepted Linda Mangano's paychecks after October 18, 2011, was he promising to take official action on the specific and focused question or matter of the TOB loan guarantees "as the opportunities to take such action arose"?

backpay for Mangano's past intervention with the TOB loan guarantees or that those specific paychecks were understood as being paid to obtain Mangano's future intervention with respect to the same matter.  Mangano also contends, for a variety of reasons, that the NDH concession amendments cannot constitute an aspect of any potential quid pro quo scheme between Mangano and Singh involving the issue of the loan guarantees.  As set out below, the Court finds beyond a reasonable doubt that the jury, if instructed on the statute of limitations, would have still convicted Mangano by concluding that Linda Mangano's paychecks and the November 2011 NDH concession amendment were all aspects of this quid pro quo scheme/conspiracy.  Additionally, the Court also identifies two additional bases to find Mangano's convictions timely that were not specifically identified by the government.

### iv.  Linda Mangano's Paychecks Were Backpay and Satisfy the Statute of Limitations

There is no testimony from Singh explicitly stating that any of Linda Mangano's particular paychecks after October 18, 2011 were given to Mangano as backpay for Mangano's intervention with the TOB in April 2010 concerning the loan guarantees.  However, there is ample other evidence showing that these paychecks were, at least in part, backpay for Mangano's prior intervention in April 2010.

The form of the bribe that Mangano received in April 2010 is itself powerful evidence that Linda Mangano's paychecks after October 18, 2011 continued to be paid in exchange, at least in part, for Mangano's earlier intervention in the TOB loan guarantees.  When a "job" is given as a bribe, it is, absent some statement to the contrary, expected—as most jobs are—to continue for the foreseeable future.  The jury would easily conclude, based on all the circumstances here that, when Singh gave Linda Mangano this "job" in exchange for (among other things) Mangano's intervention with the TOB, both Singh and Mangano assumed that the foreseeable future would

71

extend through, at the very least, October 18, 2011—only 18 months later.  In fact, all of the evidence here shows that Mangano would have, at the time of Linda's hiring, expected this "job" to continue for as long as he continued to be County Executive.  The fact that Singh ultimately ended up keeping Linda on his payroll until the FBI raided Singh's offices in August 2014 is further evidence confirming that Mangano expected, from the outset, that Linda Mangano's "job" would continue well into the future.

Mangano was not merely given Linda's two paychecks in April 2010 as a bribe for his intervention with the TOB loan guarantees—Linda Mangano was given a "no-show job" that was obviously expected to continue.  And, there is no evidence in the record indicating that the understanding between Singh and Mangano in April 2010—namely, that this "job" was given in exchange, at least in part, for Mangano's intervention with the TOB and would continue—changed in the intervening 18 months.  Accordingly, when the Manganos received Linda Mangano's October 23, 2011 paycheck (as well as her subsequent paychecks thereafter) Mangano undoubtedly continued to understand that these payments were made, at least in part, for his intervention with the TOB, which led to her being placed on Singh's payroll in the first place.

Mangano sustained a serious loss of income—to the tune of at least $100,000 a year—as a result of his election.  Mangano needed to make up for that lost income and, in response, Singh gave Linda Mangano a "job" with a salary of over $100,000 at the very time that Mangano was intervening, at a critical juncture, with the TOB concerning the loan guarantees.  Thus, even apart from Singh's confirmatory testimony on this point discussed below, this other evidence about the Manganos' financial circumstances shows that it was clear that Singh's hiring of Linda Mangano and payment of her $100,000 salary through bi-weekly paychecks—at the very time that the Manganos needed to make up for a sudden and drastic decrease in their income—came with the

expectation that her "job" and the bi-weekly paychecks for her salary would continue into the future. Of course, the Manganos' $100,000 loss in income was not a one-year aberration. Rather, the shortfall was going to continue for as long as Mangano maintained the position of County Executive. To maintain their lifestyle, the Manganos needed a source for this $100,000 per year. Thus, it is clear that Singh's scheme was expected to cushion this blow by making up this shortfall for, at the very least, as long as Mangano was still in office.

Singh's testimony confirms the common-sense expectation that Linda Mangano's "job" was expected to continue for the foreseeable future, and also confirms that Mangano's intervention concerning the TOB guarantees was a principal reason why he hired Linda Mangano in April 2010, and that he hired her at a salary of $100,000 in order to make up for Mangano's lost income and to address Mangano's concerns about finances. (Tr. 1478 ("I hired Linda Mangano because I needed this loan guarantee done from Town of Oyster Bay. So when Ed was on board and supported this loan, when he requested me to help him financially, obviously it was a mutual benefit. So I did -- I complied with that."); see also Tr. 1477, 1482, 1717.) Notably, when asked about the significance of Linda's first check being dated April 9, 2010—two days after Sinnreich's April 7 email—Singh explained that:

> While I'm lobbying . . . Ed Mangano to make sure this loan gets back on track, which was -- which was in grave danger of being done due to Jonathan Sinnreich's e-mail, so I reached out to Ed and I wanted to make sure that he's happy and he's doing whatever needs to be done. So I had my accounting process a check for Linda Mangano which was dated from March 15th til March 28th of 2010 to make sure that Ed Mangano doesn't have any concern regarding his financials so he can concentrate on getting my work done.

(Tr. 1482 (emphasis added.))

Of course, a single $3,500 paycheck would not allay Mangano's concerns about his finances. Rather, it would be abundantly clear at that time to both Singh and Mangano that, in

exchange for Mangano's assistance with the TOB loan guarantees (and other issues), Singh was giving Linda Mangano this "job" to make up for Mangano's $100,000 salary shortfall and that she would remain on Singh's payroll for as long as Mangano held office in order to allay his concern about his finances. (See also Tr. 1995–96 ("[T]he purpose of . . . giving Linda Mangano a job is to compensate for his salary reduction from the law firm to as being a county executive is to really help him so he doesn't have any financial burden so he can help me out for whatever help for my myself, my businesses, my family, my friends needed.").) All of the circumstances here— including the fact that Singh obtained Mangano's assistance on a critical matter involving millions of dollars in loans—shows that, in April 2010, both Mangano and Singh understood that, in exchange for Mangano taking official action in that matter, Linda Mangano was expected to remain on Singh's payroll through at least October 2011, a mere 18 months later. Accordingly, when Mangano received Linda Mangano's paycheck on October 23, 2011 (and those thereafter) he surely continued to understand that this paycheck was, at least in part, still being given to him because of his earlier intervention with the TOB.

Additionally, Singh's testimony concerning another bribe given to Mangano in 2012 is further evidence that Singh and Mangano understood that the bribes paid to Mangano in 2011 and 2012, including Linda Mangano's October 23, 2011 paycheck as well as other things of value that Singh gave to Mangano, were, at least in part, understood to be owed to Mangano for his earlier

intervention with the TOB loan guarantees.[33]

The Court, after considering the entire record and the results of both trials, finds beyond a reasonable doubt that a properly instructed jury would find, for all the reasons above, that one or more of Linda Mangano's paychecks after her October 18, 2011 paycheck were, at least in part, backpay for Mangano's earlier intervention with the TOB in April 2010.

> v. *This Quid Pro Quo Scheme and Conspiracy is Also Timely Because It Included Mangano's Potential Future Intervention with the TOB Loan Guarantees*

The evidence also shows that Linda Mangano's continuing paychecks (including her October 23, 2011 paycheck and those thereafter) were accepted by Mangano in exchange, at least in part, for him agreeing to intervene in the future with the TOB loan guarantees, if requested by Singh.

The strong link between Linda Mangano's hiring and Mangano's intervention with TOB officials shortly thereafter in April 2010, is powerful evidence that the quid pro quo arrangement between Singh and Mangano included an ongoing understanding that, as long as Linda Mangano still had this "job," Mangano would, if necessary, intervene again (and engage in further official

---

[33] At trial, Singh stated that his purchase of a $3,600 massage chair in September 2012—at Mangano's request—was made, at least in part, because of Mangano's earlier intervention with the TOB loan guarantees. (Tr. 1510–11, GX737.) Singh's purchase of this chair was part of a larger pattern of Singh complying with Mangano's requests for various items of value, including Linda Mangano's job. (See Tr. 1654–55 ("[W]hatever was requested I complied with that"). In explaining why he purchased the massage chair for Mangano, Singh referenced both Mangano's prior support for the loan guarantees as well as the fact that, more generally, Singh "could call [Mangano] any time and get anything done," including additional dealings with the TOB concerning Singh's businesses located there. (See Tr. 1511 ("[H]e had just done, a couple of years before, great support with the loan guarantee and  .  .  .  .  So I complied with his request. I needed him.  He was the county executive.  He was on -- any time I needed him to do anything.  I mean, I had a direct line.  I could call any time and get anything done.  So I complied with the request.  It was a small price to pay for business benefit what I was getting.") (emphasis added); see also Tr. 1513.)  Singh's testimony, along with all of the other evidence in the case, including the pattern of Singh complying with Mangano's requests, shows that the chair was itself, at least, in part backpay for Mangano's intervention with the TOB loan guarantees (and that Mangano understood it as such).  Since Singh gave Mangano the chair in 2012, that bribe would be sufficient to satisfy the statute of limitations.  Moreover, Singh's testimony about the chair is also probative evidence that Singh and Mangano understood that the Linda Mangano's paychecks after April 2010 (including those on October 23, 2011 and thereafter) were, at least in part, understood to be owed to Mangano as both backpay due to his earlier intervention with the TOB loan guarantees and as payment to ensure that, if necessary, Mangano would intervene again with the loan guarantees in the future, see discussion *infra*.

action) with TOB officials concerning the matter of the TOB guaranteeing Singh's loans.  As Mangano had already done it once, he surely knew that, if requested, he was expected to do it again.  While Linda Mangano's continuing salary was undoubtedly, to some extent, backpay for Mangano's earlier intervention with the TOB, Singh and Mangano also surely understood that, in exchange for Linda Mangano's continuing salary, Mangano was expected to intervene again in the TOB loan matter if Singh requested.[34]  Mangano also received numerous other bribes from Singh. In accepting Linda Mangano's paychecks and the other bribes from Singh (some of which were within the limitations period), Mangano understood and agreed that he was being kept on "retainer" to intervene again, if necessary, concerning the TOB loan guarantees in the future.[35]  Cf. Silver II, 948 F.3d 578 (Lohier, J., concurring) (discussing retainer theories of bribery after Silver II, including where "a bribe [is given] to an official in exchange for a future favor, in the form of a future official act (a vote, for instance) that will be identified by the payor at a later date").

As set out in the discussion of the NDH loans infra, there was ample evidence that Mangano—a sophisticated attorney and government official—knew that:  (1) the TOB's backing of loans for both the Woodlands and TOBAY Beach was an ongoing matter; (2) Singh might seek financing involving multiple loans, different lenders, and even higher loan amounts; and

---

[34] Notably, the government explicitly argued at trial that—because Mangano was on "retainer"—if the TOB "had changed its mind and decided not to back any future loans," Singh would have gone back to Mangano who would have again "used his political clout to turn that no into a yes just like he did when the loans were stalled in April of 2010 . . . ." (Tr. 4439.)

[35] The government, citing to Judge Lohier's concurring opinion in Silver II, also argues that the evidence supports Mangano's convictions under a broader "retainer" theory.  (See ECF No. 425 at 38–48,)  There is overlap between the government's arguments concerning this broader "retainer" theory and the theory—discussed in detail above— that Mangano engaged in a quid pro quo scheme/conspiracy concerning the TOB loan guarantees that continued into the limitations period.  (See ECF No. 425 at 41 ("Singh made regular payments to Mangano – in the form of biweekly payments to L. Mangano [and other items of value] – so that Mangano could use his position  . . . to influence any decision relevant to Singh's business, which necessarily included, but was not limited to, ensuring that Town officials continued to execute the amendments to the concession agreements that indirectly guaranteed Singh's loans.") Because the Court finds that Mangano's convictions are strongly supported under that latter theory, it is unnecessary for the Court to address the government's broader retainer theory.

(3) Singh's attempts to obtain financing and loan guarantees could extend past October 18, 2011. Clearly, there was the potential that further problems could arise involving the TOB's backing of Singh's loans and it was surely understood that, if requested, Mangano would again intervene with TOB officials and engage in official action on Singh's behalf.  Of course, there is also no evidence that Singh ever told Mangano that this matter was closed or that he was no longer interested in seeking the TOB's backing for his loans.

Furthermore, in addition to the millions in dollars of capital improvements that Singh discussed with Mangano in 2010 and which were mandated in Singh's agreements with the TOB, Mangano was undoubtedly aware that Singh might seek to make further capital improvements at his TOB concessions and—given Singh's continued bribery of Mangano—expected Mangano to intervene again, if necessary, to obtain the TOB's backing for any further financing.  Mangano had known Singh since 1992 and had seen him, over the years, build his restaurant empire and perform millions of dollars of renovations at his TOB concessions.  Mangano surely knew—throughout the period that he was receiving Linda's paycheck and other bribes—of the possibility that, even after the round of improvements contemplated in 2010 at the Woodlands and TOBAY Beach was completed, further improvements might follow and that, if necessary, Singh expected his assistance again concerning TOB loan guarantees in return for Linda Mangano's ongoing paychecks and Singh's other bribes.

The Court, after considering the entire record and the results of both trials, finds beyond a reasonable doubt that a properly instructed jury would conclude that that when Linda Mangano was hired and when her paychecks and Singh's bribes (including her October 23, 2011 paycheck)

were accepted by Mangano, he understood that this was in exchange, at least in part, for him intervening in the future with the TOB loan guarantees, if requested by Singh.[36]

*vi. The Mesothelioma Scheme in Silver II is Factually Distinguishable*

The evidence outlined above against Mangano differs, in critical respects, from the evidence in Silver II that the Second Circuit found insufficient to sustain Silver's convictions based on the post-2010 referrals from Dr. Taub in the Mesothelioma Scheme. For the charges against Silver to be timely, some aspect of the unlawful quid pro quo scheme had to continue through February 2010, the beginning of the limitations period for Silver. Silver II, 948 F.3d at 574.

In Silver II, there was a clear and definitive end to the scheme in which Taub exchanged referrals for HCRA grants. Id. at 564. Silver expressly told Taub in 2007 that he could no longer fund additional HRCA grants requests because of a change in New York's conflict of interest laws. Id. at 560. Nevertheless, Taub continued to send Silver referrals into 2010 and beyond. Id. at 560–61. However, the evidence indicated that Taub's post-2010 referrals were merely intended to "curry generalized goodwill." Id. at 573; see also id. (noting testimony from Taub that he hoped Silver would be "incentivized to be an advocate for mesothelioma research if the occasion arose"). id. at 561 (noting contemporaneous email from Taub stating "I will keep giving cases to Shelly because I may need him in the future").

By contrast, here, there was no clear and definitive end to the scheme in which Mangano accepted Linda Mangano's job and salary in exchange for, inter alia, his past and future intervention with the TOB concerning loan guarantees sought by Singh. There was certainly no

---

[36] Singh's bribes to Mangano, including Linda's continuing paychecks, are also intertwined with the TOB loan guarantees because, without these loans, Singh would have been financially unable to continue paying Linda's salary. Prior to obtaining these loans, Singh's companies were on the "brink of total collapse" and "bankruptcy." (Tr. 1456.) Singh even told Mangano how important the loans were "to the survival of my company." (Tr. 1484.) The loans and Singh's bribes were interdependent—and two of the loans and Linda Mangano's continued paychecks occurred within the statute of limitations period.

change in the law comparable to the scenario in <u>Silver II</u> that suddenly forced Singh and Mangano to abandon their quid pro quo arrangement concerning the TOB loan guarantees. Rather, the TOB's backing of Singh's loans was an ongoing matter that extended past October 18, 2011. Additionally, in contrast to Taub, Singh did not testify that Linda Mangano's paychecks in 2011 were only intended to curry generalized goodwill and to incentivize Mangano to help Singh in unspecified matters in the future unrelated to the TOB loan guarantees. Rather, Singh's testimony explicitly tied Linda Mangano's hiring and job—which was clearly intended to continue into future—to the TOB loan guarantees.

Moreover, even beyond Singh's testimony, there is particularly strong circumstantial evidence linking the specific matter at issue—guarantees from the TOB for millions of dollars in loans—and the payments received by Linda Mangano past October 18, 2011 because Mangano's renewed intervention in the TOB loan guarantees in April 2010 coincided with Linda's first paycheck. This contrasts with <u>Silver II</u> where, even after the HCRA grant scheme ended sometime in 2007, Taub kept sending referrals, but did not receive anything from Silver until sometime in 2008 when Silver directed a minor one-time "$25,000 state grant to the Shalom Task Force, a domestic violence nonprofit for which Taub's wife served as a board member"—a grant that was not even related to mesothelioma research. <u>Silver II</u>, 948 F.3d at 561.

And, as explained earlier, the form of Singh's bribe in April 2010—a "job" to replace Mangano's income from Rivkin—came with the obvious expectation that it would continue into the future and that Linda Mangano's future paychecks would, at least in part, be backpay for Mangano's earlier intervention with the TOB in April 2010 concerning millions of dollars in loan guarantees. By contrast, in <u>Silver II</u>, the government did not even contend that the post-2010 referrals that Silver received constituted "back pay" for the HCRA grants he secured for Taub in

2005, 2006, and 2007—more than two years before the limitations period began in February 2010. Id. at 572; see also id. at 574 (noting that there was "no evidence that post-2010 referrals . . . [were] made in return for" Silver's one-time $25,000 grant to the Shalom Task Force nonprofit in 2008).

Mangano attempts to analogize Singh's testimony to Taub's testimony, arguing that Singh's testimony shows that he only "kept [Linda Mangano] as an employee to have Mangano on 'retainer,' for the prospective assistance he might provide in any and all government matters." (Def.'s Silver II Mot. at 7, ECF No. 420.)  This argument is not persuasive.  In the testimony cited by Mangano, Singh never states that he only kept paying Linda Mangano to keep Mangano on retainer for future assistance in unspecified matters.  Rather, Singh also explicitly discussed the TOB loan guarantees in that testimony, (Tr. 1717), and at other points in his testimony where he addressed his reasons for hiring her, (Tr. 1477–78, 1482).  The fact that Singh hired Linda Mangano, in April 2010, in exchange for both official action by Mangano concerning the TOB loan guarantees and also to obtain official action and other assistance from Mangano in other matters—including, generally, "anything I needed in Town of Oyster Bay, Nassau County or even some other level of the government" that might arise in the future, (Tr. 1717)—does not make the instant case analogous to Silver II.  Here, the evidence showed that Mangano understood that Linda Mangano's paychecks after April 2010 were, at least in part, in exchange for Mangano's earlier (and, if necessary, future) intervention with the TOB loan guarantees.

Mangano also contends that the paychecks that Linda Mangano continued to receive into the limitations period are analogous to certain payments that Silver received within the limitations period that the Second Circuit found could not save Silver's untimely convictions.  Specifically, Silver's law firm continued to pay him legal fees after 2010 that were generated from cases that Taub had referred to Silver's firm prior to 2007.  As the panel in Silver II noted, "[t]he five-year

statute of limitations under 18 U.S.C. § 3282(a) is not extended 'where the payoff merely consists of a lengthy, indefinite series of ordinary, typically noncriminal, unilateral actions and there is no evidence that any concerted activity posing the special societal dangers of conspiracy is still taking place.'"  948 F.3d at 538 (quoting United States v. Grimm, 738 F.3d 498, 503 (2d Cir. 2013)).  The panel explained that the fees Silver received in 2010 were insufficient to extend the HCRA scheme into the limitations period because:

> [t]he thing of value (or the quid) that Silver received from Taub in exchange for his promise to deliver the HCRA grants was the referrals themselves—not the subsequent payouts from [Silver's law firm] on the referrals that generated fees for the firm.  If Silver had been paid in oil leases or diamonds or savings bonds, the result would be the same, regardless of when those properties were subsequently monetized.

Id. at 574.  These fees in Silver II are obviously distinguishable from the instant case where the "quid" was both Linda's hiring and her paychecks, which she continued to receive from Singh into the limitations period.

> ### vii.  Mangano's Financial Disclosure Statements are Another Aspect of the Quid Pro Scheme/Conspiracy that Continued into the Limitations Period

To satisfy the statute of limitations, it is not even necessary to find that Mangano understood that Linda Mangano's October 23, 2011 paycheck constituted backpay for his 2010 intervention with the TOB loan and/or payment for future intervention concerning the TOB loan guarantees.  Rather, the statute of limitations can be satisfied so long as Mangano understood that Linda's paychecks in January 2011—a mere nine months after her first paycheck—were still, at least in part, backpay for Mangano's earlier intervention with the TOB loan guarantees and/or payment for future intervention concerning those guarantees.  This is because in October 2012—clearly within the limitations period— Mangano filed his annual financial disclosure statement for Nassau County for the year 2011.  Although not raised by the government, the Court finds that this

financial disclosure statement is an aspect of the particular quid pro quo scheme and conspiracy involving the TOB loan guarantees.

Mangano's annual financial disclosure statements for Nassau County required him to: (1) indicate any "position" in any "business" or any "employment" for his spouse; and (2) to indicate the range of compensation she received for that "position" or "employment."  (GX446 (2010 disclosure statement dated June 30, 2011); GX447 (2011 disclosure statement dated October 15, 2012).)  Mangano's 2010 and 2011 financial disclosure forms state that Linda Mangano had a "Marketing & Advertising" "Position" at the Quinn Restaurant Group, Inc. ("Quinn"), and indicated that she was paid over $100,000 for that position.  (GX446l GX447; Tr. 3367.)  Mangano's submission of this financial disclosure—an attempt to lull Nassau County and the citizens of Nassau County (including those citizens living in the TOB) from discovering Mangano's bribery scheme—was an act in furtherance of that scheme.  See United States v. Kerik, 615 F. Supp. 2d 256, 269 (S.D.N.Y. 2009).  Thus, as long as some part of Linda Mangano's 2011 salary that was covered by this financial disclosure statement was understood by Mangano to be in exchange for past or future intervention with TOB loan guarantees, then Mangano's filing of this statement in October 2012 would constitute an aspect of that particular quid pro quo scheme that occurred within the limitations period.

In Kerik, the court found that charges of honest services fraud and conspiracy to commit honest services fraud against the former New York City Police Commissioner could be timely even though he left that position outside of the limitations period.  615 F. Supp. 2d 256.  The court found the charges could be within the limitations period because the company that bribed Kerik sent a letter to the New York City Department of Sanitation within the limitations period that was "designed to lull [that department] from discovering the honest services fraud scheme."  Id.  In the

letter, the company "checked 'no' in response to the question whether it had 'given, or offered to give, money or any other benefit to a public servant with the intent to influence that public servant with respect to any of his or her official acts, duties or decisions' within the last 10 years." Id. The court explained that that "[u]nder limited circumstances, a subsequent act designed to 'lull' a victim into believing that no scheme occurred is sufficient to constitute a substantive act in furtherance of the scheme." Id. at 269.

The evidence at trial showed that Mangano asked Singh to have Linda paid by Quinn (and Mangano then subsequently listed Quinn on his financial disclosure statements) because it was located outside of Nassau County and did not do any work for Nassau County or the Town of Oyster Bay. (Tr. 1734.) By contrast, all of Singh's employees who did marketing and advertising work were paid by the Singh Hospitality Group, the parent company located in Nassau County and the Town of Oyster Bay. (See Tr. 155, 290, 303–04, 1734.) Of course, paying Linda Mangano through Quinn, rather than through the "Singh Hospitality Group," also helped cover-up the fact that Singh—who conducted business in and with Nassau County and the Town of Oyster Bay— was paying her salary. Placing Linda Mangano on Quinn's payroll, along with Mangano's representation about Linda Mangano's employment at Quinn on his 2011 financial disclosure form, were part of a ruse to try to hide the fact that the payments that Linda Mangano received from Singh for this "job" were, in fact, bribes paid to Mangano in exchange for, inter alia, Mangano using his clout as the Nassau County Executive to pressure officials at the TOB, a municipality located in Nassau County.[37]

---

[37] The analysis above focuses on the fact that "Quinn" rather than the Singh Hospitality Group was selected as the vehicle to pay Linda Mangano and is listed as Linda Mangano's employer on the financial disclosure statements. There is also a strong argument that Mangano's financial disclosure statements were misleading and a ruse because those disclosures indicated that Linda Mangano had an "Marketing & Advertising" "Position" and implied that she was paid over $100,000 for work performed in that position. (GX447.)

Accordingly, so long as some portion of Linda Mangano's 2011 salary was part of the quid pro quo scheme and conspiracy involving the TOB loan guarantees, then the 2011 financial disclosure statement—which covered all of 2011—would also be part of the same quid pro quo scheme/conspiracy concerning the TOB loan guarantees.

Furthermore, even if, somehow, none of Linda Mangano's 2011 salary was connected to the particular quid pro quo scheme involving the TOB loan guarantees, the 2011 financial disclosure statement would still be part of that quid pro quo scheme because Mangano made similar statements on his 2010 financial disclosure statement, which covered all of 2010, including April 2010 when Linda Mangano was first put on Singh's payroll and Mangano was directly intervening in the TOB concerning the loan guarantees. Because Mangano had already listed Quinn as Linda Mangano's employer on the 2010 financial disclosure, he necessarily had to continue doing so for subsequent years as well—including on the 2011 disclosure submitted in 2012—or else the ruse of paying Linda Mangano through Quinn (and the underlying quid pro quo bribery scheme) might be uncovered by Nassau County and its citizens.

Mangano's financial disclosure statements are yet another reason why the jury, if instructed on the statute of limitations, would have still convicted Mangano.

> ### viii. The 2011 NDH Concession Amendment also Satisfies the Statute of Limitations

The government also contends that the two NDH concession amendments signed by Genova in November 2011 and June 2012 are aspects of the Manganos' and Singh's quid pro scheme that fall within the limitations period. Before addressing the parties' arguments on this issue, it is helpful to set out the background of Singh's two Madison loans and two NDH loans.

### a. Background – The June 2010 Concession Amendments and the First Madison Loan

As explained previously, in the background section of this opinion, on the day following the critical April 28 meeting at Venditto's headquarters, Cornachio devised a potential solution that he believed would satisfy Madison and allow Singh to obtain the $1.5 million loan. Singh spoke to Mangano about this and also forwarded him an email on this topic.

A little over a month later, on June 8, 2010, the TOB Board, including Venditto, voted to adopt a resolution concerning Singh's concessions, and Venditto signed two amendments to Singh's concession agreements. (DX728.) This vaguely-worded resolution stated that it was necessary to amend Singh's concession agreements "in order to facilitate the concessionaire's ability to obtain financing to make capital improvements to the facilities," and, as such, authorized the Supervisor to "execute <u>amendments</u> to [the TOB's] agreements with [S.R.B. Convention] and [S.R.B. Concession], as well as any other documents necessary to effectuate the purposes of this Resolution." (GX535 (emphasis added).)

That same day, Venditto executed two amendments to Singh's concession agreements. The first amendment concerned TOBAY Beach and the $1.5 million line of credit that S.R.B. Concession had sought from Madison. The TOBAY Beach amendment followed Cornachio's general framework, which had been finalized in the interim, to indirectly guarantee the $1.5 million Madison was loaning to Singh. The mechanics of that indirect guarantee are discussed in greater depth below. The concession amendment makes clear that S.R.B. Concession and the Town "wish to further amend [the original] Agreement in connection with [S.R.B. Concession] obtaining financing for the required capital improvements to TOBAY <u>and other matters</u>." (GX536 (emphasis added).) The concession amendment did not contain any explicit provisions restricting Singh's use of the loan proceeds.

The concession amendment also noted that S.R.B. Concession's earlier agreements required it to make, by April 2015, a total of $3.5 million in capital improvements to TOBAY Beach and that, to date, S.R.B. Concession had made $1.78 million in capital improvements. (GX536.)

On June 18, 2010, the $1.5 million loan for TOBAY Beach closed, and Singh obtained the $1.5 million revolving line of credit from Madison contemplated in the concession amendment. (GX602, Tr. 1499.)  That same day, Genova—the only other Town official authorized to sign on behalf of the Town—executed a related "Default Assignment of Concession Proceeds Agreement," which allowed Singh to assign monies he was to receive from the TOB under the agreement to Madison.  (GX536; Tr. 2879, 3021–22.)  As consideration, Singh signed a release that released any claims related to the termination of the agreement in the event that the agreement was terminated and the TOB paid the $1.5 million.[38]  (GX536.)

Cornachio had reviewed and revised both the concession amendment signed by Venditto and the assignment agreement signed by Genova.  (GX424 at RR_TOB_000007; see also id. (billing record noting that Cornachio billed .25 hours for "[a]ssist[ing] in the closing on loan" on June 18).)

On June 8, 2010, Venditto also executed a similar concession amendment to S.R.B. Convention's Woodlands agreement concerning a potential $2 million loan.  (DX 1440.)  As discussed below, this concession amendment appears to have been for a loan that Singh was contemplating or negotiating at the time, but that he never actually obtained.  The provisions of this amendment provided an indirect guarantee for a $2 million loan for the Woodlands using

---

[38] At trial, Sinnreich, who had been informed by Mei, after the April 28 meeting, about the release concept proposed by Cornachio, characterized this release as a "fabricated sham agreement to manufacture consideration for the purposes of this deal."  (Tr. 2629.)

essentially the same framework as the TOBAY Beach concession amendment.  (DX1440.)  This amendment concerning a $2 million loan for the Woodlands also recounted that S.R.B. Convention had already completed $4.95 million in capital improvements at Woodlands, as was similarly reflected in the 2008 concession amendment.  Ultimately, the $2 million loan for the Woodlands referenced in the agreement never closed.

Unlike the concession amendment for TOBAY Beach that Venditto signed on June 8, the concession amendment for the Woodlands he signed on June 8 did not mention Madison and instead referred, in Madison's place on the document, only to an unspecified "designated financing entity," indicating that Singh did not yet have a lender lined up yet to finance a loan for Woodlands. (DX1440.)  Also, unlike the concession agreement for TOBAY Beach, this amendment for the Woodlands was not accompanied by a Default Assignment of Concession Agreement Proceeds. Again, this was apparently because Singh had not yet actually secured financing for a second loan.

After the first Madison loan closed, Singh gave Mei $10,000 in cash for his assistance in securing the guarantee for Singh.  (Tr. 1542.)

### b.  Background - The Second Madison Loan

Shortly after Singh obtained the $1.5 million line of credit from Madison for TOBAY Beach, Singh and Madison began discussing a second loan for the Woodlands.  (Tr. 2504.)

In May 2011, Madison decided to extend a $3.4 million loan to Singh for the Woodlands.

Mei prepared a revised concession amendment for the Woodlands that now explicitly referenced Madison and a $3.4 million higher loan amount.  (GX541, Tr. 3034.)  As with the concession amendment for the Woodlands signed by Venditto in June 2010, this amendment recounted that Singh had already completed $4.95 million in capital improvements.  (GX541.) The 2011 Woodlands concession amendment and related Default Assignment of Concession

Agreement Proceeds followed the same framework as the June 2010 TOBAY Beach concession amendment.

Due to the size of the second loan, Madison wanted a written opinion letter from outside counsel that the concession amendment was authorized and enforceable. (Tr. 2106–07, 2523.) Mei and Singh obtained, at Singh's expense, an opinion of counsel letter from the law firm Harris Beach for Madison's benefit. The letter opined that the concession amendment was authorized and enforceable. (DX718; Tr. 1783–84, 2523–24). Although Singh paid for the letter and Singh was a client of Harris Beach, Harris Beach represented in the letter that it had been retained by the TOB.[39] (DX718, Tr. 2040.)

Mei sent copies of the concession amendment and assignment agreement to Genova for him to sign. Attached to the agreement was a cover note from Mei explaining that Genova had to sign a revised concession amendment because the original, signed by Venditto, did not specifically name Madison. (GX854, Tr. 3025–26.) Mei also asked Genova to a sign the assignment agreement, which Mei explained had not been signed previously because the earlier loan did not close. (GX854.) Mei's note did not mention the fact that the loan was now for $3.4 million and that, as such, the termination payment listed in the agreement was also increased to $3.4 million.

Genova signed both documents on May 25, 2011, and Singh obtained the $3.4 loan from Madison that same day. (GX541, GX607.)

In order to obtain this second Madison loan, Madison required Singh to use approximately $1.25 million of this loan to pay off other outstanding loans. (Tr. 2505–06; see also GX606 at 1, 7.) Thus, although Singh was obligated to make $3.25 million in capital improvements at the Woodlands, the second Madison loan was clearly insufficient to fund those improvements.

---

[39] There was somewhat conflicting testimony at trial about whether or not Genova was aware of Singh's arrangement with Harris Beach. (See 1783–84, 2044, 2106–07, 2525, 2872.)

For the $3.4 second Madison loan, Genova signed both the concession amendment as well as a "Default Assignment of Concession Agreement Proceeds," which was similar to the assignment agreement that he had signed for the first Madison loan.  (GX541.)

At trial, Genova testified that it was his practice when signing documents not to read the documents and instead to rely on the people below him to prepare the documents and make sure that everything was in order.  (Tr. 2786, 2795–96.)  Genova maintained that when he signed documents, including documents such as bond offerings and attendance-related documents, he would generally know the type of document that he was signing, but would sign it without reading it.  (Tr. 2875–77, 2795–96.)  Genova testified that he did not read any of the underlying documents concerning the second Madison loan, but that his practice would have been to read the cover note.  (Tr. 3025–26.)

As with the first Madison loan, Singh gave Mei $10,000 after the closing of the second Madison loan.  (Tr. 1783-84)

Mangano had no specific involvement in the second Madison loan.  (Tr. 2042.)

### c.  Background - The Details and Mechanics of the Indirect Guarantee in the Madison Concession Amendments

To understand how the indirect guarantees in these concession amendments worked, it is necessary to take a brief step back and review Singh's underlying concession agreements for both TOBAY Beach and the Woodlands.

The TOB could always terminate Singh's concession agreements at-will, although, even prior to 2010, Singh was entitled to certain payments if the termination was without cause (i.e. a situation where the Town terminated the agreement even if Singh was not in default).  (GX518; Tr. 2583, 2987.)

Paragraph 32 of the 2005 concession agreement for TOBAY Beach provided that the "Town has the right to terminate this AGREEMENT if" any of eight enumerated events were to occur, including S.R.B. Concession being "in default of any of the conditions of this AGREEMENT, (GX517 ¶ 32(f)), or S.R.B. Concession being in violation of "any law, rule [or] regulation . . . applicable to the operation" of the concession, (GX517 ¶ 32(c)).   The 2005 agreement provided that if the Town were to terminate the agreement without cause (i.e. "for any reason other than the default of the [S.R.B. Concession]"), the Town was obligated to pay S.R.B. Concession 5% of the value of the capital improvements that it had already made to the facility for each year remaining on the term of the agreement.  (GX517 ¶ 32.)  If, however, the Town were to terminate the agreement for cause, the Town would not have to pay Singh for any improvements he had already completed.[40]

The relevant provisions in Paragraph 32 of Singh's 2005 concession agreement for the Woodlands are, essentially, identical to the provisions in the 2005 TOBAY Beach agreement set forth above.  (GX518 ¶ 32; see id. ¶ 32 (formula for payment in event of termination without cause uses 4%, rather than 5%, per year for each year remaining on the term of the agreement).)

The 2010 TOBAY Beach concession amendment amended paragraph 32 of the 2005 TOBAY concession agreement to specify that the Town now also had "the right to terminate this AGREEMENT if" "[a] default or event of default occurs under the [S.R.B. Concession's] credit facility with Madison National Bank." (GX517 ¶ 32, GX536.)   The 2010 TOBAY Beach concession amendment also amended the portion of Paragraph 32 that discussed the payments that

---

[40] Paragraph 32 also provided that the Town was required to notify any known "financing entity" of S.R.B. Concession if any of the events of default were to occur.  (GX517 ¶ 32.)  The  agreement further provided that "[i]n the event of a default by the [S.R.B. Concession], the financing entity shall be entitled to receive any payments then due to the [S.R.B. Concession] by the TOWN."  (GX517 ¶ 32.)  In a related provision, the agreement permitted S.R.B. Concession to assign its interest in the agreement to any financing entity that provided financing to it.  (GX518 ¶ 35.)  The 2005 Woodlands concession amendment contained essentially the same provisions.  (See GX518 ¶¶ 32, 35.)

90

the Town owed the [S.R.B. Concession] for improvements if the Town terminated the agreement without cause.  (GX536.)  The 2010 TOBAY Beach concession amendment amended that portion of Paragraph 32 to now state that "[i]f the TOWN terminates the agreement for any reason prior to April 30, 2015, the TOWN shall pay [S.R.B. Concession] a termination payment equal to the greater of (a) $1,500,000 or (b) [if, and only if, the termination is without cause, the amount due under the prior formula for calculating the amount of the Town's obligation to pay for already-completed improvements in the event of a termination without cause]."  The Town's obligation to pay the $1,500,000 was set to expire in April 2015, at which time the Town's obligations would essentially revert back to the same obligations that were in place in Paragraph 32 prior to the 2010 amendment.  (GX536.)

As noted earlier, after Venditto signed the 2010 TOBAY Beach concession amendment on June 8, 2010, Genova signed the related Default Assignment of Concession Agreement Proceeds on June 18, 2010 when the loan closed.  (GX536.)  That assignment agreement between the TOB, S.R.B. Concession, and Madison assigned to Madison any payments that Singh would be entitled to under the concession agreement, including any payments due under paragraph 32.  (GX536.)  The assignment agreement also contained the following provisions:

> (e) Within five (5) business days after receipt by [the Town] of a notice with certification by [Madison] that an Event of Default which remains uncured . . . . [under] the Line of Credit [has occurred] (the "Default Notice"), [the Town] shall pay any amounts due to or to become to [S.R.B. Concession] under the Concession Agreement (including . . . amounts due . . . under Paragraph 32 thereof) to [Madison], making payment at such times and in such manner as the same would otherwise be payable to [S.R.B. Concession]

> (f) [S.R.B. Concession] and [the Town] expressly agree that a Default Notice received by [the Town] from [Madison] without further or additional notice from [the Town] to [S.R.B. Concession], <u>shall be deemed a default under the Concession Agreement **_thereby triggering_** [Madison's] **_right_** to the payments set forth in the second to last Paragraph ¶ 32 of the Concession Agreement [as amended] . . . upon delivery to TOBAY of the Default Notice."</u>

(GX536 (emphases added.)   The 2011 Woodlands concession amendment and assignment agreement had similar terms.[41]

The provisions highlighted above (including the phrase "shall be deemed a default under the Concession Agreement thereby triggering [Madison's] right to the payments set forth in . . . Paragraph ¶ 32") in the TOBAY Beach assignment agreement appear to take away the discretion that the Town was granted under the concession amendment to decide whether or not to terminate the agreement and, thus, trigger the minimum payment ($1.5 million for the TOBAY Beach and $3.4 million for the Woodlands) in the event that Singh were to default on the underlying loan.

Notably, Thomas Gilmartin, an employee at Madison, testified that he viewed both of the transactions with the Town concerning the Madison loans as guarantees and indicated his belief that "if Singh defaulted on the loan" or if the Town "kicked [Sigh] out and severed [its] relationship with him, then Madison would get paid by the Town."   (Tr. 2503–07, 2526; see also Tr. 2504 (testimony that both he and Madison's counsel felt confident that the loan was adequately secured); DX719 at 3–4 (documentation from Madison indicating that Madison would only close on the $3.4 million Woodlands loan if Madison and its counsel "ensure that there are sufficient vested payments due to the Borrower which will be paid directly to the Bank in the event:   (1) the Concession Amendment is Terminated . . . for any reason. . .; [or] (2) A Default by [S.R.B. Convention] under the [Madison] Loan.].""))

---

[41]  The 2011 Woodlands concession amendment and related assignment agreement were, in relevant parts, identical to the 2010 concession amendment and assignment agreement for TOBAY Beach, except that the 2011 Woodlands amendment included a payment for $3.4 million to reflect the amount of second Madison loan and the Town's obligation to pay the $3.4 million expired in December 2025 (rather than in 2015).   (GX541; see also DX1440 (Woodlands concession amendment signed by Venditto in June 2010 also had a 2025 expiration date for the $2 million payment referenced in that amendment).)

In any event, even if the June 2010 TOBAY Beach concession amendment and assignment agreement did not require the Town to pay Madison if Singh defaulted on the loan, at the very least, this amendment and agreement provided Singh with a new substantial benefit (namely a $1.5 million payment to Singh's lenders if the Town terminated the agreement for cause).

### d.  Background - The NDH Loans

While Singh was still in the process of obtaining the $3.4 Madison loan, he began looking for another lender because he knew that the Madison loan would not be sufficient.  (Tr. 2111.)  He was looking for a lender willing to lend a higher amount that would also allow him to pay the Madison loan off.  (Tr. 2111.)  Singh would eventually find such a lender in NDH, which would ultimately enter into two loans with Singh in November 2011 and November 2012.  Both of these loans would be backed by the TOB through concession amendments signed by Genova.

At trial, certain emails concerning the parties' negotiation leading up to the November 2011 NDH concession amendment were introduced.

In January 2011, Mei, in an email to NDH, indicated that he had "serious doubts about the Town's ability to guarantee an amount greater than the cost of the capital improvements at the site."  (DX1083.)  Notably, the loan amounts (and related minimum payments) in each of the Madison concession amendments had been less than the total amount of capital improvements that Singh had already completed at the respective facilities at issue.

In an August 2011 email, Mei informed Singh that NDH wanted a new Town Board resolution backing any new loan from NDH.  (DX1157.)  Mei, however, indicated that he would prefer to use the Town Board resolution passed in 2010, which he had also relied on for the second Madison loan in May 2011.  (DX1157, GX854.)  Ultimately, Mei would not seek a new Town

93

Board resolution for either of the NDH loans and would instead rely on the Town Board resolution passed in June 2010.[42]

In September 2011, Mei emailed Bill Garry, the attorney for Harris Beach who had prepared the opinion letter for the $3.4 million second Madison loan.  (DX1172.)  Garry would end up providing, at Singh's expense, opinion letters for both NDH loans opining that the concession amendments discussed below were authorized and enforceable.  (Tr. 2125, 2872.)

On October 27, 2011, Singh signed, on behalf of S.R.B. Convention, a note with NDH for a $7.8 million-dollar loan for the Woodlands.  (GX615.)

On November 2, 2011, Singh sent an email to Mei indicating that, even at this point, they were not sure if the deal would go through.  The email states:  "I just want to thank you my friend.  If this does not happen it would not because of lack of trying.  I have left the result in Gods hand and hope for the best.  Once again thank you from all my heart."  (DX63, Tr. 2121.)

On November 18, 2011, Genova executed a concession amendment and related assignment agreement concerning the $7.8 million loan for the Woodlands between S.R.B. Convention and NDH.  (GX542, GX615.)  The principal of this loan was $5 million.  (Tr. 1500.)  Singh used some of the proceeds of the NDH loan to pay off one of the Madison loans, presumably the second Madison loan.  (Tr. 2122 (the "net amount" Singh received after this NDH loan was $3 million).)

Subsequently, on June 19, 2012, Genova executed a second concession amendment and assignment agreement involving NDH and S.R.B. Concession for TOBAY Beach with a total loan amount of over $12 million.  (GX543, GX616.)  Genova also executed a related cross-default agreement that rendered a default under one of the NDH loans to be a default under both loans.

---

[42]  Mei had previously explained to Sinnreich in a March 2010 email that the TOB would generally leave the language in Town Board resolutions "vague" and "blissfully simple," and would then "stick all the good stuff in the agreements."  (DX729.)  At trial, Genova affirmed that keeping resolutions vague was a historical practice in the TOB.  (Tr. 3015–16.)

(GX1129; see Tr. 3031 (testimony of Genova that he was not sure if the signature on the cross-default agreement was, in fact, his signature).)

In comparison to the amendment for the Madison loans, the concession amendments involving NDH included higher loan amounts as well as more onerous default provisions and various other provisions that were not included in the earlier concession amendments for the Madison loans.  (Compare GX542, GX543 with GX536, GX541.)  For example, rather than specifying a set minimum payment in the event of a default of the concession agreement by Singh, the NDH concession amendments explicitly linked the termination payment to the total amount outstanding on Singh's loan, including any late interest, fees, costs, expenses, and attorney's fees.[43] (GX542.)  Also, for the NDH loans, it was made clear, in the concession amendments themselves, that the Town did not have the discretion to terminate Singh's concession agreement in the event that Singh defaulted on the loan.  Rather, the NDH concession amendments explicitly stated that if Singh defaulted on the loan, the concession agreement would automatically "be deemed terminated," thereby triggering the Town's termination payment to NDH.[44]  (GX542 ¶ 3, Tr. 3048–49.)  Moreover, unlike the two Madison concession amendments—where the face amounts of the loans and the related minimum payments in the concession amendments were set below the total amount of capital improvements that Singh had already completed—the NDH concession

---

[43] The termination payment in the concession amendment for the first Madison loan was $1.5 million, equal to the amount of principal for that loan.  Similarly, the termination payment in the concession amendment for the second Madison loan was $3.4 million, equal to the amount of principal for that loan.

[44]  As explained earlier, although the Madison concession amendments appear, on their face, to give the Town the option whether or not to terminate the concession agreement if Singh defaulted on the Madison loans (and, thus, the option whether to trigger the $1.5 million or $3.4 million minimum payments), language in the related assignment agreements for the Madison loans appears to have removed that discretion.  (See also Tr. 2044 (testimony of Singh stating, about the unconditional guarantee in the NDH concession amendment, that "that language, instead of having a separate agreement as it was with Madison loan, the language should go in the contract [i.e., the concession amendment] itself").)

amendments did not indicate that the capital improvements that Singh had already completed were below the loan amounts.  For example, the 2011 NDH loan for the Woodlands was for $7.8 million, inclusive of interest.  However, the concession amendment for the 2011 NDH loan recounted that Singh had only made 4.95 million in capital improvements.

As explained earlier, Genova testified that it was his practice when signing documents not to read those documents.  (Tr. 2786, 2795–96.)  Instead, he maintained that he would generally go directly to the signature tab for the document and would sign it if the signature page indicated that it had been reviewed and approved by the relevant town officials below him.  (Tr. 3050.)  For the NDH documents he signed, Genova testified that he did not know the name of the lender involved or the amounts of the loans.  (Tr. 2796.)  However, he testified that he was familiar with the "classes of documents" that Mei presented to him and he knew that these loans involved millions of dollars because the "capital improvements that [Singh] had to make were very, very significant, in the five to ten to $15 million range."  (Tr. 2796–97 (discussing Genova's "ballpark figure understanding" of the amount of these loans).)  Additionally, Genova testified that even after he signed the second Madison loan in May 2011, he knew, based on Singh's obligations to make the capital improvements, that Singh was continuing to look for financing to make those improvements.  (Tr. 3047.)

Mei received a $25,000 cash payment from Singh after each of the NDH loans closed.[45] (Tr. 1786–87.)  Although all Town agreements were supposed to be filed in the Town clerk's office, neither of the NDH loans were kept there.  (Tr. 2573–75, 2870.)

Mangano was not involved with, or even aware of, the two NDH loans.   (Tr. 2041–42.)

---

[45] After the two NDH loans, Mei would continue to assist Singh in other ways.  In 2013, Singh obtained a license to run three additional concessions in the TOB, including one at Tappen Beach.  (Tr. 1555, 3054–55; GX547.)  In connection with a loan guarantee for Tappen Beach in July 2014—after Singh had already received a grand jury subpoena in April 2014—Singh, with Mei's knowledge, forged Venditto's signature as well as the signature of another TOB official on the guarantee documents.  (Tr. 1555–56, Tr. 2122–23, 3067.)

#### e.  Analysis – Parties' Arguments

Both NDH concession amendments were executed within the limitations period.  The government contends that these amendments constitute an aspect of the quid pro quo scheme/conspiracy between Singh and Mangano and, thus, satisfy the statute of limitations. According to the government, "Mangano understood from the inception of the quid pro quo found by the jury that he was to take action and cause others to take action in the future regarding the TOB's indirect guarantee of Singh's loans through amendments to the concession agreements and that his conduct determinatively led other government officials to execute four amendments to Singh's concession agreements, all of which served as indirect guarantees for loans given to Singh and his business entities."  (Gov't Opp'n to Silver II Mot. at 59.)

Mangano responds that the NDH concession amendments cannot satisfy the statute of limitations because:  (1) according to Mangano, only two loans were contemplated at the April 28 meeting; (2) there is no evidence that he was involved in or even knew about the two NDH loans; and (3) there are numerous differences between the Madison loans and the NDH loans in both their terms and their genesis.

As explained below, the evidence at trial shows that the 2011 NDH concession amendment constitutes an aspect of the same quid pro quo scheme/conspiracy as the two Madison loans and, thus, satisfies the statute of limitations.

#### f.  Analysis – Legal Standard

As explained earlier, for the substantive counts, the Government needed to prove that "some aspect of that particular quid pro quo scheme continued into" the limitations period, which began on October 18, 2011.  Silver II, 48 F.3d at 572 (quoting Silver I, 864 F.3d at 122).

For a conspiracy charge which "requires proof of an overt act, the government satisfies the statute of limitations . . . if it establishes that the conspiracy operated within the five-year period preceding the indictment, and a conspirator knowingly committed at least one overt act in furtherance of the scheme within that period." United States v. Salmonese, 352 F.3d 608, 614 (2d Cir. 2003). The conspiracy to commit honest services wire fraud, charged in Count 3, does not require an overt act. See Tr. 4536; United States v. Roy, 783 F.3d 418, 421 (2d Cir. 2015). Thus, for the purposes of statutes of limitations, the conspiracy charged in Count 3 would only be "deemed terminated when, in a broad sense, its objectives have either been accomplished or abandoned, not when its last overt act was committed." Grammatikos, 633 F.2d at 1023.

For conspiracies, "it is well established that members of a conspiracy need not have agreed on all details of the conspiracy, so long as they agreed on 'the essential nature of the plan.'" United States v. Lloyd, 631 F. App'x 45, 48 (2d Cir. 2015) (quoting United States v. Geibel, 369 F.3d 682, 689 (2d Cir. 2004)). "Foreseeable acts of one co-conspirator in furtherance of the conspiracy are attributable to all co-conspirators." United States v. Milstein, 401 F.3d 53, 72 (2d Cir. 2005).

### g. Analysis - The 2011 NDH Concession Amendment Was Part of the Same Quid Pro Scheme/Conspiracy as the Two Madison Loans

Mangano concedes that during the April 28, 2010 meeting at Venditto's headquarters, the "participants discussed the possibility of two loans – one pertaining to Woodlands and one pertaining to TOBAY." (Def.'s Silver II Reply Br. at 15.) However, Mangano maintains that the parties at the April 28 meeting never discussed the possibility of any additional loans. Mangano stresses that he was not involved in, or even aware of, the NDH loans, and that the terms of the NDH concession amendments as well as the manner in which they were procured distinguish them from the earlier Madison loans. Thus, according to Mangano, the concession amendments for the two NDH loans cannot possibly be part of Mangano's and Singh's quid pro quo scheme.

98

Mangano, however, was not required to have knowledge of the NDH concession amendments at the time they were negotiated and signed for them to be part of his quid pro quo scheme/conspiracy.  The evidence shows that Mangano knew that he was pressuring TOB officials to guarantee Singh's loans in the future.  Accordingly, the execution of the two NDH concession amendments by Genova and Singh were foreseeable parts of the same quid pro quo scheme/conspiracy.  After Mangano pressured Venditto to back Singh's loans, Venditto ultimately agreed to do so and Genova—who was at least generally aware of what he was signing and knew that Venditto had decided to back Singh's loans—executed the NDH concession amendments. Those facts alone are sufficient to show that the NDH concession amendments were reasonably foreseeable acts in furtherance of the quid pro quo scheme/conspiracy.  Based on these basic underlying facts, the Court finds beyond a reasonable doubt that a properly instructed jury would have still convicted Mangano.

A more granular analysis is not necessary to show that Genova's execution of the 2011 NDH concession amendment, which the evidence shows Mangano caused, was an act in furtherance of this conspiracy.  Moreover, as explained below, even if a closer analysis of foreseeability is required, it is still clear that the 2011 NDH concession amendment (and Singh's efforts to obtain that amendment) are aspects of this particular quid pro quo scheme and are acts in furtherance of the conspiracy between Singh and Mangano.

Again, Mangano is correct that there is no evidence that he had any specific involvement with the two NDH loans or that he was even aware of the NDH loans or concession amendments. However, there is other evidence about what Mangano did know and what was foreseeable to him that establishes that the NDH concession amendment signed in November 2011 was an aspect of the quid pro quo scheme/conspiracy between Mangano and Singh.  In determining what was

foreseeable to Mangano, it is also noteworthy that he was a sophisticated lawyer and the Nassau County Executive.

Singh testified that he told Mangano in January 2010 about the multi-million-dollar capital improvements that he was required to make at the Woodlands and TOBAY Beach. (Tr. 1457–58, 1461–62.)  Additionally, there is also other evidence that Mangano was aware of the key aspects of the 2008 concession amendments—including that Singh was obligated to complete a total of $3.5 million in improvements at TOBAY Beach and $3.25 million in capital improvements at the Woodlands.  (GX525, GX526.)  Savino's notes from his conversation with Mangano contain numerous details about Singh's concession agreements and the loan guarantee issue, including, inter alia, "$1.5m" and "multiple concessions" as well as a reference to the 2049 termination date contained in the 2008 concession amendment for the Woodlands.  (GX423.)  Mangano also attended the April 28 meeting where the lawyers discussed amending Singh's concession agreements and Sinnreich recounted his previously expressed concerns about the "New York Constitution, the need for consideration, [and] the use of funds."  (Tr. 2619.)  Mangano also had, during April 2010, multiple conversations with Singh about his concession agreements and the loan guarantee issue.  In these conversations, Singh discussed Sinnreich's April 7 email and told Mangano "how important [this loan] is to the survival of my company."  (Tr. 1484, 1474–75.) Singh's testimony on these points was strongly corroborated by Savino's testimony and notes.

Mangano knew that millions of dollars of improvements had to be made and it was surely

foreseeable that multiple loans might be required for each location, including the Woodlands.[46]

Additionally, there is also evidence that Mangano knew that Singh was not seeking the loan proceeds solely to make capital improvements.  At the April 28 meeting, which Mangano attended, Sinnreich discussed his concerns about "the use of funds."  (See Tr. 2619 (emphasis added).)  Sinnreich's emails and communications with Mei and Genova—including the critical April 7 email that was forwarded to Singh—explain what Sinnreich's concerns about the "use of funds" entailed.  Singh did not want his use of the loan proceeds to be restricted to capital improvements, which concerned Sinnreich and led him to suggest various provisions to ensure that the proceeds of the loans went solely to capital improvements.  Mangano not only attended the April 28 meeting, but he also spoke with Singh numerous times about the loan guarantees and was told by Singh "how important [this loan] is to the survival of my company."  (Tr. 1484.)  While completing the capital improvements was, no doubt, important to Singh's companies, there is no indication that Venditto or any other TOB officials were threatening to terminate his concession agreements if he did not immediately complete these improvements.  It would have been obvious from everything known to Mangano, including Singh's "survival" statement—which was made in early 2010 in the aftermath of the 2008 financial crisis—that Singh was not seeking these loans

---

[46] Although Singh needed to obtain, at the very least, $3.25 million in financing to make improvements at the Woodlands, it was far from certain in April 2010 that Singh would be able to secure those funds in a single loan.  Thus, it was certainly foreseeable in April 2010 that the Town might have to back multiple loans at the Woodlands for Singh to obtain the financing necessary to make $3.25 million in improvements.  It is also notable that, shortly after the April 28 meeting, on June 8, 2010, Venditto signed a concession amendment for the Woodlands that only contemplated a $2 million loan and referred to an unidentified "designated financing entity."  (DX 1440.)  That concession amendment confirms that, around this time, it was uncertain:  (1) whether Singh would be able to obtain the $3.25 million he needed for the Woodlands in a single loan or whether multiple loans might be required; and (2) which lender would provide the financing for the Woodlands, another variable that could affect both the number and content of any future loans and concession amendments.

solely to do capital improvements.[47]  (Tr. 1456, 1483.)

 The possibility that Singh would not use all of the loan proceeds to make capital improvements is yet another reason why it was foreseeable that:  (1) multiple loans for each location might ultimately be needed to actually complete the required capital improvements; and (2) Singh might seek the Town's backing for loan amounts in excess of the amounts needed to do the capital improvements mandated by the 2008 concession amendments.

Of course, this is what ultimately occurred.  Although Singh obtained the second Madison loan for $3.4 million in May 2011 for the Woodlands, Madison required him, as a condition of the loan, to pay off his other outstanding loans using some of the loan proceeds, which left Singh with less than the $3.25 million he needed to actually make the capital improvements at the Woodlands. Thus, Singh had to seek out another loan to fund the improvements at the Woodlands.  As this was all foreseeable, so was the November 2011 NDH loan and concession amendment in which Singh ultimately obtained additional financing for the Woodlands.

It was also foreseeable to Mangano that:  (1) future loans might follow the complete framework devised by Rivkin; or (2) alternatively, a lender might seek changes to that framework for future loans.  Singh needed to borrow at least $3.25 million to make the required improvements at the Woodlands—this would require a much larger loan than the $1.5 million loan for TOBAY Beach.  And, it was unknown, in April 2010 (and even June 2010), what lender was willing to provide this financing.  (See DX1440.)  Obviously, other lenders—particularly if they were funding a higher loan amount—might not be similarly satisfied with Cornachio's proposed

---

[47] The TOB ultimately disregarded Sinnreich's concerns about allowing Singh to use loan proceeds for purposes other than capital improvements, as evidenced by the concession amendment for the $1.5 million Madison loan for TOBAY Beach.  That amendment—which was drafted by Rivkin and signed by Venditto on June 8, 2010, shortly after the April 28 meeting—expressly states that S.R.B. Concession and the Town were "further amend[ing] [the original concession] Agreement in connection with [SRB Concession] obtaining financing for the required capital improvements to TOBAY and other matters." (GX536 (emphasis added).)

solution and might seek changes, as NDH did, to whatever framework Rivkin ultimately crafted to allow the TOB to back the $1.5 million TOBAY Beach loan.

Mangano stresses various differences between the Madison concession amendments and the NDH concession amendments in both their terms and in the manner in which they were procured. This is all ultimately irrelevant. It was foreseeable that Singh would be seeking the TOB's backing for one or more additional loans past October 18, 2011. Whether or not the precise provisions of the 2011 NDH concession amendment or the amount of the 2011 NDH loan were foreseeable is irrelevant. Mangano knew that he was pressuring TOB officials to take action in the future and it was certainly foreseeable that this could involve multiple loans for each location and different terms. That is sufficient to bring the NDH loan and concession amendment within the scope of the scheme/conspiracy even if, assuming arguendo, some of its terms and the manner in which it was procured might not have been foreseeable. The Court finds beyond a reasonable doubt that, in light of the evidence above, a properly instructed jury would have still convicted Mangano.

Moreover, even if further scrutiny of the purported differences between the Madison concession amendments and the NDH concession amendments were required to resolve the question of foreseeability, as explained below, those differences do not show that the November 2011 NDH concession amendment was unforeseeable and outside of the quid pro quo scheme involving the two Madison loans.

Mangano points to the following aspects of the NDH loans and concession amendments that he claims are material to the issues here:

> (1) the Madison concession amendment was authorized by the Town Board's June 8, 2010 resolution whereas the NDH concession amendments were not authorized by the June 8, 2010 resolution;

(2) the NDH concession amendments occurred "over a year later";

(3) the NDH concession amendments were drafted by Fred Mei, more than 18 months after Mangano's involvement ended, in exchange for a cash bribe of $25,000 in each instance;

(4) the NDH concession amendments were not reviewed or approved by Rivkin Radler, but instead by Harris Beach—Singh's personal law firm, which falsely purported to represent the Town of Oyster Bay;

(5) the terms of the NDH and Madison concession amendment were materially different than those authored by Rivkin Radler;

(6) Genova testified that he must have signed the NDH concession amendments without reading them;

(7) the NDH concession amendments were not, as required, filed in the Town's Clerk's office; and

(8) courts have found that the 2011 NDH concession amendment was ultra vires.

These points do not show that the November 2011 NDH concession amendment was unforeseeable and outside of the quid pro quo scheme/conspiracy involving the two Madison loans. Not every difference between the Madison and NDH concession amendments needed to be foreseeable. Moreover, these points were, in fact, foreseeable to Mangano or are otherwise largely irrelevant or immaterial. And, they are certainly insufficient to show that the essential aspects of the November 2011 NDH concession amendment were so unforeseeable that it does not constitute an act in furtherance of the quid pro quo scheme/conspiracy.

As an initial matter, the fact that Singh was bribing Fred Mei in return for his assistance in drafting the NDH concession amendments is irrelevant. The NDH concession amendments (or, at the very least, some variation of those amendments) were foreseeable. The precise manner in which Singh procured the NDH concession amendments did not need to be foreseeable. Moreover, Singh was also bribing Mei in connection with the Madison loans and that fact would surely not take the two Madison loans outside the scope of Mangano's quid pro quo scheme/conspiracy.

104

Furthermore, it was, at the very least, foreseeable to Mangano—who was himself accepting thousands of dollars in bribes from Singh—that Singh might also bribe other officials who might influence or pervert the process in some respect.  It is absurd for Mangano—who helped put in motion this whole sequence of events at Singh's request and in exchange for bribes—to suggest that the 2011 NDH concession amendment was not foreseeable because Mei—who was also being bribed by Singh—expanded on Rivkin's earlier framework for the concession amendment and also engaged in other corrupt acts in connection with the NDH concession amendments in order to assist Singh.

Additionally, the fact that the terms of the concession amendment for the 2011 NDH loan differed in certain respects from the framework that Rivkin devised does not render the 2011 NDH loan unforeseeable.  As explained earlier, it was certainly foreseeable to Mangano that changes might be made to the framework Rivkin formulated for the $1.5 million TOBAY Beach loan.

Moreover, some of the purportedly critical aspects of the NDH loan cited by Mangano are not as different from the Madison loans as Mangano suggests.  While Mangano points to language in the Madison concession amendment which stated that the minimum payment would only be triggered "[i]f the Town terminated the agreement," the evidence at trial showed that even under Rivkin's framework, Madison believed that the TOB was required to pay Madison if Singh defaulted on the underlying loan and the language in the assignment agreement supports that view.[48]   And, even assuming that the Town was not obligated by the Madison concession

---

[48]  The question here is not whether, as a matter of contract interpretation, Madison would ultimately have been proven correct if the matter had been litigated in a civil breach of contract dispute.  Rather, the testimony of Gilmartin and the language of the assignment agreements on this point are probative because they show that although the NDH concession amendment included ironclad language requiring the Town to pay NDH if Singh defaulted on the loan, that language was not, as Mangano seems to imply, such a radical departure from the concession amendment framework that Rivkin itself approved.

amendments and assignment agreements to pay Madison if Singh defaulted on the loan, it would still be foreseeable that such a provision in the Rivkin framework might change down the road.

It is also notable that, even if Mei and Singh had, in November 2011, followed Rivkin's template, doing so could have still resulted in a $4.95 million loan for the Woodlands backed by: (1) a concession amendment with a $4.95 million termination payment that the Town would be obligated to pay if the Town terminated Singh's concession agreement; and (2) a related assignment agreement containing the same language as the earlier assignment agreements for the Madison loans.[49]  Such a loan was foreseeable as it was clear that Singh was not seeking these loans solely to make the capital improvements.

It is absurd to suggest that because the 2011 NDH concession amendment involved $6.7 million—instead of only $4.95 million (or some lesser amount) and included various additional terms, including more onerous default provisions—that the 2011 NDH concession amendment was so unforeseeable that it cannot be considered part of the same quid pro quo scheme/conspiracy.

Mangano also raises certain arguments about the absence of a Town Board resolution authorizing the 2011 NDH concession amendment.  None of these arguments show that the 2011 NDH concession amendment was not foreseeable.  These arguments are also unpersuasive on other grounds.

---

[49]  The evidence at trial indicated that the framework devised by Rivkin allowed the TOB to indirectly guarantee a loan amount for Singh that was either equal to, or less than, the value of the improvements that Singh had already completed at the relevant facility.  (See GX536 (June 2010 concession amendment backing $1.5 million Madison loan for TOBAY Beach and stating that Singh had already completed $1.7 million in improvements); DX1440 (June 2010 concession amendment backing $2 million loan from unspecified financing entity for the Woodlands and stating that Singh had already completed $4.95 million in improvements); GX541 (May 2011 concession amendment backing $3.4 million Madison loan for the Woodlands and stating that Singh had already completed $4.95 million in improvements); see also DX1083 (January 2011 email from Mei to NDH where he explains that he has "serious doubts about the Town's ability to guarantee an amount greater than the cost of the capital improvements at the site.").)  Thus, even under the framework devised by Rivkin, the TOB would have been able to indirectly guarantee a loan for the Woodlands of up to $4.95 million.

The fact that no further Town Board resolutions were obtained to authorize the NDH concession amendments does not establish that those amendments themselves, or some variation of those amendments, were unforeseeable, particularly for the 2011 NDH loan which was substantially less than the 2012 NDH loan.  Although Genova did not read the NDH documents he signed, he generally understood the amounts involved and still signed them.  (Tr. 2796–97.) The evidence shows that the 2011 NDH concession amendment was foreseeable.

Mangano surely believed, in April 2010, that TOB officials would take whatever measures they deemed necessary to ensure that the concession amendments backing Singh's loans were sufficiently authorized by the Town Board.  However, even if—for whatever reason—no legally sufficient Town Board resolutions were passed to authorize all of Singh's concession amendments, that would not make the concession amendments themselves unforeseeable.  Mangano had ample reason to believe that, as of April 29, 2010, Venditto would be supporting Singh's loans going forward and the evidence shows that the November 2011 NDH concession amendment, or at the very least some variation of that amendment, was foreseeable.

As part of this argument, Mangano insists that that the concession amendments for the second Madison loan were authorized by the Town Board's June 8, 2010 resolution whereas the NDH concession amendments were not authorized by that resolution.  (ECF No. 427 at 15–16.) Along similar lines, Mangano points out that the NDH concession amendments occurred "over a year" after the June 2010 resolution.  (Id.)  None of these points show that the NDH concession amendment executed by Genova in November 2011 was not foreseeable.  Furthermore, Mangano's attempt to differentiate the second Madison concession amendment from the November 2011 NDH concession amendment on these grounds is utterly unpersuasive.  The plain language of the June 8, 2010 resolution—approved by a Town Board that was controlled by Venditto and had a

history of using intentionally vague resolutions—could be read to cover multiple amendments at each location.  And, while it is true that the November 2011 NDH concession amendment was signed by Genova <u>17 months</u> after the Town Board resolution, the concession amendment for the second Madison loan—which Mangano himself argues was authorized by the June 2010 Town Board resolution—was not signed until <u>11 months</u> after that resolution.

Relatedly, Mangano argues that the NDH concession amendments were <u>ultra</u> <u>vires</u> acts because, in subsequent civil litigation, courts have determined that the NDH concession amendments are not enforceable against the Town because they were not authorized by a Town Board resolution.  In support, Mangano cites to <u>PHL Variable Ins. Co. v. Town of Oyster Bay</u>, No. 16-CV-4013, 2017 WL 2371188 (E.D.N.Y. May 30, 2017) and <u>PHL Variable Ins. Co. v. Town of Oyster Bay</u>, 929 F.3d 79 (2d Cir. 2019).[50]  The cases are irrelevant on multiple levels.

One, Mangano appears to argue that these cases establish that Genova's execution of the NDH concession amendments were not official acts.  As an initial matter, the determinations of these courts that the 2011 NDH concession amendment was, ultimately, not sufficiently authorized by a Town Board resolution to be enforceable does not establish that Genova's execution of those amendments were not official acts under <u>McDonnell</u>.  In any event, the government does not have to prove that official acts occurred within the limitations period, only that some aspect of the quid pro quo scheme/conspiracy did.  <u>See</u> <u>Silver I</u>, 864 F.3d at 122.  Thus, even if Genova's execution of the 2011 NDH concession amendment, somehow, does not qualify as an official act under <u>McDonnell</u>, it is still, undoubtedly, an act in furtherance of the quid pro scheme/conspiracy.

---

[50]  Judge Feuerstein also issued a related decision denying the plaintiff's motion for reconsideration in <u>PHL Variable</u> on January 29, 2018.  <u>See</u>  <u>PHL Variable Ins. Co. v. Town of Oyster Bay</u>, No. 16-CV-4013 (E.D.N.Y. May 30, 2017), ECF No. 29.

Two, for many of the same reasons previously outlined above, the determination of these courts, years later, that the June 8, 2010 resolution was ultimately insufficient to authorize Genova to execute the 2011 NDH concession amendment does not show that the 2011 NDH concession amendment itself—whether duly authorized by the Town Board or not—was unforeseeable.

Three, Judge Feuerstein's decisions in <u>PHL Variable</u>, which were issued in May 2017 and January 2018, are also irrelevant to the issue of foreseeability because those decisions were not introduced at trial and, thus, cannot even be considered on the issue of foreseeability.[51] If Mangano had pursued a statute of limitations defense, the issue of foreseeability would have been a factual one for the jury to decide based solely on the evidence actually introduced at trial.

In the end, none of the points raised by Mangano, when considered collectively, show that the 2011 NDH concession amendment was unforeseeable (or would lead a jury to reach such a conclusion.) For all of the reasons stated above, the Court finds that there is sufficient evidence for a jury to find that the 2011 NDH concession amendment was part of the quid pro quo scheme/conspiracy between Singh and Mangano. Additionally, the Court finds beyond a reasonable doubt that, if instructed on the statute of limitations, the jury would have still convicted Mangano.

---

[51] At the first trial, Venditto sought to introduce the two decisions from Judge Feuerstein, arguing that they were relevant to the issue of his good faith with respect to the securities charges he faced. (ECF No. 255) The Court refused to admit the decisions. Mangano, however, never sought the admissions of these documents at the second trial and certainly never argued, at either trial, that these opinions should be admitted because they were relevant to a statute of limitations defense that he never pursued before the jury. (See ECF No. 161 (letter responding to the government's pretrial motion <u>in limine</u> that sought to exclude Judge Feuerstein's decisions in <u>PHL Variable</u> in which Mangano's counsel states "we do not anticipate that we will seek to introduce Judge Feuerstein's decision in <u>PHL Variable Insurance Co. v. Town of Oyster Bay</u>"). Given that Mangano never even sought to introduce Judge Feuerstein's decisions for this purpose during trial, Mangano appears to have no basis to now argue that this Court should consider those decisions or the Second Circuit's subsequent decision in its analysis.

*ix.  The Conspiracy Charge in Count 3 is also Timely for Another Reason*

Finally, even if the November 2011 NDH concession amendment was somehow not foreseeable to Mangano, the honest services fraud conspiracy charged in Count 3 would still be timely for a separate reason.  For such a conspiracy charge, the government does not have to prove that any overt acts occurred within the limitations period.  Thus, even absent any specific acts within the limitations period, that conspiracy could still continue into the limitations period and would not terminate until its purposes "have either been accomplished or abandoned." Grammatikos, 633 F.2d at 1023.

For the reasons stated earlier, Mangano knew that Singh might seek the TOB's backing for multiple loans at each location and could continue doing so through at least October 18, 2011.  And, Singh was obviously still seeking, on October 18, 2011, the TOB's backing for additional loans.  Clearly, one of the purposes of Mangano's and Singh's conspiracy—to have the TOB guarantee Singh's loans—had not been abandoned or fully accomplished at that time.  As of October 18, 2011, it was not even certain that Singh's attempt to obtain the TOB's backing of the first NDH loan would even succeed.

Accordingly, even if the 2011 NDH concession amendment itself were somehow not foreseeable, the evidence at trial would still clearly satisfy the statute of limitations for Mangano's conviction on Count 3.  The Court finds beyond a reasonable doubt that the jury, if properly instructed, would have reached the same verdict on Count 3.

Ultimately, as set forth above, the Court has identified multiple bases on which the jury could find Mangano's convictions to be timely.  The Court, after considering all of the evidence at trial and the results of both trials, finds beyond a reasonable doubt that if the jury had been

instructed on the statute of limitations, its verdict would have been the same.  Accordingly, not only does Mangano's plain error challenge fail, but, even if he were entitled to harmless error review, any instructional error here was harmless.

## E.  Rule 29 Motion

In addition to pursuing a Rule 33 motion for a new trial, Mangano also seeks acquittal under Rule 29 based on Silver II.

A defendant raising a challenge to the sufficiency of the evidence under Rule 29 "bears a heavy burden because a reviewing court must consider the evidence 'in the light most favorable to the prosecution' and uphold the conviction if 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  United States v. Aguilar, 585 F.3d 652, 656 (2d Cir. 2009) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original)). On a Rule 29 motion, the court must consider "as a whole all of the trial evidence." United States v. Bala, 236 F.3d 87, 93–94 (2d Cir. 2000).  That evidence must be analyzed "'in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence.'"  Binday, 804 F.3d at 572 (quoting United States v. Chavez, 549 F.3d 119, 124 (2d Cir. 2008)). "A court examines each piece of evidence and considers its probative value before determining whether it is unreasonable to find 'the evidence in its totality, not in isolation,' sufficient to support guilt beyond a reasonable doubt." United States v. Goffer, 721 F.3d 113, 124 (2d Cir. 2013) (quoting United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000)).

In the plain error and harmless error analyses above, which are applicable to Mangano's motion for a new trial, the Court has already concluded that the evidence is sufficient, even after

Silver II, to support Mangano's bribery convictions based on the evidence showing that Mangano engaged in a quid pro quo scheme/conspiracy concerning the TOB loan guarantees that continued into the limitations period.  Accordingly, Mangano's sufficiency arguments under Rule 29 necessarily fail as well.

### III.  DISCUSSION OF RULE 33 MOTION BASED ON NEWLY DISCOVERED EVIDENCE CONCERNING SINGH

Mangano also seeks, under Federal Rule of Criminal Procedure 33, a new trial claiming that there is newly discovered evidence that Singh committed perjury at trial.  The new evidence is the transcript of a civil deposition of Singh taken on August 5, 2019 in which Singh purportedly testified that the bribes he paid to Mangano "had nothing to do with the Town of Oyster Bay." Mangano claims that this testimony establishes that Singh committed perjury in critical aspects of his testimony about Mangano and the TOB Loan Scheme.  Mangano also asserts that, at his deposition, Singh gave additional exculpatory testimony about Venditto that warrants a new trial on Counts One and Two in light of Silver II.  Linda Mangano joins in this motion.  On April 20, 2021, the Court held a hearing where Singh testified, explained his deposition testimony, and reaffirmed his trial testimony.  For the reasons set forth below, the Court denies Mangano's motion for a new trial.

### A.  **Standard for Motions for a New Trial Based on Alleged Perjury**

"A motion for a new trial based on new evidence is to be granted 'only with great caution . . . in the most extraordinary circumstances,' where it is 'required in the interest of justice[.]" United States v. Sasso, 59 F.3d 341, 350 (2d Cir. 1995) (quoting United States v. DiPaolo, 835 F.2d 46, 49 (2d Cir. 1987), and Fed. R. Crim. P. 33).

Generally, "'[n]ewly discovered evidence supports the grant of a new trial only if the defendant demonstrates,' inter alia, 'that the evidence is so material and noncumulative that its

admission would probably lead to an acquittal.'"  United States v. Jones, 965 F.3d 149, 164 (2d Cir. 2020) (quoting United States v. Parkes, 497 F.3d 220, 233 (2d Cir. 2007)) (additional quotations marks omitted).  This "probability" standard is a "higher standard" than the "reasonable probability" standard that applies to Brady/Giglio claims and ineffective assistance of counsel claims.  United States v. Serna, 799 F.2d 842, 848 (2d Cir. 1986), abrogated on other grounds by United States v. DiNapoli, 8 F.3d 909 (2d Cir. 1993); see also Strickland v. Washington, 466 U.S. 668, 693–94, (1984) (contrasting the "high standard for newly discovered evidence claims" with the "reasonable probability" standard).

If the newly discovered evidence establishes that a witness committed perjury, the applicable standard for determining whether a new trial is warranted depends on whether the prosecution was aware of the perjury at trial.  "If the prosecution knew, or should have known, of the false testimony prior to the conclusion of trial," a standard more favorable to the defendant applies, and "the conviction must be set aside if there is 'any reasonable likelihood' that the testimony could have affected the jury's judgment."  United States v. Aquart, 912 F.3d 1, 21–24 (2d Cir. 2018) (quoting United States v. Cromitie, 727 F.3d 194, 221–22 (2d Cir. 2013) (internal quotation marks omitted).  However, "[i]f the government was unaware of the falsity at the time of trial," then a new trial is only warranted "if the court is left with the 'firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.'"  Aquart, 912 F.3d 1, 21–24 (quoting United States v. Stewart, 433 F.3d 273, 297 (2d Cir. 2006) (internal quotation marks omitted).)  This standard is the same "probability" standard that generally applies to claims based on newly discovered evidence.  See United States v. Wallach, 935 F.2d 445, 459 (2d Cir. 1991); Sanders v. Sullivan, 863 F.2d 218, 226 (2d Cir. 1988) (discussing United States v. Stofsky, 527 F.2d 237, 245–46 (2d Cir. 1975), and the Second Circuit's "[a]doption of the probability

standard").

When seeking a new trial based on alleged perjury, the defendant must also "make a threshold showing that [the witness] in fact willfully testified falsely and that the falsehoods were not known to him at the time of trial." Aquart, 912 F.3d at 20. "A witness commits perjury if he gives false testimony concerning a material matter with the willful intent to provide false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory." United States v. Monteleone, 257 F.3d 210, 219 (2d Cir. 2001). Id. "Simple inaccuracies or inconsistencies in testimony do not rise to the level of perjury." Id.

In some cases, such as United States v. Wallach, 935 F.2d 445, 455 (2d Cir. 1991), the threshold question of whether the witness actually committed perjury is not at issue because the government conceded that the newly discovered evidence established that the witness committed perjury. Here, however, the government does not concede that Singh committed perjury. Caselaw concerning perjury claims and related claims where there is evidence that a trial witness has recanted their testimony after trial indicate that, in order to establish that the witness testified falsely at trial, a defendant has the burden to establish, based on all of the relevant evidence, that the witness gave false testimony at trial. See United States v. Lespier, 266 F. App'x 5, 7 (2d Cir. 2008) (affirming denial of Rule 33 motion where witness recanted his testimony in a post-trial affidavit and then subsequently repudiated that recantation at a hearing, and the district court ultimately found that the defendant failed "failed to meet his burden of proving that the [the witness's] trial testimony was false"); United States v. DiPaolo, 835 F.2d 46, 50–51 (2d Cir. 1987) (affirming denial of Rule 33 motion without a hearing where trial court found evidence of witness's alleged recantation was not credible and, thus, the defendant "did not satisfy the first requirement for granting a motion for a new trial-establishing the falsity of the trial testimony"); United States

114

v. Schlesinger, 438 F. Supp. 2d 76, 106 (E.D.N.Y. 2006) (denying motion for a new trial where the court held an evidentiary hearing and ultimately found that the new evidence proffered by the defendant was "plainly insufficient to demonstrate perjury"); see also United States v. Roberts, 24 F. App'x 45, 47–48 (2d Cir. 2001) (affirming denial of Rule 33 motion without an evidentiary hearing where district court found that witness's trial testimony—rather than her post-trial affidavit recanting that testimony—was credible); United States v. Donald, 417 F. App'x 41, 44–45 (2d Cir. 2011) (affirming denial of post-trial perjury claim without a hearing where trial court found affidavits from two witnesses not to be credible, court observed the alleged perjurer's testimony at trial, and the alleged perjurer submitted a supplemental affidavit denying the perjury allegations).

## B. **Singh's Deposition Testimony**

In the civil case at issue, Singh sued two former business associates who bought shares in S.R.B. Convention in December 2014, claiming that those defendants owe him $1.2 million. A relatively short section of the transcript from Singh's August 5, 2019 deposition concerns Singh's bribery of Mangano and TOB officials, as well as Singh's other crimes.

At page 173 of the transcript, Singh is shown a copy of the Superseding Information from his criminal case as well as the transcript from his October 2016 guilty plea. (Singh Dep. 173.) After some additional questioning and back-and-forth amongst the lawyers, the relevant portion of the transcript begins at page 189 with Singh being asked again to review his plea transcript. Notably, throughout the relevant portions of the deposition, Singh references his plea transcript and, in answering questions, often refers his questioner back to that transcript. The most relevant pieces of the deposition transcript for purposes of the instant motion are excerpted below:

Q:  I am going to refer you back to Page 41 of Defendant's Exhibit L [(the plea transcript)]. You can read it to yourself.  Please read Line 4 through Line 9.

115

A:  Okay.

Q:  Do any of the crimes that you admitted to or bad acts that you admitted to have anything to do with S.R.B. Convention and Catering Corporation?

A:  I don't know. It is very general. It is general.

Q: Did you commit bank fraud on behalf of S.R.B. Convention and Catering Corp?

A:  It doesn't say that here, does it?

Q: I am asking you.

A:  I answered the question that no particular companies were listed or which company the charges were brought against me.  That's my answer.

Q:  In terms of the bribery of the town officials, does that relate to S.R.B. Convention and Catering Corp.?

A:  What do you mean relate to?

Q:  Does it have anything to do with S.R.B. Convention and Catering Corp.?

A:  The person who was charged that I bribe him was found not guilty, the town Supervisor, John Venditto. So, I don't know about a bribe.

Q:  What about Ed Mangano?

A:  Ed Mangano is not Town of Oyster Bay.  He is Nassau County.

Q:  Wasn't that part of the allegation that you paid bribes to him to gain advantage for The Woodlands, the S.R.B. Convention and Catering Corp.?

A: That's up to the judge and court. That's not me. It is the county.  It had nothing to do with the Town of Oyster Bay.

Q: Didn't you plead guilty to bribing Mr. Mangano?

A:  Yes. I did.

Q: Why did you plead guilty to bribing him?

A:  I pled guilty that his wife had a job. You can see in the transcript what I pled guilty and what I said.

116

Q. Yes, but I am asking you, did pleading guilty relate to S.R.B. Convention and Catering Corp.?

A. I do not believe so.

Q. What about Mr. Venditto?

A. He was found not guilty.

Q. But you pled guilty to bribing him, correct?

A. Yes. I did.

MR. BERMAN [Singh's attorney] : He couldn't have bribed him. The guy was found not guilty.

MR. ABRAMI: Well, that is inconsistencies in our legal system.

MR. BERMAN: I understand that.

A:  That is why the inconsistent answer is there too.

MR. BERMAN:  I understand that.

Q:  As far as what you pled guilty to, not what the court found you guilty or not guilty of, did you pleading guilty to bribing Mr. Venditto have to do with S.R.B. Convention and Catering Corp.?

A:  I don't recall.  I do not believe so.

Q:  You don't recall the whole Town of Oyster Bay loan scheme?

A:  Yes. The alleged loans taken from the Town of Oyster Bay.

Q:  Right. That had to do with S.R.B. Convention and Catering Corp., didn't it?

A:  It had to do with two facilities, S.R.B. Convention and S.R.B. Concession.

Q:  S.R.B. Concession, Inc., that was for Tobay Beach, correct?

A:  Correct.

Q:  What I am getting at is that you pled guilty to bribing Mr. Venditto, and that has some relationship to S.R.B. Convention and Catering Corp. at The Woodlands, correct?

A:  I do not know what was the exact charges to Mr. Venditto directly related to S.R.B.  My pleadings were general things which I did for Mr. Venditto.  I do not believe it was, oh, in particular you did this. I do not believe that.

Q:  Not specific conduct. I understand what you are saying.  You mean like you didn't say I gave him such and such for S.R.B. Convention and Catering Corp. if that is what I am understanding.

Q:  It was more general, correct?

A:  Yes. I did things for him, whatever he needed.  Yes.

(Singh Dep. 189–194 (emphasis added).)

Singh's August 5, 2019 deposition was continued on two subsequent  dates, November 5, 2019 and November 19, 2019.

After Mangano filed his Rule 33 motion and provided the Court with Singh's post-trial deposition testimony, the government filed an opposition brief, which did not include an affidavit from Singh addressing the deposition testimony.  After reviewing Singh's deposition transcript, the Court held a hearing where Singh testified.  In his testimony, Singh explained his deposition testimony and clearly affirmed his trial testimony concerning the TOB loan guarantees.

In his post-hearing briefing, Mangano focuses on three aspects of Singh's deposition testimony.  Mangano contends that Singh's deposition testimony contradicted key portions of his trial testimony concerning Mangano and that his explanations for his deposition testimony were incredible.  Mangano also asserts that a new trial is warranted in light of statements by Singh at his deposition concerning his bribery of TOB officials and the truth of his plea guilty plea. Additionally, Mangano alleges that Singh committed additional perjury on two other issues at the post-trial hearing and, thus, is further support for a new trial.  According to Mangano, the totality of evidence—including Singh's trial, deposition, and hearing testimony; the surreptitious

recordings of Singh; and statements made by Singh in his early proffer sessions—shows that Singh lied at trial and, thus, Mangano is entitled to a new trial.

As explained below, the Court, after considering all of Mangano's arguments, finds that he has not met his burden to justify a new trial.

## C.  <u>Singh's Purported Perjury Concerning Mangano</u>

Mangano's motion focuses primarily on the handful of deposition questions in which Singh was asked about Mangano and emphasizes the three answers highlighted above.  Based on these answers, Mangano claims that Singh committed perjury at trial and, thus, a new trial is warranted.

Mangano contends that, in one of these deposition answers, Singh stated that his "payments to Mangano had nothing to do with the Town of Oyster Bay," which, according to Mangano, contradicts Singh's trial testimony "with respect to the central allegation underlying Mangano's conviction – i.e., that benefits to the Mangano's were paid as a *quid pro quo* to secure Mangano's intervention in the Town of Oyster Bay."  (Def.'s Post-Hearing Mem. at 23, ECF No. 445; Def.'s Reply Mem. for Rule 33 Mot. at 13. ECF No. 428.)  Mangano also asserts that Singh's deposition testimony contradicts Singh's claim at trial that "without [Mangano's] help I won't be able to get this loan guarantee done."  (Tr. 1477)  According to Mangano, Singh's deposition establishes that Singh actually believed that Mangano's involvement in the loan guarantees was merely "incidental" and that Mangano played "*no* material role in securing the [TOB] loan guarantees." (Def.'s Rule 33 Mot. ¶¶ 25, 31; Def.'s Reply Mem. for Rule 33 Mot. at 13.)

Mangano asserts that the Court should find, based on the deposition testimony, that Singh lied at trial.  As explained below, the Court finds that Singh's trial testimony concerning the TOB Loan Scheme, both at trial and at the hearing was credible, and that Singh's ambiguous deposition testimony does not establish that he committed perjury at trial.

119

Citing Rosebud Sioux Tribe v. A & P Steel, Inc., 733 F.2d 509, 512 (8th Cir. 1984), Mangano also asserts that "if this Court ultimately concludes that is simply *impossible* to tell if Singh was lying" at the deposition or at trial, the contradictions between Singh's deposition and trial testimony are sufficient to justify the grant of a new trial.  (Def.'s Post-Hearing Mem. at 23.) Mangano further contends that, given the purported contradictions between Singh's deposition and trial testimony, "there is an extremely strong likelihood that [the jury] would have acquitted Mangano on all counts."  (Def.'s Post-Hearing Reply Mem. at 18, ECF No. 449.)  Mangano maintains that skilled defense counsel could use the deposition testimony at trial to induce reasonable doubt in enough of the jurors to avoid a conviction.  Mangano suggests that the jury would likely view Singh's deposition testimony as credible exculpatory evidence and, failing that, the jury would likely find the deposition testimony to be, at the very least, powerful impeachment evidence for undermining Singh's credibility on this pivotal issue.

None of these arguments are persuasive.  First, this is not a situation where it is impossible for the Court to determine if Singh was lying at trial.  The overwhelming evidence shows that he did not commit perjury in his testimony about the TOB Loan Scheme, which, as explained below, was strongly corroborated by other evidence at trial.  Moreover, as explained below, the Court also finds that Singh's post-trial deposition would not "probably lead to an acquittal" by a jury.  A jury would not likely find, given all the points set out below, that Singh's deposition testimony is persuasive exculpatory or impeachment evidence that would lead to an acquittal.

In analyzing Mangano's motion, the Court has considered:  (1) Singh's post-trial testimony at the deposition and the subsequent hearing; (2) the Court's familiarity with all the evidence and witnesses in this matter that the Court observed and scrutinized over the course of two lengthy trials where Singh took the stand, in toto, for 18 days; (3) the results of both trials and the length

of deliberations at each trial[52]; and (4) the 3500 material from Singh's interviews with the
government cited in Mangano's papers.

The Court first lays out, below, the broad reasons why the Court finds that Singh did not
commit perjury concerning the TOB Loan Scheme.  Those same reasons also support the Court's
conclusion that this evidence would not "probably lead to an acquittal."  The Court then addresses
the particulars of each of Singh's specific deposition answers in more detail infra.

At the deposition, Singh provided ambiguous and equivocal answers in response to the few
questions asked about Mangano—questions that were themselves often imprecise.   Those
ambiguous and equivocal answers concerning Mangano and others do not clearly contradict
Singh's trial testimony and the Court finds that they are insufficient to establish that Singh
committed perjury at trial.  Relatedly, as a result of these ambiguities and equivocations, Singh's
post-trial deposition testimony on these points has minimal, if any, value as exculpatory or
impeachment evidence and would not "probably lead to an acquittal" by a jury.

It must also be stressed that, during his deposition on August 5, 2019, Singh was not asked
about—and did not discuss—any of his extensive trial testimony concerning Mangano, TOB
officials, and the loan guarantees.  Instead, Singh was asked multiple questions about his guilty
plea and repeatedly referred the questioner back to the transcript of his plea allocution, in which

---

[52] In both this motion (and in the motion filed before the second trial that sought dismissal of the indictment based on
alleged prosecutorial misconduct), Mangano asserts that the Court should consider a Newsday article in which certain
jurors from the first trial were interviewed.  According to that article, jurors informed Newsday that the jury had
"unanimously decided against convicting" Mangano of all charges in connection with the TOB Loan Scheme, but
were split 11-1—in favor of convicting Mangano—on the charges concerning the Bread and Rolls Scheme.  (Nicole
Fuller, "Mangano Corruption Mistrial:  What Went on in the Jury Room, Newsday, June 3, 2018, ECF No. 339-3.)
According to Mangano, this article shows the weakness of the government's case concerning the TOB Loan Scheme.
The Court does not believe that it is appropriate to consider such hearsay news articles about jury deliberations.
However, to the extent that such articles are relevant and can be considered, the Court notes that, after the second
trial—which is the subject of the pending Rule 33 motions—Newsday published an article in which the foreman of
the jury is quoted as stating:  "[w]hen we reached our decision, even if Singh didn't testify, we would have come to
the same decision that we had[.]"  (Andrew Smith & Stefanie Dazio, "Jury foreman: Jurors wanted the couple to be
innocent as they started deliberations, Newsday, March 9, 2019.)  That statement would only further confirm the
Court's conclusion that Singh's deposition testimony would not "probably lead to an acquittal."

he admitted bribing Mangano and Venditto and also admitted that he "received in return for these bribes and kickbacks . . . amendments to the concession agreement, between my businesses and the Town of Oyster Bay which acted as indirect loan guarantees." (Singh Plea Tr. at 38–39.)  Of course, during the two trials, Singh testified about his bribery of Mangano and TOB officials and explained, in detail, his interactions with Mangano and TOB officials in connection with the TOB loan guarantees.  All of that testimony about Singh's interactions with Mangano concerning the loan guarantees showed that Singh bribed Mangano in order to obtain his assistance concerning the loan guarantees and confirmed Singh's testimony that he bribed Mangano for that reason.  Yet, despite receiving vague, equivocal, and non-responsive answers from Singh during the deposition, opposing counsel at the deposition never asked Singh what should have been obvious questions about his extensive trial testimony, including his numerous interactions with Mangano concerning the TOB loan guarantees.[53]  This is another reason why the vague and ambiguous deposition testimony cited by Mangano does not establish that Singh perjured himself during trial and ultimately has little probative value.  The absence of questions at the August 5 deposition about Singh's extensive prior trial testimony and the details of his underlying conduct would provide the government with a powerful and persuasive argument why the jury should reject defense counsel's arguments about Singh's cursory, vague, and ambiguous deposition testimony.

The Court has also considered Singh's explanations of his deposition testimony from the hearing.  At the hearing, Singh not only reaffirmed his trial testimony, but he also credibly explained his deposition answers, which are each discussed in greater depth below.  Singh

---

[53] At the first day of his deposition on August 5, 2019, which contains the answers Mangano cites, Singh was not asked about—and did not discuss—his extensive trial testimony.  When Singh's deposition was continued on November 5, 2019 and November 19, 2019, Singh was asked a few general questions about the testimony he gave at the criminal trials and his criminal case, and he generally refused to answer those questions at the direction of his counsel and, at one point, simply directed the questioner to the trial transcript.  (Nov. 5, 2019 Deposition Tr. 4–5, 17, 20; Nov. 19, 2019 Deposition Tr. 312–13, 318–320.)

explained that, generally, he was being argumentative and was giving the opposing lawyer "a hard time."  (Tr. 50:13–14, 55:13–14.)   Relatedly, Singh also testified that, for the first day of the deposition, his civil lawyer advised him to answer questions about his "criminal testimonies either indirectly or . . . vaguely."  (Hr'g Tr. 110.)  It is apparent from Singh's answers at the deposition that—in accordance with his lawyer's advice—he was being a difficult witness at the deposition. His answers were often vague, indirect, incomplete, and non-responsive.  (See Hr'g Tr. 43 (explaining how he gave "incomplete" answers to what he considered to be "incomplete" questions).)  The fact that Singh was attempting to vaguely and indirectly answer questions at his deposition is a much more compelling explanation of Singh's ambiguous and equivocal answers than Mangano's suggestion that, in these answers, Singh actually intended to repudiate key aspects of his trial testimony.   Similarly, a jury—hearing Singh's deposition answers as well as his subsequent explanations and unequivocal affirmation of his trial testimony—is not likely to conclude that these ambiguous and equivocal answers were intended to be repudiations of his trial testimony.  One cannot read the deposition transcript and believe that Singh was trying to repudiate his trial testimony.

In addition to the deficiencies in Singh's deposition testimony identified above and his credible explanations of his answers at the hearing, the Court also denies Singh's motion for a new trial because:  (1)  Singh credibly and unequivocally reaffirmed his trial testimony at the hearing; (2) both that testimony at the hearing and his underlying trial testimony concerning the TOB Loan Scheme was credible and supported by independent evidence.

At the hearing, Singh credibly reaffirmed his trial testimony about the TOB Loan Scheme, including his testimony that he bribed Mangano to help him obtain the loan guarantees from the

TOB.[54]   After considering Singh's cursory, ambiguous, and equivocal deposition testimony and the other evidence Mangano cites—including the surreptitious recordings of Singh and the proffer notes cited by Mangano—the Court credits both Singh's reaffirmation of his trial testimony as well as his underlying testimony and concludes that Singh did not commit perjury at trial concerning the TOB loan guarantees.[55]   Singh's trial testimony concerning his bribery of Mangano and Mangano's intervention in the Town of Oyster Bay Loan Scheme was credible and was strongly corroborated by other evidence at trial including:

(1)  the fact that, prior to Mangano running for, and being elected as County Executive, Singh did not give Mangano anything of value;

(2)  the timing of Linda Mangano's "job" and first paycheck, as well as the overwhelming evidence that this "no-show job" was a bribe;

(3)  the credible testimony of Genova, Sinnreich, and Savino concerning, inter alia, Savino's April 13 call with Mangano about the loan guarantees, Mangano's attendance and conduct at the April 28 meeting, and the import of Mangano's attendance at this meeting, which involved solely "Town" business;

(4)  the documentary evidence in the record, including, inter alia, the phone records, Savino's notes showing Mangano's involvement in the loan guarantees, and Singh's April 26 and April 27 emails in which he asked Mangano to set up a meeting with Venditto; and

---

[54]  The Second Circuit has observed, in a related context, that when a witness provides an affidavit recanting their trial testimony and then subsequently repudiates that recantation, a "district court should give little evidentiary weight to [the] recantation." Lespier, 266 F. App'x at *7.

[55]  Mangano contends that his proffered interpretations of Singh's deposition testimony are both exculpatory and credible because they are allegedly consistent with the surreptitious recordings of Singh as well as various statements that Singh made in early proffer sessions prior to being released on bail on the government's consent. Mangano contends that this evidence contradicted "every salient point" of the government's trial narrative. However, many of the "salient points" cited by Mangano were corroborated by evidence independent of Singh's testimony, (see Gov't's Post-Hearing Mem. at 18–20), and Singh's statements to the government at these early proffer sessions are, when viewed in the light of all the evidence at trial, simply not as probative and exculpatory as Mangano suggests.

Mangano also contends that Singh committed perjury on multiple other occasions at trial and that this trial testimony supports his claims that Singh's deposition testimony establishes further perjury here and that the government knew or should have known of that perjury. While the Court has considered all of Singh's trial testimony, none of the trial testimony cited by Singh convinces the Court that the deposition testimony at issue constitutes credible evidence of perjury or that Singh's deposition testimony would "probably lead to an acquittal." These other instances of alleged perjury by Mangano were fully aired before the jury—along with numerous other attacks on Singh's credibility and alleged inconsistencies and weaknesses in his testimony—and the jury nevertheless still found Mangano guilty of the counts concerning the TOB Loan Scheme.

(5) the documentary evidence and testimony of Genova and Zike concerning the concerning the building at 329 Broadway which, <u>inter</u> <u>alia</u>, revealed Mangano's relationship with Venditto and confirmed his ability to influence Venditto and matters in the Town of Oyster Bay.

(<u>See</u> generally Gov't Opp'n to Rule 33 Mot. at 33–46; Gov't's Post-Hearing Mem. at 18–20, ECF No. 447). The evidence against Mangano concerning the Town of Oyster Bay Loan Scheme was overwhelming and strongly corroborated Singh's testimony.

Accordingly, the Court finds that Mangano has failed to establish, based on Singh's deposition testimony and the other evidence in the record, that Singh's committed  perjury at trial concerning the TOB loan scheme. For similar reasons, it is not probable that a jury would find, in light of all the evidence, Singh's ambiguous deposition testimony to be persuasive exculpatory or impeachment evidence that would result in an acquittal.

The Court's conclusions about how the jury would likely view Singh's deposition testimony evidence are informed—not only by the Court's knowledge of the evidence and first-hand observations of the demeanor and credibility of all the witnesses over two lengthy trials—but also by the government's arguments to the jury at trial. The government told the jury that Singh was only "one piece of a larger puzzle" and told them that they should carefully scrutinize Singh's testimony and compare it to all of the other evidence in this case, which the government argued "prove beyond a reasonable doubt that the defendants committed the crimes charged" and "confirm[ed] . . . Singh's testimony." (Tr. 4439-4440.) In its rebuttal summation, the government not only catalogued the evidence that corroborated Singh's testimony, but stressed that the two most "devastating" aspects of the record concerning the TOB Loan Scheme came, not from Singh, but from other witnesses. This "devastating" evidence was the testimony of Sinnreich and Genova concerning Mangano's attendance and conduct at the April 29 meeting and Savino's notes and

testimony concerning the April 13 call with Mangano, which the Government also argued were akin to a "bloody knife in a murder case or a smoking gun."  (Tr. 4417, 4431, 4435–37.)  These arguments to the jury regarding Singh's testimony and the other evidence at trial add further support to the Court's conclusion that Singh's cursory, ambiguous, and equivocal deposition testimony would not have "probably lead to an acquittal."

Mangano's post-hearing briefing relies on the Eight Circuit's decision in Rosebud Sioux Tribe v. A & P Steel, Inc., 733 F.2d 509 (8th Cir. 1984), which granted a new trial based on newly discovered evidence, in what Mangano contends were analogous circumstances.  Rosebud Sioux, however, is clearly distinguishable, from the instant case.  In Rosebud Sioux, a witness named Lone Dog told a story favorable to the defendant in a pretrial deposition in which he denied that certain payments he received were bribes.  Id. at 514.  At trial, Lone Dog indicated that he intended to take the Fifth Amendment if called to the stand.  Id. at 514, 520–23.  As such, the trial court determined that Lone Dog was an unavailable witness and then allowed the defendant to introduce his deposition testimony at trial and to use to him—through his deposition testimony—as the defense's principal witness.  Id.  The plaintiff, however, was unable to cross-examine Lone Dog at trial and was not permitted to call him to the stand so that the jury could hear his invocation of the Fifth Amendment.  Id.  The jury ultimately found for the defendant.  After trial, Lone Dog gave detailed grand jury testimony that "flatly contradicted" his deposition.  Id. at 516.  In his grand jury testimony, Lone Dog:  (1) testified about a specific incriminating conversation with the bribe payor; (2) admitted that certain checks he received were, in fact, "payoffs"; (3) admitted that he never provided any goods to the bribe payor, which had been the purported excuse for the alleged "payoffs"; and (4) testified that the bribe payor, who was an attorney, advised him to give false testimony during the deposition.  Id. at 514–516.  At the attorney's subsequent criminal trial, Lone

Dog changed his story again and reiterated the story that he told in his original deposition testimony.  Id. at 516.  The Eighth Circuit found that, under the circumstances, the plaintiff was entitled to a new trial because if Lone Dog testified truthfully in the grand jury, then that testimony would clearly be material.  Id. at 516.  The court went on to explain that "even if we make no assumptions about the truth of the testimony Lone Dog gave on three separate occasions, the inconsistent stories are still material evidence in this case."  Id. at 517.  The court reasoned that, at the very least, Lone Dog's "inconsistent stories" would necessarily "demonstrate that he is a liar and, as such, a witness whose testimony is to be discredited."  Id.  In addition to finding that the post-trial grand jury testimony warranted a new trial, the Eighth Circuit also found that the trial court erred when it precluded the plaintiff from calling Lone Dog to the stand to allow the jury to hear his invocation of the Fifth Amendment, a consideration that no doubt also colored the Eighth Circuit's overall view of the case.  Id. at 520–23.

Rosebud Sioux is easily distinguishable and does not convince the Court that a new trial is warranted here.  First, contrary to Mangano's suggestion, even where a witness has given clearly contradictory sworn statements on important issues, a new trial is not necessarily warranted.  See Lespier, 266 F. App'x 5.  Second, and more importantly, Singh's deposition testimony is easily distinguishable from Lone Dog's post-trial grand jury testimony.  Lone Dog gave "flatly contradict[ory]" and detailed sworn testimony in two different proceedings.  Singh's deposition testimony concerning Mangano, however, was:  (1) cursory, ambiguous, and equivocal; and (2) did not contradict any of Singh's detailed trial testimony about his underlying conduct and his interactions with Mangano and TOB officials.  Moreover, that trial testimony was strongly corroborated by other independent evidence and all of that evidence points to only one conclusion—that Singh bribed Mangano in exchange for his intervention with the TOB loan

guarantees.   Additionally, Singh was, of course, subjected to extensive and exhaustive cross-examination at trial whereas Lone Dog had not been subjected to any cross-examination at the civil trial (and the jury at the civil trial had not learned about his invocation of the Fifth Amendments), facts which undoubtedly strengthened the plaintiff's argument for a new trial based on Lone Dog's clear and detailed grand jury testimony.   Furthermore, because Singh's deposition testimony concerning Mangano was ambiguous and equivocal this is not a situation, like Rosebud Sioux, where the witness told two "flatly contradictory" stories and, as such, was clearly lying at one of the two proceedings.   Given the context and content of Singh's ambiguous and equivocal depositions answers as well as the explanations Singh gave the hearing—the impeachment value of Singh's testimony is minimal.   Singh's post-trial deposition transcript shows that—when asked about his bribery of Mangano and others—Singh was a difficult witness who gave vague, indirect, incomplete, and non-responsive answers.   That is weak impeachment evidence and certainly insufficient to warrant a new trial.

The Court now turns to each of the specific answers at issue from Singh's deposition   As the discussion below makes clear, the specific questions asked were imprecise and Singh's answers were ambiguous and equivocal.   Given the trial evidence, the deposition transcript itself, and Singh's hearing testimony where he both explained his deposition answers and reaffirmed his trial testimony, Mangano has not established that Singh committed perjury at trial based on the newly discovered evidence.   Nor has he established that this newly discovered evidence would "probably lead to an acquittal."

1.  **Answer #1 – "Ed Mangano is not Town of Oyster Bay.  He is Nassau County."**

The first question concerning Mangano simply asks "What about Ed Mangano?"  Singh simply responds that "Ed Mangano is not Town of Oyster Bay.  He is Nassau County."  Of course, Mangano was, in fact, a Nassau County official, and not a TOB official.

Nevertheless, Mangano appears, in his pre-hearing briefing, to somehow interpret this answer to mean that the bribes Singh paid to Mangano only concerned Nassau County and had nothing to do with the Town of Oyster Bay.  Mangano's apparent "interpretation" of Singh's response is utterly implausible and untethered to the actual words found in the answer.  Singh's non-responsive answer provides no basis to conclude that Singh committed perjury at trial and would not "probably lead to an acquittal."  Notably, in his post-hearing brief, even Mangano admits that this answer, standing alone, "would not have been particularly remarkable."  (Def.s' Post-Hearing Reply Mem. at 6.)

2.  **Answer 2 – "That's up to the judge and court.  That's not me.  It is the county. It had nothing to do with the Town of Oyster Bay."**

The second answer below is the primary focus of Defendant's motion.  The prior question-and-answer is also set out again to provide context.

Q:  What about Ed Mangano?

A:  Ed Mangano is not Town of Oyster Bay.  He is Nassau County.

Q:  Wasn't that part of the allegation that you paid bribes to him to gain advantage for The Woodlands, the S.R.B. Convention and Catering Corp.?

A:  That's up to the judge and court.  That's not me.  It is the county.  It had nothing to do with the Town of Oyster Bay.

This exchange does not establish that Singh committed perjury at the trial and would not "probably lead to an acquittal."  As an initial mater, this question and Singh's answer are, on their

face, vague and ambiguous.[56]  In fact, this answer is so ambiguous that Mangano, at various points

in his papers, proffers multiple interpretations of this answer, none of which are, on their face,

obvious or result in grammatically correct constructions.  On the first page of his initial motion,

Mangano construes "It" to refer to "alleged bribes," implying that Singh meant: "[The alleged

bribes I paid to him] is the County.  [The alleged bribes I paid to him] had nothing to do with the

Town of Oyster."  (Def.'s Rule 33 Mot. at 2.)  Mangano also posits that "It" refers to "bribes,"

implying that Singh meant: "[The bribes I paid to him] is the County.  [The bribes I paid to him]

had nothing to do with the Town of Oyster. Bay."[57]  (Def.'s Post-Hearing Mem. at 11).  Mangano

further suggests, at another point, that "It" refers to "Mangano" and asserts that Singh was saying

that "Mangano had nothing to do with the decision-making process in Oyster Bay."  (Mangano's

Post-Hr'g Br. at 9 (emphasis added.)

Whichever interpretation Mangano is advancing, the Court finds that this ambiguous

answer by Singh is  insufficient to establish that Singh committed perjury at trial.  And—given the

---

[56]  Both this question and Singh's subsequent answer are, on their face, vague and ambiguous in numerous respects. As for the question, it is not clear what the word "that" in the question refers to.  The ambiguity of the term "that" in the question is further compounded by the fact that even the prior question—"What about Ed Mangano?"—was ambiguous.  Moreover, the question at issue merely asked Singh about an "allegation that you paid bribes to him to gain advantage for The Woodlands" and not about Singh's actual conduct.  Additionally, the phrase "gain advantage" is also unclear.

As for Singh's answer, it is unclear, from the face of the transcript, what the two uses of "It" in Singh's mean. Also, Singh's response simply mentions "the Town of Oyster Bay," and does not even specifically reference the Town of Oyster Bay Loan Scheme, the loan guarantees, or S.R.B. Convention.  Finally, Singh's answer to the question is prefaced with the caveat "[t]hat's up to the judge and court.  That's not me"—which suggests that Singh's subsequent statements—whatever their content—were not intended to be a definitive factual statement.

[57]  It is inconceivable that Singh was paying "bribes" to Mangano in April 2010 in order to obtain contracts with Nassau County and, yet, believed that those same "bribes" had "nothing to do with" Mangano's contemporaneous intervention, on Singh's behalf, concerning millions of dollars of loan guarantees in the Town of Oyster Bay.  Singh undoubtedly believed that any "bribes" he paid to Mangano in April 2010—including Linda Mangano's paychecks which began that month and continued thereafter for four years—had "something" to do with any action Mangano, the sitting County Executive, was contemporaneously taking to assist Singh with the TOB loan guarantees.  Moreover, there was overwhelming independent evidence that Mangano was intimately involved in the TOB loan guarantee issue and engaged in official action on behalf of Singh.

content and context of this ambiguous question-and-answer, as well Singh's trial and hearing testimony—this deposition testimony would not "probably lead to an acquittal" by a jury.[58]

At the hearing, Singh testified that, in this answer, he was not denying that he bribed Mangano for loans for the Woodlands and TOBAY Beach.  (Hr'g Tr. 45–46:23–4.)  Singh explained that, in this deposition answer, he meant that Mangano was only a county official.  (Hr'g Tr. 45 ("I meant that he . . . was a county official, but obviously he had influence in [the] Town of Oyster Bay."; see Hr'g Tr. 104:17–18 ("I was trying to tell [the questioner] that Ed Mangano was county executive.  It came out wrong"); Hr'g Tr. 105:10–11 ("What I was saying was he was not the Town of Oyster Bay, it was the county.").  This explanation is credible and is bolstered by the fact that he made a similar statement in his prior answer when he stated that "Ed Mangano is not Town of Oyster Bay.  He is Nassau County."  Relatedly, Singh's hearing testimony indicates that Singh's vague and ambiguous deposition answer was also a product of his civil lawyer's general advice to answer questions about his criminal case vaguely and indirectly.  That is further proof that Singh did not intend, in this answer, to repudiate this trial testimony and is yet another reason why this vague and ambiguous answer does not establish that Singh committed perjury at trial or constitute evidence that would "probably lead to an acquittal."

---

[58] Cf. United States v. Williams, 199 F.3d 1324 (2d Cir. 1999) (affirming denial of Rule 33 motion after evidentiary hearing where district court did not credit the testimony of the witness at the hearing and also concluded that the alleged statement made by a cooperating witnessing did not, in any event, prove that the government's cooperating witness committed perjury because this statement was "very ambiguous" and was not a "bold admission of perjury"); United States v. Brown, No. 86 CR. 738, 1988 WL 5389, at *1 (S.D.N.Y. Jan. 15, 1988) (denying Rule 33 motion after holding a hearing to determine if ambiguous statements made by cooperating witness in a recorded conversation warranted a new trial).

### 3. Answer #3 – "I don't believe so."

The final exchange concerning Mangano is set forth in full below:

Q:  Didn't you plead guilty to bribing Mr. Mangano?

A:  Yes. I did.

Q:  Why did you plead guilty to bribing him?

A:  I pled guilty that his wife had a job. You can see in the transcript what I pled guilty and what I said.

Q. Yes, but I am asking you, <u>did pleading guilty relate to S.R.B. Convention and Catering Corp.?</u>

A. <u>I do not believe so</u>.

(Emphasis added).

Mangano suggests that, in this answer, Singh communicated that his "<u>bribes</u> to Mangano were unrelated to Town business or concession amendments."  (Def.'s Rule 33 Reply Br. at 4 (emphasis added).)  Mangano also insists that Singh's explanation of this answer at the hearing was not credible.

The Court finds that Singh's equivocal answer—in response to an imprecise question about his guilty plea—does not establish that Singh perjured himself at trial.  As an initial matter, the equivocal nature of this answer—"I do not believe so"—defeats Mangano's arguments that this answer establishes that Singh perjured himself and that this answer would "probably lead to an acquittal" by a jury.  After receiving this equivocal answer from Singh about his guilty plea, the questioning attorney did not ask Singh a single follow-up question about Mangano at this deposition—a further reason why this deposition answer is clearly insufficient to warrant a new trial.

Additionally—even apart from Singh's hearing testimony, which, as discussed below,

credibly reaffirmed his trial testimony and explained this answer—this question-and-answer about Singh's guilty plea is, on its face, simply not probative on the issue of whether Singh committed perjury during his extensive trial testimony concerning Mangano.  The question at issue did not ask Singh about his trial testimony, Singh's reasons for bribing Mangano, or the underlying conduct of Mangano and Singh in connection with the TOB loan guarantees.  Rather, this question merely asked Singh about his guilty plea.[59]  The contents of Singh's plea allocution are, obviously, contained in a written transcript—a copy of which was shown to Singh during the deposition and was explicitly referenced in prior questions and answers.[60]   The transcript of Singh's plea allocution speaks for itself.  Singh's answer here does not show that Singh's testimony at the criminal trial concerning his interactions with Mangano and his stated reasons for bribing him,

---

[59] As discussed infra, Singh was subsequently asked similar questions about Venditto.  The resulting exchange concerning Venditto suggests that, during the deposition, Singh interpreted the question above about Mangano to be asking about the limited content of Singh's plea allocution rather than about Singh's trial testimony and the totality of his underlying conduct.

[60] At his plea hearing, Singh pled guilty to bribery charges concerning Mangano and Venditto and also pled guilty to separate charges for bribing Mayor Bill DeBlasio and tax fraud.  During the plea hearing, he gave the following allocution about bribery charges concerning Mangano and Venditto:

> On or about . . . January of 2010 and February 2015, I agreed with [Mangano], [Venditto] and others, including other officials in both Nassau County government and the Town of Oyster Bay . . . . to offer and give them bribes and kickbacks in exchange for them taking official action in my favor on an as-needed basis.  The value of the benefits I received or the bribes and kickbacks I gave exceeded $5,000.
>
> My intention in providing these things of value to Mangano, Venditto and other officials was to influence their behavior and obtain benefits for myself, my restaurants and my companies.
>
> Some of the things that I received in return for these bribes and kickbacks were amendments to the concession agreement, between my businesses and the Town of Oyster Bay which acted as indirect loan guarantees.  These underlying loans were collectively in excess of $20 million.
>
> I was also awarded lucrative County contracts.

(Singh Plea Tr. at 38–39.)  During this allocution, Singh recounted that he gave an unidentified TOB "official"—who is Fred Mei—"$50,000 in cash to . . . help me pay a series of loans guaranteed by the Town of Oyster Bay." (Id. at 39.)  Singh also identified various bribes he gave to Mangano, including Linda Mangano's salary, and explained that he hired her in order to influence Mangano.  (Id. at 40.)  Singh also recounted various bribes that he provided to Venditto and other unidentified TOB officials.  (Id.)  Notably, during Singh's deposition, he was not asked questions about any of the specific statements that he made during this allocution.

were false.  Nor would Singh's equivocal answer to this question—which elicited no follow-up questions during the deposition about Mangano—"probably lead to an acquittal."

In this single equivocal answer, Singh did not intend to repudiate any of his trial testimony concerning Mangano.  At the hearing, Singh credibly testified that, in this answer, he was not denying that he bribed Mangano for loans for the Woodlands and TOBAY Beach.  (Hr'g Tr. 45:23–46:13.)  Singh also explained that he was instructed by his civil attorney to answer questions about his criminal case vaguely and indirectly, which he did here and at numerous other points throughout this deposition.  That is a compelling reason to reject Mangano's suggestion that Singh's equivocal answer to this question about his guilty plea was, in actuality, a repudiation of key aspects of this Singh's trial testimony concerning Mangano.  Singh's explanation of this specific deposition answer at the hearing was also credible.  Singh explained that he interpreted the phrase "relate to"—in this and other similar questions—as asking whether his guilty plea related to "SRB Convention . . . only" as these questions did not also mention S.R.B. Concession. (Hr'g Tr. 44:24–45:5; see 42:25–43:11, 101, 107:14–16, 128:24–130:2.)  Singh explained that because this question only referenced S.R.B. Convention (and not both companies), he considered this question "incomplete" and, thus, answered it in an "incomplete" manner.  (Tr. 44:23–45:5; see also 42:25–43:11; 99:16–100:1; 102:1–3.)  Thus, Singh answered "I don't believe so" because he was bribing Mangano for both S.R.B. Convention and S.R.B. Concession, not S.R.B. Convention alone.  Singh's explanation that he answered in this  "incomplete" manner because he viewed the question as "incomplete" is also consistent with Singh's testimony that, generally, he answered questions vaguely and indirectly in accordance with the advice of his civil attorney.

Mangano claims that Singh's explanation at the hearing is incredible.  During an earlier exchange at the deposition where Singh was asked if his bribery of town officials "relate[d] to"

S.R.B. Convention, Singh asked the questioner what he meant by the term "relate." (Dep. Tr. 190.) And, the questioner responded by saying:  "Does it have anything to do with SRB?"  (Dep. Tr. 190.)    Accordingly, Mangano contends that Singh's hearing testimony concerning his understanding and interpretation of the phrase "relate to" is not credible.

However, Singh's explanations of both this answer and answers he gave to other questions later in the deposition are bolstered by his answer to a different, but similar question.  When Singh was asked, at one point, questions about whether "the Town of Oyster Bay loan scheme" "had to do with S.R.B. Convention," Singh stressed that it had to do with "two facilities, S.R.B. Convention and S.R.B. Concession."  (Dep. Tr. 192–93.)  Despite this clarification, opposing counsel continued to ask Singh questions that only referenced S.R.B. Convention.

Moreover, Singh's explanation, at the hearing, of the final deposition question about Mangano and the phrase "related to" is also bolstered by a similar exchange involving Venditto at the deposition, which occurred shortly after Singh answered this final question about Mangano. When Singh was asked an almost identical question about Venditto, Singh provided a similar response—"I don't recall.  I do not believe so."  However, when asked essentially the same question about Venditto a second time, Singh provided a more detailed explanation that attempted to parse the contents of his plea allocution and quibbled over the meaning and application of the

135

term "related."[61]   This exchange concerning Venditto supports Singh's hearing testimony concerning the phrase "related to" and confirms that, in this final question-and-answer exchange about Mangano, Singh did not intend to repudiate his trial testimony.  In light of the above—as well as Singh's clear affirmation of his trial testimony concerning the TOB Loan Scheme at the

---

[61]  Below is the relevant exchange concerning Venditto:

> Q:  As far as what you pled guilty to, not what the court found you guilty or not guilty of, did you pleading guilty to bribing Mr. Venditto have to do with S.R.B. Convention and Catering Corp.?
>
> A:  I don't recall.  I do not believe so.
>
> ****
>
> Q:   What I am getting at is that you pled guilty to bribing Mr. Venditto, and that has some relationship to S.R.B. Convention and Catering Corp. at The Woodlands, correct?
>
> A:  I do not know what was the exact charges to Mr. Venditto directly related to S.R.B.  My pleadings were general things which I did for Mr. Venditto.  I do not believe it was, oh, in particular you did this.  I do not believe that.
>
> Q:  Not specific conduct. I understand what you are saying.  You mean like you didn't say I gave him such and such for S.R.B. Convention and Catering Corp. if that is what I am understanding.
>
> Q:  It was more general, correct?
>
> A:  Yes. I did things for him, whatever he needed.  Yes.

(Dep. Tr. 192–194 (emphasis added).)  Singh's answers here are instructive in understanding the similar exchange concerning Mangano that occurred earlier in the deposition.  First, in the exchange above, Singh does not discuss his underlying conduct, but instead explicitly refers to his "pleadings."  Even the follow-up question posed to him focused only on what Singh said at his plea allocution, rather than on his underlying conduct.  (See Singh Dep. Tr. 193–94 ("You mean like you didn't say [at your plea allocution] I gave him such and such for S.R.B. Convention and Catering Corp." (emphasis added)).)  Second, in this exchange, Singh parses the meaning of the terms "some relationship" and "related," stating that he did not know "what was the exact charges to Mr. Venditto directly related to S.R.B." because: (1) his "pleadings were general things which I did for Mr. Venditto"; and (2) Singh did not "say," at his plea allocution, that he gave Venditto certain specific bribes for S.R.B. Convention.  This answer shows that—despite the questioner's earlier attempts to define "related"—Singh, at the very least, believed that this term (and the similar phrase "some relationship") was sufficiently ambiguous that he could quibble over the meaning of these terms and phrases as they applied to his plea allocution.  Notably, that allocution:  (1) included a relatively brief factual basis for his plea; (2) did not mention S.R.B. Convention by name; (3) did indicate that any specific bribes concerned only S.R.B. Convention; and (4) also covered Singh's guilty plea for two other unrelated crimes, his bribery of Mayor Bill DeBlasio and a tax fraud crime.  Third, given Singh's more expansive response when he was asked, a second time, about his guilty plea concerning Venditto, it is reasonable to assume that, if the questioner had pressed this issue further in the earlier question about Mangano, Singh likely would have given a similar response.  That response likely would have focused solely on his plea allocution and quibbled over the meaning of the term "related," but would have said nothing about Singh's trial testimony or the underlying conduct of Singh and Mangano.  And, there is certainly no reason to believe that, if pressed further about Mangano at the deposition, Singh would have clearly repudiated this trial testimony concerning Mangano.

hearing and the credible independent evidence at trial that corroborated that trial testimony—this equivocal deposition answer does not establish that Mangano committed perjury at trial and would not "probably lead to an acquittal" by a jury.

## D.  **Mangano's Arguments Concerning Venditto**

Mangano's opening brief cites, in passing, the testimony below concerning Venditto.

Q.   In terms of the bribery of the town officials, does that relate to S.R.B. Convention and Catering Corp.?

A. What do you mean relate to?

Q. Does it have anything to do with S.R.B. Convention and Catering Corp.?

A. The person who was charged that I bribe him was found not guilty, the town supervisor, John Venditto. So, I don't know about a bribe.

****

Q:  Yes, but I am asking you, did pleading guilty relate to S.R.B. Convention and Catering Corp.?

A: I do not believe so.

Q:  What about Mr. Venditto?

Q:  But you pled guilty to bribing him, correct?

A:  Yes. I did.

(Singh Dep. Tr. 190–192.)  Certainly, this testimony—including Singh's statement about the fact that Venditto was acquitted—does not establish any perjury and would not "probably lead to an acquittal" by a jury on any of the TOB Loan Scheme counts.

In Mangano's reply brief, he raises, for the first time, a different argument about Venditto. Now, Mangano claims that other portions of the deposition transcript show that Singh's bribery of Venditto is insufficient to meet the requirements of Silver II.  Mangano further expands on this argument in his post-hearing briefing.

In order for a defendant to be convicted after Silver II under the "as opportunities arise" theory of bribery, the defendant must "at the time the bribe was accepted, [have] promised to take official action on a specific and focused question or matter as the opportunities to take such action arose." Silver II, 948 F.3d at 568; see id. at 570 (considering whether Silver "accepted referral fees with the belief that he was expected to influence a particular matter"). Mangano relies on four deposition answers in which Singh used the terms "particular" or "particularly" in discussing his bribery of TOB officials. Mangano claims that this post-trial deposition testimony about Venditto is material and exculpatory evidence and establishes that Venditto did not engage in bribery as defined by Silver II. Because Mangano cannot be liable as a principal for Federal Program Bribery concerning the TOB Loan Scheme, he contends that "potential liability under [Counts 1 and 2] hinged upon a finding that Venditto was bribed, and that Mangano somehow assisted such conduct." (Def.'s Rule 33 Reply Br. at 18; Def.'s Post-Hearing Mem. at 16.) Accordingly, Mangano argues that this deposition testimony is material exculpatory evidence and mandates a new trial on Counts 1 and 2.

As explained previously, "[a] new trial pursuant to Rule 33 based on newly discovered evidence may be granted only upon a showing that the evidence could not with due diligence have been discovered before or during trial, that the evidence is material, not cumulative, and that admission of the evidence would probably lead to an acquittal." United States v. Owen, 500 F.3d 83, 87 (2d Cir. 2007) (citations and internal marks omitted). Mangano has not met this standard.

As a threshold matter, Mangano's arguments concerning Venditto fail because Silver II does not even apply to Counts 1 and 2. (See supra n. 29.) As explained previously, both McDonnell itself, and Silver II's analysis of the "as opportunities arise" theory of bribery in the aftermath of McDonnell, do not apply to the § 666 counts in Counts One and Two even when, as

here, the jury instruction for the § 666 charges defined bribery in terms of <u>McDonnell</u>'s "official act" standard.  <u>See</u> <u>United States v. Percoco</u>, 13 F.4th 180, 190 (2d Cir. 2021) n.2 (rejecting defendant's argument that the "as opportunities arise" instructional error identified in <u>Silver II</u> "'infected the instructions for" the defendant's conviction under § 666 because, although "[a]ll counts and their instructions alleged [that the defendant] agreed to take 'official action' 'as opportunities arose,'" <u>McDonnell</u>'s official act standard does not apply to § 666); <u>United States v. Ng Lap Seng</u>, 934 F.3d 110, 139 (2d Cir. 2019), <u>cert. denied</u>, 141 S. Ct. 161, 207 L. Ed. 2d 1098 (2020) (affirming that <u>McDonnell</u>'s official act standard does not apply to § 666 and finding— where jury instructions nevertheless included an official act requirement—that any purported instructional error based on <u>McDonnell</u> was harmless).  Accordingly, Mangano's argument that Singh's post-trial deposition testimony about Venditto is exculpatory and material under <u>Silver II</u> fails and Mangano's request for a new trial on Counts 1 and 2 must be denied.

In any event, even if <u>Silver II</u> applies to Counts 1 and 2, Mangano's arguments concerning Venditto also fail on other grounds.  Singh's testimony concerning Venditto and other TOB officials at his post-trial deposition—like his deposition testimony concerning Mangano— involved imprecise questions and ambiguous, equivocal, and non-responsive answers.  In contrast, Singh clearly affirmed, at the April 2021 hearing, that he bribed Venditto, Genova, and Mei and that he did so for both S.R.B. Convention and S.R.B. Concession and to make sure that the Town guaranteed the loans for both locations.  (Hr'g Tr. at 39, 43, 46, 53–54.)  That hearing testimony was credible, particularly in light of the fact that Singh's two concessions—into which Singh had invested millions of dollars—were Singh's most important concerns involving the TOB.

Furthermore, Singh's vague deposition answers concerning his bribery of TOB officials were undoubtedly a product of his attorney's advice to answer questions vaguely and indirectly.

As such, those vague and ambiguous answers have minimal probative value, particularly in light of Singh's credible hearing testimony, which clearly affirmed that Singh bribed these town officials for both S.R.B. Convention and S.R.B. Concession and did so to make sure that the Town guaranteed the loans for both locations.  (Hr'g Tr. at 39, 43, 46, 53–54.)

Finally, the deposition transcript itself confirms that, even if Silver II applies to Counts 1 and 2, Singh's vague deposition testimony concerning those officials is not, when considered in conjunction with Singh's clear and credible hearing testimony, sufficiently material as to Venditto to warrant a new trial.  After considering the entire record, the Court finds that this deposition testimony would not "probably lead to an acquittal" on Counts 1 and 2.

Mangano focuses on four of Singh's deposition answers.  According to Mangano, in each of these answers, "Singh expressly denied that there was any understanding that [the] benefits [provided by Singh] were conveyed in exchange for the Town's intervention on a 'particular matter.'"  (Def.'s Post-Hearing Mem. at 14–15.)  The relevant answers are highlighted below and are set out along with any other relevant portions of the transcript .  The Court turns to the first relevant exchange:

Q. What about Mr. Venditto?

A. He was found not guilty.

Q. But you pled guilty to bribing him, correct?

A. Yes. I did.

****

MR. BERMAN [Singh's attorney]: He couldn't have bribed him. The guy was found not guilty.

MR. ABRAMI: Well, that is inconsistencies in our legal system.

MR. BERMAN: I understand that.

140

A:  That is why the inconsistent answer is there too.

MR. BERMAN: I understand.

Q:  As far as what you pled guilty to, not what the court found you guilty or not guilty of, did you pleading guilty to bribing Mr. Venditto have to do with S.R.B. Convention and Catering Corp.?

A:  I don't recall. I do not believe so.

Q:  You don't recall the whole Town of Oyster Bay loan scheme?

A:  Yes. The alleged loans taken from the Town of Oyster Bay.

Q:  Right. That had to do with S.R.B. Convention and Catering Corp., didn't it?

A:  It had to do with two facilities, S.R.B. Convention and S.R.B. Concession.

Q:  S.R.B. Concession, Inc., that was for Tobay Beach, correct?

A:  Correct.

Q:  What I am getting at is that you pled guilty to bribing Mr. Venditto, and that has some relationship to S.R.B. Convention and Catering Corp. at The Woodlands, correct?

A:  I do not know what was the exact charges to Mr. Venditto directly related to S.R.B. My pleadings were general things which I did for Mr. Venditto. I do not believe it was, oh, in particular you did this. I do not believe that.

Q:  Not specific conduct. I understand what you are saying. You mean like you didn't say I gave him such and such for S.R.B. Convention and Catering Corp. if that is what I am understanding.  It was more general, correct?

A:  Yes. I did things for him, whatever he needed. Yes.

(Singh Dep. 191–94 (emphasis added).)

The Court previously discussed this exchange—which is the only one of the four that is actually focused on Venditto—in the earlier analysis of Singh's answers concerning Mangano. (See supra n. 59 & 61.)  As explained previously, this exchange, on its face, simply discusses, using ambiguous language, the specifics of Singh's plea allocution.  Singh's use of the term

141

"particular" is in reference to his "pleadings," which Singh characterized as only addressing "general things which [he] did for Mr. Venditto."   And, in the next exchange—which both the questioner and Singh understood to be about Singh's plea allocution—Singh's affirmative answer indicates that, during his plea allocution, he did not "say" that he that gave Venditto specific bribes ("such and such") for S.R.B. Convention.   Singh also added that "he did things for [Venditto], whatever he needed"—all of which is consistent with Singh's allocution in which he stated that he offered and gave "bribes and kickbacks [to Venditto and others] in exchange for them taking official action in my favor on an as-needed basis."   Thus, Singh's responses are simply describing, and parsing, what was said during Singh's brief allocution.   Singh's plea allocution, of course, is not newly discovered exculpatory evidence.   Furthermore, as Singh credibly explained at the hearing, he gave these responses because he viewed these as "incomplete question[s]" in which the attorney was focused solely only on S.R.B. Convention when Singh's bribes to Venditto were for both companies.   (Hr'g Tr. 42:25–43:11.) In contrast to the convoluted and ambiguous exchange above, at the hearing, Singh clearly stated that he bribed Venditto for the both the Woodlands and TOBAY Beach.   (Hr'g Tr. 42:25–43:11.)

The post-trial deposition continued:

MR. BERMAN: I think you are beating a dead horse. He has already told you what you want to know.

Q: The loan that we referred to earlier, the N.D.H. loan that we referred to –

A:  Yes.

Q:  Was that part of the Town of Oyster Bay loan scheme?

A:  That was a loan legitimately taken from N.D.H., signed by town officials, and given the loan to S.R.B. correct.

Q:  You are saying legitimately, but did you bribe town officials to get them to help you get that loan?

142

A:  No.  <u>I didn't particularly bribe somebody, say, hey, do this loan</u>.  I had done certain things for them.  Later on which was found not guilty of Mr. Venditto.

Q:  Are you testifying here today that you did not bribe Mr. Venditto?

A:  I didn't say that.

(Singh Dep. Tr. 194–95 (emphasis added).)

This is another ambiguous and confusing response.  The most reasonable interpretation of this answer is that Singh is stating that he did not engage in an <u>explicit</u> quid pro quo with town officials because—although he did "certain things for them"—he did not explicitly "say, hey, do this loan" in exchange for certain bribes.  Thus, in this answer, Singh appears to be taking the position that he did not "particularly bribe somebody" for this loan because the parties' quid pro quo arrangement was not made explicit.  However, the law, both before and after <u>Silver II</u>, does not require an explicit quid pro where the terms of the illicit quid pro quo are explicitly stated.  Moreover, even if one interprets Singh's statement to mean that he did not "particularly bribe somebody" for "this [NDH] loan," that is consistent with Singh's credible hearing testimony that his bribes were for both locations—not for one particular location or loan—and that he answered questions that concerned only S.R.B. Convention accordingly.  Finally, the remainder of this deposition answer leads to only more confusion as Singh again returns to the fact that Venditto was acquitted in an attempt to further deflect the question and then explicitly refuses to say that he "did not bribe" Venditto.

After the transcript excerpt quoted above, there was a colloquy between the attorneys in which Singh's counsel complained about the form of opposing counsel's questions.  After that colloquy, the deposition continued:

Q:  I asked, I think, before the objection was raised, that <u>are you saying that you that you did not bribe anyone in the Town of Oyster Bay to get the town to back the loan?</u>

MR. BERMAN:  He testified already to that. <u>He said he had favors out. That's what he said.</u>

MR. ABRAMI: He didn't say favors out.

MR. BERMAN: He did.

Q: Okay. So, you had favors out.  That meant people owed you something.  Is that what that means?

SPECIAL MASTER: <u>He did nice things for people, and he believed that they owed him something.</u>  Whether they did or not is something else.

Q:  I want to know what you meant.

A:  I <u>did nice things for people</u>, you know, and they did <u>nice things for me</u>.  <u>It was no particular S.R.B. loan. No. It wasn't one particular thing.</u>  No. Your client Narang, he knew.

Q:  He knew what?

A:  He was there.  He was involved.

Q:  He was involved with what?

A:  He was involved. He knew that we treat the town officials very nicely.

Q:  I am talking about when the loan was taken out in 2011. Manoj wasn't involved in that.

A:  No. He was not.

(Singh Dep. 195–97 (emphasis added).)

Mangano cites this answer for two points.  First, Mangano points to Singh's uses of the term "particular."  In discussing this answer at the hearing, Singh credibly explained that he viewed this question—which asked if he bribed anyone "to get the town to back the loan" from NDH at the Woodlands—as "not a complete question."  (Hr'g at 49:20–21.)  Singh reiterated that point

throughout the hearing concerning his answers to similar questions, where he stressed that he considered such questions to be "incomplete" because his bribes concerned both the Woodlands and TOBAY Beach.  And, the most reasonable interpretation of Singh's answer is that, in response to this "incomplete" question, Singh is merely saying that his bribes were not only for the S.R.B. Convention loan involving NDH.  In this deposition answer, Singh stresses that his bribes were not for "one particular thing"—a statement that is entirely consistent with Singh's testimony that these bribes were for loan guarantees at two locations.

Second, Mangano asserts that doing "nice things" for people does not equate to an unlawful bribe, particularly after Silver II.  However, both Singh's deposition transcript and hearing testimony indicate that the exchanges of "nice things" referenced in the deposition testimony were, in Singh's mind, clearly "bribes."  At the hearing, Singh credibly explained that when he said "nice things for them," that was just another word for "bribe" and that he was bribing officials to get the loan guarantees.  (Hr'g Tr. 49, 57.)  Moreover, the deposition transcript indicates that Singh's adoption of the term "nice things" at the deposition was a result of interjections by both Singh's counsel and the Special Master in which they provided their own gloss on Singh's deposition testimony.  Singh's attorney first asserted, incorrectly, that Singh had previously testified that he "had favors out."  Then, the Special Master interjected and characterized Singh's earlier testimony as stating that "He did nice things for people, and he believed that they owed him something" even though, up to that point, Singh had not himself used those phrases in his answers.  While Singh, not surprisingly, adopted the Special Master's characterization, this deposition answer would—given the context and Singh's hearing testimony—not "probably lead to an acquittal."

Finally, in discussing this exchange at the hearing, Singh credibly stated that he was getting "emotional" and "angry" and was "giving" the questioner "a hard time."  (Hr'g Tr. 50:1–14.)  That

is consistent with the argumentative manner in which he answered this specific question and how he answered questions throughout the deposition.

The deposition continued:

Q:  In terms of the concession agreement with the Town of Oyster Bay and S.R.B. Convention and Catering Corp., did you bribe any town official to get any amendment to that concession agreement?

A:  No. I did not.  I asked them to extend it, and they did.  I was working for a very long time at the town facility and doing a good job. [62]

Q:  I am not talking about the amendments that extended it.  I am talking specifically about the amendments where it was alleged that the Town of Oyster Bay guarantees or purported to guarantee the N.D.H. loan.  Do you recall that?

A:  <u>Well, you can read my transcript what I pled guilty or didn't plead guilty to or who I bribed and didn't bribe.</u>

Q:  I am trying to get some more detail on that.

A:  That is the detail I am going tell you as of right now.

Q:  With respect to the 2011 amendment of the S.R.B. Convention and Catering Corp., concession agreement wherein the town guaranteed the loan, the N.D.H. loan, did you bribe any town official to obtain that amendment?

MR. BERMAN: <u>He just said no.</u>

MR. ABRAMI: Well, let him say no if he said no.

MR. BERMAN:  No. We will go through the whole transcript and we will find it because you are asking the questions until you get an answer that you want.

MR. ABRAMI: We will move on if you just let him say yes or no.

MR. BERMAN: No. You won't.

MR. ABRAMI: Yes. I will.

---

[62] Mangano maintains that in this answer Singh flatly denied bribing "any town official to get any amendment to [his] concession agreement."  However, it is clear that Singh and the questioning attorney believed that Singh's answer referred to the earlier extensions of Singh's concession for the Woodlands—which occurred in 2005 and 2008—rather than to the 2011 concession amendment involving the NDH loan guarantee that was the subject of Mangano's trial. In fact, in the very next question, when Singh is squarely asked about the 2011 concession amendment for the Woodlands NDH loan, Singh simply refers the questioner to his guilty plea transcript.

MR. BERMAN: You asked that, and he said no.

MR. ABRAMI: I believe there was some color to that.

MR. BERMAN: <u>No. There was no color to that. He answered no</u>.

Q:  Was that your answer?

A:  <u>Yes. I said that before</u>.

Q:  So, you did not bribe a town official to get an amendment to the 2001 concession agreement?

A:  As I said, I did nice things for a lot of people in the town.  <u>Did I particularly bribe somebody for S.R.B. Concession?</u>  No.

****

Q:  I want to be clear, are you referring to S.R.B. Convention and Catering?

A:  Yes.  That's the one.

(Singh Dep. 203–07 (emphasis added).)

Given the manner in which Singh used the term "particular" in earlier in the deposition, (see supra p. 142–145), the most reasonable interpretation of Singh's answer is that his repeating of that term here similarly meant:  (1) that there was no explicit *quid pro quo* for the S.R.B. Convention NDH loan guarantee; and (2) that Singh's bribes to town officials were not solely for S.R.B. Convention.

Finally, it is notable that, of the four answers cited by Mangano, only the first question-and-answer exchange set out above actually focused on Venditto.  And, as explained earlier, that first exchange was focused only on Singh's plea allocution concerning Venditto.  Subsequent exchanges above asked Singh, generally, about "town officials" and did not distinguish between Venditto, Genova, and Mei.  While the Court disagrees with Mangano's interpretation of these answers, it is notable that Mangano's arguments seem to imply that in this ambiguous deposition

147

testimony, Singh is providing truthful exculpatory evidence about Venditto while, at the same time, lying about Mei, who Mangano himself insisted throughout the trial was being bribed by Singh to obtain the loan guarantees. This is yet another reason why a jury would give little weight to this ambiguous deposition testimony and why it would not "probably lead to an acquittal."

In conclusion, given the points set out above, Mangano has not shown that Singh committed perjury when he testified about the TOB officials. Additionally, given the entire record here, the newly discovered evidence at issue would not "probably lead to an acquittal." Accordingly, Mangano's motion for a new trial concerning Counts 1 and 2 based is denied.

### E. Singh's Statement at His Deposition about His Guilty Plea

Mangano's motion also points to the following ambiguous exchange during Singh's deposition, which Mangano suggests casts further doubt on Singh's trial testimony and is also proof that he committed perjury at trial:

> Mr. Abrami: That's why we are where are. I am trying to establish here, and I don't want to say what I am going to say before the question is posed, but, clearly, he pled guilty to bribing town officials.
>
> A: So, you know the answer.
>
> Q: I'm asking you. As you said, this is very brief. I want to get some clarity on this.
>
> A: I don't have any detail. Whatever is in there, that's my answer.
>
> Q: Okay. That's your answer, and you are sticking to it.
>
> A: You can read it.
>
> Q: Everything is true in your plea, Defendant's Exhibit L, [the plea allocution transcript], and you are not disputing that, correct?
>
> A: That is between me and my attorney. That is what I pled guilty and what I didn't. If it is true or not true, that will be discussed after my sentencing. I cannot discuss anything right now with you if it is true or not true. The details of the case under the advice of my counsel. I cannot discuss that.

148

Q:  I just want to clarify now, and I understand where you are coming from, but the previous answers that you were noncommittal on yes or no, was that because your attorney said not to commit to an answer?

Special Master:  You can't go into his communications with his lawyer.

Mr. Abrami: Well, I want to know what –

Mr. Berman:  I know you want to know, but you are not going to get answers.

Mr. Abrami:  He just told me that he can't admit or deny what he pled guilty to because it might mess up his criminal case.

Mr. Berman:  Right.

Q:  I want to know if the prior answers that he gave to my questions today just before when we were going through whether or not or not he actually bribed certain officials, if he was not answering those questions honestly, but he was keeping that in mind when he was answering those questions.

A:  I answered truthfully to the best of my recollection and best of my knowledge.

Q:  Then when I got to --.

Mr. Berman:  Please move on.

Q:  I want to understand, was everything in that document, Defendant's Exhibit L true?

Special Master:  You are not going to get an answer on a forty-page document.

Mr. Abrami:  He pled guilty in his plea.

Special Master:  He pled guilty to it.  He made statements to the court.  You have that as evidence.  You have tied in the bribery apparently to the loan made to your company, S.R.B., which was guaranteed by the Town of Oyster Bay.  You have tied that into this.  I'm not sure where else you can go with this.  You have sworn testimony from him.

Mr. Abrami:  But now I got something different from the witness.  The witness was saying his attorney said not to comment on whether things are true or not.

Mr. Berman:  Other than what he testified to in there.

Special Master:  I am recognizing that.

(Singh Dep. Tr. 198–201 (emphasis added).)

At the hearing, Singh clearly and credibly affirmed that he told the truth at his guilty plea. (Hr'g Tr. 52.)  That hearing testimony is also credible because Singh's guilty plea is supported by credible and independent evidence at trial.  While Singh gave a somewhat confusing and non-responsive answer when asked about this specific deposition answer at the hearing, he then unequivocally affirmed the truth of his guilty plea.  (Id. at 51–52.)  And, the deposition transcript itself shows that Singh's confusing deposition answer was a muddled attempt to invoke an instruction from his counsel not to discuss the details of his criminal case and to focus solely on what he pled guilty to as reflected in the plea transcript—a point which Singh's civil attorney himself emphasized at the end of the exchange above.

This deposition answer does not establish that Singh committed perjury.  Nor would this new evidence "probably lead to an acquittal" given that Singh credibly affirmed the truth of his guilty plea at the hearing and the overwhelming evidence at trial confirmed the truth of the limited facts set out in plea allocution.

## F.  **Alleged Perjury at the Hearing**

Mangano maintains that Singh committed additional perjury on two other topics at the hearing.

First, Singh allegedly lied about his employment as a restaurant consultant, a purported violation of his bail conditions.  At the hearing, Singh originally denied that he had acted as a restaurant consultant at one of his former restaurants.  (Hr'g Tr. 96–97.)  Singh admitted that he knew the person who purchased this restaurant and that he goes there from "time to time," but said he was not a consultant.  (Hr'g Tr. 97.)  Singh was then shown a December 2019 email exchange between two third-parties concerning the purchase of a copier.  The emails include Singh's name

and contact info and list his title as "consultant" for 24 North LLC, the company that took over his former restaurant.  (Def.'s Hearing Ex. A; Tr. 96.)  Singh then explained that his son was working at the restaurant and that he may have gone there and helped him after his son requested his assistance.  (Tr. 98.)  Singh admitted that, in connection with this copier, he may have represented himself as a consultant.  (Tr. 98.)

The Court does not find that Singh committed perjury during this exchange.  Moreover, this entire exchange involved an immaterial and unrelated topic and is, at best, additional impeachment evidence.

Second, Mangano alleges that Singh lied when he testified, at the hearing, that his failure to tell the government about his civil deposition was an oversight.  The evidence at the hearing did not establish that Singh lied when he said that his was an oversight.

Moreover, both the Court and the jury observed Singh's testimony and the probing and exhaustive cross-examination of him at trial concerning, inter alia, the multiple crimes he committed and lies he told.  While the Court has considered the testimony cited above, none of it alters Court's assessment of the credibility of Singh's trial testimony (the key aspects of which were strongly corroborated by independent evidence) or his hearing testimony.  Nor would it likely affect the jury's assessment of Singh.

In conclusion, for all the reasons set out above, the Court denies Mangano's motion for a new trial based on newly discovered evidence involving Singh.

151

## IV.  DISCUSSION OF NEWLY DISCOVERED
## EVIDENCE CONCERNING ANTHONY GULINO

Finally, the Court turns to Mangano's request for discovery concerning newly discovered impeachment evidence about cooperating witness Anthony Gulino.

### A. **Background**

#### 1. **Gulino's Testimony at Mangano's Trials**

In May 2018, Gulino testified at the first Mangano trial.  Shortly before trial, Gulino had pled, pursuant to a cooperation agreement, to tax evasion.  Gulino also testified at Mangano's second trial on January 29, 2019.[63]

Gulino worked for his family-owned contracting businesses, Residential Fence and Laser Industries, which performs work for municipalities.  In September 2012, Gulino's employees performed $3,600 of work for Mangano, installing a porch railing at Mangano's home.  After the work was completed, Gulino met with Mangano, gave him $3,600 in cash, and told Mangano to write him a check for the same amount.  (Tr. 1149.)  The purpose of this arrangement was to provide the work for free to Mangano while creating a false paper trail indicating that Mangano had paid for the work.  (Tr. 1149; GX469.)  After Mangano initially told Gulino he did not have to do this, Mangano wrote Gulino a check and kept the cash.  (Tr. 1149.)  There was no evidence that Mangano ever took official action to benefit Gulino after this incident.  Gulino's company ended up losing out on a large contract with Nassau County and Mangano refused to do anything when Gulino sought assistance concerning the County's lengthy delays in paying Gulino's companies.  (Tr. 1171–74.)

---

[63]  While Gulino was the prosecution's final witness at the first trial, contrary to Defendants' assertion, Gulino was not the final witness at the second trial and, instead, testified about halfway through the second trial.

Gulino's testimony concerning the cash payment to Mangano was corroborated in multiple ways at trial.  Singh testified that Mangano told him about the cash Mangano had received from Gulino.  (Tr. 1749.)  Singh also testified about how he helped Mangano launder this cash.  (Tr. 1749–50.)  Singh's testimony on these points was supported by phone records.  (Tr. 1749–50; GX1413.)  An FBI Forensic Accountant also explained how the Manganos' bank records revealed that there was a gap in the regular withdrawals from their bank account, at the time of Gulino's payment, which corroborated Gulino's testimony.  (Tr. 3847–3849.)  Additionally, when Gulino was served with a grand jury subpoena for documents, he originally omitted the invoice for the work at Mangano's house from that production, which also corroborated his testimony about the Mangano payment.  (Tr. 1153–54.)  Lastly, both Genova and Gulino testified that Gulino attempted to give Genova cash in a very similar fashion.  After Gulino performed fence work at Genova's house that cost $5,800, Genova paid Gulino for the fence with a check.  (Tr. 2836–38.)  A short time later, Gulino appeared at Genova's private office and handed him an envelope full of cash, which Genova ultimately refused.  (Tr. 2836–38.)

In addition to Gulino's attempt to bribe Genova, Gulino also made efforts to bribe three other officials.  In October 2014, Gulino gave $5,000 in cash in an envelope to Rob Walker, Mangano's second-in-command.  Gulino also performed thousands of dollars in free work for two officials in the Town of Oyster Bay—Frank Nocerino and Barry Bree—between 2011 and 2013.  (2018 Trial Tr. 7564–67.)  At Gulino's initial proffer sessions, in July 2014 and February 2015, he did not tell the government about the free work he did for Nocerino and Bree, or the cash he gave to Walker and Mangano.  (2018 Trial Tr. 7590–91; Tr. 1192.)  Additionally, when Gulino received and responded to the grand jury subpoena, his response omitted documents related to the work performed for both Bree and Nocerino.  (2018 Trial Tr. 7592–93.)  In that same response, Gulino

also omitted documentation concerning the job at Mangano's house.  Gulino eventually admitted to all this conduct in subsequent proffer sessions with the government beginning in July 2017. (2018 Trial Tr. 7591.)

Mangano was aware of all this evidence prior to the first trial.  Mangano's counsel elected, for strategic reasons, not to impeach Gulino with his conduct involving Walker, and the cash given to Walker was not mentioned at either trial.  At Mangano's first trial, the government elicited the facts outlined above concerning Nocerino and Bree during Gulino's direct examination.  At the second trial, the government did not elicit this testimony about Nocerino and Bree from Gulino on direct examination.  During Gulino's cross-examination at the second trial, Mangano's counsel did not question Gulino about his efforts to bribe Nocerino and Bree or his failures to disclose that conduct to the government.

## 2. Newly Discovered Evidence that Gulino Bribed National Grid Representatives

In a letter dated January 7, 2021, the government informed Mangano that, after the second trial, the government learned about additional crimes committed by Gulino that he had not previously disclosed to the government.  Specifically, Gulino had made thousands of dollars in cash payments to two representatives of National Grid, Pat McCrann and Rich Zavada.  Gulino's companies had contracts with National Grid to perform snow removal and fence work.  McCrann and Zavada:  (1) were responsible for grading Gulino as a National Grid vendor; (2) had influence over the National Grid representatives who awarded Gulino's contracts; and (3) were responsible for determining whether Gulino's company was responsible when damage was caused during snow removal.

The government's January 7 letter represented that:

the government was unaware of [Gulino's cash payments to McCrann and Zavada] until well after the Mangano II trial.  Specifically, prosecutors and agents, who are not a part of the Mangano prosecution team, and who are involved in an unrelated (and ongoing) investigation, first learned of potential cash payments by Gulino to National Grid representatives in approximately July 2020.

(ECF No. 435 at 2.)

The government interviewed Gulino about the cash payments on October 26, 2020 and November 20, 2020.  Attached to its January 7 letter, the government provided Mangano with the 302s and underlying notes for those two interviews, along with a document recounting the dates and amounts of Gulino's payments to Zavada.

At the October 2020 interview, when Gulino was asked if he ever gave cash to National Grid representatives, Gulino stated "maybe," but said he could not recall having done so.  Gulino claimed that he may have given McCrann a fruit basket or paid for his lunch.  However, when the government pressed Gulino further about payments of cash to the National Grid representatives, Gulino's attorney asked to speak with him privately.  After they returned to the interview, the government warned Gulino about what could happen if he lied.  At that point, Gulino's attorney again asked to speak with his client.  Then, outside of the presence of Gulino, the government advised Gulino's attorney that a National Grid representative had been recorded discussing payments made by Gulino, in the tens of thousands of dollars.  Gulino's attorney then asked for the names of any National Grid representatives to assist him in speaking to Gulino.  After the government provided the names of a few individuals, the interview was discontinued.

At his subsequent interview in November 2020, Gulino acknowledged making cash payments to both McCrann and Zavada.  Gulino admitted he made one or two cash payments of $5,000 to McCrann between 2016 and 2018.  As for Zavada, Gulino stated that he began making

payments to him in 2017 or 2018, and that the initial payment to him was for $5,000 or $10,000. Gulino also told the government that he continued to make similar cash payments to Zavada for approximately two years.

An additional document produced by the government, which details the payments to Zavada, indicates that between December 2015 and July 2018, Zavada received seven payments, ranging from $1,000 to $10,000. The final two payments to Zavada were each for $10,000 and occurred in December 2017 and July 2018.

According to Mangano, this evidence shows that, in addition to committing bribery, Gulino also: (1) engaged in Structuring of Financial Transactions; and (2) made false statements to government agents, in violation of 18 U.S.C. § 1001. Mangano maintains that Gulino must have been asked during his proffer sessions before trial whether he had disclosed all of his past crimes and that his affirmative response to that question would have been a lie.[64]

Mangano insists that Gulino's misconduct is particularly probative impeachment evidence because Gulino not only committed the underlying offenses outlined above, but he also failed to disclose (and affirmatively lied about) these cash payments during his proffer sessions and cooperation with the government, and even continued to pay these bribes while cooperating, with the final bribe to Zavada occurring, in July 2018, after the conclusion of the first Mangano trial.

In response to the government's January 7 letter disclosing Gulino's recently uncovered conduct, Mangano requested that the government disclose the following information:

> The date when a representative of Government first became aware of Gulino's involvement in the National Grid scheme as well as the name of that representative.

---

[64] Mangano also asserts that Gulino made false statements during his October 2020 and November 2020 interviews with the government. The government, however, could not have possibly known about those false statements prior to Mangano trials.

The date when a representative of Government first came into possession of the recordings discussing Gulino making cash payments to National Grid employees, as well as the name of that representative.

Copies of the recordings cited in the government's January 7 disclosures as well as copies of any related wiretap applications.

Whether the Government views Gulino to be in breach of his Cooperation Agreement.

Whether the Government intends to initiate a prosecution against Gulino for any of the potential crimes committed by Gulino.

The government generally refused to respond to these requests, arguing, inter alia, that inter alia, that these requests are a speculative fishing expedition into an unrelated grand jury investigation.

## B. **Standard for Brady/Giglio Claims**

Brady v. Maryland, 373 U.S. 83 (1963), Giglio v. United States, 405 U.S. 150 (1972), and their progeny:

> require[ ] that the government disclose material evidence favorable to a criminal defendant. Evidence is favorable if it is either exculpatory or impeaching, and it is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. The defendant need not show that the suppressed evidence would have resulted in an acquittal. Rather, a conviction must be reversed upon a showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

United States v. Rowland, 826 F.3d 100, 111–12 (2d Cir. 2016) (citations and internal marks omitted).

An "individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." Kyles v. Whitley, 514 U.S. 419, 437 (1995). However, if the government does not come into possession of the alleged Brady material until after trial, then the material has not been suppressed and there is "no Brady violation

because the 'government is under no obligation to turn over that which it does not have' at the time of the trial." <u>United States v. Kenner</u>, 272 F. Supp. 3d 342, 422 (E.D.N.Y. 2017) (quoting <u>United States v. Upton</u>, 856 F. Supp. 727, 746 (E.D.N.Y. 1994), and citing <u>Morgan v. Salamack</u>, 735 F.2d 354, 358 (2d Cir. 1984)).

When a defendant requests discovery or hearing concerning a <u>Brady</u>/<u>Giglio</u> claim or a related claim that a witness committed perjury, discovery or a hearing to develop the claims further is not warranted if the claims are "speculative and implausible" or fail on other grounds unrelated to the requested discovery or hearing. <u>United States v. McPartland</u>, No. 17-CR-587 (JMA), 2020 WL 7014275, at *14 (E.D.N.Y. Nov. 27, 2020).

**C. <u>Analysis</u>**

The Court denies, for the reasons set out below, Mangano's request for discovery and his related request for a new trial based on the newly discovered evidence about Gulino.

First, Mangano is not entitled to any of his requested discovery because the alleged <u>Giglio</u> evidence here is not material and none of Mangano's requested discovery would alter that fact.

Even assuming <u>arguendo</u> that the government was in constructive possession of the Gulino recording prior to the conclusion of the second Mangano trial, Mangano cannot show that there is a reasonable probability that, had the evidence been disclosed to the defense prior to trial, the result of Mangano's trial would have been different.

As the Second Circuit has explained:

The materiality of undisclosed information which could have served to impeach a government witness is affected by the importance of the witness's testimony, as well as the importance of the disclosed information to the impeachment of the witness. Impeaching information is more likely to be deemed material if the witness whose testimony is attacked supplied the only evidence linking the defendant[ ] to the crime. Impeaching information is less likely to be considered material when it merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable. That is, if the

information withheld is merely cumulative of equally impeaching evidence introduced at trial, so that it would not have materially increased the jury's likelihood of discrediting the witness, it is not material.

United States v. Spinelli, 551 F.3d 159, 165 (2d Cir. 2008) (citations and internal marks omitted).

Mangano maintains that the recently disclosed evidence would have fundamentally undermined Gulino's credibility and that it is unlikely that the government would have even called him as a witness if this information had been known at the time of trial.

At trial, Gulino admitted he pled guilty to tax evasion and also admitted that he attempted to give cash to Len Genova, in an apparent attempt to bribe him. The newly discovered evidence concerning Gulino's cash payments to McCrann and Zavada is largely cumulative impeachment material.

Mangano is correct that Gulino's payments to Zavada and McCrann have some additional impeachment value because: (1) Gulino continued to make these payments while he was cooperating with the government and even made one such payment after the first Mangano trial; and (2) Gulino did not disclose these payments to the government prior to 2020 despite the fact that the government presumably asked him to disclose all the crimes he had committed during his earlier interviews. However, the impeachment value of this newly discovered evidence on Gulino's general credibility would still be vastly outweighed by the fact that Gulino's bribes to McCrann and Zavada would have also helped to corroborate Gulino's testimony about his payment to Mangano. This impeachment evidence would not have deterred the government from calling Gulino at trial. And, even if Mangano had known about Gulino's additional conduct prior to trial, there is not a reasonable probability that his counsel would have even raised this issue with Gulino

on cross-examination, given its obvious downside.[65]   Moreover, even assuming _arguendo_ that Mangano would have pressed this issue on cross-examination, there is not a reasonable probability that this evidence would have altered the jury's view of Gulino's testimony about Mangano, which was strongly corroborated by other evidence in the record.   Finally, the fact that Gulino's testimony, while relevant and admissible, did not directly concern the charged crimes, is further reason why—along with the other points set out above and the strength of the other evidence against Mangano—there is not a reasonable probability that the jury, hearing this evidence, would have reached a different result at trial—the ultimate question in the materiality analysis.

Mangano's discovery requests—which seek information about whether the government was in constructive possession of the new Gulino material prior trial—must be denied because Mangano's Giglio claim fails on the materiality element.   Even if the government was in constructive possession of this evidence prior to trial, Mangano's claim would still fail because the evidence at issue was not material and the discovery sought by Mangano could not change that fact.

Second, in addition to raising a Giglio claim, Mangano makes a passing reference, in one of his earlier submissions, to cases involving perjury, citing United States v. Monteleone, 257 F.3d. 210 (2d Cir. 2001) and United States v. Wallach, 935 F.2d. 445 (2d Cir. 1991).   (See ECF No. at 2.)   Mangano, however, does not raise this issue at all in his most recent filing and has, thus, waived any such claim.   In any event, these cases are inapposite because Mangano has not identified any testimony by Gulino that has been shown to be false.   Moreover, as noted earlier, Gulino's

---

[65]   It is notable that, at trial, Mangano had the opportunity to impeach Gulino with both:  (1)  his underlying conduct concerning Nocerino and Bree; and (2) Gulino's failure to disclose this conduct to the government during his two early proffer sessions and his decision to omit documentation concerning Nocerino and Bree from his response to a subpoena.  Defense counsel's decision not to raise these issues on cross-examination was surely attributable to the fact that this impeachment evidence would have shown that Gulino attempted to bribe multiple officials and would have helped corroborate Gulino's testimony about Mangano.

testimony, while relevant and admissible, did not directly concern the charged crimes.  As such, it is not probable that the jury, even if it had rejected Gulino's testimony in its entirety, would have acquitted Mangano.    Furthermore, even assuming arguendo that the government was in constructive possession of evidence about these additional bribes prior to trial, Mangano does not have a colorable argument the prosecutors on this case knew (or should have known) of Gulino's additional bribes prior to Mangano's second trial.

Third, Mangano is not entitled to know whether the government views Gulino in breach of his cooperation agreement and whether it intends to prosecute Gulino.  Contrary to Mangano's claim, even if the government ultimately decides not to find Gulino in breach or to prosecute him, those prosecutorial decisions are not a benefit or reward that could have possibly affected Gulino's trial testimony.  Gulino was not even confronted by the government about these additional crimes until October 2020 and the interview notes make clear that Gulino did not receive any benefit concerning his bribery of National Grid representatives prior to the conclusion of the second Mangano trial.  To the extent that Gulino's testimony has any relevance to sentencing, Mangano now knows about Gulino's additional conduct and failure to disclose that conduct to the government, and he can raise arguments about that conduct at sentencing.  The Court does not foresee any instance where Gulino would testify again in conjunction with Mangano's sentencing and, even if that were to happen, the government would have ample time, prior to such testimony, to make, if necessary, any further disclosures to Mangano in accordance with its obligations under Giglio.

Mangano also contends that if the government were to decline to prosecute Gulino or find him to be in breach of his cooperation agreement, such a determination "would be highly irregular—a fact which clearly requires disclosure to the defense."  This argument is meritless.

161

Thus, the Court denies all of Mangano's discovery requests concerning the recently disclosed evidence about Gulino.

## IV.  CONCLUSION

For the reasons stated above, Mangano's motions based on <u>Silver II</u>, Singh's post-trial deposition testimony, and the newly discovered evidence concerning Gulino are denied.

Defendants' sentencing is scheduled for March 23, 2022 at 2:00 PM.  Any remaining objections to the PSR shall be filed by January 21, 2022.  Defendants' sentencing submissions shall be filed by February 11, 2022.  The government's response shall be filed by March 4, 2022.

Defendants' sentencing is scheduled for March 23, 2022 at 2:00 PM.  Any remaining objections to the PSR shall be filed by January 21, 2022.  Defendants' sentencing submissions shall be filed by February 11, 2022.  The government's response shall be filed by March 4, 2022.

**SO ORDERED.**

Dated:  January 6, 2022
        Central Islip, New York

                        /s/      (JMA)
                        JOAN M. AZRACK
                        UNITED STATES DISTRICT JUDGE