

The Law Office of Kevin J. Keating, P.C.
666 Old Country Road, Suite 900
Garden City, NY 11530
516-222-1099 • 212-964-2702
kevin@kevinkeatinglaw.com
Garden City • Manhattan

March 1, 2022

**VIA ECF**
Honorable Joan M. Azrack
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, NY 11722

Re:  *United States v. Mangano*
16-CR-540 (S-2) (JMA)

Dear Judge Azrack:

As Your Honor is aware, along with Matthew Brissenden, Esq., I represent Edward Mangano, who is scheduled to be sentenced by the Court on March 23, 2022. I respectfully request that the Court consider the contents of this submission when imposing sentence.

As a matter of law, and fact, Edward Mangano is innocent. After a three month trial which ended in a hung jury, followed by a two month trial which resulted in an extremely narrow verdict in which Mangano was found not guilty of any wrongdoing related to the charged Nassau County contracts, Mangano now faces sentencing for: (a) his purported participation in the *Town of Oyster Bay's* decision to back a loan which Harendra Singh sought from a private lender 12 years ago, and (b) for obstruction of justice, by allegedly suggesting to Harendra Singh that if Singh ever speaks with anyone, he should tell them the same thing Linda Mangano was telling case agents about the nature of her work for Singh.

The centerpiece of both trials was Harendra Singh, a man initially characterized *by the Government* at his arraignment as "incapable of telling the truth . . . he lies every day for a living". At the first trial, Singh's direct examination was five and a half days long and, at the second, two days. True to form, as will be more fully detailed below, Singh perjured himself at both trials on countless occasions—effortlessly spewing vast lies on countless subject matters. Dishearteningly, the Government enabled Singh on direct examination, and by sitting silently during Singh's continued perjury on cross-examination. In fact, the Government has since stunningly double-downed, by repeatedly vouching for Singh's *credibility* in post-trial motions, when they have to know of multiple instances of Singh's material perjury.

Honorable Joan M. Azrack
March 1, 2022
Page 2

The second jury has narrowly spoken but, as detailed below, Edward Mangano is, in fact, not guilty.  Moreover, his life's history is extraordinary, a local success story born of modest hardworking parents, who worked his way through law school by working as a janitor and a printer, and rose to become a member of one of Long Island's largest law firms.  Ultimately, through his tireless work, decency and commitment to serve, he beat all odds by becoming a popular, two-term County Executive of Nassau County, while at the same time raising two sons who serve law enforcement as a Nassau County Police Officer and an Assistant District Attorney.

With this, I write with several purposes.  First, to provide an overview of the actual trial evidence which reveals that Edward Mangano is not guilty as a matter of law, and fact.  In doing so, I chronicle just a small sampling of demonstrable acts of perjury engaged in by Singh—without whose testimony this indictment could not have been brought.

Next, I offer comment on the Sentencing Guidelines applicable to this case.  In doing so, I offer strong disagreement with the Probation Department's position that Mangano should be held accountable for Guidelines purposes for all of the Town of Oyster Bay loans, and for Singh's receipt of an Emergency County Food Contract during Hurricane Sandy, and a split contract to furnish bread to the Nassau County Jail—conduct for which Edward Mangano was acquitted.

Finally, I provide detail of Mangano's laudable life's history.  In concluding, I respectfully submit that Edward Mangano, a man whose life has been ruined beyond all proportion to these events, is deserving of substantial leniency.

**The Trial Evidence As It Relates To The *Town Of Oyster Bay* Matter Revealed That Any Limited Support Mangano Gave To Singh's Efforts In The Town Was Borne Out Of Their 25 Year Friendship And, In Any Event, Fell Miles Short Of Constituting An "Official Act" Under *McDonnell v. United States*, 136 S.Ct. 2355, 3259 (2016), As "Merely Setting Up A Meeting, Hosting An Event, Or Calling Another Official" Or "Simply Expressing Support For An Idea" Does Not Qualify As An "Official Act" As A Matter Of Settled Law.**

Twelve years ago, on April 26, 2010, at the apparent request of his 25 year friend, Edward Mangano showed up late to a meeting hosted by John Venditto in John Venditto's office concerning a Town of Oyster Bay matter, and was present for perhaps 20 minutes.  At trial, most witnesses testified that Mangano said nothing at the meeting, while one witness claimed that, at most, Mangano stated at the conclusion of the meeting, "let's see *if* we could help out our friend" TR-2551 (emphasis supplied).[1]

---

[1] This witness's trial testimony conflicted with his Grand Jury testimony during which he, too, stated that throughout the meeting Mangano stood against a wall and said nothing.

Honorable Joan M. Azrack
March 1, 2022
Page 3

Just four months earlier, Ed Mangano had become the County Executive of Nassau County after surprisingly winning the election by a mere 300 votes.  TR 1938, 2958.  At that time, John Venditto had been the Supervisor of the Town of Oyster Bay for 12 years (TR 1842) and had been functioning as the *de facto* Supervisor for nearly two decades.  TR 2862-63. Venditto was assisted by his long-time Deputy Supervisor Len Genova for nearly 20 years (TR 1852, 2748-49, 2861), while Deputy Town Attorney Fred Mei would likewise serve under Venditto for nearly two decades.  TR 1369, 1754.  As Supervisor, Venditto would also serve on the Town Board, which would vote unanimously with Venditto on every vote for nearly two decades.  TR 1844, 2579, 2956, 2757.  Venditto's power and political capital in the Town of Oyster Bay was extraordinary, handily winning re-election by upwards of 70% of the vote. TR 2868, 2918.  No "pushover," Venditto ruled the Town of Oyster Bay as he saw fit, routinely pushing back against favors or demands made by political power brokers, such as Al D'Amato, if the request did not fit within Venditto's agenda for the Town.  TR 2866.

As irrefutably established at trial, from 1998-2009, Singh cultivated an extraordinarily close relationship with the Town of Oyster Bay which earned him millions as a Town concessionaire.  Beginning in 1998, the Town rigged a series of concession bids for Singh to ensure his award, and then repeatedly modified the terms of such agreements to stunningly unlawful lengths.  TR 1884, 3059, 3060, 3064.  For his part, Singh showered town officials with lavish functions, perks, and things of value.

As further established at trial, Singh's symbiotic relationship with the Town of Oyster Bay would continue for years *after* Mangano was elected. Throughout, the pattern remained the same: when Singh sought an accommodation, he would meet with Genova to present his needs, who would then direct Singh to Mei to draft the requested modified Agreements.  TR 1852, 1891, 2892, 2905, 2915.

As such, from 2010 through 2015, the TOB would continue to unlawfully rig concession agreements to ensure Singh's award (TR 2562, 2858-59, 2885, 2818, 2920); unlawfully extend the lengths of existing agreements to upwards of 70 years (TR 3059, 2263); and waive provisions in Singh's agreements which would have allowed the TOB to earn a percentage of Singh's vast revenues, instead allowing Singh to pay grossly below-market rent.  TR 1875-76, 1887.

Singh's sway over the Town was not limited to his Town Concession Agreements; he also raked in $100,000's through his corrupt "expediting business," wherein he accepted money from persons within the Indian-American community to obtain building permits from TOB officials in the Planning Department.  TR 2131, 2159, 2061, 1776, 1778, 1956.

The depth of Singh's nearly two-decade reign in the TOB may be best evidenced by the stunning fact that he and Deputy Town Attorney Fred Mei would come to communicate by <u>untraceable burner phones</u>.  TR 1373, 1791-93, 2041.  It's no wonder that Singh exclaimed, "*God is Great*" upon learning that his cohort, Len Genova, was elevated to the dual role of Deputy Supervisor and Town Attorney in 2010.  TR 2749.  Indeed, from 1998-2015, the Town of Oyster Bay "never said no" to Singh.  TR 2018, 2045.

Perhaps, then, it was understandable that Singh had internal "hopes and expectations" of similar rewards upon Mangano's surprise 2010 election as Executive of a County with a $3 billion budget. TR 2767, 1954, 2082, 3867. But, as established at trial, those expectations were not to be realized. Despite registering his company as a County vendor *three days before* Linda Mangano's first paycheck, Singh would not receive a single one of the lucrative Requirements Contracts which he coveted during the entirety of Mangano's tenure. TR 2004-2005, 2248, 2082. For that matter, while hundreds of individuals and companies were awarded under-$25,000 contracts by the Mangano administration – without the need for any legislative approval or oversight – for an endless variety of seemingly non-essential reasons, Singh would receive not a single one during Mangano's tenure. TR 641, 2083.[2]

Moreover, unlike in the Town of Oyster Bay, even Singh's corrupt expediting business "never got off the ground" in Nassau County. TR 1956-57. As repeatedly stated by Singh in 2015 to his closest confidant Fred Mei, in the privacy of his Singleton's basement conference room, "I got nothing from Ed Mangano, in fact he cost me money, they even think I got the Town Contract from him!" (a statement which caused the bewildered Fred Mei—the architect of the Town guaranty—to respond, "I know that's not true.") TR 3899.

Yet, in the face of these irrefutable facts, Mangano faces sentencing, principally for showing up near the tail end, and doing nothing at a Town of Oyster Bay meeting—regarding a matter that he had no authority (or need) to control. As set forth below, a cursory review of the three witnesses called by the Government at trial on this issue reveals that their testimony did not remotely establish Mangano's guilt, as there can be no guilt.[3] The fourth witness on this issue was Harendra Singh who is, by any measure, a liar of sociopathic proportion—a fact well known by the Government.

Remarkably, Len Genova received immunity to testify as a Government witness. TR 2820, 2826, 3000, 3073. The core of his testimony was that he was "overruled" with regard to the TOB's 2010 decision to indirectly back Singh's loans, so as to enable Singh to make capital improvements to Town facilities, laughingly claiming at trial that he was "concerned with exposing [TOB] taxpayers." TR 2789.

Of course, by 2010, Singh had been lavishing benefits on Genova for many years, and, in turn, Genova had become a central figure in rigging lucrative Town bids for Singh; extending the terms of Singh's multiple agreements to impossible lengths and costing Town taxpayers millions

---

[2] In the County, these contracts could be awarded twice annually to an individual or a corporation (TR 641), which could have generated hundreds of thousands of dollars in revenue for Singh.

[3] Notably, after calling Deputy Town Attorney Fred Mei as a cooperating witness at the first trial (hung jury), the Government shielded him from the jury at the second trial. As Deputy Town Attorney, Mr. Mei was in charge of drafting all of Singh's contracts, and was bribed by Singh from 2002-2015. Fred Mei was the architect of the "Town Guaranty" Loans, and received large cash payments from Singh after each closed. Mei's criminal conspiracy with Singh was so deep that he ultimately resorted to forging John Venditto's signature on agreements, and would come to communicate with Singh on untraceable burner phones. As noted, after Mei became Government cooperator, he was heard commenting on a body wire recording that *he knew it was untrue that Mangano got Singh the 2010 "Town Guaranty" Loan.*

Honorable Joan M. Azrack
March 1, 2022
Page 5

by choosing not to collect a percentage of Singh's massive revenues, as permitted under the concession agreements.  TR 2918-20, 2895-96, 2914-16, 3070, 2858, 2905.

At the same time, while acting as both Deputy Town Supervisor and Town Attorney, for years Genova hid from his TOB Financial Disclosure forms $100,000's in fees paid to him by his father, stemming from his father's development of several lucrative real estate complexes located in TOB.  TR 2852-2854.  Genova, likewise, failed to report the several millions of dollars he earned after purchasing a large tract of TOB land, evicting its tenants, and then selling the property as "developable" after the last remaining structure was destroyed in a mysterious nighttime blaze after the TOB's corrupt Planning Commission ordered it to be razed.  TR 2948, 2043-44.

And while incredibly testifying as to his concern for "exposing (TOB) taxpayers," it was Genova who, (1) signed the 2011 agreement, indirectly backing Singh's second Madison Loan *after* Fred Mei had slipped a page into the Agreement previously signed by Venditto, changing the loan from $2 million to $3.4 million, and (2) signed – "without reading" – amendments backing both of the later NDH loans ($7.2 million in 2011, and $12 million in 2012), which were materially different than the earlier Madison Loan in that they unconditionally obligated the TOB to pay upon Singh's default and contained false Opinion Letters authored by the Harris Beach law firm.  TR 2875-76.  It is quite obvious why Singh had a standing order to treat Genova "like a King" (TR 1923; 3029), and why Singh invoked the name of God in exultation upon learning of Genova's elevation in title.  TR 1921.  Additionally, while Genova claimed to be unaware of the operation of Singh's corrupt TOB expediting business, emails revealed this to be false and his testimony on this issue perjurious.  TR 2928.

With respect to being "overruled" based upon his concern for TOB taxpayers, at trial Genova pointed to a 3/23/10 "yellow light" email and a 4/7/10 "red light" email he had received from Jonathan Sinnreich, in which Sinnreich advised against the Town's *direct guaranty* of a loan for Singh.  TR 2973, 2992.

As testified by Genova, this represented to him that the guaranty issue was a "no go," thus, he withdrew from communicating with Singh on the issue.  TR 2781. According to Genova, this changed when John Venditto advised him that Mangano had called to suggest that the TOB contact the Rivkin firm about trying to find a solution which would permit the Town to help[4], leading to Genova's April 14, 2010 telephone call to Rivkin.  TR 2990.[5]

All of this testimony was transparently false.  The trial record was unequivocal that Genova spent his career extending extraordinary and corrupt accommodations to Singh which cost TOB taxpayers millions.  Moreover, as established at trial, two hours after receiving the March 23rd "yellow light" email, it was *Genova himself who presided over a TOB Town Board meeting and*

---

[4]  Of course, had such a call been made by Mangano, it would still fall well short of establishing the necessary "official act" to sustain conviction.

[5]  Before trial, Genova repeatedly proffered to the Government that Rivkin was called by TOB because Rivkin was, in fact, counsel to the Town of Oyster Bay, and because Genova and Venditto had a long pre-existing relationship with Bill Savino.

*facilitated the passage of the Resolution authorizing Singh's loan, which at the time was contemplated as a direct guaranty by TOB.* TR 2849, 2972, 2772-75. And, on April 8, 2010, the day after receiving the "red light" email, Genova met with Singh and Venditto at Singleton's – *the same day* that Rivkin opened a "New Business Memo" titled "TOB Guaranty." TR 2673, 2982.

Contradicting Genova's testimony, phone records introduced at trial revealed *no calls* between Mangano and Venditto between April 1 – April 13. TR 3598. Finally, while Genova claimed that he stopped communicating with Singh after the April 7th "red right email," phone records and emails show that their communications went unabated – including an email *prior* to the April 28th meeting, wherein Singh provided Genova with the names of his closing attorneys for the loan *that had yet to be approved.* TR 2024-2025.

Nothing in the testimony of Jonathan Sinnreich established Mangano's commission of the charged counts. Essentially, Sinnreich testified that, at the invitation of Fred Mei, he attended the April 28, 2010, meeting at John Venditto's office which involved a discussion concerning Singh's Town Concession Agreement. According to Sinnreich, while Mangano didn't participate in the meeting, "he contributed *by his presence.*" TR 2551. Of course, as unequivocally set forth in *McDonnell v. United States*, 136 S.Ct. 2355 (2016), "attending a meeting or expressing support for a position" are not acts which rise to the level of formal government action. As the meeting concluded, Sinnreich claimed that Mangano, who arrived late and had been standing against a wall saying nothing, put his hand on Singh's shoulder and said, to the lawyers, "Let's see if we can help out our friend." TR 2551.[6] Of course, as set forth above, this statement (if said) also falls well short of formal government action.

Significantly, Sinnreich also noted that he himself had arrived late to the meeting, and that Mangano arrived upwards of thirty minutes *after Sinnreich*. TR 2621. Sinnreich also confirmed that: (1) the meeting was chaired by John Venditto, who sat at the head of the table (TR 2617); (2) the meeting consisted of a discussion among the lawyers to see if there was a legal way to draft an agreement (TR 2619); (3) John Venditto was supportive of reaching a solution (TR 2622); and (4) Venditto gave remarks to open and close the meeting. TR 2618, 2623.

Bill Savino's testimony centered around GX 423 – a set of handwritten notes made by Savino in April of 2010, and maintained in Rivkin's legal file in the TOB Guaranty Matter. The testimony was strange. According to Savino, he believes, but is not certain – as he has *no actual recollection* – that the writing consisted of contemporaneous notes taken during a telephone conversation with Mangano on April 13, 2010, which covered the particulars of Singh's concession agreement with the Town of Oyster Bay. TR 2701-09. But a cursory examination of Savino's odd claim revealed it to be, frankly, idiotic. In fact, Savino's mobile phone records show that he was not even at his desk during his April 13th conversation with Mangano, but actively traveling through New Jersey at the time of the call – making note-taking *a literal impossibility*. TR 3594-3596; 2722-23.

---

[6] At trial, Sinnreich conceded that he offered no such testimony in the Grand Jury, wherein he testified simply that, throughout, Mangano stood against a wall and said nothing. TR 2623. And of course, Singh himself recalled Mangano saying *nothing* during the meeting.

Moreover, the substantive details of the note line-up exactly with a discussion which Savino *did have* with Len Genova.  Indeed, GX 424 reflected Savino's billing entry of April 14, 2010 regarding a call with Len Genova, which read, "T/C w/Len Genova, outlining relevant facts & addressing certain legal issues presented by license transaction; later s/w Fred Mei as per Len Genova."  TR 2705.

GX 423 – Savino's handwritten notes – were neatly written on a page-long, ruled sheet. It was headed with, "Len Genova," and the writing thereafter contained detailed particulars and relevant facts addressing certain legal issues presented by the transaction.  In fact, Savino conceded that the content of the handwritten notes (GX 423) matched that set forth in Savino's billing entry, reflecting his conversation with Genova (GX 424).  TR 2706.  The handwritten notes contained detailed and sophisticated legal concepts and provisions pertaining to the concession agreement, of the kind which would be known by the person charged with having negotiated its terms (Len Genova), such as, "license agreement terminable at will," "extended to 2049;" "Tobay willing to value construction;" and "Town willing to buy improvements."  TR 2712-2714.  The handwritten notes even contained the name and phone number of Deputy Town Attorney Fred Mei, whom Genova directed Savino to call, as reflected in Savino's billing entry, at GX 424.  TR 2705.

Further, when challenged with the obvious – that his handwritten notes were made during his April 14th conversation with Genova (as reflected in his billing records) – Savino conceded that:

- It was his custom and practice to take notes of all relevant conversations and maintain them in his legal file.  TR 2702-2703.

- It was his custom and practice to identify the name of the person with whom he was speaking on any relevant notes he took.  TR 2703.

- It was his custom and practice to bill for any substantive conversations and identify in his billing records the individual with whom he was speaking.  TR 2704.

Of course, the only notes produced at the trial were GX 423 – headed with the name "Len Genova" – which perfectly matched his billing entry concerning a conversation with Len Genova. GX 424.  No notes were produced from the Rivkin legal file regarding a substantive conversation on the TOB matter with the name "Ed Mangano" (which would have been Savino's custom and practice), and Rivkin's billing records reflect no such conversation as having taken place.  TR 2737.  In short, Savino's testimony – like Genova's – was highly suspect and riddled with inconsistencies.[7]

In short, none of these witnesses came remotely close to establishing that Ed Mangano engaged in "formal Government action" as it related to the Town matter.  Also, none of these

---

[7] Quite obviously, even if it had been Mangano who had been speaking with Savino—which it clearly was not—the Supreme Court's *McDonnell* decision makes quite clear that a public official calling a private lawyer to provide details of a transaction pending in another political subdivision does not constitute an "official act".

witnesses – Savino, Sinnreich, or Genova – spoke to the other question at trial: whether Edward Mangano's actions in the Town were taken pursuant to a corrupt, *quid-pro-quo* agreement. Only one witness – Harendra Singh – testified to such understanding.

The core of Singh's trial testimony was "without (Mangano's) help I won't be able to get this loan guaranty done" and that he hired Linda Mangano so that he could obtain Mangano's assistance in securing the Town of Oyster Bay guaranty. TR 1477.

Defense counsel, of course, argued the undeniable, that Singh was a serial liar, and that he actually hired Linda Mangano *in the hope* that he would obtain lucrative *County* requirements contracts through his corporate entity SGT. In fact, Singh was forced to concede at trial that he had registered SGT as a County vendor three days before his company issued its first paycheck to Linda Mangano. TR 2004. And, Singh was confronted at trial with multiple proffers he provided during his cooperation with the Government in which he advanced this exact position: that he had hired Linda Mangano in the hope and expectation of obtaining the County Requirements contract. Of course, during Mangano's tenure, Singh was never awarded the County Requirements contract, leading Singh to additionally proffer to the Government that, "had he hired Rob Walker's wife, he would have likely obtained the contract." TR 2003.[8]

Similarly, defense counsel argued that Singh's testimony at trial – that he needed Mangano's support to obtain the Town of Oyster Bay amendment – was obvious fiction. After all, as established at trial, by April of 2010, as Mangano completed his first three months in office as County Executive: (1) John Venditto had run the Town of Oyster Bay for *two decades* with Deputy Len Genova; (2) Singh's Woodlands concession agreement had been in effect for 12 years, during which the Town had already amended it on four separate occasions, on terms that were extraordinarily favorable to Singh; (3) the Town had, additionally, rigged a Town public bid in awarding Singh the lucrative Town beach concession, and thereafter amended this Agreement on two occasions, on terms extraordinarily favorable to Singh; (4) both Len Genova (who negotiated the terms of all Singh's agreements) and Fred Mei (who drafted all of Singh's agreements), along with most of the members of the Town Board, were being bribed by Singh; and (5) the Town had chosen *not to* enforce a provision in Singh's concession agreements that would have provided the Town with a percentage of Singh's extraordinary revenues – opting instead to accept a wildly below-market monthly rent from Singh. In fact, as established by the defense, one of the Town's earlier amendments to the Woodlands' concession agreement provided for the Town's backing of a private loan Singh obtained at one of the concessions – the exact issue Singh was raising with the Town in early 2010. TR 1907-1908; *see also* DX 651. In short, as conceded by witnesses at trial, the Town of Oyster Bay "*had never said no to Singh*."

In short, the Supreme Court's *McDonnell* decision clearly dictates that Ed Mangano's conduct in showing up (late) at a meeting hosted and chaired by the ever-powerful John Venditto, concerning a Town (not County) matter involving Harendra Singh, for whom the Town would do,

---

[8] As is now known, after the conclusion of trial, Singh has repeated his pre-trial position by testifying under oath in a civil deposition that Mangano had nothing to do with the Town of Oyster Bay matter. See, Defendant's Rule 33 Motion 1/27/20.

and had done, *anything*, and saying nothing (or, at most, saying *to the attorneys* "let's see if we can help out our friend")—does not constitute a criminal act.[9]

Moreover, the notion that cooperator Singh testified truthfully on this, or any other issue is, sadly, absurd. Below is a small sampling of some of the more transparent acts of perjury committed by Sigh at trial:

- In both Mangano I and II, in an apparent effort to put Singleton's on equal footing with Butch Yamali's South Shore restaurants (which lost power for days), Singh repeatedly testified that Singleton's was totally without power for days following Hurricane Sandy. TR 2192, 2202, 2203. Under cross-examination, Singh's testimony concerning the length of such power outage would vary when confronted with evidence that (1) Singh, early on, was voluntarily providing food from Singleton's to O.E.M. (TR 2204) and (2) that people were in fact dining at Singletons. TR 2206-2207. Despite this, Singh held firm – steadfastly maintaining that Singleton's had no power for days – all in an apparent effort to fit the Government's narrative that the emergency food procurement should have gone to a South Shore restaurant in the flood zone. It was not until the cross-examination of Singh's manager, Dave Saloney, *in Mangano II*, that it was all revealed to be a complete lie: Singh's kitchen at Singleton's, in fact, *never lost power*, a fact which was known by prosecutors, as Saloney had proffered such information to the Government long before trial. TR 3488-89.

- In Mangano I and II, Singh offered that, after Mangano tasted a cookie from Singh's storefront bakery, Mangano commented that he would have to get Singh the large-scale commercial contract to supply bread to the County Jail. TR 1503, 2128. As such, Singh repeatedly (and incredibly) testified that he met with the sheriff "perhaps 25 times," solely to discuss the Bread bid, such that Singh would come to know "everything about the bid." TR 2129. Of course, this testimony was patently false. In fact, *two days* after the County released the bid on its website, Singh sought help in an email to a friend, as he didn't even know how to access the County bid. TR 2154-2155. When confronted with this email, Singh compounded his perjury by falsely stating that "it was a different food bid." TR 2155. And, despite knowing "everything about the bid" stemming from his countless meetings devoted to the topic, it wasn't until *after* it was awarded that Singh realized his small bakery was utterly incapable of fulfilling the terms. TR 2149.

- In Mangano I and II, Singh unequivocally testified that among the things of value provided to Mangano was reduced rent for his campaign office, located at a strip mall owned by Singh's parents. TR 1964. In support, Singh pointed to a series of purported leases with the Bethpage Republican Club as evidence of the rent reduction. TR 1983. This, too was proven to be a lie. Unequivocal internal emails between Singh and his

---

[9] Unquestionably, the jury's verdict resulted from incorrect jury instructions which allowed the jury to convict if Mangano provided "advice" to the Town of Oyster Bay in any manner, without clarifying for the jury the contours of the type of advice needed to sustain conviction under *McDonnell*.

staff revealed this testimony to be a hoax, as each of these leases had been forged by Singh to fabricate his rent rolls, in furtherance of a scheme to commit bank fraud. TR 1967.[10] Moreover, it was established at trial that only the "Friends of Ed Mangano" had authority to lease a campaign office, not the "Bethpage Republican Club." And, it was irrefutably established that the signatures on each of the "Bethpage Republican Club" leases introduced by the Government were forgeries. TR 1554, 1983-85.

- In Mangano I and II, Singh pointed to his gift of a massage chair to Mangano as a bribe, as evidenced by the attached note which read "Happy Birthday," even though it was not Mangano's birthday. Singh told the jury that his note was "code for bribe." TR 1667; 2069-2070. On cross examination, it was revealed that, at that exact time, Singh's Water's Edge Restaurant hosted a "50th Birthday Fundraiser for Ed Mangano" which was attended by many influential members of the Indian community. TR 2073. Faced with this, Singh doubled down on his perjury, bizarrely offering that "I had nothing to do with that event." TR 2071. His perjury became even more transparent when Singh was confronted with Water's Edge invoices which repeatedly noted that various choices for the affair had been chosen "as per H." TR 2072.

By 2015, Deputy Oyster Bay Town Attorney Fred Mei and Harendra Singh had become *extremely* close friends and co-conspirators in an array of stunning financial crimes which exposed the taxpayers of Oyster Bay to costs in the tens of millions of dollars. Their criminal relationship had spanned 15 years, during which Singh lavished Mei with tens of thousands of dollars in cash payments, high-end automobiles and countless other things of value. The twosome travelled the world together and, as revealed at trial, exchanged warm and affectionate text exchanges. With time, their crimes grew to be outrageously brazen, ultimately leading Fred Mei to negotiate and craft $20 million in loans for Harendra Singh directly backed by the Town of Oyster Bay, without any knowledge of the Oyster Bay Town Board, and supported by false opinion letters drafted by the Harris Beach law firm which falsely indicated that the Town authorized these loans. Beyond this, Mei would eventually assist Singh in the crafting of additional town guarantees bearing the forged signature of John Venditto. As noted, their relationship and criminal bond was so tight, they would eventually communicate through non-traceable burner phones. But, in 2015, Mei realized his end was near and began cooperating with the Government. Yet, *not once* in proffer sessions with the government did the architect of the town guarantees implicate Ed Mangano. As noted, cooperator Mei eventually met with his co-conspirator while wearing a body wire and thus inquired of Singh as to what Mangano had done for him. Of course, Singh's response was clear, "I got nothing from Ed Mangano. In fact, he cost me money".

---

[10] Government prosecutors were placed on notice of such perjury, as: (1) they possessed the documents showing the creation of fake rent rolls; (2) witnesses had told them that Singh used fabricated leases to obtain loans; and (3) defense counsel expressly brought all of this information to their attention prior to the second trial. That did not prevent prosecutors from eliciting such testimony a second time around.

Honorable Joan M. Azrack
March 1, 2022
Page 11

The Supreme Court's *McDonnell* decision emphatically instructs that attending a meeting, or even expressing support for a position do not constitute official acts. After all, as stated by the Supreme Court, "public officials arrange meetings for constituents, contact other officials on their behalf, and include them in events all the time." *Id.* at 22.

The evidence at trial, indeed, established Mangano's innocence, as his actual conduct fell miles short of formal Government action, and the limited support offered to Singh was hardly a part of a *quid pro quo* relationship, but instead was the simple product of his 25-year friendship with a man he thought he knew.[11]

### As a Matter Of Fact, and Controlling Law, Ed Mangano Did Not Commit Obstruction Of Justice.  In Fact, it is Not a Close Call.

The only other charge for which Mangano stands guilty is Count 7, Conspiracy to Obstruct Justice (18 U.S.C. 1512 (c)(2)). As set forth in multiple prior filings and applications with this Court, as a matter of controlling law, and trial evidence, Mangano is transparently not guilty of this charge.

To begin, the *only* evidence offered in support of this charge was the trial testimony of Harendra Singh, a cooperator who has spent his life "lying for a living", and whose demonstrable acts of perjury at trial could fill a binder. Beyond this, a quick review of Singh's direct testimony in support of this charge – even taken at face value – reveals no act of obstruction by Mangano. A review of his testimony, in its entirety, reveals that, predictably, Singh lied.

In support of this charge, Singh offered testimony as to various occasions in which he had conversation with the Manganos in their home. (January 13, 2015; February 7, 2015, and May 18-20, 2015).[12]

With regard to January 13, 2015, Singh testified that he went to the Mangano house that day as Ed Mangano had advised Singh that the FBI had visited Linda Mangano at her home earlier that day during which she had engaged in a voluntary discussion with agents concerning her employment with Singh. (TR 6095). Once at the house, Singh claimed there was a discussion about what Linda Mangano had told the agents, the purpose of which was "so basically they wanted me to get the story straight (of what Linda Mangano had told the agents that day) and if anybody asks, that what Linda Mangano did, I tell the same thing what they told me to tell." (TR 1696).

---

[11] The trial evidence revealed that Mangano was hardly alone. Through his outwardly generous and affable way, Singh had cultivated a long list of powerful friends such as sitting judges and former federal prosecutors who Singh would occasionally lean on for favors and who, likewise, were unaware of Singh's massive criminality secretly spewn from his Singleton's basement.

[12] Of course, Singh conceded at trial that during the period relevant to this case, he went to the Mangano house on hundreds of occasions.

With regard to the events of February 7, 2015, Singh testified that he traveled to the Mangano house that day upon learning that Ed and Linda Mangano had been served with a Grand Jury Subpoena seeking the production of certain *documents* (TR 1697, 1698). While at the house, Ed Mangano asked Singh if he possessed the requested employment documents, and arrangements were made for Singh to deliver the material to Mangano, so that he could properly comply with the subpoena (TR 1701). Singh also testified that there was continued discussion at the house about the work Linda Mangano did for Singh, "which was not true", and Singh agreed with their version of events as, "I wanted to get the story, because they were going to tell the story to the FBI certain things, *and I was going to tell the FBI the same things*". (TR 1702)

Finally, with regard to various conversations at the Mangano house from May 18-20, 2015, Singh claimed that he went to the Mangano's house on May 18 upon learning that Linda Mangano was going to engage in a proffer (TR 1707). While at the house, Singh claimed there was a general discussion about what Linda did for his company and the vacations they took together . . . "you know, he paid accessories, as I would call during the vacation, basically coming with a storytelling I guess, she was beginning to tell the Government and make sure that I was aware of that, what she was telling the Government, what the same story, I know that she is telling. Basically. . . this was not true what they were telling me." (TR 1709). Next, Singh claimed that on May 19, 2015 he returned to the Mangano house with his attorney Joseph Conway, so Conway could give a general overview of what a proffer entails in an effort to calm the nervous Linda Mangano. (TR 1711). Finally, Singh testified that he returned to the Mangano house on May 20, 2015, after Linda Mangano had proffered, during which he was advised as to generally the version of events which had been offered by Linda Mangano, the purpose of which was to "know her story which would be the same story I would tell *if asked*."

As can be seen, Singh's testimony on direct examination was facially insufficient to make out a violation of §1512(c)(2), which occurs when a defendant obstructs, influences or attempts to influence an <u>official proceeding</u>. First, with regard to the January 13, 2015, discussion, Singh's claim (if true) was that there was a discussion about what Linda Mangano had voluntarily told agents that day so that "if anybody asks . . . I tell the same thing what they told me to tell". On several grounds (had this conversation occurred) it fell well short of obstruction. To begin, of some note is the fact that, at trial, Linda Mangano was found not guilty of giving false statements to case agents when she spoke to them on January 13, 2015, so it is hard to conjure circumstances under which purportedly relaying to Singh Linda Mangano's earlier truthful conversation with agents could constitute an act of obstruction. More to the point, Singh's simple claim that the idea was for him to "parrot" Linda's version "should anyone ask" does not remotely constitute obstruction as there was no *official proceeding*.

The term "official proceeding" is defined under 18 U.S.C. § 1515(a)(1) to include "a proceeding before . . . a grand jury." In this case, there was no testimony—as there could not be— that Mangano submitted false evidence in response to the Government's Grand Jury Subpoena or

that he sought to influence any witness testifying before the Grand Jury.  And, as the Ninth Circuit has explicitly recognized, that term *does not* encompass generalized criminal investigations.  *See United States v. Ermoian*, 752 F.3d 1165 (9th Cir. 2013) (the term "official proceeding", for purposes of 18 U.S.C. § 1512(c), does not encompass mere criminal investigations).

As the Supreme Court explained with respect to 18 U.S.C. § 1503 – an analogous obstruction statute that broadly criminalizes efforts to influence the "due administration of justice" -- "[t]he action taken by the accused must be with an intent to influence judicial or grand jury proceedings; it is not enough that there be an intent to influence some ancillary proceeding, such as an investigation independent of the Court or grand jury's authority."  Accordingly, the Supreme Court specifically warned that it is not enough to prove that a defendant made a false statement to a law enforcement agent – even where the defendant *knew* that there was a pending grand jury proceeding.  As the Court explained:

> We do not believe that uttering false statements to an investigating agent—and that seems to be all that was proved here—who might or might not testify before a grand jury is sufficient to make out a violation of the catchall provision of § 1503.

> The Government did not show here that the agents acted as an arm of the grand jury, or indeed that the grand jury had even summoned the testimony of these particular agents. The Government argues that respondent "understood that his false statements would be provided to the grand jury" and that he made the statements with the intent to thwart the grand jury investigation and not just the FBI investigation . . . Because respondent knew of the pending proceeding, the Government therefore contends that Aguilar's statements are analogous to those made directly to the grand jury itself, in the form of false testimony or false documents.

> We think the transcript citation relied upon by the Government would not enable a rational trier of fact to conclude that respondent knew that his false statement would be provided to the grand jury, and that the evidence goes no further than showing that respondent testified falsely to an investigating agent. Such conduct, we believe, falls on the other side of the statutory line from that of one who delivers false documents or testimony to the grand jury itself. Conduct of the latter sort all but assures that the grand jury will consider the material in its deliberations. But what use will be made of false testimony given to an investigating agent who has not been subpoenaed or otherwise directed to appear before the grand jury is

Honorable Joan M. Azrack
March 1, 2022
Page 14

far more speculative. We think it cannot be said to have the "natural and probable effect" of interfering with the due administration of justice.

*United States v. Aguilar*, 515 U.S. 593, 600–01, 115 S. Ct. 2357, 2362–63, 132 L. Ed. 2d 520 (1995).

The same reasoning applies with even *more force* in the instant case, where the statute in question requires the specific intent, not merely to impede the "due administration of justice", but to affect a specific "official proceeding" – *i.e.*, a grand jury proceeding. Thus, Singh's amorphous claim that on January 13th there was a discussion that Singh should parrot a purportedly false version of events should anyone ask, is not obstruction.

Likewise, the events of February 7, 2015, as described by Singh, do not remotely constitute obstruction as a matter of law, and fact. By Singh's telling, while Ed Mangano was compiling records so that he could lawfully and properly respond to a document subpoena, there was generalized discussion about the nature of Linda's work "which was not true" as, "I wanted to get the story, because they were going to tell the story to the FBI certain things, and I was going to tell the FBI the same things". Such a discussion, had it occurred, lacks any required intent to obstruct an official proceeding necessary to sustain an obstruction charge. Instead, Singh recounted a generalized kitchen table conversation about what "they were going to tell the FBI. . . and what Singh was going to tell the FBI". As an aside, Singh's version was a lie. After initially testifying that, in the timeframe of this conversation, he in fact had plans of speaking with the FBI, Singh was confronted with his earlier sworn testimony where he conceded that, in fact, he had no plans to speak with the FBI in 2015. In fact, as revealed at trial, Singh's own criminality continued unabated throughout calendar year 2015 and Singh would not begin speaking to the FBI until April of 2016 after enduring months of incarceration (TR 2102-2104).

Likewise, the events as described by Singh from May 18th – May 20th fare no better. According to Singh, on May 18, 2015, the Manganos described for Singh "the story" that Linda Mangano was going to proffer to the Government so that he would be aware of the story. On May 19th, Singh and his attorney Joseph Conway went to the Mangano house so that Conway could calm Linda's nerves concerning her impending proffer. And on May 20th, according to Singh, Singh was advised by the Manganos of the general version of events which had been offered by Linda Mangano during her proffer which would "be the same story I would tell *if asked*". As set forth above, none of these events (if true) come close to constituting an act of obstruction under settled law.

In short, the only evidence offered to support the obstruction charge was the testimony of Harenda Singh rendering the evidence dubious from the outset. True to form, as noted above,

Singh lied.  Moreover, even at face value, the testimony fell well short of establishing obstruction as a matter of settled law, and fact.

### The Guidelines Applicable To This Case

The Probation Department's Guideline Analysis is contained paragraphs 66-84 of the PSR.[13]

We are in accord with the Probation Department that, the base offense level for Conspiracy to Commit Federal Program Bribery, substantive Federal Program Bribery, Conspiracy to Commit Honest Services Fraud and Honest Services Fraud is 14 (2C1.1(a)(1)) (PSR ¶68); a 4 level increase is mandated pursuant to 2C1.1 (b)(3) by virtue of Mangano's elected position as Nassau County Executive (PSR ¶71), and that 2 points are added for grouping Count 7 (obstruction) with these counts pursuant to 2J1.2, 3C1.1, and 3D1.2 (PSR ¶74).

As detailed below, we offer disagreement with Probation's position that, **(1)** a 2 level Guidelines increase is warranted pursuant to 2C1.1(b)(1), premised upon the contention that Mangano accepted "multiple bribes from Singh in exchange for assistance in arranging the TOB to act as a guarantor of four loans and obtaining (sic) Nassau County contract" (PSR ¶69), and **(2)** that a 3 level increase pursuant to 3B1.1.(B) is mandated as Mangano supervised participants in an offense that involved five or more participants (PSR ¶73).  And, we offer strong disagreement with Probation's astonishing position that, for Guidelines loss purposes, Mangano is responsible for the $20 million NDH loans (even though the trial evidence stablished that Mangano was completely uninvolved in these events), and the Nassau County contracts (conduct for which he was acquitted at trial)—a position that would stratospherically raise his Guidelines by 20 levels (PSR ¶70).

A.      <u>The Two Level Multiple Bribe Enhancement Is</u>
                    <u>Inapplicable to This Case</u>

The PSR accords Mangano a two-level increase pursuant to Guidelines 2C.1.1(b)(1), premised upon the contention that Mangano "accepted multiple bribes from Singh in exchange for assistance in arranging the TOB to act as a guarantor of four loans and obtaining (sic) Nassau County contract."  Probation is incorrect.

Application Note 2 to § 2C1.1 unequivocally states that "related payments, that, in essence constitute a single incident of bribery . . . (e.g., a number of installment payments for a single action) are to be treated as a single bribe."  Hence, the number of bribes is not dictated by the number payments, but rather, by the number of "quid pro quo" arrangements proven at trial.

---

[13] The Probation Department's version of the Offense Conduct is contained in ¶¶10-61 of the PSR.  Our objections to the PSR are contained within Exhibit A, and we ask that they be incorporated and made part of the PSR.

Here, the evidence at trial was unequivocal that Mangano's last act remotely related to the TOB matter was his attendance at an April 28, 2010 meeting hosted by Town of Oyster Bay Supervisor John Venditto, arranged by Venditto's assistant, chaired by Mr. Venditto, and held in Mr. Venditto's office. As will be more fully detailed below, Mangano was utterly uninvolved in Singh's 2011 and 2012 criminal scheme with Fred Mei and others which led to the $20 million NDH loans. In short, while we believe that Mangano's attendance at the April 28th meeting was fully lawful and fell well short of constituting "official conduct", it is undeniable that his conduct ceased on April 28, 2010. Hence, it is incorrect that Mangano received "multiple bribes" from Singh for assistance in the TOB matter. While we strongly disagree with the jury's verdict, it reflected a single bribe—the employment of Linda Mangano which began in April 2010 – in exchange for Mangano's purported assistance in the TOB that same year.

Moreover, the trial evidence surely did not establish that Mangano received multiple bribes from Singh in exchange for assistance in obtaining Nassau County contracts. At trial, Mangano was correctly acquitted with regard to the Nassau County contracts, the jury concluding that Singh's receipt of an 18 day Emergency Contract to supply food to the Office of Emergency Management during Hurricane Sandy, and his award of a portion of a contract to supply bread to the Nassau County Jail (from which Singh withdrew)—were not the product of a *quid pro quo* scheme with Mangano. Nor was there a preponderance of evidence to support these charges.

With regard to the Emergency Food Contract, as is well known, Superstorm Sandy was one of the largest disasters ever to hit Long Island. Hundreds of thousands of people were without power for days, and the South Shore of Long Island was flooded. Thousands of relief workers poured into Long Island to assist in the disaster, and were headquartered at the OEM Facility in Bethpage. For the first few days of the relief operation, as was customary, food for the relief workers was supplied by the Nassau County Jail. Neither Nassau County, nor Edward Mangano, had any role in the stoppage of this supply. Instead, a New York State supervisor halted the jail's production of food as it was unsanitary. With this, a replacement facility had to be urgently located. During a declared emergency, any vendor who could best supply may be chosen. Dover was a previously registered vendor with Nassau County. Yet, at the time that the jail food system was halted, the Dover facility (1) had no power; (2) was in the flood zone, and (3) was located 14 miles from OEM. Singletons was located three miles from the Office of Emergency Management, was not in the flood zone, and, as noted, never lost power.

The Office of Emergency Management was located less than three miles from Singletons, a restaurant/catering facility owned and operated by Harendra Singh. At both trials, Singh perpetrated a hoax upon the Court and jury by perjuriously and repeatedly testifying that Singletons had lost all power during Hurricane Sandy—a particularly outrageous act of deception designed to put Singletons on equal footing with Dover which was, in fact, without power for days. This testimony was patently false, as was known by the Government. As revealed during the

Honorable Joan M. Azrack
March 1, 2022
Page 17

cross-examination of Singh's General Manager in *Mangano II*, one of Singletons large kitchen facilities never lost power throughout Superstorm Sandy.

Of course, prior to trial, Singh had proffered to the Government a different version, that he had obtained the Emergency Contract through the efforts of Craig Craft (the head of OEM who signed the purchase orders) and Larry Eisenstein, the head of the Health Department.  Notably, both of these individuals had a preexisting relationship with Singh.

With regard to Singh's award of a portion of a contract to supply bread on a large-scale wholesale level to the Nassau County Jail, at trial, Harendra Singh offered the perjurious testimony that, in approximately November 2010, he went to the home Edward Mangano with a box of cookies from his small bakery which Mangano and the Nassau County Sheriff Michael Sposato sampled, which resulted in Mangano volunteering, "I have to get you the Bread and Rolls contract for the Nassau County Jail".  Of course, the Bread and Rolls contract involved the supplying of thousands of loaves of white bread, and is customarily supplied by a commercial bakery.  Singh had recently purchased a small storefront bakery *which had one baking oven*.

Next, Singh offered the perjurious testimony that, following the purported November 2010 meeting, he held approximately 30 meetings over a period of a year and a half with Sheriff Michael Sposato in his years long quest to obtain the Bread and Rolls contract.  Yet, it was established by the defense at trial that the existing Bread and Rolls contract could have been cancelled at any time by Nassau County, which never occurred.  Thus, had there been an ongoing effort by Nassau County to award this contract to Singh, it could have been done in 2010 or 2011.  At trial, Singh further offered the testimony that based upon his dozens of meetings with Sposato purportedly about the Bread and Rolls contract, he knew "everything there was to know about the bid for the contract".  Yet, it was established by the defense that, in 2012, when Nassau County released the bid online, Singh had to contact a friend to learn how to download the bid (of course, he had not been given advance notice by Sposato, nor had he been given a copy of the bid).  In a remarkable display of perjury, when confronted with this fact at trial, Singh offered the false assertion that the online bid which he sought to download was "another Nassau County food contract".  Of course, had this assertion been true, the Government would have shored of Singh's testimony on redirect by presenting the "other food contract".  The Government undertook no such effort as the testimony was rank perjury.

By law, and under the terms of the Nassau County Bread and Rolls bid itself, all bids could be split into separate parts by line item.  Moreover, no vendor was permitted to submit a proposed bid at variance with the terms of the bid.  The bid submitted by Singh's bakery was lower than Rockland's bid with regard to a number of items.  Moreover, Singh's bakery offered a faster delivery time than Rockland which, under the terms of the bid, was a "tiebreaking" factor.  Finally, Peter Schmidt, the Presiding Officer of the Nassau County Legislature, and the Head of the Rules Committee of the Legislature, which awards these bids, had an ongoing policy of, when legally

Honorable Joan M. Azrack
March 1, 2022
Page 18

possible, choosing a local vendor to supply on Nassau County contracts.  Singh's bakery was a local vendor, Rockland was not.

In short, the jury was correct in acquitting Mangano of these events as Singh's testimony on these events was preposterous and demonstrably perjurious.  For these reasons, too, the multiple bribe enhancement is inapplicable.

**B.**     <u>Probation Is Incorrect In Applying A Three Level Increase Pursuant to 3B1.1.(B) as Mangano Supervised No One With Regard to The Counts of Conviction, and Engaged in No Wrongdoing with Regard to The Nassau County Contracts, For Which He Was Acquitted</u>

Probation accords Mangano a three level Guidelines increase for "supervising participants in an offense that involved five or more participants".  (PSR ¶73).  Probation is wrong.

With regard to the TOB matter, Mangano supervised no one.  At the time, Mangano was the County Executive of Nassau County, and had no supervisory authority over anyone in Town of Oyster Bay Government.

With regard to the two Nassau County contracts, as detailed above, at trial the jury correctly acquitted Mangano of these events.  Moreover, as detailed above, it cannot be credibly argued that there was a preponderance of evidence to support these counts.  As such, application of the enhancement is not warranted.

**C.**     <u>The Probation Department's Guidelines Loss Analysis Which Holds Mangano Responsible for Over $20 Million in Losses is Factually and Legally Flawed</u>

The Probation Department seeks a staggering, 20 level loss adjustment pursuant to 2C1.1(b)(2) and 2B1.1(b)(1)(k) by holding Mangano responsible for the cumulative sum of $20,956,824, consisting of the $20 million in loans Singh purportedly "otherwise would not have been able to obtain", the $193,824 value of the bread and rolls contract, the $233,000 value of the OEM Emergency Food Contract, and the "$530,000 in gifts, services and bribes" purportedly received by Mangano (PSR ¶70).  Probation's analysis is flawed, and we address each loss category separately below.

Honorable Joan M. Azrack
March 1, 2022
Page 19

1.    **The $20 Million in Loans Received by Singh**
      **From Private Lenders**

The loans in this case fall under two categories—the Madison loans and the NDH loans.

Mangano's last act related to the TOB matter was his attendance at the April 28, 2010 meeting in John Venditto's office.  In the meeting, there was a discussion (not involving Mangano), of whether Singh's existing TOB Concession Agreement could be "lawfully" amended so as to provide the town's indirect support of potentially two loans Singh might seek from *private lenders,* so as to enable Singh to provide capital improvements to his concession facilities.  As is known, the resulting Town Amendments authorized the TOB's backing of the Madison loans—a $1.5 million loan executed on June 9, 2010, and $3.4 million loan executed on May 11, 2011.[14]  Both loans were subsequently paid back in full.

Generally, as set forth in 2B1.1, loss is calculated as, "the greater of actual loss or intended loss".  The Commentaries to this provision define "actual loss" as the "reasonably foreseeable pecuniary harm that resulted from the offense", and "intended loss" as the "pecuniary harm that the defendant sought to inflict".  Commentary 3(a)(i)(ii).

In cases involving the bribery of a public official (as here), 2C1.1 applies.  In relevant part, this provision instructs as follows:

> If the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the Government from the offense, whichever is greatest, exceeded $6,500, increase by the number of levels from the table in §2B1.1 corresponding to that amount.

These Guidelines require the Court to adopt one of three measures of loss/gain – *either*: (1) the value of the payment or thing of value obtained by the public official; (2) the value of the benefit bestowed upon the bribe payor; or (3) the loss to *the Government* (not a third party).  Notably, the Guidelines do not allow a Court to combine such categories.  As such, Probation is clearly wrong when it *combines* the value of Linda's salary with the purported value of the benefits received by Singh.

Moreover, as the Application Notes make clear, the "benefit received . . . in return for the payment" includes only the "net benefit" obtained by the bribe payor; it is not measured in terms

---

[14]    At trial, Government witness Sinnreich conceded that these loans were different than the NDH loans in that they were not direct guaranties which would have violated the New York State Constitution.

of "gross benefit."  *See* Application Note 3 (explaining that, in the case of a bribe to obtain a "$150,000 contract on which $20,000 was profit . . . the value of the benefit received is $20,000").

Finally, in relevant part, Application Note 7 of 2C1.1 instructs that, "where . . . the value of the benefit cannot be determined, the value of the bribe is used because it is likely that the payor of such bribe expected something in return that would be worth more than the value of the bribe".

### A.    The Madison Loans

It is undisputed that the *Government sustained no losses* in connection to the Madison loans.  In short, the Town of Oyster Bay did not extend a loan to Harendra Singh -- the private entity Madison Bank extended the loan (which was, in any event, paid back in full).

Because there is no governmental loss, the question then becomes, what was the "the benefit received . . . [by Singh] in return for the payment."  If Singh had bribed the bank itself to obtain a loan, then it might be fair to utilize the face value of the loan under § 2C1.1(b)(2).  But that is not the fact pattern here.  The thing which Singh purportedly "received in return for the payment" to Mangano was not the loan itself, but the Town's amendment of his existing concession agreement, in the form of an option (not a guaranty), pursuant to which the Town of Oyster Bay could, but was not required to, reimburse Singh's private lender upon default of his loan (which never occurred).[15]

In short, the "benefit" extended to Singh by the TOB was an amendment to his concession agreement (not a loan) and the "losses" incurred by the Town of Oyster Bay were nonexistent. While, perhaps, the Town's Amendment in the form of an *option* to reimburse Singh's lender upon default might have some theoretical value in a financial market, it cannot be credibly argued that the "net value" of such option would be equal to the face amount of the loans received by Singh. Notably, neither the Government nor Probation offers any lucid method of valuing this option.

Thus, as instructed by 2C1.1.(B)(2), the only permissible way to calculate loss as it relates to the Madison loans is the value of the payment received by Mangano.

### B.    NDH Loans

With respect to the NDH loans, the trial evidence was unequivocal that the November 19, 2011 and June 22, 2012 NDH loan amendments were wholly unrelated to the Madison loans,

---

[15]    Of course, Singh's receipt of this amendment to his concession agreement was only one part of Madison's decision to extend a loan to Singh.  As established at trial, Singh submitted extensive loan applications to Madison Bank (which were fraudulent), consisting of his personal and corporate books and records and tax returns in support of the request of these loans, material that was relied upon by Madison in its decision to extend the loan to Singh.

which occurred as a result of the April 28, 2010 meeting.  During that April 2010 meeting, participants discussed the possibility of <u>two loans</u>—*one* pertaining to Woodlands and *one* pertaining to TOBAY.  At no time did the parties discuss the possibilities of multiple *additional* loans.  The amendments authorizing those two Madison loans—which followed a template created by Rivkin Radler—were executed on June 9, 2010 and May 11, 2011.  Such amendments were authorized by the Town Board, by means of a specific resolution dated June 8, 2010.  *See* GX 535.  And that is where Mangano's "role" ended.

By way of contrast—the additional *NDH loans* did not occur until over a year later.  The Government introduced *no evidence* that Mangano was even aware of such loans, much less that he exerted official pressure to get them approved.  There was absolutely *no* testimony that Mangano was paid for any role in obtaining such loans, or that he even discussed them with Singh.  To the contrary, Singh himself testified that Edward Mangano had *no involvement* in such loans.

> Q. About a year after the Madison loan, there would be another amendment to your concession agreement and another loan with the company called NDH, correct?
>
> A. Yes.
>
> Q. And there's no Ed Mangano meetings, there's no involvement with Ed Mangano, correct?
>
> A. No.

TR 2041-2042.

Instead, the evidence established that these loans were corruptly drafted by Fred Mei, more than 18 months after Mangano's "involvement" ended, in exchange for a cash bribe of $25,000 in each instance.  TR 1542.  Such amendments were not reviewed or approved by Rivkin Radler, but instead by Harris Beach—Singh's *personal* law firm, which falsely purported to represent the Town of Oyster Bay.  TR 2872.  While the amendments relating to the Madison loans were authorized by the Town Board, the NDH loans were not.  Indeed, unlike the Madison loans, such amendments were never even filed in the Town Clerk's office as required.  TR 2871, 3018.  Rather, they were kept hidden in Fred Mei's office, and only discovered in 2015.  TR 3072.  Leonard Genova admitted that the terms of such documents were materially different than those authored by Rivkin Radler, and testified as to his belief that he must have signed such documents without reading them.  TR 3048-49.

In short—as the Government well knows—Edward Mangano had *no involvement* in such loans, received no payments in connection with them,[16] and never discussed them with either Singh or TOB personnel.  In fact, there is simply no evidence in the record that Mangano was even aware of such loans.  As such, under no theory can Mangano be responsible for these loans for Guidelines purposes.  And as noted above – even if Mangano *had been* involved in helping Singh to obtain such later amendments (he was not), the "net benefit" received from the Town would <u>not be</u> equal to the face value of loans.  Rather, it would be the value of the contractual amendments.

Finally, as with the Madison loans, it is undisputed that the TOB submitted *no losses* stemming from the NDH loans.  Notably, multiple courts have found NDH amendments crafted by Mei to have constituted *ultra vires* acts.  See *PHL Variable Ins. CO. v. Town of Oyster Bay*, 2017 WL 2371188 (EDNY, 5/30/17); *PHL Variable Ins. Co. v. Town of Oyster Bay*, 929 F.3D 79, 93 (2d Cir. 2019).

    **2.**      <u>**Mangano is Not Responsible for Guidelines Loss Purposes for the $233,000 Value of the OEM Emergency Food Contract and the $193,824 Bread and Rolls Contract**</u>

To begin with, the Guidelines are crystal clear – where it is alleged that a government contract was secured by bribery, the "net benefit" to the bribe payor is *not* the total value of the contract, but the profits earned by the bribe payor.  Probation is clearly wrong, as a matter of law, when it seeks to hold Mangano accountable for the *gross* amounts of the County contracts.

More importantly, Mangano was <u>acquitted</u> by the jury with regard to an alleged *quid pro quo* scheme regarding the two Nassau County contracts—the OEM Emergency Food Contract, and the contract to supply bread and rolls to the Nassau County Jail.  Thus, under present law, the Court would only be able to consider these events for sentencing purposes, if a determination was made that there was a preponderance of evidence in support of these charges.  As set forth above, and as revealed during trial, there was no such level of evidence.  To hold otherwise, one would have to ignore the wholesale acts of perjury engaged in by Singh concerning Mangano's purported involvement in these events.

It is worth noting that the long-criticized use of acquitted conduct to elevate a sentence may well be coming to an end.  As is known, the chorus to end this practice has been growing for years.

---

[16] It cannot be contended that Singh's continued paychecks to Linda Mangano after Mangano's April 2010 involvement with the TOB loan guaranty were in furtherance of obtaining Mangano's assistance on future TOB loan guaranties.  Singh testified that such continued payments were made in hopes of obtaining Mangano's assistance on any number of other, hypothetical issues which might come up.  Singh never testified that such continued payments represented "back pay" for Mangano's intervention to the TOB matter, or to obtain his future intervention with respect to that same matter.

Honorable Joan M. Azrack
March 1, 2022
Page 23

In fact, in *Jones v. United States*, 135 S.Ct. 8 (2014), Justice Scalia, joined by Justice Ginsburg and Justice Thomas, observed in his dissent addressing the use of acquitted conduct, as follows:

> Any fact that increases the penalty to which a defendant is exposed constitutes an element of a crime and must be found by a jury, not a judge.  We have held that a substantively unreasonable penalty is illegal and must be set aside.  It unavoidably follows that any fact necessary to prevent a sentence from being substantively unreasonable—thereby exposing the defendant to the longer sentence—is an element that must either be admitted by the defendant or found by the jury.  It *may not* be found by a judge . . . For years, however, we have refrained from saying so . . .  This has gone on long enough.

Moreover, members of Congress have also been actively seeking to end acquitted conduct sentencing.  Senate Bill 601 ("SB 601") was introduced in the 117th Congress (2021-20-22) by Senator Richard Durbin, Chairman of the Senate Judiciary Committee.  Titled the "Prohibiting Punishment of Acquitted Conduct Act of 2021," SB 601 seeks, *inter alia*, to amend 18 U.S.C. §3661 to prohibit any court of the United States from considering acquitted conduct for the purpose of determining the appropriate sentence, except for the purposes of mitigation.  This Act has also been introduced in the House of Representatives as House Bill 1621.  The proposed legislation has been endorsed by 24 organizations.

Accordingly, as a finding of a preponderance of evidence to support the acquitted Nassau County contracts counts would necessarily require crediting Singh's outrageous testimony on these issues—an exercise rejected by the jury—it is respectfully submitted that the value of these contracts – net *or* gross – should not be considered for Guidelines purposes.

**Ed Mangano's Life History, Which Has Been Characterized By Hard Work, Decency, And A Steadfast Commitment To Help Those For Whom He Served, Is Deserving Of This Court's Strongest Consideration.**

Ed Mangano is 60 years old, has been married to his wife Linda for 30 years, and has spent virtually his entire life in Bethpage.  Not surprisingly, he has never previously been the subject of a criminal complaint.  To the contrary, he has lived a remarkable life characterized by hard work, decency, and a commitment to help those for whom he has served.

Mangano was raised by his parents John and Rachel who, despite being in their 80s, attended both trials on a daily basis.  Mangano was raised in a supportive, loving, middle class

environment.  His father worked in a maintenance capacity at JFK Airport and was also an ironworker, while his mother was a homemaker who cared for Mangano and his two brothers.

Mangano graduated Bethpage High School.  Thereafter, he attended Hofstra University and graduated with a Bachelor of Arts Degree.  In 1987, he obtained a Juris Doctorate from Hofstra University School of Law, the first of his family to attend law school.  Notably, Mangano supported himself while attending college and law school by working as a janitor and a printer.

After graduating law school, Mangano opened his own legal practice, which he maintained for three years while also working as a printer in a small printing shop he established.  In 2001, Mangano became counsel with the Rivkin Radler firm, where he would remain until December 31, 2009, at which time he became County Executive of Nassau County.

Mangano's foray into politics began in 1996, when he was elected as a Nassau County Legislator.  Mangano would serve in the legislature for 14 years, successfully winning seven elections in a district that covered his hometown of Bethpage, and also South Farmingdale, Hicksville, Plainedge, Levittown, and Syosset.

 As is well chronicled, in 2010 Mangano surprisingly won election as County Executive by a razor thin margin over the heavily favored incumbent.  In 2014, Mangano was easily elected to a second term, winning nearly 60% of the votes.  As reflected by his popularity, by any objective measure, the Mangano administration was a success. The administration's innovative programs in the areas of, Community Policing to combat the heroin epidemic; reducing costs through public private partnerships; job creation, and environmental conservation, achieved statewide and national recognition.  Among the awards received by Mangano and his administration were the Citizens Campaign for the Environment; the New York League of Conservation Voters for a Greener Nassau; the Pine Barrens Society's Environmental Award; the Regional Leadership Award from Vision Long Island; the Annual National Council for Public-Private Partnership's Award for Waste Water Operation; the Congressional Award for Community Service; the Environmental Equinox Award for Outstanding Commitment for the Protection and Restoration of the Western Bays; the Excellence in Public Health Award from the National Association of County and City Health Officials; the New York State Local Government Performance and Efficiency Award; the 2014 Community Policing Award for the Department's efforts in fighting the heroin epidemic, and countless others.  Of course, Mangano's universally acclaimed leadership during Hurricane Sandy gave him well deserved national recognition.

Ed and Linda Mangano have two sons, Salvatore and Alexander.  Salvatore is a Nassau County Police Officer working as a Patrol Officer in the Second Precinct.  He resides with Ed and Linda in their Bethpage home.  Alexander is an Assistant District Attorney in the Bronx County District Attorney's Office.  Alex was married in April 2021, and he and his wife are expecting their first child this summer.  They reside in a rental home in Bethpage.

As set forth in the probation report, and as echoed by all those who know them, despite the enormous personal demands placed on public officials, the Mangano children were raised in a loving, supportive and caring environment by Ed and Linda.

Enclosed are numerous testimonials offered in support of Ed Mangano (Exhibit B).  They come from all walks of life—colleagues, clergy, political figures, neighbors and friends.  The truth is, we could have provided this Court with many binders filled with sincere testimonials of those whose lives have been positively impacted by Ed Mangano, while attesting to his humbleness and decency.  The enclosed letters are a powerful sampling, and are universal in describing Ed Mangano as a decent, kind, and honest public servant, neighbor, friend, and father.

Steven Schlesinger, Esq. is a partner at Jaspen Schlesinger LLP, and was counsel to the Nassau County *Democratic* County Committee for almost 40 years.  As such, he has represented democratic candidates in election matters and democratic elected officials in political controversies for decades.  He has also represented numerous governments on Long Island, including Nassau and Suffolk counties, and many towns, villages, and political subdivisions on Long Island.

Notably, Mr. Schlesinger represented Tom Suozzi in the recount of the election where Ed Mangano squeaked out a victory over Suozzi for County Executive by less than 1,000 votes.  Schlesinger offers powerful insight into the *actual* political landscape as it existed in 2010.  He notes that the Republican County Chair, Joe Mondello, could not find a candidate to oppose Tom Suozzi in the election as it was fait accompli that Suozzi would win.  As Ed Mangano "was the last man left in the room and not powerful enough to say no", Mangano was selected.

Pointedly, Schlesinger contrasts Ed Mangano in 2010 with John Venditto, the Oyster Bay Supervisor:

> In my opinion, Ed Mangano had no ability to cause John Venditto to do anything.  Unlike New York City, where the mayor has substantial power, the Nassau County Executive has no power to coerce a town supervisor to take any action other than to ask "pretty please".  Neither in the food chain of the republican party or in the power structure of the differing governments, county and town, could Ed Mangano have exerted pressure to convince John Venditto to approve the loan at issue. . . in my humble opinion, given my extensive knowledge of all the political players, it was impossible for Ed Mangano to have done anything more.

Schlesinger concludes by noting that he was not solicited by Ed Mangano to write his letter, but did so as he recognizes the injustice that has been done.

Louis J. Yevoli is a lifelong Democrat and former Supervisor of the Town of Oyster Bay. He writes of Mangano's "refreshing" quality of putting "partisan politics aside in the public's best

interest"—a fact he observed for years through interacting with Mangano. He notes that Mangano was always "courteous and responsive", and respectfully requests that the Court consider Ed's decades long positive service in fashioning an appropriate sentence.

John Ciampoli previously served as County Attorney in the Mangano administration. He counts Ed Mangano as a friend, and cites his gratitude for the opportunity Mangano gave him to serve the people of Nassau County. He describes Mangano as a "dedicated public servant . . . committed to doing what was right for the people who elected him. He was loyal and true to his friends. He repeatedly went out of his way to help others". Ciampoli notes his belief that his observations are objective because, after all, it was Mangano who would eventually terminate Ciampoli's appointment as County Attorney. Ciampoli cites numerous examples of Mangano's good nature and constant and daily efforts to go out of his way to help people. Prophetically, Ciampoli notes that his last words to Mangano as County Attorney were to, "be careful of the people around you who pretend to be your friends they will get you in trouble." In concluding, he describes Mangano as a good man who has lost everything, and been deeply punished. He pleads the Court for leniency.

Ed Ward has known Ed Mangano for nearly 20 years and served as a Deputy County Executive in the Mangano administration. He writes that he always found Mangano "responsible and of the highest ethical standards. He always worked well with interested groups and never compromised his values". He writes anecdotally of Mangano's compassion and caring during an illness suffered by Ward. He pleads for leniency.

Richard Turan is the former president of Briarcliff College, where Mangano served for a time as general counsel. He has known Mangano for decades and writes of "Ed's untiring devotion to the residents of Bethpage". Like others, he describes Mangano as "modest, trustworthy and caring.

Richard Rotanz served as the Nassau County Commissioner for Energy Management before Mangano became County Executive, and is a former captain in the New York City Fire Department. He was present with Mangano throughout the events of Super Storm Sandy and writes of Mangano's remarkable demeanor and leadership during these trying events.

Gary Krupp is the President of Pave the Way Foundation, an international not-for-profit, whose mission to open historic gestures between the world's religions. Krupp first met Mangano in 2009 and he describes their relationship as "personal and non-political". He writes that Mangano is a "positive and caring man who has quietly helped our mission from behind the scenes for no notoriety". In fact, Krupp writes that *today* Mangano is helping his foundation with a project designed to shed light on life saving efforts by clergy in Italy to save Jewish refugees during the Holocaust.

Honorable Joan M. Azrack
March 1, 2022
Page 27

Bishop Philip E. Elliot has served as the Senior Pastor of the Antioch Baptist Church in Hempstead for the last 26 years, and served as a Deputy County Executive of Nassau County Health and Human Services during Mangano's tenure.  As such, he worked "directly with Mangano in a personal and professional way".  He notes that his ten year relationship with Mangano has led to a "sincere spiritual connection".  He describes him as "warm, genuine, respectful and spiritual person", noting that they would often pray together before meetings, major decisions and events.  He adds that Mangano and his wife would frequently visit his church, particularly during Holy Week services.  He notes that he remains Mangano's friend and spiritual advisor.  He, too, appeals for leniency.

Rev. Derek Garcia is the Pastor at Generations Church in Copiague, New York, serves on the Board of the Long Island Hispanic Chamber of Commerce on Health, and serves as the Nassau County Police Chaplain.  Garcia writes that he came to know Ed Mangano when he was running for County Executive, and was proud to be present at both of his inaugurations.  He notes that Mangano would be present "in every event in which we served the humble communities around us".  He describes Mangano as a "gentlemen to our community" and he requests leniency from the Court.

Numerous leaders and clergy from the Hispanic community offer their support.  Gil Bernardino is an immigrant teacher from Spain, and has known Mangano for more 20 years.  He is the Executive Director of Circulo de La Hispanidad, a non-profit organization and community center in Long Beach and the Evergreen Charter School in Hempstead, New York. He writes of Mangano's year's long support of him and his community, and describes him as a compassionate man with a big heart.  The Rev. Carlos Luis Vargis is the Senior Pastor of the Freeport Bible Center, the presiding Apostle of the Missionary Apostolic Network of N.Y., and the Executive Director of the Freeport Christian Academy.  He describes his years working with Mangano in support of the Latino community as a privilege, and notes that Mangano was "instrumental in bringing unity and fairness to our community," and notes that Mangano, "always was available to hear our concerns and act accordingly".

Margarita Grasing is the Executive Director of the Hispanic Brotherhood, Inc., a non-profit that provides services to the low income Latino population in Nassau County.  She describes the steadfast support given by Mangano to her causes during his tenure as County Executive.  She notes that "Ed has always been supportive to our community.  I have a friendly relationship with both Ed, and his lovely wife Linda".  She prays for leniency.

The Rev. Jose Chaver is the pastor of a Christian church in Elmont.  He, too, notes of Mangano's steadfast commitment to his church and community.  As stated by Rev. Chaver:

> Seeing him make an appearance to various church hosted events was evidence of his servitude and support to Hispanic pastors and

churches.  His request for our prayers in his office will surely be unforgettable for all of us.

Rev. Salvatore Garcia is the Pastor of a Hispanic Church in Glen Cove, and writes of his ten year friendship with Ed Mangano.  He notes that Mangano was "instrumental in many of the things we accomplished for those without a voice in our different communities".  He notes that Mangano, "never wanted to take any credit or use our gatherings as a photo op for his own political gain.  I found that amazing in a world of big egos".  He humbly requests mercy from the Court. And, Edward Melendez has been the Senior Pastor at a Hispanic Christian Church in Hempstead for 16 years.  He notes that he, along with a number of his fellow local pastors, met once a week for prayer with Mangano.  He notes that Mangano always remembered to ask about his family and his ministry.  Tellingly, he adds, "to be honest, there are not many politicians that I would write a letter for, but Ed Mangano is definitely an upstanding man of character and it is with honor that I stand for him on his behalf and write this letter".

Longtime friends and neighbors offer their support.  Robert Essig and his family have lived down the block from Ed and Linda Mangano for nearly 30 years.  Together, they have "raised children, shared holidays and went on many vacations together".  He describes Mangano's beginning in politics as being borne of a "genuine desire to help people".  "Ed was never too busy. Ed always took the call.  Ed would follow with some words of advice, or a phone number for someone who could help . . . Ed's position was never more important than the people he represented".  He notes that he remains "proud to call Ed my friend".

William Brady has been a Bethpage resident for more than 20 years and writes of Mangano's steadfast commitment to the betterment of the lives of his fellow residents.  He asks that the Court judge Mangano on the totality of his life, and not these isolated events.  William's wife, Susan, shares these sentiments in seeking leniency.

Finally, enclosed are moving letters authored by Mangano's sons, Alex and Salvatore. Alex presently serves as an Assistant District Attorney in Bronx County.  He writes that:

> All my life my parents have instilled within my brother and myself the importance of giving back to the community and helping others whenever possible, and that is what both my parents have done their entire lives.

He writes of his earliest childhood memories of walking door to door in his community with his father to find out "what the issues were and how he could help solve them".  He also writes:

Honorable Joan M. Azrack
March 1, 2022
Page 29

> I have never met a more dedicated and hardworking man in my life, and I can only aspire to have half the work ethic he does.  I will aways be proud of my dad and all the good things he has done for so many people.  He has been, and continues to be a loving father and good person.

Salvatore Mangano is a Nassau County Police Officer, and he notes that "the reason I am the man I am today and the reason I have accomplished all the things I have done so far in my life is all due to my parents".  He writes that, "my parents have always told me to keep my head high and never, ever give up.  They taught me that family and friends are what is most important and they always made me realize the importance of being kind, giving and compassionate to others".  He begs the Court to be merciful and compassionate.

Finally, I enclose a moving and commendable letter authored by Ed Mangano.  Mangano does not write seeking the Court's compassion concerning himself.  As he correctly notes, he is innocent and his fight for full exoneration will continue.  Instead, he writes seeking compassion and leniency for his wife, Linda, a woman who, "has already served an undeserved six year sentence of enormous emotional distress, humiliation and ruin."

## Conclusion

It is impossible to overstate the punishment which has already been inflicted upon Ed Mangano.  There are few life events which match the crushing pressure realized by an accused at trial.  Ed Mangano had endured *two trials*, spanning months of courtroom testimony and weeks of jury deliberation.

In the seven years since the commencement of this investigation, Ed Mangano has lost virtually everything.  His political career and boundless future has been lost.  His law license has been taken away, virtually all of his assets are gone, and his good name vanquished—all because 12 years ago a phony friend of 25 years asked him to show up at a meeting over which he had no ability to impact.

It is respectfully submitted that, based upon the facts of this case, the narrowness of the jury's verdict, and the enormity of the real life punishment already inflicted upon Ed Mangano, substantial leniency is warranted.

Honorable Joan M. Azrack
March 1, 2022
Page 30

Thank you for your consideration.

Very truly yours,

/s/ *Kevin J. Keating*

KEVIN J. KEATING
MATTHEW W. BRISSENDEN
*Attorneys for Edward Mangano*

KJK:dg
Enclosures

cc:   AUSA Christopher Caffarone
      AUSA Catherine Mirabile