# EXHIBIT A

# LAW OFFICE OF KEVIN J. KEATING, P.C.

Kevin J. Keating, Esq.

Counsel:
Stefani Goldin, Esq.

666 Old Country Road, Suite 900
Garden City, New York 11530

T: (516) 222-1099
F: (516) 745-0844

MANHATTAN OFFICE
BY APPOINTMENT
T: (212) 964-2702

February 16, 2021

**Via Email**

Lisa A. Langone
Senior United States Probation Officer
United States Department of Probation
Central Islip, New York 11722

      Re: United States v. Edward Mangano
         Docket No. 16-CR-00540 (S-2) (JMA)

Dear Probation Office Langone:

  As you are aware, I am attorney for Edward Mangano in the captioned matter. I write to register objection to the content of the Presentence Investigation Report you prepared in this matter dated December 2, 2019, as set forth below:

**Paragraph 11**

  The PSR notes that Mangano served as a Nassau County Legislator between 1996 and 2000. In fact, Mangano served as a Nassau County Legislature from 1996-2009.

**Paragraph 13**

  This paragraph omits the following relevant facts:

- Each of these extensions were negotiated by Singh and the Town of Oyster Bay without any involvement of Edward Mangano. Each of these extensions contained terms which were extraordinarily favorable to Singh, including the fact that Singh eventually was awarded a Concession Agreement at the Woodlands with a *70 year term*. Throughout the time that Singh negotiated these extraordinary terms, he was engaged in a years' long bribery scheme with his closest friend, Deputy Town Attorney Frederick Mei; Deputy Supervisor Leonard Genova, and other members of Town of Oyster Bay government. And, throughout Singh's tenure at the Town of Oyster Bay, during which time his TOB facilities brought in extraordinary revenue, the Town of Oyster Bay *never* exercised their right to convert Singh's well-below monthly rent, to a percentage of his huge profits.

Law Office of Kevin J. Keating, P.C.
February 16, 2021
Page 2

### Paragraph 14

The PSR omits the following relevant facts:

- Singh obtained this contract after the bid was rigged by officials within the Town of Oyster Bay to ensure that Singh would be awarded the contract.

- Each of these extensions were negotiated by Singh and the Town of Oyster Bay without any involvement of Edward Mangano. Each of these extensions contained terms which were extraordinarily favorable to Singh, including the fact that Singh eventually was awarded a Concession Agreement at the Woodlands with a *50 year term*. Throughout the time that Singh negotiated these extraordinary terms, he was engaged in a years' long bribery scheme with his closest friend, Deputy Town Attorney Frederick Mei, Deputy Supervisor Leonard Genova, and other members of Town of Oyster Bay government. And, throughout Singh's tenure at the Town of Oyster Bay, during which time his TOB facilities brought in extraordinary revenue, the Town of Oyster Bay *never* exercised their right to convert Singh's well-below monthly rent to a percentage of his huge profits.

### Paragraph 15

The PSR omits the following relevant facts:

- Each of these extensions were negotiated by Singh and the Town of Oyster Bay without any involvement of Edward Mangano. Each of these extensions contained terms which were extraordinarily favorable to Singh, including the fact that Singh eventually was awarded a Concession Agreement at the Woodlands with a 70 year term. Throughout the time that Singh negotiated these extraordinary terms, he was engaged in a years' long bribery scheme with his closest friend, Deputy Town Attorney Frederick Mei; Deputy Supervisor Leonard Genova, and other members of Town of Oyster Bay government. And, throughout Singh's tenure at the Town of Oyster Bay, during which time his TOB facilities brought in extraordinary revenue, the Town of Oyster Bay never exercised their right to convert Singh's well-below monthly rent, to a percentage of his huge profits.

- Edward Mangano had no involvement in these events. Singh was the only bidder in connection with these concession agreements as the bid was rigged in favor of Singh. Extraordinarily, the contract, indeed, required Singh to perform $1 million in capital improvements, but it did not require Singh to engage in the actual improvements by any date certain. It is worth noting that the Tappan Beach concession *was for a 50 year term*, thus Singh could have provided said improvements 49 years after signing the agreement.

Law Office of Kevin J. Keating, P.C.
February 16, 2021
Page 3

### Paragraph 16

This paragraph contains a number of errors and material omissions. First, the paragraph omits the fact that in 2003, seven years before Edward Mangano became County Executive, Singh obtained financing from a lending institution secured against one of Singh's Town of Oyster Bay concession agreements. In short, the Town of Oyster Bay already had agreed to back one of Singh's loans *seven years* before Edward Mangano became County Executive.

Next, the paragraph incorrectly states that, "Singh secured approximately $20 million via four loans, each of which were indirectly guaranteed by the TOB". The accurate facts are as follows: Singh's initial $1.5 million credit line was not guaranteed by the Town of Oyster Bay, as the trial testimony unequivocally revealed that this loan fully comported with the provisions of the New York State Constitution. Notably, this loan was paid back in full. Singh's second loan of $3.5 million, likewise, was not guaranteed by the Town of Oyster Bay. However, with regard to this loan, Frederick Mei had secretly changed the anticipated loan amount from $2 million to $3.5 million prior to securing the signature of Town of Oyster Bay officials.

The next two loans, $7,843,138 and $12,273,748 were unequivocally guaranteed by the Town of Oyster Bay, thus, were unenforceable as they violated the provisions of the New York State Constitution. Moreover, both of these loans were signed by Leonard Genova in his capacity as Deputy Supervisor of the Town of Oyster Bay. Genova, who was bribed by Singh for many years, testified under oath that when he signed these loans *he didn't read them and didn't know what they were*, even though his signature line on the documents appeared approximately one inch above the signature of Harendra Singh, his close friend. Finally, both of these loans were supported by Opinion Letters by the law firm of Harris Beach, who purported to be acting on behalf of the Town of Oyster Bay, yet, in reality the Town of Oyster Bay never retained Harris Beach and never paid Harris Beach. Instead, Harendra Singh paid Harris Beach for providing the Opinion Letters.

### Paragraph 17

This paragraph contains a number of inaccuracies as set forth below:

- The report states that, "Edward Mangano assured Singh that the TOB would back the loans". This is not true.

- The report notes that, "In January 2010 Edward Mangano called TOB Supervisor Venditto and explained that without the TOB backing, Singh would be unable to perform the capital improvements. During the call, and again approximately one week later at an event, Venditto agreed that the TOB would act as a guarantor on the loan". This is not true.

- The report notes that, ". . . Edward Mangano agreed to have additional legal counsel find a way for the TOB to guaranty the loan. On April 13, 2010, Edward Mangano

Law Office of Kevin J. Keating, P.C.
February 16, 2021
Page 4

called his former law firm, Rivkin Radler, and asked attorney William Savino to find a way for the TOB to guaranty Singh's loans." This is not true. The Rivkin law firm was well known to the Town of Oyster Bay and to John Venditto and Leonard Genova. In fact, the Rivkin firm, with William Savino as lead counsel, was representing the Town of Oyster Bay in a long running litigation matter at the time of these events. The first call that was placed to the Rivkin firm *by the Town of Oyster Bay* was on April 8, 2010. Subsequently, Leonard Genova called the Rivkin law firm to secure their legal services in connection with this matter. This fact is borne out by the fact that a message was left at the Rivkin firm by Leonard Genova on April 13, 2010, and handwritten notes taken by William Savino which clearly referenced a detailed conversation with Leonard Genova concerning this matter, which precisely matched Savino's billing entries concerning a conversation with Genova.

**Paragraph 18**

This paragraph contains a number a number of inaccuracies as set forth below:

- Your report notes that the April 28, 2010 meeting was held "at the behest of Edward Mangano". This is false. Singh himself testified that the meeting had been set up by Richard Porchelli, and that Singh had simply requested that Edward Mangano stop by.

**Paragraph 19**

This paragraph contains a number of inaccuracies. (See objections to paragraph 16 set forth above).

**Paragraph 20**

Your report notes that the Town of Oyster Bay remains in litigation regarding the loan balances due and owing from the NDH loans. Since your report issued, these litigations have ended, as several judicial opinions have uniformly held that the Town of Oyster Bay is not liable for these default amounts as the Agreements are unenforceable due to the fact that (1) the Oyster Bay Town Board never approved these loans (instead, as noted above, Leonard Genova signed these agreements without reading them and never presented them to the Town Board), and (2) these loans were directly guaranteed by the Town of Oyster Bay, in violation of the New York State Constitution.

**Paragraph 21**

Your report notes that the government believes that there is a preponderance of evidence in support of Mangano being responsible for the "Nassau County contracts". The government is wrong.

Law Office of Kevin J. Keating, P.C.
February 16, 2021
Page 5

### Paragraph 23

This paragraph contains a number of material omissions and inaccuracies as set forth below:

- At trial, Harendra Singh offered the perjurious testimony that, in approximately November 2010, he went to the home Edward Mangano with a box of cookies from his small bakery which Mangano and the Nassau County Sheriff Michael Sposato sampled, which resulted in Mangano volunteering, "I have to get you the Bread and Rolls contract for the Nassau County Jail". Of course, the Bread and Rolls contract involved the supplying of thousands of loaves of white bread, and is customarily supplied by a commercial bakery. Singh had recently purchased the small storefront bakery which had one baking oven. Next, Singh offered the perjurious testimony that, following the purported November 2010 meeting, he held approximately 30 meetings over a period of a year and a half with Sheriff Michael Sposato in his years long quest to obtain the Bread and Rolls contract. Yet, it was established by the defense at trial that the existing Bread and Rolls contract could have been cancelled *at any time* by Nassau County, which never occurred. Thus, had there been an ongoing effort by Nassau County to award this contract to Singh, it could have been done in 2010 or 2011. At trial, Singh further offered the testimony that based upon his dozens of meetings with Sposato purportedly about the Bread and Rolls contract, he knew "everything there was to know about the bid for the contract". Yet, it was established by the defense that, in 2012, when Nassau County released the bid online, Singh had to contact a friend to learn how to download the bid (of course, he had not been given advance notice by Sposato, nor had he been given a copy of the bid). In a remarkable display of perjury, when confronted with this fact at trial, Singh offered the false assertion that the online bid which he sought to download was "another Nassau County food contract".

- By law, and under the terms of the Nassau County Bread and Rolls bid itself, all bids could be split into separate parts by line item. Moreover, no vendor was permitted to submit a proposed bid at variance with the terms of the bid. The bid submitted by San Remo Bakery was *lower* than Rockland's bid with regard to a number of items. Moreover, San Remo offered a faster delivery time than Rockland which, under the terms of the bid, was a "tiebreaking" factor. Finally, Peter Schmidt, the Presiding Officer of the Nassau County Legislature, and the Head of the Rules Committee of the Legislature, which awards these bids, had an ongoing policy of, when legally possible, choosing a Local Vendor to supply on Nassau County contracts. San Remo was a local vendor, Rockland was not.

Law Office of Kevin J. Keating, P.C.
February 16, 2021
Page 6

### Paragraph 24

This paragraph contains a number of inaccuracies and material omissions as set forth below:

- See our response to paragraph 23 above.

### Paragraph 25

This paragraph contains a number of inaccuracies and material omissions as set forth below:

- See our response to paragraph 23 above.

### Paragraph 26

This paragraph contains a number of inaccuracies and material omissions as set forth below:

- See our response to paragraph 23 above.

### Paragraph 27

This paragraph contains a number of inaccuracies and material omissions as set forth below:

- See our response to paragraph 23 above.

### Paragraph 28

This paragraph contains a number of inaccuracies and material omissions as set forth below:

- The Office of Emergency Management was located less than three miles from Singletons, a restaurant/catering facility owned and operated by Harendra Singh. Harendra Singh committed perjury at the initial Mangano trial, and the second Mangano trial, by repeatedly testifying that Singletons lost all power during Hurricane Sandy. This was false, as was known by the Government. In fact, one of Singletons large kitchen facilities never lost power throughout Hurricane Sandy.

- Hurricane Sandy was one of the largest disasters ever to hit Long Island. Hundreds of thousands of people were without power for days, and the South Shore of Long Island was flooded. Thousands of relief workers poured into Long Island to assist in the disaster, and were headquartered at the OEM Facility in Bethpage. For the

Law Office of Kevin J. Keating, P.C.
February 16, 2021
Page 7

      first few days of the relief operation, as was customary, food for the relief workers was supplied by the Nassau County Jail. Neither Nassau County, nor Edward Mangano, had any role in the stoppage of this supply. Instead, a New York State supervisor halted the jail's production of food as it was unsanitary. With this, a replacement facility had to be urgently located. During a declared emergency, *any vendor* who could best supply may be chosen. Dover was a previously registered vendor with Nassau County. Yet, at the time that the jail food system was halted, the Dover facility (1) had no power; (2) was in the flood zone, and (3) was located 14 miles from OEM. Singletons was located three miles from the Office of Emergency Management, was not in the flood zone, and, as noted, never lost power.

- John McGuire, referenced in the PSR, repeatedly sought to have Dover supply the food. As was revealed by the defense during trial, John McGuire had a preexisting relationship with Dover's owner, Butch Yamali.

- Prior to trial, Singh proffered to the Government that he obtained the Emergency Contract through the efforts of Craig Craft (the head of OEM who signed the purchase orders) and Larry Eisenstein, the head of the Health Department. Both of these individuals had previous relations with Singh.

### Paragraph 29

This paragraph contains a number of inaccuracies and material omissions, as set forth below:

- See our response to 28 above.

### Paragraph 30

This paragraph contains a number of inaccuracies and material omissions as set forth below:

- Your report notes that, "Singh compensated Edward Mangano for exerting his influence with travel expenses, items and improvements for Ed Mangano's home, jewelry, discounted catering services, free meals at Singletons Restaurant and, as detailed further below, a salary for Linda Mangano". This is false as set forth below.

- Singh did not compensate Edward Mangano for exerting his influence. Singh *hoped* that Edward Mangano would exert unlawful influence to the benefit of Harendra Singh, which did not occur. For instance, one of Harendra Singh's companies registered as a Nassau County vendor in April 2010. Singh repeatedly proffered to the Government that Singh registered this vendor in the hope of obtaining the lucrative Nassau County requirements contract, which he never

obtained. In fact, Singh further proffered that, had he hired Robert Walker's wife, he would have done better in Nassau County. Moreover, in 2015, Singh was overheard on a recorded conversation with his closest confident and accomplice Frederick Mei stating, on three occasions, "I never got anything from Edward Mangano, in fact, he cost me money". Moreover, as established at trial, Nassau County Government has a system wherein contracts can be awarded to vendors in amounts under $25,000 without any legislative approval. In fact, an individual can receive such a contract four times annually, and they were routinely awarded in Nassau County for a variety of seemingly unnecessary services. During the entirety of Edward Mangano's eight year tenure, neither Singh, nor any of his dozens of entities, received a single Nassau County contract. The only thing Singh ever received from Nassau County, was the temporary Emergency Food Service contract stemming from his restaurant/catering facility being located three miles from the Office of Emergency Management. It should be noted that Singh repeatedly advised the Government in proffers that he obtained this contract as a result of the efforts of Craig Craft, the Head of OEM, and Larry Eisenstein, the Head of the Nassau County Department of Health. Both of these individuals were close to Harendra Singh.

### Paragraph 31

This paragraph contains a number of inaccuracies and material omissions as set forth below:

- Singh repeatedly advised Edward Mangano that these trips were, for Singh, free, as a result of a vast amount of "points" he had accumulated stemming from the use of his business credit cards associated with his various restaurants. For each of these trips, the Mangano's spent their own money, never once inappropriately utilizing campaign funds. And, the summary of trips in the PSR omits the fact that, for one these trips, Singh's costs included his brother's entire family, who also attended the trip.

### Paragraph 32

This paragraph contains a number of inaccuracies and material omissions as set forth below:

See 31 above.

### Paragraph 33

This paragraph contains a number of inaccuracies and material omissions as set forth below:

See 31 above.

Law Office of Kevin J. Keating, P.C.
February 16, 2021
Page 9

### Paragraph 34

This paragraph contains a number of inaccuracies and material omissions as set forth below:

See 31 above.

### Paragraph 35

This paragraph contains a number of inaccuracies and material omissions as set forth below:

See 31 above.

### Paragraph 36

This paragraph contains a number of inaccuracies and material omissions as set forth below:

- At trial, Singh initially testified that all invoices from his company were from a premade template. However, in reviewing the invoice for $57,766.20 which he claimed legitimately set forth Mangano's campaign expenses at Singh's facilities, at trial Singh confirmed that it was replete with misspellings and inaccurate information, including misspelling his own business address and providing the wrong zip code for his own office. In short the $57,766.20 invoice was not legitimate.

- With regard to the custom made chair purchased by Singh, your report omits the fact that Singh perjured himself at trial concerning this issue. Specifically, Singh offered the testimony that, shortly after Edward Mangano was elected to the position of County Executive, he presented Harendra Singh with a picture of an office chair and stunningly stated "buy this for me". His preposterous testimony was revealed to be perjury when Singh was confronted with emails between him and the interior designer in which Singh is asking his designer about furniture that he wished to obtain for Mangano's office.

### Paragraph 37

This paragraph contains a number of inaccuracies and material omissions as set forth below:

- Edward Mangano never told Harendra Singh that he would have "additional legal counsel find a way for the TOB to act as a guarantor for the loans". Among other

Law Office of Kevin J. Keating, P.C.
February 16, 2021
Page 10

things, in April 2010, Edward Mangano had been County Executive for four months, and John Venditto had been effectively acting as Supervisor for the Town of Oyster Bay for more than a decade, during which the Town of Oyster Bay had accommodated Singh at every turn owing from Singh's systematic acts of bribery to various Town of Oyster Bay officials. As conceded by Singh at trial, the Town of Oyster Bay *had never said no to Singh*.

- In point of fact, Linda Mangano's first payment *was two days after* Harendra Singh registered his company as a vendor with Nassau County in the hope of securing the requirements contract. As noted, Singh never got the contract.

**Paragraph 38**

This paragraph contains a number of inaccuracies and material omissions as set forth below:

- Singh committed perjury during his testimony concerning the massage chair. Trial evidence revealed that when the massage chair arrived at Edward Mangano's home, it was accompanied by a note reading "Happy Birthday". At the same time, The Water's Edge, Singh's restaurant located in Long Island City, was hosting a high-end campaign fundraiser in celebration of Edward Mangano's 50th birthday. When confronted with this fact at trial, Singh offered the false testimony that the chair had nothing to do with the fundraiser *being hosted at his restaurant*. Instead, he called the Happy Birthday note accompanying the chair a "code" for bribe, while at the same time, claiming that it was just a coincidence that the chair arrived at the same time as the fundraiser, as he was uninvolved with the fundraiser (at his restaurant). Singh's testimony was revealed to be perjury when Singh was confronted with internal communications at his restaurant which revealed that Singh was instrumental in the decision making and planning of the 50th birthday fundraiser for Mangano at his restaurant.

**Paragraph 39**

This paragraph contains a number of inaccuracies and material omissions as set forth below:

- Since your initial PSR issued, revelations undermining the credibility of the vendor noted in paragraph 39 have come to light. These revelations are contained in documents which are filed Under Seal. Moreover, it is worth noting, that the internal documentation of this vendor offered as exhibits at trial by the Government contained a number of inconsistencies.

Law Office of Kevin J. Keating, P.C.
February 16, 2021
Page 11

### Paragraph 40

This paragraph contains a number of inaccuracies and material omissions as set forth below:

- With regard to the watch, in point of fact, the trial evidence revealed the Mangano asked Singh to buy his son a watch for his 18th birthday as Mangano was working virtually 24 hours a day at the time at OEM during Hurricane Sandy, and because Singh's close friend, Kamlesh Meta, owned a family jewelry business. Critically (and omitted from your report), as revealed in trial testimony, Mangano gave Singh a budget for the watch and compensated Singh for the watch. It was Singh, without knowledge of Mangano at the time, who exceeded the budget price.

### Paragraph 41

This paragraph contains a number of inaccuracies and material omissions as set forth below:

- It is incorrect that there were several conversations between Edward Mangano and Singh with regard to a salary for Linda Mangano. Harendra Singh set the salary. The PSR also states that, "it was expected that the salary would entail little to no work to be performed". This is not true.

### Paragraph 53

This paragraph contains a number of inaccuracies and material omissions as set forth below:

- It is entirely incorrect that "during the time period in question Edward Mangano caused TOB officials to modify existing concession agreements with Singh, thereby indirectly guaranteeing $20 million in loans sought by Singh". (See responses above).

### Paragraph 54

This paragraph contains a number of inaccuracies and material omissions as set forth below:

- It is inaccurate that Edward Mangano used his position to exert pressure with regard to the Bread and Rolls contract, and the emergency food contract during Hurricane Sandy.

Law Office of Kevin J. Keating, P.C.
February 16, 2021
Page 12

### Paragraph 97

- Your report notes that Mangano's son, Salvatore, is a jeweler. Since the issuance of your initial report, Salvatore has become a Nassau County Police Officer.

### Paragraph 108

- Your report notes that Edward Mangano is unemployed. Since the issuance of your initial Presentence Investigation Report, Mangano has obtained employment at Oheka Castle. Mangano timely notified Pretrial Services of this employment and has supplied his paystubs Pretrial Services. His annual gross income at Oheka is approximately $88,000.

### Paragraph 138

- Your report notes, generally, that as a result of his felony conviction, Mangano faces a potentially broad range of collateral consequences. I note that, prior to his conviction in the instant matter, Mr. Mangano was a licensed attorney in the State of New York. Upon his conviction, he was automatically disbarred.

### Your Guidelines Calculations

### Paragraph 69

The PSR accords Mangano a two level increase pursuant to Guidelines 2C1.1 (b) (1) premised upon the contention that, "the defendant accepted multiple bribes from Singh in exchange for assistance in arranging the TOB to act as guarantor of four loans and obtaining (sic) Nassau County contract". I register objection to this increase as set forth below:

To begin, the evidence at trial was unequivocal that Mangano's last act remotely related to the TOB matter, was his attendance at an April 28, 2010 meeting hosted by Town of Oyster Bay Supervisor John Venditto; chaired by Mr. Venditto, and held in Mr. Venditto's office. Witnesses describe Mangano arriving late to this meeting, standing against a wall (while the group sat around a conference table headed by Mr. Venditto), and either saying nothing or, at most, stating "Let's see if we can help out our friend". At the time of this meeting, Ed Mangano had been Nassau County Executive for approximately four months, while John Venditto had been running the Town of Oyster Bay for more than a decade. The discussion at the meeting apparently centered upon Singh's effort to obtain funding from a private lender in the form of a $1.5 million line of credit. The trial evidence revealed that subsequent to this meeting attorneys at Rivkin Radler were able to construct a lawful, appropriate agreement which fully comported with the New York State Constitution in which TOB had the *option* (if they chose) to reimburse Singh upon default-a reimbursement which could then be assigned to the lender. Thereafter, Singh obtained a $1.5 million line of credit in June 2010 with Madison Bank—which was subsequently paid back in full.

Law Office of Kevin J. Keating, P.C.
February 16, 2021
Page 13

As referenced above, Singh subsequently obtained multiple loans from lenders stemming from his corrupt relationship with Frederick Mei; Leonard Genova, and the Harris Beach law firm. Approximately one year after the $1.5 million Madison line of credit closed, Singh obtained a $3.5 million loan from Madison Bank which was supported by an agreement by the Town of Oyster Bay which similarly gave the Town the *option* (not a guaranty) to provide funding upon default. Unbeknownst to Town of Oyster Bay Supervisor John Venditto, Frederick Mei had unilaterally changed the term of the Town's option in support of Singh from $2 million to $3.5 million. In 2011, and 2012, Singh obtained additional loans totaling approximately $20 million from NDH Capital. These loans were vastly different from the two prior in that they were unequivocally guaranteed by the Town of Oyster Bay and, thus, unenforceable as they violated the provisions of the New York State Constitution which bar a municipality from guarantying a private loan. Moreover, these loans were never approved by the Oyster Bay Town Board. Instead, Leonard Genova, in his capacity as Deputy Supervisor of the Town of Oyster Bay, signed these agreements while offering the preposterous trial testimony that "he never read them". Notably, Mr. Genova was bribed for years by Harendra Singh. And, Frederick Mei received $25,000 cash from Singh upon the closure of each of these loans. Finally, each of these loans was supported by Opinion Letters from the Harris Beach law firm, who purportedly was acting at the behest of the Town of Oyster Bay. In reality, Harendra Singh paid the Harris Beach to write the fraudulent opinion letters.

In short, while we believe Mangano's attendance at the April 28th meeting was fully lawful and fell well short of constituting improper "formal government action", it is undeniable that his conduct ceased on April 28, 2010. The trial evidence revealed Mangano to be utterly uninvolved in Singh's attempt to obtain the $3.5 million Madison loan, and the subsequent NDH loans. And, as noted, Mangano was acquitted of unlawful conduct related to the 2012 Emergency Food Contract, and the 2013 Bread and Rolls Contract.

With this, it is incorrect that Mangano received "*multiple bribes* from Singh in exchange for assistance in arranging the TOB to act as guarantor of four loans and obtaining (sic) Nassau County contract". While we strongly disagree with the jury's verdict, it reflected a single bribe— the employment of Linda Mangano which began in April 2010. Thus, the multiple bribe enhancement does not apply.

**Paragraph 70**

The PSR accords Mangano a 20 level enhancement pursuant to 2b1.1(b)(1)(K). As set forth below we object to this enhancement on multiple grounds.

To begin, you arrive at this enhancement by *adding* the $20 million in loans that Singh, purportedly, would otherwise been unable to obtain; the value of the Bread and Rolls Contract ($193,824); the value of the OEM Emergency Food Contract ($233,000), and the value of the gifts, services and bribes purportedly received by Mangano ($530,000). (PSR ¶70) However, the plain language of 2C1.1(b)(2) instructs as follows:

Law Office of Kevin J. Keating, P.C.
February 16, 2021
Page 14

> If the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense, *whichever is greatest*, exceeded $6,500, increase by the number of levels from the table in 2B1.1 corresponding to that amount (emphasis supplied).

In short, the guidelines instruct that the greatest of these sums are to be used, not the cumulative total. Thus, the methodology employed in the PSR is incorrect.

With this, we turn to the issue of which of these sums, if any, are to be used.

On multiple grounds, the use of the loan amounts obtained by Singh from private lenders to calculate an enhancement under 2B1.1., is impermissible under 2C1.1(B)(2). First, as detailed above, Mangano's "involvement" in the TOB matter ended on April 28, 2010 when he briefly attended a meeting at John Venditto's office. Discussed at the meeting was whether the TOB could back in some form a $1.5 million loan sought by Singh from a private lender. The trial evidence revealed Mangano to be utterly uninvolved in Singh obtaining private loans from lenders in the years that followed. Moreover, as set forth above, these subsequent loans were materially different from the initial $1.5 million loan obtained by Singh. Thus, under no analysis, can Mangano be held responsible under 2B1.1 for $20 million in loans obtained by Singh.

But the analysis goes deeper. As indicated above, in relevant part, 2C1.1(B)(2) instructs that for this count of conviction, the 2B1.1 loss table can be utilized by calculating "the benefit received or to be received in return for the payment—or the loss to the Government from the offense". First, the Government (the TOB) sustained no losses stemming from these loans. The TOB extended no loans to Singh following the meeting of April 28, 2010. Instead, Singh simply received from TOB an amendment to his existing Concession Agreement in the form of an option to reimburse upon default, as discussed above. This option was utilized by Singh in applying for $1.5 million line of credit from private lender Madison Bank. But, the option in his amended Concession Agreement was just one of countless documents submitted by Singh to Madison in seeking the line of credit. The trial evidence revealed that Singh submitted a full set of fraudulent financials and fraudulent tax returns to Madison in support of the request for the line of credit.

In short, the Government sustained *no losses* from the TOB matter, as Singh simply obtained from the TOB an amended Concession Agreement in form of an option by TOB to reimburse upon default.

Next, Singh received no "benefit" (see, 2C1.1(B)(2), above) from the amended Concession Agreement. As noted, the trial evidence revealed that this amendment was just one of many documents submitted by Singh in support of his line of credit with private lender Madison. Of course, a line of credit is a *liability* which, in this case, was repaid in full.

In short, under no permissible legal or factual Guidelines theory can Mangano be held responsible for $20 million in loans.

Law Office of Kevin J. Keating, P.C.
February 16, 2021
Page 15

       Thus, the only permissible manner under 2C1.1(B)(2) to calculate loss based upon the counts of conviction in this case is to utilize the value of Linda Mangano's salary (approx. $475,000).

### Paragraph 73

       You accord Mangano a 3 level increase pursuant to 3B1.1.(B) for supervising the participants in an offense that involved five or more participants. This is erroneous. Mangano was acquitted of all conduct related to the Nassau County contracts, and at trial there was not a preponderance of evidence in support of such charges. With regard to the TOB matter, Mangano supervised no one. At the time, Mangano was the County Executive of Nassau County, and had no supervisory authority over anyone in Town of Oyster Bay government.

### Paragraph 84

       With the adjustments set forth above, Mangano's total offense level is 32, not 45.

       Very truly yours,

       *Kevin J. Keating*

       KEVIN J. KEATING

KJK/dg