| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>EASTERN DISTRICT OF NEW YORK<br>------------------------------------------------------------------------X<br>UNITED STATES OF AMERICA,<br><br>       -against-<br><br>EDWARD MANGANO, and<br>LINDA MANGANO,<br><br>       Defendants.<br>------------------------------------------------------------------------X | For Online Publication Only<br><br><br><br>**ORDER**<br>16-CR-540 (JMA) |

**AZRACK, United States District Judge:**

In his sentencing submission, Defendant Edward Mangano ("Mangano") objects to the application of three sentencing enhancements. Mangano also raises various factual objections to his Presentence Report ("PSR"). Below, the Court addresses Mangano's objections to his PSR and to the three specific enhancements at issue.

In making my factual findings below, I have considered all the trial testimony, which I, of course, witnessed first-hand over the course of two trials. Additionally, I have considered all other materials relevant to sentencing, including: (1) Mangano's PSR dated December 2, 2019; (2) the Addendum to the PSR dated February 25, 2022; (3) the Second Addendum to the PSR dated March 29, 2022; (4) Mangano's sentencing submission dated March 1, 2022; (5) the Government's sentencing submission dated March 10, 2022; and (6) all materials and arguments cited in, and attached to, the sentencing submissions, including Mangano's objections to the PSR.

The facts set out in the PSR and the Addendum are premised, in part, on the testimony of Harendra Singh ("Singh"), whose credibility Mangano continues to vigorously challenge. After considering all of Mangano's arguments concerning Singh's testimony and credibility, I find

1

Singh's testimony to be credible and reliable as to: (1) all the relevant points set out in the PSR and (2) all the additional points of his testimony cited in the discussion below.

### A. Mangano's Factual Objections to the PSR

Unless otherwise noted below, I am adopting the PSR, as amended, and find that the points set out therein are sufficiently supported by credible, reliable, and accurate evidence.

Mangano's objections primarily challenge Singh's credibility and ask the Court to include, in the PSR, certain testimony and evidence that purportedly undermine Singh's credibility and other factual findings set out in the PSR. The Court finds that the facts set out in the PSR are supported by credible evidence from Singh, other witnesses, and the evidence introduced at trial. It is unnecessary to list every potentially relevant subsidiary fact in the PSR. The Court's January 6, 2022 Order denying Mangano's Post-Trial Motions ("January 6 Order" or "Jan. 6 Order") recounts much of the evidence in detail. The Court has considered all the evidence and notes that a number of the factual assertions set out in Mangano's objections to the PSR were already acknowledged in the January 6 Order.

It is unnecessary to separately address each of Mangano's factual objections, which, unless indicated otherwise below, are overruled. The Court briefly addresses some of Mangano's objections to specific paragraphs of the PSR. To the extent any paragraphs in the PSR warrant further amendment, clarification, or explanation, those paragraphs are addressed below.

#### i. Paragraph 16

The Court finds that the Madison Bank ("Madison") concession amendments and assignment agreements were indirect guarantees of the Madison loans. Not only did Thomas Gilmartin and Madison's counsel view the Madison documents as indirect guarantees by the Town of Oyster Bay ("TOB"), but the Court also finds that, on their face, the Madison assignment

2

agreements obligated the TOB to make millions of dollars in payments to Madison if Singh defaulted on the loans. (See also Jan. 6 Order at 90–92, 105.)

### ii. Paragraph 17

This objection is overruled. The Court's January 6 Order cited and recounted the testimony of Singh and Leonard Genova concerning the conversations with Mangano and John Venditto. The Court credits that testimony. Additionally, the Court credits the testimony of William Savino, Singh, and Genova concerning Mangano's intervention with Rivkin Radler. The Court agrees with Paragraph 17's account of this credible testimony.

### iii. Paragraph 18

The evidence showed that Mangano played a key role in setting up and organizing the critical April 28 meeting with Venditto and that this meeting occurred at Mangano's behest.

### iv. Paragraph 20

The Court acknowledges that the civil litigations involving the TOB loan guarantees have concluded and that the NDH guarantees were, ultimately, found to be unenforceable against the TOB. As explained infra, those determinations are, in the end, irrelevant in determining the value to Singh of the NDH guarantees and loans—a question which underlies one of the sentencing enhancements at issue.

### v. Paragraphs 23, 28 and 54.

Mangano cites to various pieces of testimony and evidence concerning the OEM Contract and the "Bread and Rolls" Contract that Mangano contends establish that Singh lied when he testified about these contracts.

The Court has considered all of the evidence introduced at trial and credits Singh's testimony about the OEM Contract. The Court's finding that Mangano intervened in the OEM

Contract and directed that Singh receive the OEM Contract is supported by ample credible evidence including: (1) Singh's credible testimony concerning his conversations with Mangano and Laura Munafo; (2) Munafo's text messages and her credible testimony about her communications with Singh and Mangano concerning the OEM Contract; and (3) the credible testimony of John Morrisey and John Maguire, including Maguire's testimony that Munafo told him, "Butch gets enough."

Similarly, the Court has considered all the evidence introduced at trial and credits Singh's testimony about the Bread and Rolls Contract, including his testimony about his conversations with Mangano concerning this contract. After considering the evidence cited by Mangano and all the other evidence at trial, the Court finds that Rob Walker's extraordinary intervention in the Bread and Rolls Contract was done at Mangano's behest.

Finally, as explained infra, the Court finds, based on all the evidence concerning the two Nassau County contracts, that Mangano committed bribery offenses in connection with both of these contracts.

### vi. Paragraph 30

The Court overrules this objection, which seeks to relitigate Mangano's convictions concerning the TOB loan guarantees. Additionally, as set forth herein, the Court finds that Mangano also committed bribery offenses in connection with the OEM Contract and the Bread and Rolls Contract.

### vii. Paragraph 38

The Court overrules Mangano's objections concerning the massage chair that Singh gave to him. The Court credits Singh's testimony that the massage chair was a bribe. Notably, prior to

Mangano running for and being elected County Executive, Singh had not given the Manganos any expensive gifts or other things of value.

### viii. Paragraph 40

The Court also adopts and relies on the additional facts set out in the Addendum to the PSR about Singh's payments towards the luxury watch.

## B. <u>Mangano Committed Bribery Offenses in Connection with the Nassau County Contracts</u>

Before turning to Mangano's objections to specific enhancements, the Court will address Mangano's criminal liability for the Nassau County Contracts. This issue is implicated in both Mangano's objections to the facts set out in the PSR and in his objections to the application of certain enhancements.

Mangano argues that the trial evidence shows that "Mangano was correctly acquitted" with regard to the Nassau County Contracts because, at trial, the jury correctly concluded that these contracts were not the result of a "quid pro quo scheme with Mangano." (Mangano Sentencing Mem. at 16.) Mangano asserts that there was not a preponderance of the evidence to support these charges because Singh's testimony on these issues was "preposterous and demonstrably perjurious." (<u>Id.</u> at 18.) The Court disagrees. The Court finds Singh's testimony concerning these contracts credible. The Court also finds that ample other credible evidence corroborates Singh's testimony and confirms that Mangano and Singh engaged in a quid pro quo scheme and conspiracy concerning these two Nassau County Contracts.

The Court notes that, in his sentencing submission, Mangano's challenges concerning the OEM Contract and Bread and Rolls Contract are factual and are premised on Mangano's argument that the Court should not credit Singh's testimony. In addressing the two Nassau County contracts, Mangano's sentencing submission never raises any arguments premised on <u>McDonnell v. United</u>

States, 136 S. Ct. 2355 (2016), or United States v. Silver ("Silver II"), 948 F.3d 538 (2d Cir. 2020). Accordingly, the Court finds that Mangano has waived any such arguments. In any event, as explained in the January 6 Order, Silver II does not affect the standard for Federal Program Bribery, (Jan. 6 Order at 66 n. 29), and the Court finds that Mangano committed Federal Program Bribery and conspired to commit Federal Program Bribery concerning both the OEM Contract and the Bread and Rolls Contract.

The Court also finds that, even taking into account Silver II, Mangano committed honest services fraud and extortion (and conspired to commit honest services fraud) concerning these two Nassau County Contracts. Notably, with respect to the OEM Contract, Singh paid approximately $5,000 towards a luxury watch for Mangano's son shortly after Mangano obtained the OEM Contract for Singh. Singh credibly testified about the link between the watch payment and the OEM Contract. (Tr. 1525–26 ("Ed Mangano had request[ed] it. I just had gotten a quarter a million dollars a year contract. So obviously I had to comply with the request.").) Singh's testimony and text messages about the watch payment—in conjunction with the close timing of Mangano's involvement with the OEM Contract and the watch payment—confirm that Singh's payment was part of a quid in pro quo scheme involving the OEM Contract. Cf. United States v. Jennings, 160 F.3d 1006, 1014 (4th Cir. 1998) ("Because the distinguishing factor between a bribe and an illegal gratuity is the intent behind the payment, the timing of the payment in relation to the official act for which it is made is (in theory) irrelevant. Bribes often are paid before the fact, but 'it is only logical that in certain situations the bribe will not actually be conveyed until the act is done.'") (citation omitted) (quoting United States v. Campbell, 684 F.2d 141, 148 (D.C. Cir. 1982))).

The Court's finding that Mangano committed honest services fraud and extortion in connection with the OEM Contract is further supported by the prior dealings between Singh and Mangano prior to the watch payment. Singh's prior conduct indicated to Mangano that Singh would comply with Mangano's requests for items of value in exchange for Mangano taking official action requested by Singh. Mangano and Singh understood that, in exchange for Mangano taking official action concerning the OEM Contract, Singh would compensate Mangano by, inter alia, complying with Mangano's requests for items of value (as well as by continuing to keep Linda Mangano on his payroll).

Mangano advances two other arguments about the OEM Contract and the Bread and Rolls Contract, both of which broadly challenge the ability of courts to rely on acquitted conduct at sentencing. First, Mangano advances a policy argument concerning the use of acquitted conduct at sentencing that is premised on legislation that has yet to be enacted into law. However, to date, U.S.S.G. § 1B1.3, which governs the Court's determination of "Relevant Conduct," remains good law and permits the Court to consider acquitted conduct. Second, Mangano advances a legal argument, which is premised on a three-justice dissent in Jones v. United States, 574 U.S. 948 (2014). However, the legal principle set out in this dissent—which would require a jury to find any facts that are necessary to prevent a sentence from being substantively unreasonable—is not the law of this Circuit. This argument is also premature as the Court has not yet imposed a sentence. Relatedly, it appears extremely unlikely that the substantive reasonableness of Mangano's sentence would turn on the Court's findings that he committed bribery offenses in connection with the Nassau County Contracts. As explained infra, the sentencing enhancements at issue would apply even if the Court were to focus solely on the TOB Loan Scheme and were to completely disregard the OEM Contract and the Bread and Rolls Contract.

## C. The Three Challenged Sentencing Enhancements

### i. Multiple Bribes Enhancement (U.S.S.G. § 2C1.1(b))

This enhancement provides for a two-level increase if "the offense involved more than one bribe." U.S.S.G. § 2C1.1(b).

Mangano contends that the Court should find that only a single bribe—Linda Mangano's employment—was given in April 2010 in exchange for his intervention with the TOB loan guarantees. The Government insists that the paychecks Linda Mangano received over four years constitute multiple bribes. Additionally, the Government also points to the various other bribes that Singh provided, including the massage chair, hardwood flooring, vacation expenses, free food, and Singh's payment of approximately $5,000 towards the luxury watch.

It is unnecessary to determine whether Linda Mangano's job and paychecks could qualify as more than one bribe under § 2C1.1(b), because—along with Linda Mangano's employment and paychecks—there are various other bribes in the record that are sufficient to trigger the multiple bribe enhancement.

In addition to Linda Mangano's salary, Singh gave Mangano massage chair as a bribe in September 2012. Singh's testimony credibly tied this massage chair to, inter alia, Mangano's intervention in the TOB loan guarantees. (See Jan. 6 Order at 75 n. 33.) The Court finds that Mangano and Singh understood that this massage chair was given, at least in part, to Mangano as both backpay for his earlier intervention with the TOB loan guarantees and as payment to ensure that, if necessary, Mangano would intervene again with the loan guarantees in the future. The Court also finds that Mangano and Singh similarly understood that other items of value Mangano received—including the hardwood flooring, vacation expenses, and free food—were also given, at least in part, to Mangano as both backpay for his earlier intervention with the TOB loan

8

guarantees and as payment to ensure that, if necessary, Mangano would intervene again with the loan guarantees in the future.

Additionally, Mangano also committed bribery offenses concerning the OEM Contract and the Bread and Rolls Contract. Mangano received multiple bribes in connection with those offenses, including Singh's $5,000 payment toward the luxury watch. As explained earlier, the evidence at trial—including the timing of the watch payment and the OEM Contract—confirm that this payment was, at least in part, given in exchange for Mangano's intervention in the OEM Contract.

As set out above, there are multiple additional bribes in the record, including, but not limited to, the massage chair and the watch payment. As such, the two-level enhancement for multiple bribes clearly applies.

### ii. Enhancement Based on the Value of Bribes or the Value of the Benefits Received by Singh (U.S.S.G. § 2C1.1(b)(2))

Under U.S.S.G. § 2C1.1(b)(2), the Court must first determine the "value of the payment, the benefit received or to be received [by the bribe payor] in return for the payment," or "the value of anything obtained or to be obtained by a public official or others acting with a public official." The "value of 'the benefit received or to be received' means the net value of such benefit.'" U.S.S.G. § 2C1.1, cmt. n. 3. As an example, if the bribe payor received a "$150,000 contract on which $20,000 profit was made . . . the value of the benefit received is $20,000." Id. After determining the relevant "value" of the bribes or benefits received by the bribe payor, the Court then determines the applicable enhancement as follows:

- a "value" of more than $250,000 results in a 12-level increase;
- a "value" of more than $550,000 results in a 14-level increase;
- a "value" of more than $1,500,000 results in a 16-level increase;

9

- a "value" of more than $3,500,000 results in an 18-level increase; and

- a "value" of more than $9,500,000 results in a 20-level increase.

See U.S.S.G. § 2C1.1(b)(2); U.S.S.G. § 2B1.1(b)(1).  The Government and Mangano agree that the Court must either rely on the value of the benefits received by Singh or the value of bribes received by Mangano, and cannot combine these amounts.

The PSR asserts that, under this enhancement, the value of the benefit received by Singh is:  (1) $20 million in loans that he otherwise would have been unable to obtain; (2) the $233,000 value of the OEM Contract; (3) the $193,824 value of the Bread and Rolls Contract; and (4) the approximately $530,000 in salary and other items of value Mangano received from Singh.

Mangano objects to this enhancement and asserts that this enhancement should be calculated based solely on the value of the benefits received by Mangano.  Mangano maintains that there is insufficient evidence in the record to determine the value of the amendments Singh received to his concession agreements concerning both the Madison loans and the NDH loans.  Mangano also maintains that there is insufficient evidence connecting him to the NDH loans for the Court to consider those loans, in any fashion, in calculating this enhancement.

The Government asserts that the 20-level enhancement is applicable based on the benefits Singh received from the NDH loans alone.  According to the Government, the net benefit Singh received from Singh on the NDH loans was over $11 million.  The record shows that, on the NDH loans, Phoenix Life Insurance Company funded a total of $13,873,010 and Singh repaid, in interest and principal, only $3,242,993 across the two loans.

The Court agrees with the Government that the 20-level enhancement is applicable here. First, the Court rejects Mangano's argument that there is insufficient evidence to determine the value of loan guarantees for both the Madison and NDH loans.  It is undisputed that the NDH

10

amendments, on their face, guaranteed the NDH loans. Although years later, courts ultimately determined that the TOB was not bound by the NDH amendments, those rulings do not alter the fact that: (1) the NDH amendments include, on their face, guarantees; (2) relevant parties believed that these guarantees were enforceable when they were executed; and (3) Singh would not have received the NDH loans without these guarantees from the TOB. As for the Madison loans, as explained earlier in connection with Mangano's objection to Paragraph 16 of the PSR, the Court finds that the language in the assignment agreements constituted indirect guarantees and, on their face, obligated the Town to make millions of dollars in payments to Madison if Singh defaulted on the loans.

Mangano asserts that the net benefit Singh received is not equal to the face value of the NDH or Madison loans. Mangano also maintains that there is insufficient evidence to determine the value of either the NDH or Madison guarantees. The Court disagrees. First, the Government only seeks to hold Mangano liable for the amount of NDH loans that Singh received and never repaid—not the face value of those loans. Second, the evidence at trial established that, absent the Town's guarantees, Singh would not have received either the NDH loans or the Madison loans. No lender would have issued these loans to Singh's businesses without the TOB's guarantees. This is not a situation where the TOB's backing merely enabled Singh to obtain more favorable terms. The evidence made clear that Singh would not have received any of these loans without the TOB's backing. In these circumstances, the value of the TOB's guarantees for the NDH loans are, at the very least, the amount of the funds that Singh received from these loans and never paid back. Accordingly, the Court finds the value of the NDH guarantees to be at least $11 million.

The Court now turns to Mangano's claim that the evidence was insufficient for him to be held responsible for the NDH guarantees and loans. The Court finds this argument unavailing and

11

concludes that Mangano is responsible for the $11 million of value attributable to the NDH guarantees and loans. The January 6 Order addressed, at length, why the November 2011 NDH concession amendment and loan was part of the quid pro quo schemes and conspiracies for which Mangano was convicted at trial. For largely the same reasons set out in the January 6 Order, the Court finds that Mangano is responsible for the NDH guarantees and loans under U.S.S.G. § 2C1.1(2). As the January 6 Order explained:

> (1) Mangano knew he was pressuring TOB officials to guarantee Singh's loans in the future and that pressure led to Venditto agreeing to back Singh's loans and Genova executing the NDH loans;
>
> (2) Mangano knew that Singh had to make millions of dollars in improvements and it was foreseeable that multiple loans might be required for each location; and
>
> (3) Mangano knew that Singh was not seeking to use the loan proceeds solely to make those capital improvements, which made it foreseeable that multiple loans would be required for each location and that Singh would seek the TOB's backing for amounts in excess of the amounts needed to do the capital improvements mandated by the 2008 concession amendments.

Furthermore, as noted in the January 6 Order, Mangano was aware that Singh might seek to make further capital improvements at his TOB concessions. Mangano had known Singh since 1992 and had seen him, over the years, build his restaurant empire and perform millions of dollars of renovations at his TOB concessions. Mangano knew that Singh was seeking TOB-backed loans for multiple purposes, and it was foreseeable that Singh would use the TOB loan guarantees to obtain funding for Singh's operations and to make further capital improvements.

Mangano's arguments concerning the NDH concession amendments and loans do little more than repeat the arguments presented in his post-trial motion papers and make scant attempt to address the Court's analysis set out in the January 6 Order. In addition to other points set out above, the January 6 Order also explained that, while there are some differences between Madison documents executed by the TOB and the NDH concession amendments, none of the differences

cited by Mangano render the NDH concession amendments and loans unforeseeable. Nor do they convince the Court that the NDH loans were not part of the same quid pro quo scheme and conspiracy as the Madison amendments and loans. Most notably, as explained above, the Court has found that the TOB guaranteed both the Madison loans and the NDH loans.

There is ample credible evidence to support the Court's finding that Mangano is responsible for the more than $11 million in benefits Singh received from the NDH loans. Accordingly, the Court finds that Mangano qualifies for the 20-level enhancement.

Finally, even if the Court were to focus solely on the Madison loans or the bribes paid to Mangano, Mangano would still qualify for more than the 12-level enhancement he suggests should be applied here.

First, with respect to the Madison loans, the Court has already explained above that the Madison concession amendments and assignment agreements constituted an indirect guarantee by the TOB and that, absent that guarantee, Singh could not have obtained the two Madison loans. As such, the Court finds that it would be appropriate to equate the benefit of this guarantee to the face value of the Madison loans—which was $4.9 million. Accordingly, even the Madison loans alone would result in an 18-level enhancement.[1]

Second, Mangano suggests that, at most, a 12-level enhancement would be applicable based on the amount of bribes Mangano received. As the PSR explains, the bribes received by Mangano totaled approximately $530,000. However, even if the Court were to focus solely on the

---

[1] Even if the Court did not rely on the face value of the Madison loans, Mangano would still qualify for a 16-level enhancement based on the guarantee and Madison loan for the Woodlands. When Singh obtained the November 2011 NDH loan he had to use $2 million from that NDH loan to pay off the Madison loan for the Woodlands. In essence, Singh used the NDH loan to refinance the outstanding $2 million balance on the Madison loan for the Woodlands. Given that Singh eventually only paid off approximately 15% of the principal of the NDH loans, it would be reasonable for the Court to conclude that the net benefit to Singh from this Madison loan was, at the very least, $1.7 million because, ultimately, Singh never repaid that amount. Pursuant to that valuation—which exceeds $1.5 million— Mangano would receive a 16-level enhancement based solely on the Madison loan for the Woodlands.

13

value of the bribes to Mangano, a 14-level enhancement, rather than a 12-level enhancement, would apply. The value of the bribes Mangano actually received is approximately $20,000 less than the $550,000 threshold that would trigger a 14-level increase. However, under U.S.S.G. § 2C1.1(b)(2), the Court looks to the "value of anything obtained or to be obtained by a public official or others acting with a public official." Id. (emphasis added). Linda Mangano's lucrative paychecks only stopped because a search warrant was executed at Singleton's in August 2014. The Court finds that absent the search warrant—which ultimately led to the unraveling of the bribery scheme and Singh's other schemes—Singh would have continued to pay Linda Mangano's salary through the end of Mangano's second term. Relatedly, the Court finds that both Mangano and Singh shared this understanding from the outset of Linda's hiring. Because U.S.S.G. § 2C1.1(b)(2) includes the "value of anything . . . to be obtained by a public official" it would be appropriate to also factor in the additional 3-plus years of salary that was "to be obtained" by Mangano (and would have been obtained absent the search warrant). In fact, even if the Court were to focus solely on the amount of money Linda Mangano would have been paid through the end of 2014, those additional paychecks would be sufficient on their own to push the total value of the benefits at issue past the $550,000 threshold, which would result in a 14-level enhancement.

The Court has included the alternative calculations above merely to emphasize that, under no circumstances, would Mangano be subject to only a 12-level enhancement under U.S.S.G. § 2C1.1(b)(2). As set forth earlier, the Court finds the 20-level enhancement applies to Mangano.

### iii. Aggravating Role Enhancement (U.S.S.G. § 3B1.1(a))

Under U.S.S.G. § 3B1.1(a), a four-level increase applies if "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." Under U.S.S.G. § 3B1.1(b), a three-level increase applies if "the defendant was a manager or

14

supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." "To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." U.S.S.G. § 3B1.1 cmt. n. 2. "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1 cmt. n. 1. According to the commentary:

> In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.

U.S.S.G. § 3B1.1 cmt. n. 4; see also United States v. Paccione, 202 F.3d 622, 624 (2d Cir. 2000) (finding defendants were organizers or leaders where they "played a crucial role in the planning, coordination, and implementation of a criminal scheme"). The commentary also explains that:

> This adjustment is included primarily because of concerns about relative responsibility. However, it is also likely that persons who exercise a supervisory or managerial role in the commission of an offense tend to profit more from it and present a greater danger to the public and/or are more likely to recidivate. The Commission's intent is that this adjustment should increase with both the size of the organization and the degree of the defendant's responsibility.

U.S.S.G. § 3B1.1 cmt. background.

"[A] defendant may properly be considered a manager or supervisor if he 'exercise[d] some degree of control over others involved in the commission of the offense . . . or play[ed] a significant role in the decision to recruit or to supervise lower-level participants.'" United States v. Al-Sadawi, 432 F.3d 419, 426–27 (2d Cir. 2005) (quoting United States v. Blount, 291 F.3d 201, 217 (2d Cir. 2002)).

15

The PSR concluded that Mangano was a manager or supervisor who qualified for a three-level enhancement based on his actions concerning the TOB loan guarantees and the Nassau Contracts.

The Court finds that Mangano's involvement in the Nassau County Contracts does not qualify him for this enhancement. Although Mangano supervised and directed Rob Walker and other subordinate Nassau County employees concerning these two contracts, none of those employees were criminally responsible for the commission of the offense.

As such, the Court focuses on Mangano's conduct involving the TOB loan guarantees. Mangano argues that this enhancement cannot apply to his conduct in connection with the TOB loan guarantees because, according to Mangano, he had no supervisory authority over anyone in the TOB government.

While Mangano did not exercise any formal supervisory authority over Venditto, Mangano still had both governmental and political levers he could use—and did use—to pressure Venditto. For example, the evidence at trial showed that Mangano could bring pressure to bear on Venditto because, <u>inter alia</u>, Mangano could direct or influence Nassau County's hiring and promotion of Venditto's people. The Court finds that Mangano engaged in official action by, <u>inter alia</u>, pressuring Venditto to back the loans, use Rivkin Radler, and hold the critical April 28 meeting. That said, the Court finds that Mangano did not manage or supervise Venditto in any conventional sense. In the end, the structure and nature of this bribery scheme simply make it a poor fit for application of the manager/supervisor enhancement. Accordingly, the Court finds that this enhancement is not applicable here.

16

**D. Defendants' Final Guidelines Calculations**

The parties do not dispute that Mangano's Adjusted Offense Level is 16 for Count Seven, Conspiracy to Obstruct Justice.

For Count Group 1, which covers the bribery offenses, Mangano's Base Offense Level for Count Group 1 is 14.  The parties do not dispute that: (i) a four-level enhancement applies because Mangano held the highest level position in Nassau County; and (ii) a two-level enhancement applies for obstruction of justice   Two of the disputed enhancements also apply—a two-level enhancement for multiple bribes pursuant to U.S.S.G. § 2C1.1(b), and a twenty-level enhancement under U.S.S.G. § 2C1.1(2) based on the value of the benefits received by Singh.  The applicable enhancements and the base offense level result in a final adjusted offense level of 42.  Based on this adjusted offense level of 42 and a criminal history category of I, the guidelines imprisonment range for Mangano is 360 months to life.

**SO ORDERED.**

Dated: April 11, 2022
Central Islip, New York

                                                    _____/s/ (JMA)_____
                                                    JOAN M. AZRACK
                                                    UNITED STATES DISTRICT JUDGE