UNITED STATES DISTRICT COURT                      <u>For Online Publication Only</u>
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
UNITED STATES OF AMERICA,

             -against-

                                                     **<u>ORDER</u>**
                                                   16-CR-540 (JMA)
EDWARD MANGANO, and
LINDA MANGANO,

                           Defendants.
----------------------------------------------------------------------X

**AZRACK, United States District Judge:**

Defendants Edward Mangano ("Ed Mangano" or "Mangano") and Linda Mangano have sought a stay for bail pending appeal and to stay financial penalties.  For the reasons stated below, their motions are denied.

Ed Mangano, the former Nassau County Executive, was convicted at trial of four bribery offenses in connection with the Town of Oyster Bay ("TOB") Loan Scheme.  Mangano was convicted of Count Two, Federal Program Bribery under 18 U.S.C. § 666(a)(1)(B), and Count Four, honest services fraud under 18 U.S.C. §§ 1343 and 1346.  Mangano was also convicted of Count One, conspiracy to commit Federal Program Bribery, and Count Three, conspiracy to commit honest services fraud.  Additionally, Mangano was convicted of conspiracy to obstruct justice in violation of 18 U.S.C. §§ 1512(c)(2) and 1512(k).  He was acquitted of bribery counts in connection with certain Nassau County contracts.

On April 14, 2022, the Court sentenced Mangano to five years' imprisonment on Count One, ten years' imprisonment on Count Two, and twelve years' imprisonment on Counts Three, Four and Seven, with the sentences to all run concurrently to each other.  Mangano has also been

ordered to pay a fine, forfeiture, and restitution.  Mangano filed his notice of appeal on April 27, 2022.

Linda Mangano was convicted at trial of Count Seven, conspiracy to obstruct justice; Count Eight, obstruction of justice; and Counts Ten and Eleven, making false statements to the FBI under 18 U.S.C. 1001.  Her two false statement convictions were based on false statements she made during two proffer sessions in May 2015.  She was acquitted of Count Nine, which charged her with making false statements to FBI agents on January 13, 2015.[1]

On April 14, 2022, the Court sentenced Linda Mangano to fifteen months' imprisonment on each count, with sentences to all run concurrently.  Linda Mangano filed her notice of appeal on April 21, 2022.

The Court previously denied Defendants' post-trial motions in an order dated January 6, 2022 (the "Jan. 6 Order").  See United States v. Mangano, No. 16-CR-540, 2022 WL 65775 (E.D.N.Y. Jan. 6, 2022).  The Jan. 6 Order set out, in detail, the evidence concerning the TOB Loan Scheme, and rejected Mangano's arguments that he was entitled to acquittal and a new trial based on the decision in United States v. Silver, 948 F.3d 538, 571 (2d Cir. 2020) ("Silver II"), which was issued after Defendants' trial.

Defendants are unlikely to flee, pose no danger to the community, and their appeals are not for the purpose of delay.  Accordingly, resolving their motions for bail pending appeal turns on whether their appeals "raise[] a substantial question of law or fact likely to result in . . . reversal," "an order for a new trial, or "a reduced sentence to a term of imprisonment less than the total of

---

[1] At trial, the testifying FBI Agent, Laura Spence, admitted that when she and her partner interviewed Linda Mangano on January 13, 2015, they did not warn her prior to the interview that lying to federal agents is a crime.  (Tr. 1224–25.)  When the agents realized this oversight as they were leaving Linda Mangano's house, they returned and then admonished her that lying to the FBI was a crime.  (Id.)  Given the jury's guilty verdicts on the two other false statement charges and both obstruction charges, the agents' failure to warn Linda Mangano prior to her January 13, 2015 interview is the obvious explanation for her acquittal of this one count.

the time already served plus the expected duration of the appeal process."[2] 18 U.S.C. § 3143(b)(1)(A)–(B).  A "substantial" question is "a 'close' question or one that very well could be decided the other way."  United States v. Randell, 761 F.2d 122, 125 (2d Cir. 1985) (quoting United States v. Giancola, 754 F.2d 898, 901 (11th Cir. 1985)).  If the defendant raises a question that is "substantial," the court must "then consider whether that question is 'so integral to the merits of the conviction on which defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the conviction or a new trial.'"  Id. (quoting United States v. Miller, 753 F.2d 19, 23 (3d Cir. 1985)).  A defendant must establish that "the appeal raises a substantial question of law or fact likely to result in reversal or an order for a new trial on all of the counts for which he received prison terms."  Id. at 126 (emphasis added).

The Court addresses below each of the arguments Defendants are pursuing on appeal. These arguments do not raise substantial questions that are likely to result in reversal or an order for a new trial on all of the convictions.  Accordingly, the Court denies Defendants bail pending appeal.

The Court's Jan. 6 Order set out the governing standards for waiver, forfeiture, plain error, harmless error, and challenges to sufficiency of the evidence under Rule 29.  It is unnecessary to recount those standards here.  See Mangano, 2022 WL 65775, at *26, 32–35, 58.

---

[2]  In addition to asserting that her arguments on appeal raise substantial questions, Linda Mangano also stresses that: (1) her entire 15-month sentence will likely have run by the time her appeal is decided; and (2) the dangers of the COVID-19 pandemic.  She maintains that these points also warrant bail pending appeal.  As to her first argument, this is not a relevant factor under 18 U.S.C. § 3143(b)(1)(A)–(B).  Linda Mangano must raise a substantial question as to all of her counts of conviction.  Her second argument is also not a reason for bail pending appeal.  Vaccines are available which greatly reduce the risk of serious illness or death from COVID-19.  And, as the government's submission details, the Bureau of Prisons has made extensive efforts to respond to COVID-19.

A. __Ed Mangano's Challenges to the Bribery Convictions__

    1. __Silver II__

Mangano argues that the issues concerning Silver II that were litigated in his post-trial motions constitute substantial questions.  The Court disagrees.  The Jan. 6 Order rejected Mangano's arguments concerning Silver II on multiple grounds and set out numerous alternative bases why the statute of limitation argument raised by Mangano does not warrant a new trial. Mangano's arguments do not raise a substantial question.

It is unnecessary to recount all of the points set out in the Court's comprehensive Jan. 6 Order addressing these issues.  The Court will, however, briefly respond to one point raised in Mangano's reply brief.  Mangano insists that the Court's statute of limitations analysis concerning the paychecks that Linda Mangano received after April 2010 was erroneous and that the paychecks at issue are analogous to the fees Sheldon Silver received within the limitations period that the Second Circuit found insufficient to satisfy the statute of limitations in Silver II.  This argument does not raise a substantial question.

The Jan. 6 Order explained why Linda Mangano's paychecks were not remotely analogous to the fees received by Sheldon Silver from his law firm.  As recounted in the Jan. 6 Order, the statute of limitations "is not extended where the payoff merely consists of a lengthy, indefinite series of ordinary, typically noncriminal, unilateral actions and there is no evidence that any concerted activity posing the special societal dangers of conspiracy is still taking place." Mangano, 2022 WL 65775, at *43 (quoting "Silver II", 948 F.3d at 573 and United States v. Grimm, 738 F.3d 498, 503 (2d Cir. 2013)).  Here, the continued paychecks that Harendra Singh issued every two weeks to Mangano's wife were not "unilateral" actions akin to the fees Silver received from his law firm years after Dr. Taub had referred cases to Silver's law firm.  As the

Jan. 6 Order explained, the "fees in Silver II are obviously distinguishable from the instant case where the 'quid' was both Linda's hiring and her paychecks, which she continued to receive from Singh into the limitations period." Mangano, 2022 WL 65775, at *43.  Moreover, the evidence showed that Linda Mangano's paychecks after April 2010 were also given in exchange for Mangano's future intervention, if necessary, with the TOB loan guarantees.  That was further proof that Linda Mangano's paychecks implicated the "special societal dangers" of an ongoing conspiracy.

Additionally, contrary to Mangano's claim, the paychecks Singh issued to Linda Mangano are also not analogous to the paychecks received by the defendants in United States v. Doherty, 867 F.2d 47, 61 (1st Cir. 1989).  In Doherty, police officers fraudulently used stolen promotional exams to obtain promotions.  While the promotions themselves occurred outside of the statute of limitations, the government argued that the statute of limitations was satisfied because the officers continued to receive increased salary payments as a result of the promotions.  The First Circuit rejected this argument, finding that these payments were insufficient to extend the statute of limitations.  However, these "unilateral" payments by the police department are not remotely analogous to the continued paychecks issued to Linda Mangano by Singh, who was the bribe payor and a co-conspirator with Ed Mangano.  See Doherty, 867 F.2d at 62 (distinguishing United States v. Helmich, 704 F.2d 547 (11th Cir. 1983), a case where a payment made to a spy by his co-conspirators years after the underlying espionage was committed was found to satisfy the statute of limitations).

Finally, the issues raised by Silver II are irrelevant to Mangano's obstruction of justice conviction, and, as explained in the Jan. 6 Order, they also do not affect the Federal Program Bribery convictions in Counts One and Two.  Mangano, 2022 WL 65775, at *35 n. 29.

## 2.  The Jury Instruction Concerning "Advice" under <u>McDonnell</u>

Mangano argues that the Court's "official act" instruction was erroneous.  Based on language taken from the Supreme Court's decision in <u>McDonnell v. United States</u>, 579 U.S. 550, 572 (2016), the Court instructed the jury that:

> An official act must involve a decision, an action, or an agreement to make a decision or to take action. The decision or action may include using one's official position to exert pressure on or to order another to perform an official act. It may also include using one's official position to provide advice to another, knowing or intending that such advice will form the basis for an official act by another.

(ECF No. 393 at 20.)

Mangano contends that, based on <u>McDonnell</u> and <u>United States v. Birdsall</u>, 233 U.S. 223 (1914), the Court's instructions should not have included the sentence concerning "advice." According to Mangano, the term "advice" in <u>McDonnell</u> is "best understood as the inverse of 'pressure'; whereas 'pressure' involves the exercise of formal authority to influence the actions of subordinate officials, 'advice' involves the exercise of formal authority to influence the actions of reliant superiors."  (ECF No. 478-1 at 27.)  Mangano insists that "advice" only involves "the type of formalized recommendation provided by a government official with specialized knowledge or expertise, which is – in the regular course of governmental business – 'necessarily' relied on by other officials."  (<u>Id.</u>)

Mangano's argument does not raise a substantial question.  This argument has been rejected by multiple Circuits.  <u>See</u> <u>United States v. Lee</u>, 919 F.3d 340, 342 (6th Cir. 2019) ("Defendant claims that an official can only 'provide advice' to a second official if the first official is in an advisory role to the second . . . . However, nowhere in <u>McDonnell</u> did the Supreme Court state that it was creating such a rule. . . . [W]e do not adopt Defendant's additional constraints on the requirements for an official to 'provide advice' . . ."); <u>United States v. Roberson</u>, 998 F.3d

1237, 1254 n.22 (11th Cir. 2021), cert. denied, 142 S. Ct. 1109 (2022) (rejecting defendant's argument that, based on Birdsall, "advice [under McDonnell] must come from someone in a more formal advisory role").

Notably, Lee is factually similar to the instant case.  In exchange for bribes, the defendant—a county council member—reached out to a city prosecutor and attempted to influence a pending criminal case.  The Sixth Circuit concluded that the evidence at trial was sufficient to establish that the defendant "agreed to or had in fact pressured or advised other officials to perform official acts in exchange for receiving things of value from [the bribe payor]." Lee, 919 F.3d at 358 (emphasis added).

Mangano maintains that his argument is supported by a recent Third Circuit decision, United States v. Defreitas, 29 F.4th 135 (3d Cir. 2022)  In Defreitas, an inspector for the Virgin Islands Department of Consumer Affairs discovered during an inspection that an employee was undocumented.  The inspector then solicited sexual favors from the employee in exchange for not reporting the employee to authorities.  The Third Circuit concluded that "an official act must be an action encompassed by an official's legal duties." Id. at 145. The Third Circuit went on to find that the inspector did not engage in an official act because "no internal regulation, guideline, or statute . . . advised the Department [of Consumer Affairs] to engage in any activity related to the policing of immigration laws." Id. at 147.

Defreitas does not raise a substantial question on the advice instruction.  First, Defreitas is contrary to the decisions of the Sixth and Eleventh Circuits cited above, which addressed the argument concerning "advice" pressed by Mangano here.  Second, Defreitas is factually distinguishable as it did not involve a high-level elected official such as Mangano.  Third, the persuasive value of Defreitas is limited because it is in tension with United States v. Fattah, 914

F.3d 112, 127 (3d Cir. 2019), an earlier decision by the Third Circuit, which is more factually similar to Mangano's case and which supports the "advice" instruction given at Mangano's trial. Notably, Fattah was not even mentioned in Defreitas.

Fattah was a Congressman from Pennsylvania who accepted bribes in exchange for taking actions to benefit the bribe payor, including writing letters to President Obama and one of Pennsylvania's senators recommending the bribe payor for an ambassadorship.  Fattah, 914 F.3d at 137–38, 159.  The Third Circuit vacated Fattah's convictions because the jury—which convicted Fattah shortly before McDonnell was decided—was not instructed on McDonnell's definition of "official act."  The Third Circuit, however, found that the evidence against Fattah was sufficient under McDonnell to permit a retrial under the theory that Fattah's letters of recommendation constituted "advice" under McDonnell.  See id. at 156 ("the finder of fact will need to decide whether Fattah's efforts constituted permissible attempts to 'express[ ] support,' or impermissible attempts 'to pressure or advise another official on a pending matter.'") (emphasis added); id. at 159 n.17 ("[I]t will be for a jury to decide if Fattah's efforts to secure an ambassadorship . . . crossed the line from permissible "support" to impermissible "pressure or advice."  (emphasis added).).  Of course, the House of Representatives has no legal role in the appointment or recommendation of ambassadors.  As the Third Circuit explained, the "formal appointment of an ambassador is a matter that is 'pending' before the President—the constitutional actor charged with nominating ambassadors—as well [as] Senators, who are charged with confirming the President's ambassadorial nominations."  Id. at 155.  Fattah is inconsistent with Mangano's "advice" theory and, instead, supports the "advice" instruction given at Mangano's trial.

Moreover, even assuming arguendo that a substantial question exists as to whether the Court's "advice" charge was proper, Mangano's claim that this purported instructional error

warrants a new trial does not raise a substantial question.  There was overwhelming evidence that Mangano pressured Venditto, and the government emphasized that pressure in its summations. (See Gov't Opp'n Mem. at 30–33 (citing trial record), ECF No. 485.)  The evidence made clear that Mangano brought "pressure to bear on TOB officials at the April 28 meeting for which his presence served no other purpose."  Mangano, 2022 WL 65775, at *37.  The pressure applied by Mangano was evidenced by, inter alia, the testimony of Jonathan Sinnreich, Len Genova, and Singh, which is recounted in the Court's Jan. 6 Order.  (See id. at *4–9; see also Gov't Opp'n Mem. at 30–32 (citing trial record).)  Mangano was clearly pressuring Venditto to take action to benefit Singh and, in return, Venditto asked Mangano to hire people from Venditto's Republican club and to promote other people in the club who were already working for Nassau County.  See Mangano, 2022 WL 65775, at *9.  The evidence that Mangano pressured TOB officials was overwhelming.

Finally, even if Mangano's "advice" arguments raised a substantial question concerning Counts Three and Four, McDonnell does not apply to the Federal Program Bribery Counts and, thus, any instructional error concerning official action would not result in reversal of those counts. See id. at *35 n. 29.  And, even assuming arguendo that Mangano's "advice" argument raises a substantial question concerning all four bribery counts, as explained infra, Mangano still has not raised a substantial question concerning his obstruction of justice conviction.

Mangano's arguments concerning Silver II do not raise a substantial question of law or fact that is likely to result in reversal or an order for a new trial on all of his convictions.

### 3. **Mangano's Liability for the Federal Program Bribery Counts**

Mangano argues that the Court's instructions concerning Counts One and Two—which concerned Federal Program Bribery—were deficient. Mangano also contends that the evidence was insufficient to support his convictions on these counts under theories of aiding and abetting or Pinkerton liability.

#### i. *Jury Instructions*

The jury charge explained that, for Federal Program Bribery, the government had to prove, inter alia, that: (1) "the defendant was an agent of a local government"; and (2) "the defendant acted corruptly with the intent to be influenced or rewarded with respect to a transaction or a series of transactions of that same local government." (ECF No. 393 at 17 (emphasis added).) The jury charge also explained that:

> An 'agent' is a person who is authorized to act on behalf of a local government. People who are employees, partners, directors, officers, managers, or representatives of a local government all qualify as 'agents' of that government.

> Elected officials are agents of the government to which they were elected to serve. Hence, the prosecution alleges that Edward Mangano was an agent of Nassau County government. The prosecution also alleges that John Venditto and Len Genova were agents of the Town of Oyster Bay. It is not alleged that Edward Mangano is an agent of the Town of Oyster Bay.

(Id. at 17.) The Court included the final sentence at the request of Mangano's counsel. (Tr. 3708.)

In his motion for bail pending appeal, Mangano contends that the Court should have also instructed the jury that "you may not convict [Mangano of Federal Program Bribery] with respect to the TOB loan scheme, unless you first determine that John Venditto committed federal program bribery, and was aided and abetted in the commission of that offense by Mr. Mangano." (Tr. 4492–93.)

Mangano did not object at the charging conference to the absence of this language in the Court's proposed charge.  Nor did Mangano raise any objection about the absence of this language in his February 21, 2019 letter, (ECF No. 381), which raised other objections after the charge conference and reasserted Mangano's position that aiding and abetting liability and Pinkerton liability should not be charged at all with respect to Count Two and the TOB Loan Scheme. Mangano first objected to the absence of the specific language at issue on February 27, 2019,  after Mangano's counsel had already completed his summation.  (ECF No. 387.)

Mangano argues that this requested language concerning aiding and abetting was necessary because the government's opening summation advanced a defective theory of direct liability on the Federal Program Bribery counts.  (Tr. 3738.)  Mangano did not raise this objection during (or even at the conclusion of) the government's opening summation and instead waited until after his own summation—which spanned two trial days—had already concluded.[3]  (ECF No. 387.)  At no point during his summation did Mangano's counsel address, as to Count Two and the TOB Loan Scheme, issues of direct liability, aiding and abetting liability, or Pinkerton liability.

After Mangano's counsel raised this objection for the first time on February 27, the Court rejected Mangano's requested language, finding that the charge, as written, was sufficiently clear. (Tr. 4493.)

The Court's refusal to grant Mangano's requested instruction about aiding and abetting does not raise a substantial question for appeal.

Mangano's proposed instruction was not necessary given the language that was already included in the Court's instructions.  The Court instructed the jury on the elements of Federal Program Bribery, making it clear that:  (1) Ed Mangano was not an agent of the Town of Oyster

---

[3]  In response to Mangano's February 27 objection to the jury charge, the government argued that Mangano could be liable for Federal Program Bribery because he pressured Venditto.  (See Tr. 4279, 4377–78.)

Bay; and (2) that, to be convicted of Federal Program Bribery, the defendant had to be "an agent of a local government" and had to act "corruptly . . . with respect to a transaction or a series of transactions of that same local government." (ECF No. 393 at 17.)  The Court also instructed the jury, for Count Two, on aiding and abetting liability and Pinkerton liability.  Furthermore, the Court told the jury that "[i]f any attorney has stated a legal principle different from what I tell you, you must follow my instructions." (ECF No. 393 at 2.)

Mangano's proposed instruction was also improper because it was not accurate.  Mangano also could have been convicted of Count Two pursuant to Pinkerton liability—a point which Mangano's proposed instruction simply ignored.

### ii.  Sufficiency of the Evidence

Mangano argues that the evidence was insufficient for him to be held liable on Count Two under an aiding and abetting theory.  Mangano also maintains that the evidence was insufficient to establish a conspiracy under Count One or to establish related Pinkerton liability for the substantive charge in Count Two.  The Court disagrees.  This does not raise a substantial question. Singh was bribing Venditto, Genova, and Mei.  A reasonable juror could infer that Mangano was aware of that fact and could also, at the very least, conclude based on all the evidence that such bribes were reasonably foreseeable.  See Mangano, 2022 WL 65775, at *55 ("[I]t was, at the very least, foreseeable to Mangano—who was himself accepting thousands of dollars in bribes from Singh—that Singh might also bribe other officials who might influence or pervert the process in some respect.")  Singh was willing to bribe Mangano as soon as Mangano was in a position of power.  Mangano was also well aware of Singh's long history of doing business in the TOB and his relationships with TOB officials.  The evidence was sufficient to support both aiding and abetting liability and Pinkerton liability.

Moreover, even assuming arguendo that a substantial question exists concerning the sufficiency of aiding and abetting liability for Count Two, this argument does not apply to Count One.  There is not a substantial question concerning the sufficiency of the conspiracy conviction for Count One (or the related liability under Pinkerton for Count Two).  Furthermore, Mangano's argument that the Court should not have permitted the jury to consider aiding and abetting liability for Court Two does not affect Count One.  The aiding and abetting instruction only applied to Count Two.

Finally, the Court notes that Mangano's arguments concerning both instructional error and sufficiency are premised on the assumption that Mangano could only potentially be liable for Federal Program Bribery for the TOB Loan Scheme under aiding and abetting or Pinkerton theories and that, under no circumstances, could Mangano be directly liable for Federal Program Bribery concerning the TOB Loan Scheme because he was not an agent of the TOB.  That assumption is incorrect.  Based on the record at trial, Mangano could be found directly liable for Federal Program Bribery (and conspiracy to commit that offense) based on the actions he took as an agent of Nassau County in connection with the TOB Loan Scheme.  Genova testified that: (1) Mangano pressured Venditto to take action on the TOB loan guarantees; and (2) in turn, Venditto sought, at the April 28 meeting, Mangano's assistance in hiring and promoting people from Venditto's Republican club; and (3) Mangano was receptive to Venditto's requests. Mangano, 2022 WL 65775, at *9.  Singh gave similar testimony, stating that, at the April 28 meeting, he witnessed Mangano and Venditto discussing Venditto's requests that his people be hired.  (Id.)  This testimony—along with other evidence at trial—established that Mangano accepted bribes from Singh "intending to be influenced . . . in connection with" Nassau County business, including the hiring and promotion of multiple employees discussed at the April 28

meeting.  18 U.S.C. § 666(a)(1)(B).  Singh was bribing Mangano to use any levers of his authority that were necessary to pressure Venditto to back the TOB loan guarantees, Singh's ultimate goal. The evidence at trial established that both Singh and Mangano were aware that, in exchange for the bribes he received before and after the April 28 meeting, Mangano was expected use his influence over Nassau County business (including, specifically, County jobs and promotions) to help Singh obtain his ultimate goal of securing the TOB loan guarantees.

Mangano's challenge to the jury instructions and his sufficiency claims do not raise substantial questions on Counts One and Two.  Moreover, these arguments are irrelevant to Mangano's honest services fraud convictions for Counts Three and Four.

### 4. Collateral Estoppel

Mangano maintains that Venditto's acquittal should have collaterally estopped the government from arguing at the second trial that Mangano conspired with Venditto or aided and abetted Venditto's alleged bribery offenses.  The Court previously rejected Mangano's collateral estoppel argument in an order dated January 17, 2019.  (ECF No. 350).  Mangano argues that a substantial question is raised by his collateral estoppel argument.  The Court disagrees.  As the Court explained in the January 17, 2019 Order, Mangano has not cited a single decision applying collateral estoppel in these circumstances, and decisions from other Circuits have either rejected his argument outright or cast doubt on the viability of such an argument.  Additionally, the closest decision on this issue from the Second Circuit, United States v. Ustica, 847 F.2d 42 (2d Cir. 1988), weighs against Mangano's argument here.

Moreover, even assuming arguendo that this collateral estoppel argument raised a substantial question concerning Counts One and Two, it does not raise a substantial question on the validity of Mangano's convictions for Counts Three, Four, and Seven.

14

Mangano contends that the Court's alleged erroneous ruling on collateral estoppel potentially infected the jury's guilty verdicts on the honest services fraud charges in Courts Three and Four.  Specifically, Mangano asserts:

> If we accept that the jury understood and followed the Court's instructions, it means that, however improbable, the jury somehow convicted Mangano on Counts 1 and 2 under a theory of secondary liability – i.e., based upon a finding that Venditto accepted things of value in connection with Town business.
>
> And if, in fact, that was the jury's thought process, then it follows that the jury would have necessarily convicted Mangano on Counts 3 and 4 based upon the same reasoning.  Once the jury found that Mangano was guilty under an aiding and abetting theory, it would not have needed to reach the question of principal liability on any bribery count.  In short, there is a non-frivolous argument that the Court's refusal to apply the doctrine of collateral estoppel allowed the jury to convict Mangano on Counts 1 through 4, based upon a factual finding that was flatly incompatible with the verdict delivered by the first jury, acquitting Venditto on all counts.

(ECF No. 478-1 at 24.)

This argument is meritless.  While the Court explicitly instructed the jury that Count Two charged Mangano under aiding and abetting liability, the Court did not instruct the jury that aiding and abetting applied to Count Four, the substantive honest services fraud count.  (ECF No. 393 at 40.)  Mangano's claim that the jury may have nevertheless convicted him of Counts Three and Four on the basis that Mangano aided and abetted Singh's bribery of Venditto's bribery does not raise a substantial question.  See Zafiro v. United States, 506 U.S. 534, 540–41 (1993) ("[J]uries are presumed to follow their instructions.").

## B.  Mangano's Prosecutorial Misconduct Argument about Summation

Mangano claims that the government's summation was improper and warrants reversal of all his convictions.  The government's opposition brief comprehensively and persuasively addresses this argument.  For the reasons set forth by the government, it is clear that Mangano's challenge to the government's summation does not raise a substantial question.

**C.  The Manganos' Challenges to the Obstruction Counts**

**1.  The Jury Instructions**

Both Ed Mangano and Linda Mangano argue that the Court erred in instructing the jury on the obstruction of justice counts because the Court did not include in the charge certain language based on the Supreme Court's decision in United States v. Aguilar, 515 U.S. 593 (1995).  Aguilar held that merely "uttering false statements to an investigating agent . . . who might or might not testify before a grand jury" is insufficient to establish obstruction of justice under 18 U.S.C. 1503. Id. at 600.

The Manganos assert that the jury should have been given the following instruction based on Aguilar:

> [T]he Government must prove that the defendant obstructed, influenced or impeded that grand jury proceeding, or attempted to do so. In this regard, I instruct you that "[t]he action taken by the accused must be with an intent to influence judicial or grand jury proceedings; it is not enough that there be an intent to influence some ancillary proceeding, such as an investigation independent of the Court or grand jury's authority." As a result, merely "uttering false statements to an investigating agent who may or may not testify before the grand jury" is not sufficient to satisfy this element.

(ECF No. 381-1 at 47 (citing Aguilar, 515 U.S. at 599–600).)

This claim of alleged instructional error does not present a substantial question.

Defendants' challenges to the Court's obstruction of justice instruction will be subject to, at best, plain error review.  Prior to the charging conference on February 21, 2019, only Ed Mangano submitted the proposed instruction quoted above.  (ECF No. 381-1.)  Linda Mangano did not submit any proposed instructions concerning obstruction of justice.  At the charge conference, neither defendant objected to the Court's proposed instructions concerning obstruction of justice, which did not include the additional language that had been proposed by Ed Mangano prior to the charging conference.

After the charge conference, Ed Mangano filed a letter with the Court outlining three specific objections to the charge, none of which concerned the obstruction of justice instruction. (ECF No. 381.)  Attached to the letter was a copy of Mangano's proposed instructions that he had previously provided to the Court.  (Id.)  The letter also states:  "For the sake of preservation, we are filing herewith the Defendant's requests to charge, which were previously provided to the Court on February 19th."[4]  (Id.)  This letter, and the attached instructions Ed Mangano submitted prior to the charging conference, did not constitute a "specific objection" to the Court's obstruction of justice charge.  See Fed. R. Crim. P. 30 ("A party who objects to any portion of the instructions or to a failure to give a requested instruction must inform the court of the specific objection . . . . Failure to object in accordance with this rule precludes appellate review, except as permitted under Rule 52(b)."); United States v. Locascio, 6 F.3d 924, 942 (2d Cir. 1993) ("[A] defendant's 'requested instructions do not substitute for specific objections to the court's instructions.'") (quoting United States v. Tannenbaum, 934 F.2d 8, 14 (2d Cir. 1991).  Accordingly, the Manganos' challenges to the Court's obstruction of justice instruction will be reviewed, on appeal, only for plain error.

Turning to the merits of the Manganos' challenges to the jury charge, there was no instructional error here, and certainly no plain error.  The Court's instruction adequately explained obstruction of justice under 18 U.S.C. § 1512(c)(2).

The Court's instructions repeatedly directed the jury to focus on the "grand jury investigation," stating, that:

---

[4]  Linda Mangano did not join in Ed Mangano's proposed instructions that he submitted prior to the charging conference or in the February 21, 2021 letter Ed Mangano submitted after the charging conference.  Nevertheless, the Court assumes that, for purposes of preservation, Linda Mangano preserved any objections in these filings to the same extent as Ed Mangano.

> The first element the government must prove beyond a reasonable doubt is that the defendant obstructed, influenced or impeded <u>a federal grand jury investigation</u>. The government must prove that the defendant knew that her actions were likely to obstruct, influence or impede <u>a federal grand jury investigation</u>. The government must also prove that the defendant intended to obstruct, influence, or impede <u>a federal grand jury investigation</u>.

(ECF No. 393 at 35 (emphasis added).)

Given these instructions, the instruction proposed by Mangano was not necessary.  <u>See</u> <u>United States v. Smith</u>, 831 F.3d 1207, 1215 (9th Cir. 2016) ("There was no need for the district court to give an additional instruction proposed by the [defendants] which stated that it was insufficient for the Government to show that they obstructed an FBI investigation, as opposed to a grand jury investigation."); <u>United States v. Monus</u>, 128 F.3d 376, 390 (6th Cir. 1997) (rejecting argument that jury instruction was erroneous because it failed to state that "it is not enough for the government to prove that the defendant knew an investigation was being conducted by the FBI or IRS" and finding that instruction that only referenced "Grand Jury proceedings" was sufficient).

It is also notable that Defendants did not argue to the jury, during summation, that the alleged obstructive conduct concerned only an FBI investigation and not a grand jury investigation. Rather, Defendants made a strategic decision to simply argue that Singh was a liar and that they never sought to obstruct any investigation.  This point further shows that the absence of the instruction at issue did not constitute plain error.  Defendants' claim of purported instructional error does not raise a substantial question.

### 2. Sufficiency of the Evidence

The Manganos also argue that the evidence of obstruction at trial was insufficient.

According to Defendants, the instant record is even weaker than the facts of <u>Aguilar</u>, in which the Supreme Court found the evidence insufficient to establish obstruction.[5]   Defendants contend that Linda Mangano's lies to agents and prosecutors during the two proffer sessions were not sufficiently connected to the grand jury investigation to constitute obstruction under <u>Aguilar</u>. Defendants insist that, at best, the evidence showed that during the meetings between Singh and the Manganos, the Manganos merely discussed false statements by Linda Mangano to the FBI to ensure that Singh was "on the same page" in the event that Singh himself decided to speak with the FBI.

The jury, however, was not required to accept Defendants' blinkered view of the evidence, which is contrary to both the record and common sense.   The evidence at trial was more than sufficient to establish that Defendants sought to obstruct a grand jury investigation.   Defendants' sufficiency arguments on the obstruction counts do not raise a substantial question.

The government's briefs set out the relevant evidence concerning obstruction and it is unnecessary to recount all of those points here.  (ECF No. 485 at 39–41; ECF No. 489 at 12–14.) The Court stresses a few points below.

Evidence at trial showed that Linda Mangano first lied to FBI Agents Spence and Hagerty when they interviewed her on January 13, 2015.  (Tr. 1216–21.)   Later that day, Singh met with the Manganos.  (Tr. 1696.)  During this meeting, Linda recounted false statements she made to the

---

[5]  Defendants' sufficiency arguments are based on the premise that although grand jury investigations constitute an "official proceeding" under § 1512(c)(2) and § 1515(a), an independent FBI investigation does not qualify as an "official proceeding" under these provisions.  While the Court has assumed, for purposes of the instant motion, that Defendants are correct on this point, this question still appears to be unsettled in the Second Circuit.  <u>See</u> <u>United States v. Perez</u>, 575 F.3d 164, 168–69 (2d Cir. 2009).

FBI, and Singh agreed with those false statements.  (Tr. 1696–98, see also Tr. 2454 (testimony that both Linda Mangano and Ed Mangano went over the "list of the work . . . Linda Mangano did" and that Singh "agreed [with] whatever they said").)  Singh and the Manganos wanted to get their "story straight."  (Tr. 1696–98.)

Then, on February 6, 2015, the same two FBI agents served Linda Mangano with a grand jury subpoena that sought both documents concerning her employment with Singh and her testimony before the grand jury.  (GX316; Tr. 1231–36.)  The next day, the Manganos met with Singh to discuss the subpoena.  (Tr. 1700–01, 2108.)  Singh explained that, during this meeting:

> Ed and Linda Mangano was going over a list of work Linda Mangano did for my company, like, oh, remember she did the logo for Chow Down, remember she did the basic logo, remember she did the menu for Besi, remember she did the menu for Fuego Picante.  Going over things telling me which she did, I agreed with him, yeah.

(Tr. 1702; see also Tr. 2465–66).  Singh's testimony and other evidence in the record established that these were lies.

During the February 7, 2015 meeting, Ed Mangano was also collecting documents to respond to the subpoena and discussed the subpoena and the documents with Singh.  (Tr. 1701.)  While those documents were not themselves fraudulent, a jury could conclude that the production of those documents was part of the scheme to mislead investigators and the grand jury that Linda Mangano's employment was legitimate and not a bribe.  (Tr. 1701–02, 1705.)

The evidence concerning the February 7 meeting is, standing alone, more than sufficient to establish that the obstructive efforts of Singh and the Manganos during this meeting were aimed at the grand jury proceedings in which Linda Mangano had been subpoenaed to both testify and produce documents.  Singh was the one individual who would have had the most intimate knowledge of any alleged work performed by Linda Mangano.  His agreement with, and encouragement of, this false narrative—during a meeting that occurred in direct response to the

grand jury subpoena—is sufficient evidence that the conspirators sought to obstruct the grand jury investigation.  Aguilar is clearly distinguishable because, inter alia, the defendant in Aguilar was never served with a subpoena that directed him to testify before the grand jury.  Here, the evidence was more than sufficient to establish that, on February 7, the Manganos conspired to obstruct justice after Linda Mangano received a subpoena to testify in the grand jury.  Cf. Aguilar, 515 U.S. at 602 (indicating that a jury could find a defendant guilty of obstruction if the defendant acted with the intent to "lie to a subpoenaed witness who is ultimately not called to testify").

Defendants have suggested that one statement by Singh at trial establishes that this obstruction conspiracy had nothing to do with the grand jury.  When Singh was asked why he was "agreeing" with Linda's false narrative, he stated, "I wanted to get the story, because they were going to tell the story to the FBI certain things, and I was going to tell the FBI the same things." (Tr. 1702.)  This testimony does not require an acquittal.  The February 7 meeting—where Singh encouraged and reinforced the false narrative about Linda's work—was held in direct response to the grand jury subpoena that directed Linda Mangano to testify in the grand jury.  Moreover, by this time, the FBI agents who had served the grand jury subpoena were, as explained below, already acting as an arm of the grand jury.  Relatedly, a jury could conclude that, after the service of the grand jury subpoena by these FBI agents, the FBI and grand jury investigations were inextricably intertwined and the Manganos (and Singh) would have viewed them as such.

Additionally, in May 2015, three months after she received the grand jury subpoena, Linda Mangano appeared at two proffer sessions with agents and prosecutors where she made various false statements.  Prior to, and after, these proffer sessions, Singh met with the Manganos to again discuss Linda's false narrative and ensure that she and Singh were "telling" the "same story."  (Tr. 1708–1716.)

The government contends that these proffer sessions were conducted in lieu of Linda Mangano testifying before the grand jury. Ed Mangano responds that there is no specific evidence in the record to support this factual assertion. While there is no testimony in the record directly addressing this point,[6] the jury could easily infer, from the timing of these events and the other evidence in the record, that Linda Mangano's proffer sessions were in lieu of testifying in the grand jury.

Ed Mangano also argues, without citation to any evidence, that the proffer sessions were not in lieu of grand jury testimony because the proffers purportedly occurred "long after counsel had produced documents for the grand jury." (ECF No. 488 at 13.) Mangano, however, provides no citation to the record in support of this argument and the Court has found nothing in the trial record indicating when, in fact, Linda Mangano provided documents in response to the subpoena. Moreover, even if there were record evidence on this point to support this factual assertion by Mangano, an earlier production of documents by Linda Mangano would not be dispositive as the subpoena also sought her testimony, and she obviously did not testify in the grand jury prior to her proffer sessions.

Aguilar is also distinguishable because the evidence at trial established that, unlike the agent in Aguilar, Agent Spence "acted as an arm of the grand jury." Aguilar, 515 U.S. at 593. Agents Spence and Hagerty personally served Linda Mangano with the grand jury subpoena at issue on February 6. Agent Hagerty then "[e]xplain[ed] what the subpoena was for, . . . read through [the subpoena] a bit," and told Linda Mangano she should speak with husband about the subpoena. (Tr. 1324–25.) Agent Spence was, of course, also present at the two proffer sessions

---

[6] Attorney Joe Conway—who was, during this time, advising Singh and the Manganos and also speaking with TOB officials—apparently saw the obvious connection between the grand jury subpoena and Linda Mangano's proffer. Conway told Genova that "Linda Mangano had received a grand jury subpoena and . . . had subsequently went in and proffered with the government." (Tr. 2814.)

where Linda Mangano lied.  Additionally, the presence of prosecutors at the May proffer sessions was further proof that these proffer sessions were connected to the ongoing grand jury proceedings and were not an independent FBI investigation.

Finally, the jury would be entitled to consider all of the evidence cited above cumulatively, and the totality of the circumstances were clearly sufficient to convict the Manganos of the obstruction of justice counts.  This argument does not raise a substantial question.

### D.  **False Statement Charges**

For her false statement convictions, Linda Mangano's opening brief contends that the Court's instructions on the false statements counts were erroneous and that the evidence was insufficient to support these convictions.

Her claims of error in the jury instructions are utterly meritless.  In fact, her reply brief makes no mention of this baseless argument, which clearly does not raise a substantial question. The Court's instructions on the false statement counts included two unanimity instructions, one of which was added at the joint request of Linda Mangano and the government.  (ECF No. 383; ECF No. 393 at 39.)  Linda Mangano's opening brief also asserted that the Court erred by refusing to list each of the false statements on the verdict sheet.  Such interrogatories were not necessary given the Court's unanimity instructions in the charge itself.

Linda Mangano also argues that her false statement convictions must be dismissed because Agent Spence's testimony was insufficient for the jury determine whether Linda Mangano's answers were literally true or whether the questions and responses were fundamentally ambiguous. Linda Mangano maintains that:  (1) Agent Spence could not recall the specific questions that were asked during the proffer sessions; and (2) Agent Spence did not testify about Linda Mangano's "exact words" from the proffer sessions.

These arguments do not raise substantial questions.  It is well-established that the absence of a verbatim transcript or recording of a defendant's allegedly false statements does mandate an acquittal on false statement charges.  See, e.g., United States v. Sorich, 523 F.3d 702, 717 (7th Cir. 2008) (stating that "there is no requirement that a conversation be transcribed or recorded in order to support a conviction under § 1001" and rejecting argument that witness's "questions were fundamentally ambiguous and untrustworthy, given his reliance on his notes rather than a transcript or recording of the interview"); United States v. Fern, 696 F.2d 1269, 1275–76 (11th Cir. 1983) (affirming Section 1001 conviction where there was no verbatim account of the false statement).   And, Agent Spence's testimony about Linda Mangano's statements—which was corroborated by her 302s— was sufficiently specific for these counts to go the jury.  See United States v. Mahaffy, 285 F. App'x 797, 799 (2d Cir. 2008) (finding "ambiguity in the trial testimony—with respect to both the questions posed and the answers given—created a question of fact for the jury's consideration"); United States v. Khan, No. 18-CR-00195, 2020 WL 7767890, at *2 (D. Conn. Dec. 30, 2020) (denying Rule 29 motion where agent admitted that he was not certain what question was asked that elicited alleged false statement); cf. United States v. Boskic, 545 F.3d 69, 89 (1st Cir. 2008) (affirming false statement conviction and relying on testimony of a translator—who translated a question on an immigration form for the defendant and testified about her customary practice of asking the question in a particular manner—even though the translator had no recollection of her encounter with the defendant and admitted that "she did not use precisely the same wording each time").

The cases Linda Mangano cites in which false statement convictions were actually dismissed contain unique factual scenarios, unpersuasive reasoning, or are otherwise inapposite.

Linda Mangano relies heavily on United States v. Clifford, 426 F. Supp. 696 (E.D.N.Y. 1976), which involved a sui generis fact pattern and relied on alternative holdings in dismissing the false statement charge.

In Clifford, the government's witness—a bank examiner—testified to one version of a statement made by the defendant. In his testimony, the bank examiner recounted the defendant's specific statement. Id. at 699. Notably, the transcript from the trial even set out the defendant's statement with quotation marks during this testimony. The government also introduced into evidence a summary report prepared by the bank examiner which contained a different version of this statement. It does not appear that the bank examiner was ever even squarely asked, at trial, about the accuracy of the version of the statement contained in his summary report.

At the outset, the court in Clifford acknowledged that "[i]t may be that under certain circumstances a prosecution for false statements may be sustained despite lack of proof as to the exact words used." Id. at 703 (emphasis added). However, based on the specific circumstances before it, the court in Clifford dismissed the false statements conviction given the absence of a transcript and the fact that the government's own evidence was inconsistent. The court, however, also decided the case on alternative ground. For this alternative ground, the court stressed that the examiner's testimony—rather than the summary report prepared by the examiner—was clearly the best available record of the interview and that the exchange recounted in the examiner's testimony was fundamentally ambiguous and, thus, warranted dismissal.

Linda Mangano's reliance on United States v. Thevis, 469 F. Supp. 490 (D. Conn.), aff'd, 614 F.2d 1293 (2d Cir. 1979), is also misplaced. Thevis reversed false statement convictions based on the "exculpatory no" doctrine, which the Supreme Court subsequently eliminated in Brogan v. United States, 522 U.S. 398, 401 (1998).

United States v. Ehrlichman, 379 F. Supp. 291 (D.D.C. 1974) is also inapposite and distinguishable.  Ehrlichman dismissed the false statement convictions at issue based on a sweeping and overbroad pronouncement that "Congress did not intend that statute to be applied to statements given to the F.B.I. voluntarily and without oath or verbatim transcription during an interview initiated by the Bureau in the course of a criminal investigation."  Id. at 292; compare Sorich, 523 F.3d at 716–17; Fern, 696 F.2d at 1275–76 n.8 (distinguishing Ehrlichman factually and noting that Ehrlichman was also premised on the exculpatory "no" doctrine, which, as stated above, was subsequently eliminated by the Supreme Court after Fern).  The court's brief decision stressed the fact that the defendant "was faced with the difficult task of arguing that his statements to the F.B.I. were literally true on the sole basis of the agent's sketchy notes, which do not purport to be a verbatim record of either the questions or the answers at issue and which were not even shown to him until shortly before trial."  Ehrlichman, 379 F. Supp. at 292.  The decision, however, did not discuss the content of the actual testimony at trial about the false statements at issue.  Moreover, as explained infra, Agent Spence's agent's notes—which were produced long before trial—are not "sketchy" and, in fact, corroborated Agent Spence's testimony concerning each of the false statement at issue.

United States v. Jiang, 476 F.3d 1026 (9th Cir. 2007)—a case involving a single false statement—is distinguishable on multiple grounds.  Critically, the defendant had limited English skills."[7]

United States v. Poutre, 646 F.2d 685 (1st Cir. 1980) presents another sui generis and inapposite fact pattern.  The defendant in Poutre made certain sworn, but unrecorded, statements during a meeting with IRS agents.  Later, in the same meeting, the defendant "agreed to repeat his answers to questions" under oath "with a stenographer present."  Id. at 686.  The agent testified at trial that the defendant made certain false statements in the first half of the interview, which were not repeated during the second half of the interview, which was recorded.  For one statement, the transcript indicates that, during the recorded session, the defendant gave a literally true and, thus, lawful response.  While the agent testified that the defendant gave a different response to this question during the first half of the meeting, this alleged response was not recorded in the agent's memorandum summarizing the interview.  Similarly, the agent testified about another alleged lie that was not contained in either the recorded portion of the meeting or in the agent's memorandum.  By contrast, here, all of Linda Mangano's alleged false statements set out in Agent Spence's testimony were contained in the relevant 302s, which were reviewed and approved by another agent who was also present for the interviews.  (Tr. 1379–1388.)

---

[7]  The court in Jiang also found, inter alia, that the exchange at issue was ambiguous and stressed that, although the case turned on whether the term "the product" included some or all of the "amplifiers" at issue, the testifying agent admitted he could not recall whether he used the singular form or the plural form when the discussing the "amplifiers." Id. at 1029.  By contrast, here, the only specific statement that Linda Mangano's counsel singled out in making her Rule 29 motion concerned her alleged false statement about the menus at Singh's restaurants.  Defense counsel argued that it was unknown whether Linda Mangano was asked "Did you do a menu for Singh? or "Did you do the menus for Singh?." (Tr. 3689 (emphasis added).)  Defense counsel also argued that it was unknown whether Linda Mangano said "I did a menu for Singh" or "I did the menus for Singh." (Tr. 3689.)  This argument was meritless.  Whether the statement was about "one menu or some menus, either one is a false statement" since the evidence showed that Linda Mangano "did no menus," (Tr. 3691–92), including the two-sided menu for Besi Linda Mangano claimed to have designed in a related false statement.  It is also notable that Singh's testimony further corroborated Agent Spence's testimony about these false statements as he testified that lies about the menus were part of the false narrative Linda Mangano advanced—and that Singh affirmed and reinforced—at the February 7, 2015 meeting between Singh and the Manganos.

27

Linda Mangano's sufficiency challenge for the false statements counts does not raise a substantial question.

Finally, even assuming <u>arguendo</u> that Linda Mangano has raised a substantial question concerning the sufficiency of the evidence concerning the false statements charges based on Agent Spence's testimony, she has not raised any substantial questions concerning the obstruction of justice counts.

## E.  Ruling on Evidence and Arguments Concerning the Prosecution's Trial Team

Linda Mangano maintains that a substantial question is raised by the Court's January 29, 2019 ruling, which precluded counsel from:  (1) "referring to the government trial attorneys <u>by name</u> when referring to specifics of the investigation of the case"; (2) "referring to, or seeking to elicit, the prosecutors' <u>names</u> in connection with any witness interview or proffer session"; and (3) "imputing conduct, actions, strategies and thoughts to <u>named</u> government trial attorneys and accusing <u>named</u> government trial attorneys of improper conduct."  (ECF No. 361 (emphasis added); <u>see also</u> ECF No. 359; Tr. 1194–1203.)  The Court issued this ruling after defense counsel's opening statement repeatedly referred by name to the two specific members of the government's trial team and discussed their involvement in Linda Mangano's 2015 proffer sessions.

Linda Mangano insists that the presence of these specific prosecutors—Ms. Mirabile and Ms. Gatz—at the proffer sessions "was a significant matter to the jury" and that the jury "deserved to know that the very people who lodged the charges against Mrs. Mangano were the ones who made sure that her exact words were not recorded and that the evidence of those statements was ambiguous."  (ECF No. 482 at 21.)

This argument does not raise a substantial question on appeal.  The Court's ruling on this issue will presumably be reviewed for abuse of discretion.  Linda Mangano's underlying argument is meritless and there is not a substantial question whether the Court's ruling was an abuse of discretion.

 This line of inquiry and argument was improper.  Linda Mangano never sought the disqualification of these prosecutors prior to trial and the prosecutors could not call themselves as witnesses.

Moreover, Linda Mangano's claim that her defense was hamstrung by the Court's ruling is meritless.  During Agent Spence's cross-examination, defense counsel was able to:

> (1) elicit that Department of Justice policy encourage agents and prosecutors to consider recording non-custodial interviews and that the policy also "encourages agents and prosecutors to consult with each other in such circumstances," (Tr. 1269–70.);
>
> (2) elicit from Agent Spence that, at every proffer Agent Spence had attended, "the prosecutors" "make[] the rules by which the proffers are conducted,"  (Tr. 1329);
>
> (3) ask Agent Spence whether the decision to only use note-taking to make a record of a proffer session is a "result of the prosecution team's decision-making," (Tr. 1331–32); and
>
> (4) elicit from Agent Spence that there were no conversations between the agents and the prosecution team about whether it would make sense to record Linda Mangano's statements, (Tr. 1337).

And, in his summation, defense counsel was able to argue that:

> (1) "prosecutors call the shots at these meetings . . .  They decide how they record their evidence," (Tr. 4202–03);
>
> (2) "They were the ones, they were the ones, the government, the prosecutors, the agents, they were the ones that chose to violate the Department of Justice policy" concerning the recording of interviews, (Tr. 4308);

(3) "The FBI and the prosecutors, they weren't building a false statement case against Linda Mangano on May 20th.  Really?  Is that believable? . . . .  They are making a false statement case, a perjury case with no video.  The government controls the content.  They control the evidence," (Tr. 4310); and

(4) "I'm not meaning to suggest [that Agent Spence deserves 95 percent of the responsibility for how the case against Linda was put together].  What I am meaning to suggest is there is plenty of blame to go around; three prosecutors, five, probably agents altogether.  This was truly a team effort," (Tr. 4316.).

Linda Mangano was still able to argue to the jury that the unnamed prosecutors present at the proffer sessions made the decision not to record her proffer sessions.  Irrespective of whether or not those "prosecutors" were on the trial team, the prosecutors at her proffer sessions still had a potential interest and incentive in building a criminal case and obtaining a conviction.  The jury did not need to know that two of the prosecutors at the proffer sessions were the same attorneys now representing the government at trial.  The purported probative value of this evidence was clearly outweighed by the potential prejudice and unfairness of allowing the evidence and arguments about the trial team that defense counsel sought to pursue.  As noted above, Linda Mangano never sought the disqualification of these prosecutors prior to trial and the prosecutors could not call themselves as witnesses.

Linda Mangano also contends that the Court's ruling was prejudicial because the government did not object during her counsel's opening statement.  She maintains that the Court's ruling precluded her counsel from fulfilling the purported "promises" he made to the jury during his opening.  This argument is also meritless.  If anything, Linda Mangano benefitted from this sequence of events.  The jury was likely left believing that the two members of the prosecution's trial team did, in fact, attend the proffer sessions and were responsible for the decisions of the unnamed prosecutors that defense counsel subsequently attacked at trial.

Linda Mangano's challenges to the Court's January 29, 2019 ruling do not raise a substantial question.

## F.  **The Sentencing Enhancement**

Linda Mangano contends that the Court's application of a three-level sentencing enhancement for "substantial interference with the administration of justice" raises a substantial question on appeal.   The government's opposition brief comprehensively and persuasively addresses this argument.  For the reasons set forth in the government's brief, it is clear that Linda Mangano's challenge to this sentencing enhancement does not raise a substantial question.

## G.  **Conclusion**

Defendants' motions for bail pending appeal and Ed Mangano's motion to stay financial penalties pending appeal are **DENIED**.

Defendants are scheduled to surrender on July 27, 2022.  Linda Mangano has requested that her surrender date be extended to August 27, 2022.  The government does not oppose this extension.

While the Court has denied Defendants' motions for bail pending appeal, the Court will extend the surrender date for both Defendants to **August 27, 2022**.  The Court has determined that Defendants are not entitled to bail pending appeal because they have not raised substantial questions that are likely to result in reversal or an order for a new trial on all of their convictions. However, Defendants will undoubtedly seek bail pending appeal from the Second Circuit. Defendants have raised multiple arguments and there is a voluminous record in this case—the Court presided over two lengthy trials, the parties filed numerous motions, and the Court issued a 162-page decision denying Defendants' post-trial motions.   Accordingly, the Court grants

Defendants a final extension of their surrender date to allow the briefing of their motions for bail pending appeal and the consideration of those motions by the Second Circuit.

Dated:  July 20, 2022
Central Islip, New York

_____/s/ (JMA)_____
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE